**Exhibit 13**

**City of Detroit Bankruptcy Case – Doc. Nos. 13000 and 13025**
**(Motion to Enforce Against Ricks et al., Order Granting Motion)**
**and Transcript of Hearing**

Docket #13000  Date Filed: 01/30/2019

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DESMOND RICKS, AKILAH COBB AND DESIRE'A RICKS

The City of Detroit, Michigan ("City") by its undersigned counsel, Miller, Canfield, Paddock and Stone, PLC, files this *Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Desmond Ricks, Akilah Cobb and Desire'a Ricks* ("Motion").  In support of this Motion, the City respectfully states as follows:

## I.  Introduction

1.  On August 23, 2017, Desmond Ricks ("Ricks"), Akilah Cobb and Desire'a Ricks (collectively, the "Plaintiffs") filed a federal court lawsuit against the City seeking monetary damages on account of alleged events that occurred in 1992.  The filing of the lawsuit violates the discharge and injunction provisions in the City's confirmed Plan and the Bar Date Order (each as defined below).  The City informed the Plaintiffs of these violations and asked them to voluntarily dismiss the City from their federal court lawsuit, but to no avail.  As a result, the City is left with no choice but to seek an order barring and permanently enjoining

- 1 -

the Plaintiffs from asserting and prosecuting the claims described in the federal court action against the City or property of the City and requiring the plaintiffs dismiss the federal court action with prejudice to the extent it seeks any such relief.

## II.   Factual Background

### A.   The City's Bankruptcy Case

2.      On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

3.      On October 10, 2013, the City filed its *Motion Pursuant to Section 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* ("Bar Date Motion") [Doc. No. 1146], which was approved by order of this Court on November 21, 2013 ("Bar Date Order").  [Doc. No. 1782].

4.      The Bar Date Order established February 21, 2014, as the deadline for filing claims against the City.  Paragraph 6 of the Bar Date Order states that the

> following entities must file a proof of claim on or before the Bar Date…any entity: (i) whose prepetition claim against the City is not listed in the List of Claims or is listed as disputed, contingent or unliquidated; and (ii) that desires to share in any distribution in this bankruptcy case and/or otherwise participate in the proceedings in this bankruptcy case associated with the confirmation of any chapter 9 plan of adjustment proposed by the City…

Bar Date Order ¶ 6.

5.      Paragraph 22 of the Bar Date Order also provides that:

32868644.3\022765-00213

Pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(2), **any entity that is required to file a proof of claim in this case pursuant to the Bankruptcy Code, the Bankruptcy Rules or this Order with respect to a particular claim against the City, but that fails properly to do so by the applicable Bar Date, shall be forever barred, estopped and enjoined from: (a) asserting any claim against the City or property of the City** that (i) is in an amount that exceeds the amount, if any, that is identified in the List of Claims on behalf of such entity as undisputed, noncontingent and liquidated or (ii) is of a different nature or a different classification or priority than any Scheduled Claim identified in the List of Claims on behalf of such entity (any such claim under subparagraph (a) of this paragraph being referred to herein as an "Unscheduled Claim"); (b) voting upon, or receiving distributions under any Chapter 9 Plan in this case in respect of an Unscheduled Claim; or (c) with respect to any 503(b)(9) Claim or administrative priority claim component of any Rejection Damages Claim, asserting any such priority claim against the City or property of the City.

6.    None of the Plaintiffs filed a proof of claim.

7.    On October 22, 2014, the City filed its *Eighth Amended Plan of the Adjustment of Debts of the City of Detroit* ("Plan"), which this Court confirmed on November 12, 2014. [Doc. Nos. 8045 & 8272].

8.    The discharge provision in the Plan provides:

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date. Except as provided in the Plan or in the Confirmation

> Order, Confirmation will, as of the Effective Date,
> discharge the City from all Claims or other debts that
> arose on or before the Effective Date, and all debts of the
> kind specified in section 502(g), 502(h) or 502(i) of the
> Bankruptcy Code, whether or not (i) proof of Claim
> based on such debt is Filed or deemed Filed pursuant to
> section 501 of the Bankruptcy Code, (ii) a Claim based
> on such debt is allowed pursuant to section 502 of the
> Bankruptcy Code or (ii) the Holder of a Claim based on
> such debt has accepted the Plan.

Plan, Art. III.D.4, at p.50.

9.     Further, the Plan injunction set forth in Article III.D.5 provides in pertinent part:

> **Injunction**
>
> **On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**
>
> **a.     all Entities that have been, are or may be holders of Claims against the City…shall be permanently enjoined from taking any of the following actions against or affecting the City or its property…**
>
> **1.     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affect the City of its property…**
>
> **5.     proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**
>
> **6.     taking any actions to interfere with the implementation or consummation of the Plan.**

Plan, Article III.D.5, at pp.50-51 (emphasis added).

- 4 -

10.     The Court also retained jurisdiction to enforce the Plan injunction and to resolve any suits that may arise in connection with the consummation, interpretation or enforcement of the Plan.  Plan, Art. VII. F, G, I, at p.72.

### B.     Plaintiffs' United States District Court Lawsuit

11.     On December August 23, 2017, the Plaintiffs filed a complaint against the City and certain individuals, in the United States District Court for the Eastern District of Michigan, commencing case number 17-12784 ("Lawsuit").  On May 18, 2018, the Plaintiffs filed their *First Amended Complaint* ("Amended Complaint") against the City and three individuals in their individual capacity. The Amended Complaint is attached as Exhibit 6.

12.     In the Amended Complaint, the Plaintiffs assert claims which all arise from or relate to the alleged wrongful conviction of Ricks on September 23, 1992. Amended Complaint ¶ 75.

### III.   Argument

13.     The Plaintiffs violated the Plan's injunction and discharge provisions when they filed the Lawsuit to assert claims and otherwise seek relief against the City.  And, they continue to violate them by persisting in prosecuting the Lawsuit.

14.     The Plan's discharge provision states that the "rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the

Effective Date." Plan Art. III.D.4, at p.50.  The Plaintiffs did not file a proof of claim in the City's bankruptcy case.  Consequently, they do not have a right to a distribution or payment under the Plan on account of the claims asserted in the Lawsuit.  Plan, Art. III.D.5, at p.50 ("[A]ll entities that have been, are or may be holders of Claims against the City . . . shall be permanently enjoined from . . . proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan."). *See also* Plan, Art. I.A.19, at p.3; Art. I.A.134, at p.11; Art. VI.A.1, at p.67 ("Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.").  Any claims that Plaintiffs may have had were discharged, and the Plan enjoins Plaintiffs from pursuing them.  The Bar Date Order also forever barred, estopped and enjoined the Plaintiffs from pursuing the claims asserted in the Amended Complaint.

15.    Even if the Plaintiffs could somehow seek relief on their claims against the City or its property (which they cannot), the proper and only forum for doing so would be in this Bankruptcy Court.  There is therefore no set of circumstances under which Plaintiffs are or would have been permitted to commence and prosecute the Lawsuit against the City or its property.

## IV.    Conclusion

16.    The City thus respectfully requests that this Court enter an order, in substantially the same form as the one attached as Exhibit 1, (a) directing Plaintiffs to dismiss, or cause to be dismissed, the City with prejudice from the Lawsuit; (b) permanently barring, estopping and enjoining Plaintiffs from asserting the claims alleged in, or claims related to, the Lawsuit against the City or property of the City; and (c) prohibiting Plaintiffs from sharing in any distribution in this bankruptcy case.  The City sought, but did not obtain, concurrence to the relief requested in the Motion.

Dated: January 30, 2019          MILLER, CANFIELD, PADDOCK AND
                                 STONE, P.L.C.

                                 By: /s/ Marc N. Swanson
                                 Marc N. Swanson (P71149)
                                 150 West Jefferson, Suite 2500
                                 Detroit, Michigan 48226
                                 Telephone: (313) 496-7591
                                 Facsimile: (313) 496-8451
                                 swansonm@millercanfield.com

                                 Attorneys for the City of Detroit

- 7 -

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## **EXHIBIT LIST**

| | |
|---|---|
| Exhibit 1 | Proposed Order |
| Exhibit 2 | Notice of Opportunity to Object |
| Exhibit 3 | None |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None |
| Exhibit 6 | Complaint |

- 8 -

## EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DESMOND RICKS, AKILAH COBB AND DESIRE'A RICKS

This matter, having come before the Court on the Motion to Enforce Order, Pursuant to Sections 105, 501, and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing of Proofs of Claim and Approving Form and Manner of Notice Thereof Against Desmond Ricks, Akilah Cobb and Desire'a Ricks ("Motion"),[1] upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.      The Motion is granted.

---

[1] Capitalized terms used but not otherwise defined in this Order shall have the meanings given to them in the Motion.

2.      Within five days of the entry of this Order Desmond Ricks, Akilah Cobb and Desire'a Ricks shall each dismiss, or cause to be dismissed, the City of Detroit with prejudice from the case captioned as *Desmond Ricks, Akilah Cobb and Desire'A Ricks, Plaintiffs, v David Pauch, in his individual capacity, Donald Stawiasz, in his individual capacity, and City of Detroit, a Municipal Corporation, Defendants*, filed in the United States District Court for the Eastern District of Michigan and assigned Case No. Case No. 17-cv-12784 ("<u>Lawsuit</u>").

3.      Desmond Ricks, Akilah Cobb and Desire'a Ricks are each permanently barred, estopped and enjoined from asserting claims asserted in the Lawsuit or claims arising from or related to the Lawsuit against the City of Detroit or property of the City of Detroit.

4.      Desmond Hicks, Akilah Cobb and Desire'a Ricks are each prohibited from sharing in any distribution in this bankruptcy case.

5.      The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

**EXHIBIT 2 – NOTICE**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**NOTICE OF OPPORTUNITY TO OBJECT TO CITY OF**
**DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING**
**THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST**
**DESMOND RICKS, AKILAH COBB AND DESIRE'A RICKS**

The City of Detroit has filed papers with the Court requesting the Court to enforce the Order, Pursuant To Sections 105, 501, and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates For Filing Proofs Of Claim and Approving Form and Manner Of Notice Thereof Against Desmond Ricks, Akilah Cobb and Desire'a Ricks.

**Your rights may be affected.  You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order granting the *City Of Detroit's Motion To Enforce Order, Pursuant To Sections 105, 501, and 503 Of The Bankruptcy Code and Bankruptcy Rules 2002 and 3003(C), Establishing Bar Dates For Filing Proofs Of Claim and Approving Form and Manner Of Notice*

32868644.3\022765-00213

*Thereof Against Desmond Ricks, Akilah Cobb and Desire'a Ricks,* within 14 days, you or your attorney must:

1.    File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.  You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.   If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson (P71149)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com

Dated:  January 30, 2019

**<u>EXHIBIT 3 – NONE</u>**

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 30, 2019, he served a copy of the foregoing **CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DESMOND RICKS, AKILAH COBB AND DESIRE'A RICKS** upon counsel for Desmond Ricks, Akilah Cobb and Desire'a Ricks, in the manner described below:

Via first class mail and email:

James J. Harrington , IV
Fieger, Fieger, Kenney, Giroux & Harrington, P.C.
19390 W. Ten Mile Road
Southfield, MI 48075-2463
Email: j.harrington@fiegerlaw.com


Milica Filipovic
Fieger, Fieger, Kenney & Harrington
19390 West Ten Mile Road
Southfield, MI 48075-2463
Email: m.filipovic@fiegerlaw.com

Sima G. Patel
Fieger, Fieger, Kenney & Harrington
19390 W. Ten Mile Rd.
Southfield, MI 48075-2463
Email: s.patel@fiegerlaw.com

DATED: January 30, 2019

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

# EXHIBIT 5 – NONE

# EXHIBIT 6 – AMENDED COMPLAINT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESMOND RICKS, individually;
AKILAH COBB, individually; and
DESIRE'A RICKS, individually;

        Plaintiffs,

                             No.  17-cv-12784
-v-                         Hon. Paul D. Borman

DAVID PAUCH, in his individual capacity;
and DONALD STAWIASZ, in his
individual capacity; ROBERT B. WILSON,
in his individual capacity; and CITY OF
DETROIT, a municipal corporation;

        Defendants.
_____

## **FIRST AMENDED COMPLAINT**

     NOW COME the Plaintiffs, DESMOND RICKS, individually, AKILAH

COBB, individually, and DESIRE'A RICKS, individually, by and through

their attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and file

their Complaint against the Defendants in this civil action, stating unto this

Court as follows:

     1.    This is an action for damages brought pursuant to 42 U.S.C.

§§1983 and 1998, the Fourth, Fifth, Sixth and Fourteenth Amendments to

the United States Constitution against Defendants, DAVID PAUCH, in his

individual capacity, DONALD STAWIASZ, in his individual capacity,

ROBERT B. WILSON, in his individual capacity, and CITY OF DETROIT, a municipal corporation.

 2. Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

 3. Forum is proper based on the situs of the incident, which occurred in the CITY OF DETROIT.

 4. At all pertinent times Plaintiffs, DESMOND RICKS, AKILAH COBB, and DESIRE'A RICKS, were United States citizens.

 5. At all pertinent times, Defendant, DONALD STAWIASZ ("STAWIASZ"), was employed as a Sergeant by the Detroit Police Department ("DPD"), a department of the CITY OF DETROIT ("DETROIT") and was acting under color of law.

 6. At all pertinent times, Defendant, DAVID PAUCH ("PAUCH"), was employed as a police officer and Evidence Technician for the DPD and was acting under color of law.

 7. At all pertinent times, Defendant, ROBERT B. WILSON ("WILSON"), was employed as a police officer and Evidence Technician for the DPD and was acting under color of law.

2

8.      At all pertinent times, DETROIT was a municipal corporation formed under the laws of the State of Michigan and was the employer of STAWIASZ and PAUCH.

## **GENERAL ALLEGATIONS**

9.      On March 3, 1992, at approximately 4:45 p.m., Gerry Bennett was shot to death in the parking lot of a Top Hat restaurant located at 16101 James Couzens, in the City of Detroit.

10.     On that occasion, Plaintiff, a friend of Mr. Bennett, accompanied Bennett to the Top Hat restaurant in a red Ford Escort. Bennett, the driver of the Escort, parked the vehicle.  Soon, a yellow Chevrolet Monte Carlo pulled up next to the Escort.  Bennett got out of the Escort, while a light-skinned black man of medium height got out of the back seat of the Monte Carlo and entered the restaurant with Bennett. Plaintiff remained in the front passenger seat of the Escort.

11.     When the two men left the restaurant about five to 10 minutes later, Plaintiff saw the light-skinned man point a chrome handgun at Bennett and shoot him in the stomach.  Plaintiff got out of the Escort to confront the man.  As he did, he saw the other man shoot Bennett in the head, then turn to shoot at Plaintiff.

12.     Plaintiff turned and ran, shedding his winter coat to avoid it being caught in bushes as he ran through bushes into an adjacent neighborhood. The coat was later found by DPD officers.  It contained his visitor's pass to Hutzel Hospital, where his girlfriend had just given birth to his baby daughter, Desire'a.  The jacket also contained a phone book and a picture of his newborn baby.

13.     An eyewitness at the scene, Arlene Strong, who was working as a cashier at the restaurant, gave a statement to police on the date of the murder.  She stated that the shooter was an occupant of the yellow car. She described a *"big silver gun"* and described the shooter as *"bright complexion, medium height."*

14.     Desmond Ricks is dark-skinned and stands 6'3"; in no way can he be described as *"bright complexion, medium height."*

15.     The initial police report from the murder, authored by Officer R. Turner, described Ms. Strong as *"[o]ne of the best witnesses."*

16.     Ms. Strong was the only eyewitness at the scene who provided a physical description of the shooter.   Her description did not match Desmond Ricks.

17.     On or about March 4, 1992, Defendant, STAWIASZ, was assigned as Officer-in-Charge ("OIC") of the homicide investigation.

4

18.     On March 4, an autopsy was performed on Bennett's body.  The Medical Examiner, Dr. Sawait Kanluen, retrieved one bullet from Bennett's brain, where it lodged after penetrating his skull.  A second bullet was lodged in Bennett's spine.

19.     On March 5, 1992, at approximately 4:00 p.m., Detroit Police Officer, James Fleming, acting on orders from DPD Sgt. Robert Gerds, and accompanied by federal A.T.F. agent, Anthony Primak, and Deputy U.S. Marshal, John Reghi, arrived at Plaintiff's mother's house at 16500 Hubbell Street in Detroit.  Fleming later testified that Mary Ricks, Plaintiff's mother, was working in her garden in the front yard when they arrived.

20.     Fleming also testified that the officers saw Plaintiff standing inside the doorway of the front door.  He was arrested inside his home.

21.     The officers did not have an arrest warrant, or consent to enter, or exigent circumstances, or probable cause, to arrest Plaintiff inside his home.  It was an illegal, unconstitutional arrest.

22.     Before Plaintiff was removed from the house, Mary Ricks allegedly told the officers that her son didn't shoot anybody, as he didn't even own a gun.  She also stated that she was the only one in the house who owned a gun, which was a pistol she kept under her pillow, and that her son, Desmond, had <u>never</u> fired the gun.

23.     Mrs. Ricks allowed the officers to take her handgun, a Rossi .38 Special, 5-shot revolver, serial #: D373334.

24.     As the agents left the house, Plaintiff heard one agent, Primak, tell Fleming, *"This gun hasn't been fired."* Fleming responded, *"Take it anyway."*

25.     The .38 Special caliber revolver was given to Fleming to take to the DPD.

26.     Plaintiff was arrested before Mary Ricks' handgun was recovered and tested to compare the slugs removed from the victim's body to bullets test-fired from the handgun.

27.     At the time of Desmond Ricks' arrest, there were no witnesses who identified Plaintiff as the shooter and no physical evidence linking him to the crime. The DPD had no evidence upon which to base probable cause for an arrest. The only evidence the police had was Plaintiff's mere presence at the murder scene.

28.     Long before March 3, 1992, it was clearly established under Michigan and federal law that an individual's mere presence at a crime scene was insufficient, without more, to establish probable cause for an arrest. *People v. Olszewski*, 119 Mich.App. 455, 459; 326 N.W.2d 394 (1982); *Harris v. Bornhorst,* 513 F.3d 503, 515 (6th Cir. 2008), *cert. denied*,

6

554 U.S. 903; 128 S.Ct. 2938; 171 L.Ed.2d 865 (2008) ("[I]t is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest").

29.    On March 6, 1992, one day after Plaintiff was illegally arrested, Defendant, STAWIASZ, requested that firearms identification testing be conducted on the Rossi handgun taken from Ricks' home, to compare bullets to the slugs removed from Gerry Bennett's body.  STAWIASZ brought the handgun to Defendants, PAUCH and WILSON, firearm and tool-mark experts in the DPD Crime Lab.  PAUCH and WILSON had previously received the slugs from the victim's body.

30.    PAUCH, WILSON, and STAWIASZ, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

31.    PAUCH and WILSON, with STAWIASZ present, test-fired bullets from the Rossi handgun and compared them to bullets removed from Bennett's body.

7

32.    A fundamental part of firearms identification, known to every competent (and even incompetent) firearms examiner, including PAUCH and WILSON, is the classification of bullets and guns by the number of lands and grooves in the barrel of a gun, and the direction of twist of the lands and grooves.

33.    In firearms, rifling consists of helical grooves on the inside surface of a gun's barrel, which impart a spin to a bullet around its longitudinal axis. This spin serves to gyroscopically stabilize the bullet, improving its aerodynamic stability and accuracy.

34.    A manufacturer's gun barrel can have any number of lands and grooves.  The diameter of a barrel is measured between the distance of the lands, or raised surfaces, on the inside of the barrel.



**6-R**
**Inside surface of a gun barrel showing lands and grooves.**

35.     As a bullet passes through the barrel of a gun, the bullet surface, which consists of a softer metal than the barrel, is scored by the lands in the barrel, which make the grooves in the bullet, allowing for a stable flight, much like the spin on a football.

36.     The lands and grooves in the barrel are directional, meaning that the bullet will spin clockwise or counterclockwise.  This is designated as the direction of the twist ("Right-hand twist" or "Left-hand twist").

37.     Competent firearms examiners, such as PAUCH and WILSON, can microscopically determine the number of lands and grooves and the direction of twist of the firearm or bullet.  These are known as class characteristics and can help determine whether a certain bullet was fired from a specific gun.

38.     PAUCH and WILSON's report noted that the Rossi .38 Special caliber revolver was classified as "6-R," so PAUCH and WILSON clearly knew the significance of such classifications.

39.     The "6" designation means that the barrel of the Rossi handgun would cut six grooves (and corresponding lands (identifying features)) into the surface of the bullet, while the "R" designation signifies a "right-hand" rotation of the bullet as it passes through the barrel.

9

40.     PAUCH and WILSON's examination revealed that one of the two slugs removed from the victim's body, bullet #2 removed from the spine (Evid. Tag # 923410), clearly was a "5-R" classification, meaning that it had five lands and grooves with a right-hand twist.

41.     Based on their independent examinations, PAUCH and WILSON, well-trained, competent firearm and tool-mark examiners who had testified as expert witnesses on numerous occasions, knew to a certainty that the 5-R bullet recovered from Gerry Bennett's body could not have come from the 6R Rossi .38 Special caliber revolver.

42.     Knowing the bullets did not match the suspect's gun, and that the description of the shooter by the only eyewitness did not describe Plaintiff, PAUCH, WILSON and STAWIASZ conspired and agreed to commit the overt act of falsifying the firearms identification test results to indicate a *"Positive ID"* (match) between the evidence bullets and the Rossi .38 Special caliber revolver removed from Plaintiff's home.

43.     The fabricated *"Positive ID"* lab report provided the only link between Desmond Ricks and the murder of Gerry Bennett, as there was no physical evidence or eyewitness identification linking him to the crime.

44.     PAUCH, WILSON, and STAWIASZ, all experienced, well-trained police officers who took an oath to protect citizens' constitutional

rights, conspired to knowingly deprive Desmond Ricks of his constitutional rights under the 4th Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation …."

45.   PAUCH, WILSON, and STAWIASZ knew their decision to fabricate the firearms lab report ran afoul of the United State Supreme Court's recognition of the *"fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." In re Winship*, 397 U.S. 358, 372; 90 S.Ct. 1068, 1077; 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). See also T. Starkie, Evidence 956 (1824) *("The maxim of the law is . . . that it is better that ninety-nine . . . offenders should escape, than one innocent man should be condemned"*).

46.   PAUCH and WILSON also made a deliberate, knowing, and intentional choice not to identify the number of grooves and lands, or the orientation of rotation, on either of the two slugs removed from the victim's body.  Instead, the report simply stated that the slugs demonstrated *"[t]races of lands and grooves,"* even though the lands and grooves,

especially on bullet #2 (ET# 923410) were clearly able to be measured.

**(Lab Report, 3-6-92, Exhibit 1).**

47.     Despite knowing that the bullets did not match the weapon, the

PAUCH and WILSON report declared that a comparison of the bullets

removed from Bennett's body to the Rossi handgun *"yielded a POSITIVE*

*ID.  Meaning the fired evidence was fired from the above weapon." Id.*

PAUCH would later testify at trial that *"It leaves the same marks such as*

*fingerprints would leave to that gun."* TT, 9-21-92, p. 52.  PAUCH would

further testify to his degree of certainty in his conclusion, *"Positive*

*identification.  These bullets were fired from this weapon and no other*

*weapon." Id.*

48.     In fact, as later established by the Michigan State Police

firearms expert, D/Sgt. Dean Molnar, Jr., in April and May of 2017, the slug

removed from the head wound (Slug #1) was too mangled to identify any

number of lands and grooves.  However, the report stated that the other

slug, removed from the back wound (Slug #2), *"is consistent with being a*

*.38/9mm caliber class fired lead bullet displaying conventional rifling*

*specifications of five lands and grooves with a right twist."* **(MSP report, 5-**

**24-17, Exhibit 2).**

49.     A "6-R" gun <u>cannot</u> make a "5-R" identification in the bullet.

50.     PAUCH and WILSON, competent, well-trained evidence technicians who had testified as firearms identification experts on numerous prior occasions, knew long before March 6, 1992, that a "5-R" bullet cannot come from a "6-R" handgun.

51.     Every expert in this case who has examined the subject bullets, including Defendants' own retained expert, Jay Jarvis, a retired firearms identification expert from the Georgia Bureau of Investigations, has concluded that the subject bullets are classified as "5R*." "Based on data in the 2010 version of the General Rifling Characteristics File published by the FBI Laboratory and the undersigned's previous experience, the rifling characteristics of five lands and grooves with a right twist exhibit on the item 1 and 2 bullets are commonly found in Smith & Wesson, Ruger and Taurus .38 Special and .357 Magnum revolvers."* **(Jarvis report, 11-30-17, Exhibit 3)**.

52.     Neither the slugs removed from Bennett's body, nor photographs of the slugs, were provided to the prosecutor.

53.     Based on the results of several Freedom of Information Act requests to the DPD, it is believed that PAUCH and WILSON did not take any photographs of the evidence bullets from the victim's body, or any

13

comparison photographs to document that the evidence bullets and the test-fired bullets matched like "fingerprints."

54.    On March 6, 1992, PAUCH and WILSON made a deliberate, knowing, and intentional and/or reckless choice not to photograph the slugs from the victim's body.

55.    On March 6, 1992, STAWIASZ made a conscious, knowing, and intentional and/or reckless choice not to request or require photographs of the fired slugs.

56.    Had the slugs been provided to the prosecutor, Kenneth Simon, before trial, Simon would have had a constitutional "*Brady*" obligation to provide them to the defense, as they clearly impeached PAUCH's conclusion that the slugs were a perfect match to Ricks' gun, and were exculpatory evidence, because the slugs did not match Ricks' revolver.

57.    Neither PAUCH nor STAWIASZ told the prosecutor that the slugs from the victim's body did not match the Rossi .38 Special caliber revolver retrieved from Plaintiff's mother.

58.    Had the true test results (that the slugs did not match the alleged murder weapon) been provided to the prosecutor before trial, he would have had a constitutional "*Brady*" obligation to provide them to the defense, as they clearly impeached PAUCH and WILSON's conclusion that

14

the slugs were a perfect match to Ricks' gun, and were exculpatory evidence, <u>because the slugs did not match Ricks' handgun</u>.

59. Had PAUCH and STAWIASZ told the prosecutor before trial that they had fabricated the lab report results, he would have had a constitutional "*Brady*" obligation to provide that evidence to the defense, as it clearly impeached PAUCH's conclusion that the slugs were a perfect match to Ricks' gun, and were exculpatory evidence, <u>because the slugs did not match Ricks' handgun</u>.

60. Since PAUCH, WILSON, and STAWIASZ knew that the slugs did not match the Rossi .38 Special caliber revolver removed from Desmond Ricks' mother's house, STAWIASZ, as Officer-in-Charge, made a conscious, knowing, and intentional and/or reckless choice <u>not</u> to request a fingerprint examination of the handgun to check for a match with Desmond Ricks, despite having requested a fingerprint test of the victim's cell phone and automobile.

61. On March 6, 1992, one day after his arrest, Plaintiff was interviewed by STAWIASZ and Investigator, Richard Ivy. Plaintiff explained what had occurred at the Top Hat restaurant and that he did not shoot Gerry Bennett, to which STAWIASZ responded, *"We know you didn't; but*

15

*you know who did, and you'll be the one going to prison if you don't tell us."*
After that, Plaintiff refused to speak to STAWIASZ any further.

62.     Later that morning, STAWIASZ informed Plaintiff that the
bullets from the victim's body matched the Rossi .38 Special caliber
revolver taken from Plaintiff's mother's bedroom.

63.     On March 6, 1992, a witness on the scene, Howard Dillworth,
was asked to view a live lineup with Desmond Ricks in the lineup.  Mr.
Dillworth <u>did not</u> identify Mr. Ricks as the shooter.  STAWIASZ supervised
the live lineup.

64.     On March 11, 1992, another witness on the scene, Ollie
McAdoo, was asked to view a live lineup with Desmond Ricks in the lineup.
Mr. McAdoo <u>did not</u> identify Mr. Ricks as the shooter.  STAWIASZ
supervised the live lineup.

65.     Despite police reports describing Arlene Strong as "one of the
best witnesses" in the case, and Ms. Strong having previously described the
shooter as *"bright complexion, medium height,"* STAWIASZ made a
conscious, knowing, and intentional and/or reckless choice not to have
Arlene Strong view a live lineup.

66.     On July 15, 1992, the trial court ordered the physical evidence,
including the slugs and handgun, to be examined by retired Michigan State

Police D/Lt., David Townshend. The examination was to be conducted at the Detroit Police Department.

67.    Inexplicably, a subsequent order, dated August 6, 1992, was entered, allowing Defendant, STAWIASZ, to transport the evidence to Townshend's lab in Mason, Michigan, instead of testing being conducted at the DPD lab.

68.    In furtherance of the decision to frame Desmond Ricks for murder, STAWIASZ switched the slugs taken from Gerry Bennett's body with the test-fired bullets from the Rossi .38 Special caliber revolver and marked the test-fired bullets as Evidence Tags 923409 and 923410. STAWIASZ then transported the evidence to Townshend's office for testing on August 16, 1992.

69.    After viewing the evidence bullets, Townshend, an experienced firearms examiner, was concerned that the two bullets represented to be from the victim's body were not from the victim at all, because their condition was "too pristine" and they were not damaged, as he would have expected.  STAWIASZ, however, assured Townshend that the bullets provided to him were, in fact, from the victim's body.

70.    Relying on STAWIASZ's integrity and ethics, David Townshend, with STAWIASZ present, microscopically examined the

evidence and compared the bullets presented by STAWIASZ to bullets Townshend test-fired from the Rossi handgun. Townshend concluded that the bullets represented by STAWIASZ to have come from the victim's body matched the Rossi .38 Special caliber revolver.

71.    STAWIASZ knew they would match, since he supplied Townshend with the fabricated evidence (previously test-fired bullets from the Rossi handgun) and told Townshend that they were from the victim's body!

72.    The firearms identification evidence was the centerpiece of the State's case, since no eyewitness testified that Plaintiff shot Gerry Bennett. The prosecutor stressed the physical evidence in his closing:

> This case, ladies and gentlemen, comes down to really one thing, one piece of evidence, and that is this gun here. Because this is the one . . . inescapable fact of this case is that this gun is the weapon that killed Gerry Bennett. And this gun . . . was found at the defendant's house. That's the one inescapable fact. No matter how the defendant tries to escape it, he can't. This gun that killed Gerry Bennett was found at his house.
> TT, 9-23-92, p. 107.

73.    The prosecutor continued to emphasize Pauch's testimony:

> You heard Officer Pauch say the nature of this evidence is about like a fingerprint. He has never seen – Officer Pouch (sic) has never seen a gun or two different guns that fired the same bullet the same way such as they would be misidentified. That just does not happen. This is the nature of fingerprint evidence. You can always tell when slugs were fired from a certain gun. It is that certain. And Officer Pouch (sic) told you he was certain.

*Id.* at 109.

74.     PAUCH and WILSON's doctored test results were so important to prosecutor, Kenneth Simon's, case, that Simon mentioned the phrases "*inescapable fact*" and "*can't escape the fact*" [that Ricks' gun killed Gerry Bennett] no less than seven times during his closing argument.

75.     Based on the fabricated "scientific testing," the jury convicted Plaintiff of second-degree murder and felony firearm on September 23, 1992.

76.     But for Defendants' conduct, as set forth below, there would have been no probable cause for Plaintiff to be charged with the murder of Gerry Bennett.

77.     After 25 years of wrongful incarceration, testing by the Michigan Police Department Crime Lab in 2017 demonstrated that the bullets from Gerry Bennett's body did not match the alleged murder weapon taken from Desmond Ricks' home.

78.     On May 26, 2017, after Desmond Ricks had spent **9,214 days, or 25 years, 2 months, and 22 days**, in jail and/or prison, he was released from the Richard A. Handlon Correctional Facility in Ionia, Michigan, on the order of Wayne County Circuit Court Judge Richard Skutt.

79.     On June 1, 2017, charges were dismissed by the Wayne County Prosecutor's Office and Desmond Ricks, now 51, was finally set free. **(Order of Nolle Prosequi, 6-1-17, Exhibit 4).**

80.     On June 1, 2017, the Wayne County Prosecutor's Office released a statement saying *"We worked collaboratively with the University of Michigan Innocence Clinic to secure a reanalysis of the ballistic evidence in this case.  The ultimate result was that we agreed to the motion requesting a new trial on May 26, 2017.  After thoroughly examining the remaining evidence in the case we have concluded that we cannot proceed to trial, and today we agree that Mr. Ricks should be released."*

## <u>DETROIT'S CUSTOMS AND POLICIES THAT LED TO PLAINTIFF'S WRONGFUL CONVICTION</u>

81.     In and before March 5, 1992, the date of Plaintiff's arrest, the City of Detroit, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate and approve illegal and unconstitutional actions by Detroit Police Department officers and command staff.

82.     The illegal and unconstitutional actions and practices included but were not limited to:

> a.      Conducting inadequate investigations into serious felony cases, such as murder, in order to expeditiously close

20

cases, and affirmatively choosing not to develop or pursue actual leads or evidence;

b. Knowingly and deliberately fabricating evidence in order to manufacture probable cause to arrest and/or strengthen a case for conviction;

c. Knowingly and deliberately choosing not to conduct formal tests and identification procedures because investigators knew that the results would contradict evidence against their target suspect.

83. Defendant, DETROIT, through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including their duty not to fabricate evidence and to disclose apparent exculpatory and impeachment evidence.

84. DETROIT's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Desmond Ricks, and were the moving force behind the individual Defendants' constitutional violations.

85. Due to the conduct of Defendants, STAWIASZ, WILSON, PAUCH, and DETROIT, as set forth below, Plaintiff, DESMOND RICKS, suffered the following injuries and damages:

A. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over twenty-five years, including significant time spent in solitary confinement;

21

B.    Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with second-degree murder and felony-firearm, facing a sentence of 32- to 62-years in prison; and being wrongfully convicted of crimes the Defendants knew he did not commit;

C.    Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

D.    Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

E.    Loss of enjoyment of daily activities including, but not limited to, seeing his children grow up;

F.    Not being able to attend the funerals of family members, including his beloved mother;

G.    Physical injuries suffered in prison;

H.    Loss of employment opportunity, past income and future earning capacity;

I.    Loss of his close relationship with his minor daughters;

J.    Physical injuries while being imprisoned, including being assaulted;

K.    Loss of employment opportunity, past income and future earning capacity;

L.    Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity,

22

family relations, recreational activities, and personal expression;

M.    Many of Plaintiff's injuries and damages are likely to be permanent;

N.    Other damages which may be revealed through discovery.

86.    Due to the conduct of Defendants, STAWIASZ, WILSON, and PAUCH, as set forth below, Plaintiff, AKILAH COBB, only seven years old when her father was arrested, suffered the loss of the parental society, companionship, guidance, and full relationship with her father.

87.    Due to the conduct of Defendants, STAWIASZ, WILSON, and PAUCH, as set forth below, Plaintiff, DESIRE'A RICKS, only five days old when Plaintiff was arrested, suffered the loss of the parental society, companionship, guidance, and full relationship with her father.

88.    Due to the conduct of Defendants, STAWIASZ, WILSON, and PAUCH, as set forth below, the true killer has never been caught and the victim's family has never received true closure.

## COUNT I
## CONSTITUTIONAL VIOLATIONS BY ALL DEFENDANTS

89.    Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

23

90.    Defendants, STAWIASZ and PAUCH, were under an
unwavering legal duty (*"Brady"* duty) to disclose to the prosecutors all
material evidence where its exculpatory and impeachment value was
apparent, including, but not limited to, the evidence that they fabricated the
test results to state that the examination *"yielded a POSITIVE ID.  Meaning
the fired evidence was fired from the above weapon,"* when, in fact, the
bullets did not match the Rossi .38 Special caliber revolver.   Defendants'
failure to disclose the above-referenced evidence to the prosecutor resulted
in material exculpatory and impeachment evidence not being turned over to
Plaintiff's defense counsel, in violation of the State's *Brady* obligations.

91.    Defendant, STAWIASZ, as Officer-in-Charge, was under a
further duty to make truthful statements to the prosecutor and magistrate
judge to establish probable cause for an arrest warrant.

92.    Defendants, PAUCH and WILSON, were under a further duty to
make truthful statements in forensic reports they knew would go to the
prosecutor to establish probable cause for an arrest warrant.

93.    Defendants violated DESMOND RICKS' constitutionally-
protected rights, including his right to liberty protected by the Due Process
clause of the Fifth Amendment, as applicable to the States via the
Fourteenth Amendment to the U. S. Constitution, his right to a fair trial,

24

guaranteed by the Sixth Amendment, as well as his right to be free from continued unlawful detention without probable cause based on fabricated evidence, guaranteed by the Fourth Amendment, by the following conduct:

### *Brady* Violations

> Defendants, STAWIASZ and PAUCH, deliberately and knowingly, or with reckless disregard for the truth, chose not to disclose material exculpatory and impeachment evidence in their files to the prosecutor in violation of their constitutional obligation under *Brady v Maryland*, 373 US 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a "*Brady* violation" under the Fifth Amendment;

### Malicious Prosecution

> Defendant, STAWIASZ, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false evidence by switching bullets to be provided to David Townshend, and supplied false information and omitted material information which showed a reckless disregard for the truth in requesting an arrest warrant and swearing to facts in support of probable cause, which was material to a finding of probable cause. Such conduct constitutes a claim of federal "malicious prosecution" under the Fourth Amendment;

> Defendants, PAUCH and WILSON, influenced or participated in the initiation of criminal prosecution when they deliberately and knowingly supplied false information (that the bullets from Gerry Bennett's body matched Ricks' gun) that was relied upon by the prosecutor in bringing criminal charges, and was material to a finding of probable cause that Plaintiff had committed the crime of murder, which otherwise would have been lacking. Such conduct constitutes a claim of federal "malicious prosecution" under the Fourth Amendment;

## Fabrication of Evidence

Defendants, STAWIASZ, WILSON, and PAUCH, deliberately and knowingly fabricated evidence to create probable cause, including the "positive ID," to suggest that the bullets from the victim's body had come from the handgun retrieved from Ricks' mother's house, which was material to a finding of probable cause that Plaintiff had committed the crime of murder, and would otherwise have been lacking; such conduct constituting a claim of "fabrication of evidence" under the Fourth Amendment;

Defendant, STAWIASZ further fabricated evidence, in deliberate and knowing fashion, to secure a conviction, including switching the bullets provided to expert, David Townshend, which was material to the jury's decision that Plaintiff had committed the crime of murder, and which otherwise would have been lacking; such conduct constituting a claim of "fabrication of evidence" under the Fourth Amendment;

## DETROIT's *Monell* Liability

Defendant, DETROIT, created policies, practices and customs, including a failure to provide adequate training to its police officers, including Defendants, PAUCH and STAWIASZ, in the manner set forth above, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the individual Defendants' violations of Plaintiff's constitutional rights.

94. Desmond Ricks' right not to be deprived of liberty based upon fabrication of evidence by a government official acting in an investigatory capacity, including a police detective and police evidence technician, was clearly established before March 5, 1992.

26

95.     Desmond Ricks' right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before March 5, 1992.

96.     Desmond Ricks' right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing fabrication of evidence and false statements and material omissions to prosecutors and magistrate judges, guaranteed by the Fourth Amendment, was clearly established before March 5, 1992.

97.     Defendants' *Brady* violations resulted in Plaintiff not receiving a fair trial, described as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, (1995).

98.     As a direct and proximate result of the Defendants' willful violation of his constitutionally-protected rights, Plaintiff was detained without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned for over 25 years, and deprived of his liberty, causing him to suffer the injuries and damages set forth above.

WHEREFORE, Plaintiff, DESMOND RICKS, prays for compensatory damages in a minimum amount of Fifty Million Dollars ($50,000,000.00). Plaintiff further seeks punitive damages pursuant to 42 U.S.C. §1983 as to Defendants, PAUCH and STAWIASZ, in a minimum amount of Twenty-

Five Million Dollars ($25,000,000.00) against each Defendant, together with interest, costs, attorney fees, and other such relief as the Court deems appropriate.

**COUNT II**
**COMMON LAW MALICIOUS PROSECUTION BY DEFENDANTS, DONALD STAWIASZ, ROBERT B. WILSON, AND DAVID PAUCH**

99. Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

100. Defendant, STAWIASZ, initiated criminal prosecution against Plaintiff in state court by submitting a Warrant Request and swore to false facts in support of an arrest warrant.

101. The criminal proceedings ultimately terminated in Plaintiff's favor with a dismissal of the charges in state court on June 1, 2017.

102. STAWIASZ initiated the prosecution by deliberately stating false and misleading facts in his Request for Warrant, which were relied upon by the Wayne County Prosecutor's Office. STAWIASZ acted maliciously and/or with a wanton or reckless disregard for Plaintiff's rights, by deliberately fabricating evidence (the "bullet evidence") to suggest that the handgun retrieved from Plaintiff's mother's house was the same weapon used in the murder of Gerry Bennett. Thus, STAWIASZ did not act with good faith.

103.  PAUCH and WILSON also initiated the prosecution by deliberately stating false and misleading opinions in their March 6, 1992, lab report, which were relied upon by the Wayne County Prosecutor's Office.  PAUCH and WILSON acted maliciously and/or with a wanton or reckless disregard for Plaintiff's rights, by deliberately fabricating evidence (the "bullet evidence") to suggest that the handgun retrieved from Plaintiff's mother's house was the same weapon used in the murder of Gerry Bennett.  Thus, PAUCH and WILSON did not act with good faith.

104.  The prosecution was undertaken without probable cause, with malice, and for the purpose of framing Plaintiff for the murder and covering up an illegal arrest, not with the intention of bringing Plaintiff to justice for having committed the alleged murder.

105.  The prosecution was undertaken to justify and cover up an illegal, warrantless arrest, and to counter the DPD's abysmal and long-standing record and reputation for failing to solve homicides.

106.  As a direct and proximate result of Defendants' malicious conduct, Plaintiff, DESMOND RICKS, was charged with crimes he did not commit, causing him to suffer the injuries and damages set forth above.

107.  As a direct and proximate result of Defendants' malicious prosecution, Plaintiffs, AKILAH COBB and DESIRE'A RICKS, suffered the injuries and damages set forth above.

108.  Defendants' conduct was malicious and so willful and wanton as to demonstrate a reckless disregard of Plaintiffs' rights, and would readily inspire feelings of humiliation, outrage and indignity, such as would warrant exemplary damages.

WHEREFORE, Plaintiff, DESMOND RICKS, prays for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of Fifty Million Dollars ($50,000,000.00), together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

WHEREFORE, Plaintiffs, AKILAH COBB and DESIRE'A RICKS, pray for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of Twelve and One Half Million Dollars ($12,500,000.00) for each Plaintiff, together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

**COUNT III**
<u>**COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS BY DEFENDANTS, DONALD STAWIASZ,
ROBERT B. WILSON, AND DAVID PAUCH**</u>

109.  Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

110.  Defendants, STAWIASZ, WILSON, and PAUCH, by their extreme and outrageous conduct, described above, demonstrated such intent and/or recklessness as to cause Plaintiff, Desmond Ricks, severe emotional distress.

111.  Defendants' conduct can only be described as atrocious, outrageous, and utterly intolerable in a civilized society.

112.  Defendants' conduct meets the elements of the common law claim for Intentional Infliction of Emotional Distress.

WHEREFORE, Plaintiff, DESMOND RICKS, prays for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of Fifty Million Dollars ($50,000,000.00), together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

WHEREFORE, Plaintiffs, AKILAH COBB and DESIRE'A RICKS, pray for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of

Twelve and One Half Million Dollars ($12,500,000.00) for each Plaintiff,

together with pre-judgment interest, costs and attorney fees in an amount

to be determined by the Court.

MUELLER LAW FIRM

s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
Attorneys for Plaintiffs
34405 W. Twelve Mile Rd., Ste. 200A
Farmington Hills, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com

Dated: May 18, 2018

## RELIANCE ON JURY DEMAND

Plaintiffs, by and through their attorneys, MUELLER LAW FIRM, rely

on their previously filed jury demand in this matter.

MUELLER LAW FIRM

s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
Attorneys for Plaintiff
34405 W. Twelve Mile Rd., Ste. 200A
Farmington Hills, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com

Dated: May 18, 2018

---

### CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2017, I electronically filed First Amended Complaint with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Jerry Ashford, Esq. and Jacob Satin, Esq.

I further hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: None.

s/Wolfgang Mueller
MUELLER LAW FIRM
34405 W. Twelve Mile Rd., Ste. 200A
Farmington Hills, MI 48331
248-489-9653
wolf@wolfmuellerlaw.com
(P43728)

---

# EXHIBIT 1

# LABORATORY ANALYSIS

515-92

LOCK SEAL NO.

\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_

DETROIT
DEPARTMENT
POLICE

| RECEIVED BY | DATE | TIME | DELIVERED BY | | PRECT/SECTION |
|---|---|---|---|---|---|
| Johnston | 3/5/92 | 930AM | Gerds | | Homicide |

REFERENCE

Gerry Bennett    Puritan and James Cousins    (Fatal shooting)

| CASE OFFICERS | PRECT/SECT. | TECHNICIAN ASSIGNED | DATE STARTED | DATE COMPLETED | HOURS |
|---|---|---|---|---|---|
| Stawiasz | Homicide | D Pauch | 3/6/92 | 3/6/92 | |

## SERVICE REQUESTED

1. Examine, classify submitted evidence.

2. Examine, classify and test fire submitted weapon.

3. Microscopic comparison of fired evidence against test shots.

## EVIDENCE SUBMITTED

ET#923423          (1)38spl, Rossi, 68, Brazil, BSr, 5shot, 3"bbl,
                         class 6R, serial#D373334,
                         (3)38spl, remington peters, lead round nose,
                         (1)38spl, Winchester, lead round nose,
                         (1)38spl, Norma, lead round nose cartridges,
                         (2)used for test.

NOTE: Above evidence received by Wilson, 3/6/92, 850AM, Delivered Edwards,

ET#923409          (1)38spl, lead bullet, traces of lands and grooves,

ET#923410          (1)38spl, lead bullet, traces of lands and grooves,

## RESULTS OF EXAMINATION

The submitted evidence was examined and classified as stated. Weapon
test fired fully functional and test shots retained. A microscopic
comparison of the test shots from weapon on ET#923423 against the
fired evidence on tag#s 923409, 923410 yielded a POSITIVE ID. Meaning
the fired evidence was fired from the above weapon.

All evidence sent to property section.

DAVID W. PAUCH

POLICE OFFICER

FIREARMS EXAMINER

ROBERT B. WILSON

SERGEANT

FIREARMS EXAMINER

D.P.D. 282

# EXHIBIT 2



**STATE OF MICHIGAN**
# DEPARTMENT OF STATE POLICE
## FORENSIC SCIENCE DIVISION
Metro Detroit Forensic Laboratory
1301 Third Street
Detroit, MI 48226

### LABORATORY REPORT
### <mark>Corrected Copy</mark>

| | | | | |
|---|---|---|---|---|
| Laboratory No. | : | MD17-1738 | Record No. | : 1 |
| Investigating Ofcr. | : | Frances Donnelly | Date Received | : March 30, 2017 |
| Agency | : | Detroit Police Department | Time Received | : 10:02 a.m. |
| Agency No. | : | 0092029495 | Date Completed | : May 24, 2017 |

**Nature of Offense:**

   0900-1 - Murder/Nonnegligent Manslaughter

**Victim:**

   Bennett, Gerry

**Suspect:**

   Desmond, Ricks

**Evidence Received:**

| | |
|---|---|
| Container 1 | 1 - Tape sealed envelope (DPD Tag 465922-1), containing: |
| | 1 - String tied envelope (marked Head), containing: |
| **Item 1** | **1 - Fired lead bullet.** |
| Container 2 | 1 - Tape sealed envelope (DPD Tag 465937-1), containing: |
| | 1 - String tied envelope (marked Back Bone), containing: |
| **Item 2** | **1 - Fired lead bullet.** |

**Results of Physical/Microscopic Examination:**

   **Items 1 and 2** (fired lead bullets) could not be identified or eliminated (inconclusive) as having been fired in the same firearm.  The individual characteristics present did not display sufficient agreement.

   **Item 1** is consistent with being a .38/9mm caliber class fired lead bullet displaying conventional rifling specifications of a right twist.  Damage/mutilation prevented a more definitive classification.

   **Item 2** is consistent with being a .38/9mm caliber class fired lead bullet displaying conventional rifling specifications of five lands and grooves with a right twist.

   <mark>The classification statement for Items 1 and 2 will be separated and Item 2 is going to add that it is has five lands and grooves with a right twist.</mark>

*This report contains the conclusions, opinions, and/or interpretations of the laboratory analyst whose signature appears on this report. This analyst is qualified by education, training, and experience to perform this analysis and does so as part of his or her regular duties. The analysis was conducted in an MSP laboratory accredited under the ASCLD/LAB international testing program since July 26, 2012.*

*The relevant supporting data upon which the expert opinion or inference was made are available for review/inspection.*

Laboratory No.:   MD17-1738          Record No.:   1          Date of Report:   May 24, 2017
    Agency No.:   0092029495

D/Sgt. Dean Molnar Jr.
State Police Specialist
Firearms/Toolmarks Unit
email: molnard1@michigan.gov

May 24, 2017

cc:   Krista Chludzinski, Jonathan Mycek

*This report contains the conclusions, opinions, and/or interpretations of the laboratory analyst whose signature appears on this report. This analyst is qualified by education, training, and experience to perform this analysis and does so as part of his or her regular duties. The analysis was conducted in an MSP laboratory accredited under the ASCLD/LAB international testing program since July 26, 2012.*

*The relevant supporting data upon which the expert opinion or inference was made are available for review/inspection.*

# EXHIBIT 3



# ARMA FORENSICS

Post Office Box 116
Armuchee, Georgia 30105
706-331-9971
www.armaforensics.com

## OFFICIAL REPORT

**November 30, 2017**                    **2017-CV-100201**

Jerry Ashford
City of Detroit Law Department
2 Woodward Ave, Suite 500
Detroit, Michigan 48226

RE: Desmond Ricks vs. City of Detroit

**DESCRIPTION OF EVIDENCE**
On November 27, 2017, the following evidence was received from Sgt. David Marshall:

1. Sealed manila envelope identified as containing one bullet.
2. Sealed manila envelope identified as containing one bullet.

**SERVICES REQUESTED**
Bullet examination and comparison

**EXAMINATIONS CONDUCTED**
The Item 1 package consists of a larger string tie manila envelope sealed with evidence tape. There is evidence that the package has been opened and re-sealed on more than one occasion. Inside the outer envelope is a smaller string tie commercially printed evidence envelope. Affixed to the smaller envelope with a staple is a small clear heat sealed plastic bag containing a lead bullet.

The Item 1 lead bullet is identified by markings on the package as coming from the autopsy of Gerry Bennett and removed from the decedent's head. It is identified as a 38 caliber bullet and exhibits damage consistent with a lead bullet that has penetrated a human skull. There is dried tissue and what appears to be a fragment of bone embedded in the side. This hollow base lead bullet is consistent with 158 grain .38 Special ammunition marketed by the Federal Cartridge Corporation. This fired bullet weighs 138.6 grains. Due to damage, the rifling characteristics were determined by dividing the bullet circumference by the combined widths of the best available land and groove impressions.

Inscribed on the side of the item 1 bullet is the number 51592 followed by what appeared to be initials. The characters comprising the initials could not be definitively discerned. Inscribed inside the base of the item 1 bullet is the number MD17-1738 followed by what appeared to be initials and the number 1. The characters comprising the initials could not be definitively discerned. The item 1 bullet was compared microscopically with the item 2 bullet.

The Item 2 package consists of a larger string tie manila envelope sealed with evidence tape. There is evidence that the package has been opened and re-sealed on more than one occasion. Inside the outer envelope is a smaller string tie commercially printed evidence envelope. Affixed to the smaller envelope with a staple is a small clear heat sealed plastic bag containing a lead bullet.

Page 1 of 2



# ARMA FORENSICS

Post Office Box 116
Armuchee, Georgia 30105
706-331-9971
www.armaforensics.com

## OFFICIAL REPORT

November 30, 2017                    2017-CV-100201

The Item 2 lead bullet is identified by markings on the package as coming from the autopsy of Gerry Bennett and removed from the decedent's back. It is identified as a 38 caliber bullet and exhibits damage consistent with a lead bullet that has penetrated a human body. There is dried tissue on the side and inside the base. This hollow base lead bullet is consistent with 158 grain .38 Special ammunition marketed by the Federal Cartridge Corporation. This fired bullet weighs 152.2 grains. Due to damage, the rifling characteristics were determined by dividing the bullet circumference by the combined widths of the best available land and groove impressions.

Inscribed on the side of the item 2 bullet is the number 51592 followed by what appeared to be initials. The characters comprising the initials could not be definitively discerned. Inscribed inside the base of the item 2 bullet is the number MD17-1738 followed by what appeared to be initials and the number 2. The characters comprising the initials could not be definitively discerned. The item 2 bullet was compared microscopically with the item 1 bullet.

**CONCLUSIONS**

The item 1 bullet from the decedent's head was compared microscopically with the item 2 bullet from the decedent's back. There were sufficient corresponding individual characteristics on both the land and groove impressions on multiple areas of the bullets to conclude the two bullets were fired from the same firearm barrel.

Based on data in the 2010 version of the General Rifling Characteristics File published by the FBI Laboratory and the undersigned's previous experience, the rifling characteristics of five lands and grooves with a right twist exhibited on the item 1 and 2 bullets are commonly found in Smith & Wesson, Ruger and Taurus .38 Special and .357 Magnum revolvers. This does not preclude the possibility that a firearm produced by a different manufacturer with the same rifling characteristics could have fired the two bullets.

This report contains the interpretations and opinions of the undersigned based solely on the results of examinations conducted on the evidence discussed above. Analytical bench notes, photographs and other data supporting the conclusions are maintained separately within the case record.

Respectfully submitted,

*Jay Jarvis*

Francis T. "Jay" Jarvis, M.S.
Principal Scientist

# EXHIBIT 4

Approved SCAO

| | | |
|---|---|---|
| | Original – Court | 3rd copy – Police agency |
| | 1st copy – Prosecutor | 4th copy – Arresting agency |
| | 2nd copy – Defendant/Juvenile | PROBATE JIS CODE: NOL |

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT WAYNE COUNTY | MOTION/ORDER OF NOLLE PROSEQUI | CASE NO. 92-003680-01-FC |
|---|---|---|

ORI MI- 821095J    Court address    1441 St. Antoine – Detroit, MI 48226    Courtroom    303    Court telephone no.    313-224-2477

Police Report No.

| THE PEOPLE OF | ☒ The State of Michigan | | Defendant/Juvenile name, address, and telephone no. |
|---|---|---|---|
| | ☐ | V | Desmond Ricks 16500 Hubbell |

| | CTN/TCN 92214636-01 | SID MI-1363210W | DOB 05/08/1966 |
|---|---|---|---|

☐ Juvenile    In the matter of

| Count | CRIME | CHARGE CODE(S) MCL citation/PACC Code |
|---|---|---|
| 1 | Homicide - Murder - Second Degree | 750317 |
| 2 | Weapons Felony Firearm | 750227B-A |
| 3 | Habitual Offender - 2nd Offense Notice | 76910 |

### MOTION

**Jason W. Williams**
Name (type or print)

, prosecuting official, moves for a nolle prosequi in this case
for the following reason(s): People have insufficient evidence to proceed.

6/1/17
Date

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK
DEPUTY CLERK

Prosecuting official

5/503
Bar no.

### ORDER

**IT IS ORDERED:**

☒ 1. Motion for nolle prosequi is granted and the case is dismissed without prejudice.
☐ 2. Motion for nolle prosequi is granted as to the following charge(s) which are dismissed without prejudice:

☐ 3. Motion for nolle prosequi is denied.
☐ 4. Defendant/Juvenile shall be immediately discharged from confinement in this case.
☐ 5. Bond is canceled and shall be returned after costs are deducted.
☐ 6. Bond is continued on the remaining charge(s).

June 1, 2017
Date

Judge/Magistrate    Richard M. Skutt

20564
Bar no.

If item 1 is checked the clerk of the court shall advise the Michigan State Police Criminal Justice Information Center of the disposition as required under MCL 769.16a.

**TO THE DEFENDANT:** Your fingerprints and arrest card will be destroyed by the Michigan State Police within 60 days of the date of this order when permitted by MCL 28.243.

MC 263 (03/09) MOTION/ORDER OF NOLLE PROSEQUI            MCL 28.243, MCL 767.29, MCL 769.16a, MCR 5.936(D)

Docket #13025  Date Filed: 03/20/2019

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DESMOND RICKS, AKILAH COBB AND DESIRE'A RICKS

This case is before the Court on the motion filed by the City of Detroit, entitled "City of Detroit's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Desmond Ricks, Akilah Cobb and Desire'a Ricks (Docket # 13000, the "Motion").[1]  The Court held a hearing on the Motion on March 20, 2019.  For the reasons stated by the Court on the record during the hearing,

**IT IS ORDERED THAT:**

1.      The Motion is granted.

2.      No later than March 27, 2019, Desmond Ricks, Akilah Cobb and Desire'a Ricks must each dismiss, or cause to be dismissed, the City of Detroit with prejudice from the case captioned as *Desmond Ricks, Akilah Cobb and*

---

[1]  Capitalized terms used but not otherwise defined in this Order have the meanings given to them in the Motion.

*Desire'A Ricks, Plaintiffs, v. David Pauch, etc., et al.*, *Defendants*, filed in the United States District Court for the Eastern District of Michigan and assigned Case No. Case No. 2:17-cv-12784 (the "Lawsuit").

3.    Desmond Ricks, Akilah Cobb and Desire'a Ricks (the "Plaintiffs") are each permanently enjoined from asserting claims asserted in the Lawsuit or claims arising from or related to the Lawsuit against the City of Detroit or property of the City of Detroit.  Any and all claims made by Plaintiffs against Defendants David Pauch, Donald Stawiasz, and/or Robert B. Wilson (the "Individuals") in their individual capacity (rather than in their official capacity) are unaffected by this Order.  This Order does not affect any right to indemnity that the Individuals may have against the City of Detroit.

4.    The Court will retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

**Signed on March 20, 2019**



/s/ Thomas J. Tucker

**Thomas J. Tucker**
**United States Bankruptcy Judge**

1

1      UNITED STATES BANKRUPTCY COURT
       EASTERN DISTRICT OF MICHIGAN
2              SOUTHERN DIVISION

3

IN RE:                    .    Case No.  2:13-53846-tjt
4                         .    Chapter 9
CITY OF DETROIT, MICHIGAN,  .
5                         .
        Debtor.           .
6                         .
. . . . . . . . . . . . . . .

7

8

9

10   **TRANSCRIPT OF HEARING ON CITY OF DETROIT'S MOTION FOR ENTRY**
     **OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION**
11              **ORDER AGAINST DESMOND RICKS**

12

13

14        BEFORE THE HONORABLE THOMAS J. TUCKER
              UNITED STATES BANKRUPTCY JUDGE
15
            WEDNESDAY, MARCH 20, 2019
16               DETROIT, MICHIGAN

17

18

19

20

21

22

23

24

25

2

```
 1   APPEARANCES:

 2   For the Debtor:              Miller Canfield Paddock &
                                     Stone, PLC
 3                               By:  Marc N. Swanson
                                 150 West Jefferson Street
 4                               Suite 2500
                                 Detroit, MI  48226
 5                               (313) 496-7591

 6   For Desmond Ricks:          Fieger Law
                                 By:  James J. Harrington, IV
 7                               19390 West 10 Mile Road
                                 Southfield, MI  48075
 8                               (248) 355-555

 9   Court Recorder:             Jamie Laskaska
                                 Clerk's Office
10                               U.S.  Bankruptcy Court
                                 211 West Fort Street
11                               Detroit, MI  48226

12   Transcription Service:      Randel Raison
                                 APLST, Inc.
13                               6307 Amie Lane
                                 Pearland, TX  77584
14                               (713) 637-8864

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

1                    (Time Noted:  1:34 p.m.)

2              THE COURT CLERK:  Please rise.  This Court is back

3    in session.

4              You may be seated.

5              Court will call the matter of the City of Detroit,

6    Michigan, case number 13-53846.

7              THE COURT:  All right.  Good afternoon to each of

8    you.  Would you enter your appearances for the record,

9    please, starting with counsel for the City?

10             MR. SWANSON:  Thank you, Your Honor.  Marc Swanson

11   on behalf of the City of Detroit.

12             MR. HARRINGTON:  Good afternoon, Your Honor.

13   James J. Harrington on behalf of the Plaintiffs Ricks.

14             THE COURT:  All right.  Good afternoon again,

15   everyone.  This is the hearing, as you know, on the City of

16   Detroit's motion seeking relief against Desmond Ricks et al.,

17   motion for entry of an order enforcing the bar date order and

18   confirmation order, et cetera.

19             I have reviewed the papers filed by the parties

20   regarding this -- relating to this motion.  I have also done

21   some review of the record of the U.S. District Court in the

22   lawsuit that's pending over in District Court, which is

23   referred to and discussed in the motion and related papers.

24             So, Mr. Swanson, let me hear from you first.

25             MR. SWANSON:  Good afternoon.  Plaintiff Desmond

1   Ricks is suing the City on account of a claim which arises

2   from alleged unlawful events in 1992, and an alleged unlawful

3   conviction in 1992.  The claims against the City are, in

4   Plaintiff's own words, based on the City's alleged policies

5   that were in effect, quote, "In and before March 5, 1992."

6   Reading from paragraph 81 of the complaint.

7           The claim is further based on alleged unlawful and

8   unconstitutional actions taken by the City's police officers

9   in 1992.  It's undisputed that the alleged unlawful

10  conviction was in 1992, the actions by the City's police

11  officers were in 1992, and the City's alleged unlawful

12  policies were those in place in 1992, and the City didn't

13  file for bankruptcy until 2013, 21 years later.  Yet,

14  Plaintiff claims that its claim is not barred by the City's

15  bankruptcy case and didn't arise until 2017.

16          And why does Plaintiff make this assertion?  Well,

17  Plaintiff asserts that the proper test for the Court to

18  determine when the claim arose is the right to payment test.

19  That is the leading argument on page 1 of the Plaintiff's

20  objection to the City's motion.

21          As this Court knows, and as this Court has wrote

22  about, that test holds that a bankruptcy claim does not

23  accrue until the cause of action is ripe under non-

24  bankruptcy law.  So under applicable federal law or

25  applicable state law.

1            This Court, however, rejected that test in an

2    opinion that's cited in the City's reply filed on Friday.

3    And instead of the right to payment test, the Court adopted

4    the fair contemplation test.

5            And under that test, a claim is considered to have

6    arisen pre-petition if the creditor could have ascertained

7    through the exercise of reasonable due diligence that it had

8    a claim at the time the petition is filed.

9            And as this Court wrote, this test allows the

10   Court to examine all the circumstances surrounding a

11   particular claim:  The Debtor's conduct, the parties' pre-

12   petition relationship, the parties' knowledge, the elements

13   of the underlying claim, and use its best judgment to

14   determine what is fair to the parties in context.

15           Now, attached as exhibit 17 to the City's reply

16   was a very recent District Court decision in the case *Sanford*

17   *v. City of Detroit*.  That case has many factual similarities

18   to the case here today.  It's an alleged unlawful conviction

19   case.  The alleged unlawful conviction occurred before the

20   City filed for bankruptcy.  The conviction was not overturned

21   until after the City exited from bankruptcy.

22           And the plaintiff in that case, Sanford, asserted

23   that the City's alleged customs, policies, and practices,

24   resulted in his unlawful conviction.  And that's the same

25   type of claim that the Plaintiff here is making against the

1   City.

2           And *Sanford* advanced the exact same argument that

3   the Plaintiff here is making to support its argument that the

4   claim is not subject to the Plan.  And that's the argument

5   that the pre-petition conviction was not overturned until

6   after the City exited bankruptcy, and, thus, the cause of

7   action was not ripe under non-bankruptcy law until after the

8   City exited bankruptcy, and, thus, it was not subject to the

9   City's Plan.

10          The Federal District Court rejected that argument,

11  and stating that Mr. Sanford certainly contemplated the

12  factual bases underlying the claims raised in his complaint

13  since he attempted repeatedly to argue actual innocence

14  before the State Court since at least 2008, insisting that

15  his confessions were falsely obtained, concocted, and

16  coerced.

17          *Sanford* correctly points out that he could not

18  have sued the City until his convictions were set aside,

19  which did not happen until after the bankruptcy.

20          But the courts that have considered the question

21  uniformly have concluded that claims based on pre-petition

22  malicious prosecutions were barred, notwithstanding that the

23  Plaintiff could not file suit on his claims until his

24  criminal conviction was overturned.  The case is on all fours

25  with the facts here.

1             And despite this Court's adoption of the fair

2 contemplation --

3             THE COURT:  There's actually an even more recent

4 case from the District Court similar to this case and similar

5 to *Sanford*, which maybe you're familiar with.  I happened to

6 cross it recently.  It was decided March 6, 2019.  It's

7 called *Monson*, M-O-N-S-O-N, *versus City of Detroit, et al.*

8 It's 2019 Westlaw 1057306, 1057306.

9             MR. SWANSON:  Wow.

10             THE COURT:  A decision by Judge Michelson, very

11 similar to *Sanford,* and same result as *Sanford*.  I happened

12 to cross it when I was looking for something else.

13             And so there's two District Judges in two

14 different cases, the District Court for this District, that

15 have ruled the way you've described as characterized as

16 *Sanford* and as you want the Court to rule in this matter.

17             And so I want to make both parties aware of that

18 case, that *Monson* case.  Were you aware of that?

19             MR. SWANSON:  I had run across it, Your Honor.

20             THE COURT:  Okay.  Well, so those are two cases

21 where the City defended an action brought against it in

22 District Court and raised the argument that you're raising in

23 this Court now on this motion in the District Court as a

24 defense and let the District Court decide the issue.

25             Why didn't the City let the District Court -- or

1  why isn't the City leaving it to the District Court in this

2  case, in the Ricks case, to decide the issues raised by this

3  motion?

4          MR. SWANSON:  Your Honor, I apologize.  I don't

5  have a great answer for you.  I was told by the City that

6  this claim had been asserted in the District Court and to

7  file a motion with you.  I never had any discussion about

8  filing a motion in the --

9          THE COURT:  Well, let me ask you this:  Do you

10  know why the City waited until January 30, 2019, to file this

11  motion in this Court when the case, the District Court case

12  against it by the Ricks, the Ricks parties, was filed back in

13  August 2017?  A year and a half or so, the City waited to

14  seek relief from this Court.  Do you know why that is?

15          MR. SWANSON:  I don't know why that is.

16          THE COURT:  The City, I noticed in looking at the

17  District Court record, the pending case, the Ricks case in

18  the District Court, the City filed a motion for summary --

19  the City and all Defendants filed a motion for summary

20  judgment in that case.  I'm sure you're familiar, as is your

21  opposing counsel, with that.

22          And in that motion -- and that was that, that was

23  filed on -- the City's motion was filed on February 6th, and

24  it raised a whole bunch of arguments, but one of the

25  arguments it raised was, the City of Detroit raised the same

1   argument that you're making in this current motion in its

2   summary judgment motion filed in the District Court.

3           And I did see that, and I did see the response to

4   that that was filed on March 6, 2019, by the Plaintiffs, the

5   Ricks plaintiffs, to that motion.

6           Now, in that response, the Ricks Plaintiffs argue

7   the fair contemplation test and they argue that they should

8   prevail on that fair contemplation test.  They make their

9   arguments there, and that's in a brief that they filed on

10  March 6, 2019, docket number 99 in the District Court case,

11  case number 17-12784.

12          So they made that argument about the fair

13  contemplation test on March 6th.  And that, of course, was

14  before your reply brief was filed in this case pointing out

15  the fair contemplation test, so forth, on March 15.

16          So we've got this issue, or these issues, being

17  raised simultaneously, essentially, in both cases, this

18  bankruptcy case and the District Court case.  Why shouldn't I

19  leave it to the District Court to decide this issue, as was

20  done in the *Monson* case and in the *Sanford* case, as those

21  Courts decided?

22          MR. SWANSON:  Well, Your Honor, this Court has, of

23  course, jurisdiction over the Plan, can enforce the Plan, has

24  jurisdiction over the bar date order, and the City's moving

25  and asking for relief in this Court.  I don't -- I don't --

1          THE COURT:  Now, the District Court is aware that

2  you are doing this, I see from the District Court papers.  I

3  saw there was a motion for extension of time, and the

4  District Court recently denied that motion.

5          And then in the course of that motion, and the

6  papers filed in that motion, and the District Court's ruling

7  on that motion, it's clear the District Court is aware the

8  City is making this same argument in this case, in this

9  bankruptcy case.  And just didn't really say that this Court

10 shouldn't do that or, should or shouldn't do that, but just

11 basically noted it.

12         So it's just, you know, perhaps the City had a

13 deadline, I assume they had a deadline to file any summary

14 judgment motion in the Ricks case in District Court that they

15 had to meet, and I can understand that.

16         And when you file a motion for summary judgment,

17 you want to put in all your arguments.  But by the time the

18 City filed its summary judgment motion in the District Court

19 case, you had already made the motion in this case.

20         MR. SWANSON:  Yeah.  And I checked before I came

21 here today.  I believe the deadline for the City to file its

22 summary judgment motion in the District Court case was

23 February 6th, and I believe that it filed its motion --

24         THE COURT:  And you filed it on the deadline?

25         MR. SWANSON:  Not me.

1              THE COURT:  Yeah.

2              MR. SWANSON:  Yeah.

3              THE COURT:  Right.  The City Law Department.

4              MR. SWANSON:  City Law Department filed it on

5    February 6th.  And I saw that motion.  I saw -- I did check

6    the docket last week.  I saw that it had not been ruled on by

7    the District Court.  I wasn't aware that the City --

8              THE COURT:  It looks like there's a deadline --

9    the briefing isn't done yet.  I think there's a deadline of

10   March 27th for reply briefs to be filed in connection with

11   those motions --

12             MR. SWANSON:  Sure.

13             THE COURT:  -- in the District Court.  So it will

14   be sometime after that, presumably, before the District Court

15   makes any ruling on those motions.

16             But you want this court to go ahead and rule,

17   presumably, now, today, on your motion, and in your favor, as

18   a means, in your view, of what would shortcut and make

19   necessary the District Court ruling on this issue in the

20   District Court case.

21             MR. SWANSON:  Yes, Your Honor.

22             THE COURT:  Are there other cases like this

23   floating around out there in District Court where this same

24   issue is at play?

25             MR. SWANSON:  Not that I'm aware of.

 1              THE COURT:  Okay.  Well, so perhaps you saw and

 2   reviewed the summary judgment brief filed by the Ricks

 3   Plaintiffs in the District Court.  That is the brief in which

 4   they filed on March 6th in which they argued fair

 5   contemplation.  That is that Ricks' claim was not within his

 6   fair contemplation at the time the bankruptcy petition was

 7   filed in the City's bankruptcy case.  Did you read that

 8   brief?

 9              MR. SWANSON:  I may have glanced at it, but I

10   don't --

11              THE COURT:  Okay.

12              MR. SWANSON:  I did not look at it in any detail.

13              THE COURT:  Well, it's only a couple --

14              MR. SWANSON:  Yeah.

15              THE COURT:  It's a couple pages long.

16              MR. SWANSON:  Yeah.

17              THE COURT:  But we'll hear, presumably, the same

18   kind of arguments, the same arguments, and maybe other

19   arguments, here from Mr. Harrington on that subject.

20              But, you know, in your opening motion and in the

21   response filed by the Ricks Plaintiffs to your motion, nobody

22   argues anything about the fair contemplation test.  Nobody

23   says a word about it.  It only gets discussed, you know,

24   application of it and what the test means and requires and

25   everything else, in your reply, right?  In this case.

1          MR. SWANSON:  That's true.

2          THE COURT:  Okay.  So my only clue at the moment

3  about what the Ricks Plaintiffs are going to argue about fair

4  contemplation is in what they filed in the District Court

5  case that I've just alluded to.

6          So I did read your reply brief, of course, and I

7  looked at the exhibits you attached to that in support of

8  your argument that Mr. Ricks was claiming innocence and

9  claiming all the facts that he needed to know as claims of

10  innocence and wrongful imprisonment and everything else long

11  before the City filed its bankruptcy petition in 2013.  I did

12  review those exhibits.

13          Do you want to say anything about those things or

14  that subject further before we hear from Mr. Harrington?

15          MR. SWANSON:  Yes, Your Honor.  I'd like to go

16  through the exhibits, because I think they certainly go to

17  Mr. Ricks fairly contemplating that he had a claim against

18  the City prior to the City's bankruptcy filing.

19          The first exhibit here is a deposition transcript

20  from Mr. Ricks on May 21, 2018.  The portions that were

21  excerpted from the deposition, however, talk about events in

22  Mr. Ricks' own words which occurred in 2009.  So Mr. Ricks

23  describes in 2009 that he saw -- this is in Exhibit 1.  He

24  saw an ad in the Bar Journal with the name of the expert

25  witness he used on the ballistic issue in 2009.  A gentleman

1    by the name of David G. Townsend.  And the ad is at Page 32

2    of 108 at Docket 13021.

3              And Mr. Ricks describes in 2009 his efforts to

4    contact Mr. Townsend because he believed that he had been

5    wrongfully convicted and he believed that the ballistics test

6    was a factor in that wrongful conviction.

7              The next exhibit, Your Honor, is a letter from the

8    state appellate defender officer dated August 6th, 2009.  And

9    they write to Mr. Ricks --

10             THE COURT:  That's exhibit 2, right?

11             MR. SWANSON:  That's exhibit 2.

12             THE COURT:  Yeah.

13             MR. SWANSON:  I write in response to your letters

14   regarding the Detroit Crime Lab.  The State Appellate

15   Defender Office is undertaking a complete review of our Wayne

16   County clients to determine whether tainted evidence from the

17   Detroit Crime Lab resulted in your -- resulted in conviction.

18             Again, it would certainly appear here Mr. Ricks

19   had made a claim to the State Appellate Defender Officer --

20   Office that a tainted crime lab played a -- played a role in

21   his conviction.

22             Exhibit number 3, Your Honor, is another letter

23   dated February 11, 2010 from the same sender, the State

24   Appellate Defender Office, which writes to Mr. Ricks:  "You

25   have expressed interest in having our office review your case

1   for potential Detroit Crime Lab issues."  Again, Mr. Ricks is

2   asserting that some malfeasance with the Detroit Crime Lab

3   resulted in his conviction.

4         Exhibit 4, Your Honor, dovetails with Exhibit 1.

5   This is a letter from David Townsend, the expert Mr. Ricks

6   used in his 1992 trial and ultimate conviction, writing to

7   Mr. Ricks that he was going to the prison to try to visit Mr.

8   Ricks but couldn't get there.

9         Exhibit 5, Your Honor, is a email dated June 22,

10   2011 and June 23, 2011.  The bottom email is from a lady

11   named Claudia Whitman, and Ms. Whitman was a investigator who

12   was working on Mr. Ricks' behalf.  Her official title, I

13   believe, is Director of National Capital Crime Assistance

14   Network, and she is writing here to a U.S. attorney about

15   contacting the University of Michigan Innocence Clinic to

16   work on Mr. Ricks' claim.  And this is in 2011.

17         Exhibit 6 is correspondence between the lady, Ms.

18   Whitman, that I just identified, and another man named

19   Roberto Guzman, who is a Senior Legal Assistant at the

20   People's Task Force to Free the Wrongfully Convicted, again

21   another individual that was working on Mr. Ricks' case,

22   talking about sending him, to Mr. Ricks, a letter regarding

23   some ballistic testing to the prison where Mr. Ricks was

24   incarcerated and that material not getting through to Mr.

25   Ricks.

1              Exhibit 7, again, some correspondence between Mr.

2    Guzman, the assistant at the People Task Force to Free the

3    Wrongfully Convicted, and Claudia Whitman, the investigator,

4    discussing efforts to contact some of the original agents who

5    made Mr. Ricks' arrest in 1992.

6              Exhibit 8 is a letter dated February 1, 2012, from

7    Mr. Ricks to the Bureau of Alcohol, Tobacco, and Firearm.  He

8    states quite clearly in the second paragraph on Page 1:  "I

9    have been incarcerated for the past 20 years for a crime that

10   I did not commit, but recently, I've been blessed to have the

11   assistance of Ms. Claudia Whitman.  She is the Director of

12   NDRAN of Cure ND -- NDRAN of Cure, which is a national

13   organization that reaches out to aid and assist the

14   wrongfully convicted."

15             And this is a letter where he essentially requests

16   that the Bureau provide him with access to the agents that

17   arrested him.

18             Page 2 of that letter also talks about Mr. Ricks,

19   in the middle there, having an affidavit from the independent

20   firearms examiner, David G. Townsend, the individual

21   identified in exhibit 1 and exhibit 4, in which he says that

22   the two slugs that he was given to test did not have any

23   blood or other trace evidence.

24             At the end of the letter he has a PS there which

25   says:  "I wrote to the United States Attorney, Barbara L.

1   McQuaid, and she directed me to you."

2            Exhibit 9 is that letter to Ms. McQuaid, or is one

3   of the letters to Ms. McQuaid, and this is written, again,

4   June 13th, 2012, a year before the City filed for bankruptcy,

5   written by David Moran, who I believe was a lawyer at the

6   Michigan Innocence Clinic, and Sally Larson, a student

7   attorney at the University of Michigan Innocence Clinic.  So

8   at that time Mr. Ricks had the University of Michigan

9   Innocence Clinic working on his behalf trying to overturn his

10  alleged unlawful conviction.

11           Exhibit 10 --

12           THE COURT:  This letter says in the first

13  paragraph:  "We do not represent Mr. Ricks," --

14           MR. SWANSON:  Oh.  Right.

15           THE COURT:  -- "but are investigating his claims

16  of innocence," et cetera.  So I'm not sure what that means

17  exactly, if they were investigating claims of innocence of

18  Mr. Ricks on his behalf.  I don't know why they said they

19  weren't representing him, but they were investigating his

20  claim.

21           MR. SWANSON:  Yes.

22           THE COURT:  Okay.

23           MR. SWANSON:  And I think the complaint makes a

24  reference to the Michigan Innocent Clinic playing a critical

25  role in his, in his -- in overturning his conviction.

1          So to the extent they were representing him, they

2    were certainly working on his behalf, to the extent there is

3    a difference, I suppose.

4          Exhibit 10 is a letter from the Michigan Innocence

5    Clinic.  This is six days after they wrote to Ms. McQuaid,

6    June 19, 2012, and this is to the City of Detroit Law

7    Department FOIA coordinator requesting, you know, it's a FOIA

8    request for information related to the homicide that he was

9    convicted of.

10         Exhibit 11, more emails between Sally Larson, who

11   was the student attorney who signed the letter to Ms.

12   McQuaid on behalf of the Michigan Innocence Clinic, to

13   Claudia Whitman, the investigator.  And in this letter the

14   parties are discussing the possibility of rerunning

15   ballistics from the 1992 conviction.

16         Exhibit 12, I believe, is similar.

17         Exhibit 13, another letter dated September 24,

18   2012, again, from Mr. Ricks to Ms. Larson, the student

19   attorney at the University of Michigan Law School and

20   Michigan Innocence Clinic, talking about new case law which I

21   believe Mr. Ricks asserts could or would help in overturning

22   his unlawful conviction.

23         Exhibit 14, these are emails between the Michigan

24   Innocence Clinic, again Ms. Sally Larson and Ms. Claudia

25   Whitman, regarding their notes on discussion of, you know,

1    ballistics experts.

2            Exhibit 15 --

3            THE COURT:  I noticed that exhibit 14 has as part

4    of it a copy of notes that Ms. Larson made of the phone

5    conversation that she had with David Townsend on October 2,

6    2012, where they're talking about the ballistics evidence and

7    problems with it, and so forth.

8            MR. SWANSON:  Yeah, in the Detroit Crime Lab.

9            THE COURT:  Go ahead.

10           MR. SWANSON:  Thank you.

11           Exhibit 15, is another set of emails between the

12   Michigan Innocence Clinic and Claudia Whitman, again talking

13   about ballistics and the bullets and, you know, that same

14   subject matter.

15           Exhibit 16 is a letter from Mr. Ricks dated

16   December 12, 2012, where one of the alleged witnesses in the

17   Plaintiff's complaint, named in the Plaintiff's complaint,

18   Ms. Strong, where he's writing to her, again discussing the

19   case and potential misidentification of him by Ms. Strong.

20           And so -- and this is -- this is -- there's more

21   that's similar to this.  We only attached --

22           THE COURT:  I noticed in that letter, exhibit 16,

23   the letter from Mr. Ricks to Ms. Strong, he does complain

24   about the police, and he refers to what the police did to me,

25   and he's angry and frustrated about what the police did to

1    me.  And he says -- he talks about the Detroit Crime Lab was

2    closed down in 2008 for doing bad testing on evidence, such

3    as guns and bullets.  I'm hoping that they will retest the

4    evidence in my case, and so forth.

5           The next -- the last page of his letter he says:

6    "The police have been running wild in Detroit doing all sorts

7    of corrupt and unethical things to lock people up.  Whether

8    innocent or not, they don't care."  That's the last page of

9    the exhibit 16 letter to Mr. Ricks to Ms. Strong.

10          Anyway, go on.

11          MR. SWANSON:  Well, Your Honor, I believe going

12   through those 16 exhibits we have conclusive evidence that

13   the claims Mr. Ricks is asserting in his complaint against

14   the City were within his fair contemplation well before the

15   City filed for bankruptcy.

16          When this Court applies the fair contemplation

17   contest it looks at a number of things:

18          The debtor's conduct.  The debtor's conduct here

19   all occurred in 1992.

20          The relationship between the parties is another

21   factor that the Court looks at.  The relationship between the

22   parties all occurred in 1992.

23          The Court also looks at the parties' knowledge.

24   Well, here, Mr. Ricks, he's demonstrated that he knew of this

25   potential claim probably from the minute that he alleges he

1   was unlawfully arrested, and certainly well before the City's

2   bankruptcy case, because the Michigan Innocence Clinic was

3   investigating this on his behalf.  He was contacting experts.

4   He was contacting witnesses.  All the while professing his

5   innocence and professing that issues with the Detroit Police

6   Department and Detroit Crime Lab led to his unlawful

7   conviction.

8        And, Your Honor, these are the same claims and

9   facts that formed the basis for Mr. Ricks' complaint against

10  the City of Detroit.  And sure, Your Honor, all of the

11  factors --

12       Oh, I guess, finally, this is a *Monell* claim that

13  the Plaintiff here is asserting against the City of Detroit,

14  and *Monell* holds municipalities may be held liable for the

15  constitutional violations of their employees only where the

16  municipality's policy or custom led to the violation, and

17  there can be no liability under *Monell* without an underlying

18  constitutional violation.

19       All of the constitutional violations that Mr.

20  Ricks is complaining about occurred in 1992, 21 years before

21  the City filed for bankruptcy.

22       And as exhibits 1 to 16 demonstrate, Mr. Ricks

23  knew of the factual bases, or at least was asserting the

24  factual bases for these alleged constitutional violations

25  well before the City filed for bankruptcy.

1          In short, Your Honor, all of the factors

2    considered under the fair contemplation test demonstrate that

3    the claims that were asserted by Ricks against the City arose

4    no later than 1992, and, thus, were subject to the discharge

5    in the City's Plan and the bar date order.

6          The City would thus respectfully request that this

7    Court enter an order dismissing the City of Detroit with

8    prejudice from the Federal District Court lawsuit asking the

9    Plaintiff -- requiring the Plaintiff to dismiss the City of

10   Detroit with prejudice from the lawsuit.

11          THE COURT:  With respect to the *Monell*, what you

12   characterize as the *Monell* claims, the claims against the

13   City that are asserted in the U.S. District Court complaint,

14   first amended complaint, I know accrual -- the accrual test

15   is not the test here, and I understand that.  I've written

16   about that, as you know, in the published opinion that you

17   cite in your brief.

18          But in terms of when a claim, a *Monell* claim

19   accrues in this kind of situation, is it correct to say that

20   in the case of someone wrongfully imprisoned, wrongfully

21   convicted, wrongfully imprisoned, because of violations of

22   that person's constitutional rights by police is the sort of

23   the theory that's alleged here, and then seeking liability

24   against the municipality because of its policies and

25   practices and so forth, does that claim only accrue when

1  there has been a reversal, vacation, dismissal of the

2  charges, conviction against the claimant?  I'm talking about

3  accrual here not -- accrual under non-bankruptcy law, not

4  when it arises for purposes of it being a bankruptcy claim.

5  Is that the case?

6              MR. SWANSON:  Your Honor, I have not researched

7  that.  I know that in the opinion that we cited, the *Sanford*

8  opinion, the District Court there, I believe, said that

9  *Sanford* correctly points out that he could not have sued the

10 City until his convictions were set aside, which did not

11 happen until after bankruptcy.

12             THE COURT:  All right.  I see.  So that's the

13 answer that the Court in the *Sanford* case gives to that.

14             MR. SWANSON:  Yeah.  And I have nothing to add to

15 that to support it or deny it.

16             THE COURT:  All right.  Anything else you'd like

17 to say?

18             MR. SWANSON:  No, Your Honor.

19             THE COURT:  All right.  Thank you.

20             Mr. Harrington?

21             MR. HARRINGTON:  Yes, Your Honor.  Thank you.

22             If I may speak briefly on the accrual as you were

23 asking in the non-bankruptcy setting?

24             THE COURT:  Sure.

25             MR. HARRINGTON:  Yes, Your Honor, you are correct

1  in the sense that the claim has not accrued until the

2  conviction has been set aside.

3         I mean, think about the practical ramifications if

4  say somebody like Mr. Ricks was to have filed his 1983 *Monell*

5  claim in 1990, 1995, the first thing that's going to be met

6  with is a simple 12(b)(6) motion.  I mean, there's --

7         THE COURT:  Well, you cite the *Heck* case --

8         MR. HARRINGTON:  Yes, we do.

9         THE COURT:  -- in your response to the City's

10  motion in this case.  Is it the *Heck* case, that Supreme Court

11  case, that stands for this proposition that a *Monell* type

12  claim in this kind of a situation, wrongful imprisonment,

13  wrongful conviction, does not arise until the conviction is

14  set aside?

15         MR. HARRINGTON:  That is accurate, Your Honor.

16         THE COURT:  It is.  Okay.

17         MR. HARRINGTON:  Now --

18         THE COURT:  It doesn't sound like the City

19  disputes that, really, so.  All right.

20         MR. HARRINGTON:  I don't think they do, because

21  it's -- I think you're just getting a little bit of context

22  because this is bankruptcy and that's -- what we're talking

23  about is non-bankruptcy with the accrual of the claim.

24         But it kind of dovetails and tailors into what

25  we're talking about here with the fair contemplation, because

1  as counsel was walking through all of these exhibits talking

2  about what Mr. Ricks was doing in contacting and really

3  professing his innocence, all he's doing is trying to build a

4  case.

5           And I think that is a distinction, that he's

6  trying to build a case, as opposed to being able, really, to

7  file a case.  And what was to happen if he files a proof of

8  claim without this determination that it was a wrongful

9  conviction?  The policy implications are very, very

10 interesting.

11          What is he really supposed to do?  He files this

12 claim, and he could face possible sanctions because he

13 doesn't have a claim.  He doesn't have a case until it's been

14 set aside.

15          I mean, if we were to go through and take a vote

16 on everybody in prison who believes that they were wrongfully

17 convicted, I think we'd see a pretty strong showing of hands.

18          And I don't think the policy and the underlying

19 intent of all of this is to put that type of a burden on all

20 of these inmates to say, hey, if you think you've got a, you

21 know, possible claim, although you might get sanctioned for

22 filing a frivolous either lawsuit or notice of claim, you

23 better -- you better do it.  And I don't think that's the

24 intent.  So I think --

25          THE COURT:  Well, Mr. Ricks had filed a proof of

1   claim in the City's bankruptcy case by the bar date, which I

2   think was February 13, 2014, or thereabouts.  If he had done

3   that, and, of course, that was a time when his conviction had

4   not yet been set aside.  That happened in 2017, it seems

5   undisputed in this case.  But it hadn't happened yet.  He was

6   still trying to get it -- get relief, get it set aside, get

7   freed, but he hadn't been yet.

8          So if he had filed a proof of claim then, it seems

9   to me in terms of that sort of bankruptcy world it would be

10  deemed a contingent claim.  That is, it's a claim that's

11  contingent upon obtaining -- setting aside of the conviction,

12  which had not happened yet.

13         And if that contingency doesn't come to pass, then

14  he would -- the City would never -- could never possibly owe

15  him a debt on a *Monell*-type claim.

16         But if it did come to pass later, at a later date,

17  the City might.  Or at least his claim wouldn't be subject to

18  dismissal, in effect, or rejection on the ground of *Heck,*

19  that it hadn't accrued yet.

20         In bankruptcy when a contingent claim is filed it

21  doesn't necessarily get disallowed just because it's a

22  contingent claim, but there is a provision in the Bankruptcy

23  Code for estimating contingent claims under certain

24  circumstances where you don't know if the contingency will

25  happen, or not yet.

1              And so there's a process for estimating for

2    purposes of claims allowance in the bankruptcy case.

3              So it's not enough when somebody files a

4    contingent claim like that, in this scenario I'm -- the

5    hypothetical scenario I'm describing, the City, it's not

6    enough for the City to have objected to that just on saying

7    it's contingent, the conviction hasn't been set aside yet, so

8    there's no claim accrued, so we owe them nothing.

9              It's not enough, because if the contingency occurs

10   later, that argument goes out the window.  So the claim, the

11   contingent claim has to be estimated.  That's the idea there.

12   Okay.

13             MR. HARRINGTON:  Understood.  And I don't --

14             THE COURT:  So it's not -- it's not just that the

15   claim would have been rejected out of hand in the bankruptcy

16   case only because it was then contingent.  You see what I'm

17   suggesting?

18             MR. HARRINGTON:  In concept, yes.

19             THE COURT:  Okay.

20             MR. HARRINGTON:  But I don't think that applies

21   here.  And how tenuous of a claim, or as you would maybe say,

22   how tenuous of a contingency would be allowed, would be okay,

23   would not be sanctionable or deemed to be a frivolous filing

24   with the Court.  I mean, I mean, how far --

25             THE COURT:  That's part of what bankruptcy courts

1   have to figure out when they are doing this type of claims

2   estimation process on a contingent claim that I've -- or on

3   an unmatured or contingent, either one, claim that I've been

4   describing to you.

5           MR. HARRINGTON:  Right.

6           THE COURT:  It's not necessarily an easy thing to

7   do.

8           MR. HARRINGTON:  And that's what I'm --

9           THE COURT:  It's not a -- there's no science to

10  that.  It's not a scientific precision.

11          MR. HARRINGTON:  Well, and that's what I'm getting

12  at.  Because what would have to happen is would be literally

13  a whole almost a trial within a trial on the evaluation of

14  Mr. -- the viability of his claim, and so we would literally

15  have a trial within a trial to determine how viable this is.

16          Because if that was the case, and if everybody who

17  is currently incarcerated at the hands of the Detroit Police

18  Department for, let's just say, you know, gross mishandling

19  of evidence -- and I'm not -- I'm not casting stones, I'm

20  just saying let's just assume that for this discussion.  How

21  many people would have to come forward and literally try

22  their case to say, Your Honor, look at my contingencies, if

23  this, and this, and then this, this, this, and this actually

24  come to fruition, then I'm going to have a great case.

25          And so where are we with that?  What is -- and

1   that's why I think when this Court, this Bankruptcy Court,

2   today, can look at all of the circumstances surrounding, and

3   I think with this imprisonment case it presents a bit of a

4   different picture, because without -- no matter what Mr.

5   Ricks thinks, no matter what he knows, no matter what he

6   says, what he researches, if he doesn't have the exoneration,

7   there is no claim.  So I guess the question really for the

8   Court is, is how tenuous, I mean, how many times are

9   convictions really turned over?

10          So my position to the Court is, is that if you are

11   even looking at this, which I would ask you -- what I would

12   suggest that it doesn't apply, but if you're looking at this

13   as to the contingencies by as far removed in the, really, the

14   likelihood of him actually getting a conviction overturned

15   for somebody who has spent over 20-some years in prison, it

16   almost never happens.

17          So you're talking about, really, the Hail Mary of

18   all Hail Mary's happening and that's the contingency that

19   the, that the City wants you to, if you're going to apply

20   this contingency-type of analysis, they would look at this as

21   like a cover the eyes, and we're almost in March madness,

22   cover the eyes, inbound pass, without looking over the

23   shoulder and it's the swish and we win by one at the buzzer,

24   and --

25          THE COURT:  You know, though, really, what you're

1    arguing sounds like an argument in substance.  An argument

2    against the fair contemplation test, rather than an argument

3    that says courts, Bankruptcy Courts should use the accrual

4    test, and the case law has rejected that.  I have rejected

5    that.

6            Many bankruptcy cases have rejected that accrual

7    test as inconsistent with Congressional intent in the very

8    broad definition of claim that's in the Bankruptcy Code.  And

9    you know that, because you've read -- you've read my opinion

10   in the City of Detroit case, I assume, that's cited.

11           MR. HARRINGTON:  Yes.

12           THE COURT:  And you've read the *Sanford* case, I

13   assume?

14           MR. HARRINGTON:  Yes.

15           THE COURT:  And have you read the *Monson* case?

16           MR. HARRINGTON:  I have not.

17           THE COURT:  Okay.

18           MR. HARRINGTON:  I will.

19           THE COURT:  It's very similar to *Sanford*.

20           MR. HARRINGTON:  And I would love it if the Court

21   did apply the accrual test, because then this would be

22   extremely easy.

23           But under the reasonable contemplation, or the --

24   I'm sorry, the fair contemplation test, as we look at it to

25   the Ricks case, I think creates a situation where how can he

 1  reasonably contemplate that he has a claim?  Even in his

 2  mind, he knows what he did.  He knows what he didn't do.

 3          But, in order to get -- I mean, the mountains that

 4  have to be moved for that to happen is really, I mean, there

 5  is his subjective belief and then there is a reasonable

 6  belief, and if we look at this, how could he -- we know that

 7  he got out and he was exonerated.  But as we sit here

 8  evaluating it before it could happen, how could we reasonably

 9  believe, in light of all of the evidence, in light of what we

10  know, in light of 20-some years having been in prison, how

11  could we reasonably believe that he has a cause of action?

12          And so I guess even when you apply the fair

13  contemplation test, I believe that under the authority -- and

14  I appreciate the --

15          THE COURT:  Well, what about -- in relating to

16  that question, what about what David Townsend was saying, as

17  of October 2, 2012, in his phone call with Sally Larson of

18  the Michigan Innocence Project, about the ballistics tests

19  and the ballistics evidence in Mr. Ricks' case?

20          MR. HARRINGTON:  Yeah.

21          THE COURT:  That's exhibit 14 --

22          MR. HARRINGTON:  No, I --

23          THE COURT:  -- to the City's reply brief.

24          MR. HARRINGTON:  No, I understand.

25          THE COURT:  You've seen it.

1          MR. HARRINGTON:  Yes.  I know.  Where he's talking

2   about how, I think it was about the soft lead and talking --

3   correct me if I'm wrong.  Right?  Where he's talking about

4   the soft lead, he would expect to have seen more damage to

5   the, to the bullet.  He's just providing evidence in support

6   of that.

7          And look, I don't disagree that that evidence

8   brings it closer to whether or not he has a claim, but

9   there's still an incredible hurdle that has to be overcome to

10  get the conviction over --

11         THE COURT:  Is it fair to say that at least as

12  early as the time frame 2009 through 2012, time frame of

13  these exhibits that are attached to the City's reply, that

14  Mr. Ricks and his ballistics consultant, Mr. Townsend, and

15  the people at the Michigan Innocence Clinic, Project Clinic

16  that we're investigating this case for Mr. Ricks, with him,

17  all had reasons to believe that the ballistics evidence in

18  this case was simply wrong and bad evidence, and upon

19  retesting would lead to, it would lead to setting aside the

20  conviction?

21         MR. HARRINGTON:  Okay.  If I can break --

22         THE COURT:  Now, that last part is a little

23  trickier than the first part of my question.

24         MR. HARRINGTON:  Right.  Because the last part of

25  your question --

1          THE COURT:  You got to find the bullets.

2          MR. HARRINGTON:  Well --

3          THE COURT:  The real bullets you got to find.

4          MR. HARRINGTON:  Right.  But the last part of what

5    you just said is to overturn the conviction which presumes

6    that you can anticipate, number one, what a judge is going to

7    do, what an appellate court is going to do, and what the

8    highest court would do.  So that presumes quite a bit.

9          And one thing that my father taught me, who is an

10   attorney, is you never presume ever, ever, ever what a judge

11   is going to do.  So I think all that he can really assume is

12   that he is building and trying to build a case.

13         I mean, it's clear, there's no doubt he's trying

14   to, one, he's trying -- not trying to build a case, trying to

15   get out of prison for a crime he never committed.

16         But number two, he's trying to build evidence to

17   do just that.  But to make -- to have that evidence and to

18   take that leap to say that he knows, reasonably knows, that a

19   judge is going to side with him I think is way too far

20   tenuous and it comes back to the Hail Mary and it doesn't

21   fall within the fair contemplation because it is so tenuous.

22   Because it would require --

23         THE COURT:  In your view, when did it become not

24   so tenuous?  When in time?

25         MR. HARRINGTON:  When he was --

1          THE COURT:  What event and when did it happen that

2     it became not so tenuous?  We know in 2017 there came a time

3     when the conviction was vacated, I presume, or charges were

4     dismissed.  It was over.  He was freed.  But at some point

5     before that event it must have become apparent that he had a

6     strong case for vindication.

7          MR. HARRINGTON:  I will say this, and I know

8     you're going to say, Mr. Harrington, now you're arguing

9     accrual, but this is a rare circumstance where I believe the

10    roads have merged, and I believe that at the time that that

11    reversal of the conviction came down, was inked at that time,

12    and maybe even I would go so far as to say after all

13    appellate remedies have been expired, at that point in time

14    would be the time when we would apply his contemplation of

15    the claim.

16          Going through the fair contemplation analysis, I

17    think we get to the same location that you do under the

18    accrual, because otherwise to apply to, to -- because really

19    what it requires is, is it requires Mr. Ricks to have a

20    reasonable belief that the judge is going to set aside the

21    conviction.  And I don't know a person in this world that

22    could ever reach that conclusion.  It's just not possible.

23          And also, I'm not trying to go backwards or

24    sideways on anything.  You know, or position obviously is

25    that we would ask that you deny the City's motion, or

1    alternatively abstain and have this heard by the District

2    Court, as one of the other cases have, and plus that this

3    case --

4              THE COURT:  Well, wait a minute.  You're saying if

5    I'm not inclined to -- if I'm not going to rule for you, I

6    should -- I should not rule and let the District Court

7    decide.  But otherwise, you want me to decide.

8              MR. HARRINGTON:  Judge, I'm just being an

9    advocate.

10             THE COURT:  I mean, you can't do that.  You can't

11   argue that.  You want this Court to decide this, or don't

12   you?

13             MR. HARRINGTON:  I want you to decide this, Your

14   Honor.

15             THE COURT:  All right.

16             MR. HARRINGTON:  I think I'm right on the

17   position.

18             THE COURT:  But you want this Court to decide it.

19   You don't want me to abstain.

20             MR. HARRINGTON:  No, Judge, I want you to decide

21   it.

22             THE COURT:  Okay.  All right.  All right.

23             Well, so when -- the conviction was vacated, I

24   guess.  Is that the right term?

25             MR. HARRINGTON:  Yeah.  Yeah.  It was over --

1  yeah.  Overturned.

2         THE COURT:  What's the correct terminology of what

3  happened?  Some circuit judge, some Michigan circuit judge

4  vacated the conviction?   What was it?

5         MR. HARRINGTON:  For lack of a better term, I'm

6  just, I'm going to go with the --

7         THE COURT:  Maybe it's in your first amended

8  complaint.  But what happened exactly?

9         MR. HARRINGTON:  May I have just one second, Your

10  Honor?

11         THE COURT:  Yeah.  Uh-huh.

12         MR. HARRINGTON:  Because I don't believe that I --

13         THE COURT:  I'm looking at paragraph 78 of your

14  first amended complaint.  It's exhibit 6 to the City's motion

15  in this case, docket 13,000.

16         Well, it says when he was released.  Paragraph 78

17  says the day he was released from prison.  Paragraph 79 says

18  June 1, 2017, charges were dismissed by the Wayne County

19  Prosecutor's Office.  Maybe it doesn't say when the

20  conviction was actually vacated, or what.  Or is it in there

21  somewhere?

22         MR. HARRINGTON:  I'm looking, as well, Your Honor.

23  I apologize for not having it in my --

24         THE COURT:  I thought I saw somewhere, maybe I'm

25  thinking of a different case, but where some state court

1  vacated the conviction, ordered a new trial, did something.

2          MR. HARRINGTON:  Just a moment, Your Honor.

3          THE COURT:  Yeah.  Uh-huh.

4      (Pause)

5          MR. HARRINGTON:  What I do have, Your Honor, is

6  there is exhibit 4.  It looks like it was exhibit 4 to the

7  City of Detroit's motion dated June 1st, 2017, of a

8  motion/order of nolo -- I apologize for lack of

9  pronunciation, but *nolle p-r-o-s-e-q-u-i*, meaning that

10 they're not going to prosecute, and the case was dismissed

11 without prejudice.  And I think for --

12         THE COURT:  Okay.  Hold on one second.  I'm

13 looking at the City's exhibit 4, it's docket 13,000 in this

14 case.  Hold on.

15         MR. HARRINGTON:  I'm sorry, Your Honor.

16         THE COURT:  It's docket number 13,000 in this

17 case.  The motion, City motion, I'm looking at it.  It's

18 exhibit 4 you've just cited me to, right?

19         MR. HARRINGTON:  It looks like -- I apologize.  It

20 looks like it's exhibit -- if you look at exhibit 6, it's the

21 amended complaint, and it's exhibit 4 to the amended

22 complaint.

23         THE COURT:  Oh, I see.  Yeah.  All right.  I think

24 I'm there.  Hold on.

25         MR. HARRINGTON:  And that looks like the order.

1          THE COURT:  Okay.  It's State of Michigan, Third

2    Judicial Circuit, Wayne County, motion/order of *nolle*

3    *prosequi,* and there is a motion, I presume, by the

4    Prosecutor's Office, and an order granting that motion,

5    saying the motion is granted and the case is dismissed

6    without prejudice, June 1, 2017, signed by the judge.  That's

7    what you're talking about, right?

8          MR. HARRINGTON:  Yes.

9          THE COURT:  Okay.  So that would be when the,

10   basically when the City moved to dismiss the case and --

11   criminal case, and the judge granted it.

12          At some point before that date was there --

13   there's a conviction, a judgment of conviction and sentence

14   on the books before -- it must have been, something must have

15   been done with it before there could be a dismissal of the

16   case.  I mean, I'm just assuming, I'm guessing that that's

17   got to be true.  Was there some order that preceded this June

18   1, 2017 order that vacated the conviction, for example?  Do

19   you know?

20          MR. HARRINGTON:  I don't know.  At the -- I could,

21   I'd be happy to give you more procedural history on

22   supplemental briefing and I could limit it to two pages.

23          THE COURT:  Well, I'm kind of working my way

24   backwards a little bit in time chronologically.  And what I'm

25   trying to get to is, part of what I'm trying to get to is, at

1   some point -- assuming there was an order at some point in,

2   let's say in some time in 2017, before June 1, vacating the

3   conviction ordering a new trial, doing something that took

4   the conviction off the books and restored the case as a

5   pending criminal case that had to be dealt with, there must

6   have been a motion, a briefing, some sort of presentation to

7   the Court, even if it was just a stipulation between Mr.

8   Ricks and the Prosecutor's Office, something that triggered

9   that action by the Court.

10           And I'm asking, you know, what was that, and when

11  was that filed?  And in sort of working backwards it's, you

12  know, at some point, at least potentially, at some point

13  before there was actually an order vacating the conviction,

14  there must have been a reasonable anticipation by Mr. Ricks

15  or his attorneys that the conviction would be vacated.

16           MR. HARRINGTON:  Can I make a comment?

17           THE COURT:  And the question is:  When did that

18  happen?

19           MR. HARRINGTON:  Let me make a comment.

20           Hypothetically, if there was some type of motion

21  for a new trial, based on either newly discovered evidence or

22  something of that kind, and let's say the judge granted --

23  and I'm, and I'm -- literally, Judge, I'm just speaking out

24  of -- off the cuff.  If there was some type of motion for a

25  new trial, and say the judge granted it, I think you're

1  asking me, Mr. Harrington, okay, I see this order where

2  they're saying they're not going to prosecute anymore, but we

3  do know that there was a conviction, so we have this window

4  of time.

5        What happened in that window to get us to this

6  order that says no conviction?  Was there a motion for new a

7  trial that was granted by the judge?  Was there some, as you

8  say, stipulation?

9        And as I stand here today, Your Honor, I don't

10 have the answers to that.  I could have those answers to you

11 on extremely short order.  I can limit it to one to two pages

12 of just bullet point dates with the appropriate exhibits for

13 you to examine.  I just don't have those at my fingertips

14 now, and I --

15       THE COURT:  Well, the record in -- strictly

16 speaking, the record in this bankruptcy case, I think, does

17 not show when there was this new testing of bullets, which I

18 thought I remembered that there was new testing of bullets,

19 that showed that the bullets, the actual bullets that were

20 recovered from the deceased victim's body were not a match to

21 the gun that was connected to Mr. Ricks through his mother.

22       But there may be something about that in the

23 District Court record, which, of course, has -- you know, the

24 motion for summary, the cross motions for summary judgment

25 have a million exhibits.  There's tons of stuff in there, and

1   I didn't go and look through all that.  But do you know that?

2   Was there new testing that basically triggered this relief

3   from the conviction?

4            MR. HARRINGTON:  Well, I know that -- yes, I know

5   that there is testing from David Ballish, who is a retained

6   expert.  I know there is -- here's what I don't know, and I

7   know you want answers to this and I don't know the dates of

8   when that occurred.

9            And from listening to this Court, I do think that

10  it's important that we have those dates because I think it

11  would help analyze this.  But I don't have those dates, Your

12  Honor.

13           THE COURT:  You don't know offhand if there's

14  anything in the record of the District Court that I can look

15  at to get me to get that information?  I know if we dig, it

16  might be in there.

17           But I'm asking whether you happen to know offhand

18  where that may be, where that is in there.  I presume it

19  would be, if it's anywhere, it would be in one or more of the

20  summary judgment exhibits.

21           MR. HARRINGTON:  We would -- we would have to

22  consult with the motion, cross motions.

23           THE COURT:  As I said, there's a lot of exhibits

24  there.

25           MR. HARRINGTON:  Right.  We had two people from

1  our appellate department --

2            THE COURT:  Yeah.

3            MR. HARRINGTON:  -- writing it.  And I'm more of

4  trial counsel on the case --

5            THE COURT:  Okay.

6            MR. HARRINGTON:  -- and so I'm not going to -- I'm

7  not going to make anything up and I'm not going to

8  misrepresent and just say, yeah, it's there and just hope it

9  is.  But I would -- I'm making an oral request, I guess, to

10 be able to issue the Court supplemental briefing on these

11 just narrow issues and for the factual basis.

12           THE COURT:  Your view, I take it from what you've

13 said, of the fair contemplation test as applied in this case

14 is that the issue is at what point did Mr. Ricks first have

15 enough information to give him -- to justify a reasonable

16 belief, reasonable belief, that his conviction would be set

17 aside?

18           MR. HARRINGTON:  In June of '17 when --

19           THE COURT:  No, I'm saying --

20           MR. HARRINGTON:  Oh, I'm sorry.

21           THE COURT:  -- that's your view of how the -- what

22 the issue is under the fair contemplation test in this case.

23 Is that right?

24           MR. HARRINGTON:  Yes.  When -- yes.

25           THE COURT:  And --

1          MR. HARRINGTON:  I mean, that's --

2          THE COURT:  And how do we know when that was?

3          MR. HARRINGTON:  That's what I was just going to

4    say.

5          THE COURT:  Based on what's currently in the

6    record.

7          MR. HARRINGTON:  Well, I guess what we can look at

8    is the order of the June -- exhibit 4 of the of first amended

9    complaint, that is exhibit 6, to the Defendant -- the City of

10   Detroit's motion where -- it would be June 1st, 2017, where

11   they're not going to prosecute.

12          Where that decision is made, I believe that would

13   be -- that would be the time.  Because I -- and I think your

14   question, if I heard you correctly, was, Mr. Harrington,

15   based on the record that's in front of me, meaning the

16   motion, your response, and the reply.  Is that what you're

17   asking?

18          THE COURT:  Yeah.  I'm not including the District

19   Court record at this point.

20          MR. HARRINGTON:  That's what I thought.

21          THE COURT:  Though this Court I think technically

22   can take judicial notice of anything that's filed as a matter

23   of public record over in that District Court case.  It's

24   available to me electronically as I'm sitting right here at

25   my computer.  But, yeah.  Well, you're pegging it at the date

1   on which, the earliest date upon which the *Monell* claim could

2   have, could be deemed to have accrued.  That's where you're

3   saying they merge.  It's the same date.

4          MR. HARRINGTON:  Yeah.  Under the analysis of fair

5   contemplation versus accrual, whether you walk through the

6   steps of the fair contemplation, it ends up being the same

7   date as the accrual.

8          THE COURT:  So how do we know though -- how do we

9   know that there wasn't some date or time before June 1, 2017,

10  and perhaps well before that time, when Mr. Ricks knew enough

11  of the facts, or knew facts that would give -- that would

12  justify a reasonable belief that his conviction would be set

13  aside?

14         MR. HARRINGTON:  Sure.  That's fairly -- I can

15  answer that.  That's, in my mind, I think fairly simple.

16  Because if it's let's just say a set aside, and the

17  conviction was overturned, but let's say it comes about

18  through a motion for a new trial, well there is still a new

19  trial that is in place and the prosecutors could still have a

20  -- get a conviction.

21         And so if Mr. Ricks was to have immediately have

22  filed his 1983 *Monell* claim while this -- while the Wayne

23  County Prosecutor's Office still has the case open and

24  pending, well, if they go and get a conviction again, and

25  he's got his 1983 *Monell* claim, it all goes away.  There is

1    no case.  I mean, it's -- it would be summarily dismissed on

2    its face, really, by 12(b)(6).  It wouldn't even -- I mean,

3    maybe Rule 56, but it would be -- it would be just gone.

4            THE COURT:  Well, what I'm getting at is it seems

5    to me that the record before me in this bankruptcy case, that

6    is the papers filed by the City and by you, your side,

7    relating to this motion, including these exhibits attached to

8    the City's reply brief, maybe don't necessarily enable this

9    Court to answer the question:  Was there a time before June

10   1, 2017, when Mr. Ricks had facts, knew facts, that would

11   justify a reasonable belief that his conviction would be

12   vacated and that he would not again be convicted?

13           You know, if, just hypothetically speaking, on,

14   you know, June 1, 2013, a month before the City filed its

15   bankruptcy case, facts came to light, facts became known that

16   made it clear that -- evidence and facts that made it clear

17   that Mr. Ricks was wrongfully convicted and that he -- that

18   the City had no -- or the county, county prosecutor had no

19   hope of convicting him in a new trial of this murder, then it

20   would seem to me under that hypothetical situation, clearly

21   under the fair contemplation test, the claim had to -- would

22   have to be deemed to have arisen at that time, pre-petition.

23   Do you see what I'm saying?

24           MR. HARRINGTON:  Yeah.  And if it -- can I add to

25   that, if I may?

1          THE COURT:  So what I'm -- what I'm getting at is,

2    it seems to me the record doesn't, at present, doesn't

3    necessarily permit this Court to conclude that that time,

4    that time when that happened, that fair contemplation first

5    happened under the test you -- the way you framed the issue,

6    didn't have pre-petition before the June -- the July 2013

7    bankruptcy case filed.

8          MR. HARRINGTON:  I agree with you.  And if I may

9    add, for example, if there was something in the record where

10   the prosecutor's office walked into his cell and said, you

11   know, we've been looking over everything that you've

12   submitted to us.  We've just got some paperwork to go over,

13   the City, Mr. Ricks, even though it wasn't our doing, screwed

14   up.  You have a great case.  We're going to do this

15   paperwork, your case will be dismissed, and then we want you

16   to file your 1983 claim against the City.

17          Now, pretty sure that didn't happen, but it would

18   -- I would be hard pressed to argue the position that I'm

19   arguing before this Court if those were the facts.  Because

20   if at that time, and say, you know, I'm sorry the date and

21   year, the 2000 -- you know, pre-petition stuff, if that, if

22   that conversation happened under the reasonable contemplation

23   as to whether or not he has a case, he's being told by the

24   people prosecuting him that he does.

25          THE COURT:  Well, but you don't have to go that

1   far to get to fair contemplation.

2           MR. HARRINGTON:  I know.  But --

3           THE COURT:  I mean, there's some -- let me, let me

4   ask it this way.  There's some event, or events, that

5   occurred that basically triggered or opened the door for Mr.

6   Ricks to get his conviction vacated and to be freed.

7           MR. HARRINGTON:  Yes.

8           THE COURT:  What was it?  Was it new ballistic

9   testing?  What was it?

10          MR. HARRINGTON:  It was the culmination of all of

11  the evidence that he had been getting.  But is the question

12  that you're asking me, is it what was the triggering event

13  through the court process that --

14          THE COURT:  What occurred.  What occurred that

15  made it possible, or even likely, or even inevitable, that

16  this conviction was going to be vacated?  What occurred?

17          MR. HARRINGTON:  Based on the record that you have

18  in front of you, I believe, Your Honor, that it is an

19  insufficient record to answer that exact question.

20          THE COURT:  Is there anything in your first

21  amended complaint which is in the record here in this case

22  that would give any clues about that?  That's a long

23  complaint, and I didn't read every paragraph, I confess.  I

24  was looking at things, certain specific things in there at

25  the time, and didn't go through and read them all.

1          MR. HARRINGTON:  Well, I'm going to start with,

2     again, with exhibit 4, which is the order that we've talked

3     about.  You also have, you know, the exhibit 3.  You also

4     have ballistics, you know, ballistics testing.  Same with

5     exhibit 2, there's forensic laboratory testing.  And those

6     are dated in March of 2017, November 2017.  And then the

7     order of the dismissal, or the nolle prosecution, ending up

8     dismissing the case was June 1st of '17.  So all three of

9     those pieces of evidence were obtained post-petition.

10          THE COURT:  Okay.  So you're pointing me to

11     exhibits to your first amended complaint that are in the

12     record in this case?

13          MR. HARRINGTON:  Yes, Your Honor.

14          THE COURT:  What about allegations in the first

15     amended complaint?  Do any of those shed a light on the

16     timing of these events that triggered the vindication,

17     essentially, of Mr. Ricks?

18          MR. HARRINGTON:  And specifically focusing on when

19     that date occurred?

20          THE COURT:  What the events were and when they

21     occurred, or at least what the events were.

22        (Pause)

23          MR. HARRINGTON:  I'm reading through paragraph 48

24     on page -- it looks like it's page 12, Your Honor.

25          THE COURT:  I see that.

1          MR. HARRINGTON:  That talks about testing done by

2    Detective Sergeant Dean Molnar.  He conducted some type of,

3    it looks like, test in April, May of 2017.

4          THE COURT:  I see that.  Anything else?

5          MR. HARRINGTON:  I'm going through it as I flip

6    the pages, Your Honor.

7        (Pause)

8          MR. HARRINGTON:  On -- again, and I turn back to

9    paragraph 78 which you had previously identified, talking

10   about May 26 when he was released from the Ionia Correctional

11   Facility.

12         THE COURT:  I mean, his conviction must have been

13   vacated, you would think, before that date, right?  There's

14   nothing in the first amended complaint, is there, showing

15   what happened to his conviction in that way.

16         MR. HARRINGTON:  And I've flipped through it and

17   I've read it, Your Honor.  No, I don't -- I don't believe

18   that's in there.  And as I've stated, I'd be, I'd be happy to

19   provide that with this Court.

20         THE COURT:  All right.  Anything else in the first

21   amended complaint you want to point me to?

22         MR. HARRINGTON:  No, Your Honor.

23         THE COURT:  Okay.  What else would you like to say

24   about the motion, then?

25         MR. HARRINGTON:  No, I have nothing else to add,

1  Your Honor.  Thank you for being so well read.

2                THE COURT:  All right.  Thank you.

3                Mr. Swanson, you may briefly reply in support of

4  your motion, if you would like.

5                MR. SWANSON:  Your Honor, two points.  The first

6  is, I wanted to correct something I said earlier.

7                In the City's summary judgment brief in the

8  District Court case, docket number 91, case 17-12784, on page

9  34, the City does argue that Plaintiff's claims are barred by

10  the applicable statute of limitations because accrual occurs

11  when a plaintiff has a complete and present cause of action.

12  That is when the plaintiff can file suit.

13                The City thus argued that all of Plaintiff's

14  claims in the Federal District Court action, I guess,

15  including those against the City, were time-barred under the

16  applicable statute of limitations.

17                THE COURT:  What does that have to do with

18  anything?  What's the point of that, of the -- of you making

19  this point?

20                MR. SWANSON:  Well, that the statute of

21  limitations would presumably run when the cause of action

22  accrued.  And the City's arguing and --

23                THE COURT:  When does the -- does the City make an

24  argument about when the cause of action accrued in that paper

25  there?

1        MR. SWANSON:  Well, it argues that the -- that Mr.

2   Ricks was free to file suit in 1992 on all of his claims.

3   And because he didn't file suit then when the cause of action

4   accrued, that that all of the claims are barred by statute of

5   limitations.

6        THE COURT:  Well, I must have misunderstood, then.

7   I thought the City, in connection with this motion, basically

8   was not disputing that the claim, the *Monell* claim, did not

9   accrue until the Ricks conviction was vacated, and that

10  didn't occur until 2017.

11       MR. SWANSON:  The City has taken --

12       THE COURT:  Isn't that what -- isn't that what you

13  were agreeing to?

14       MR. SWANSON:  Well, I tried to say, Your Honor

15  I -- you know, I had not looked into that and had not taken a

16  position.  I pointed the Court to a quote from the *Sanford*

17  case, but I didn't take a position on that issue in my

18  pleadings, and then I went --

19       THE COURT:  Well, what's the City -- tell me in

20  more detail, what's the City's argument about this in the

21  City -- in the Ricks case.

22       MR. SWANSON:  Sure.

23       THE COURT:  The cause of action under *Monell*

24  accrued in 1992, is the City saying?

25       MR. SWANSON:  In Michigan, a three-year statute of

1    limitations applies to federal claims brought under 43 U.S.C.

2    1983, citing a *Scott* decision from the Sixth Circuit.

3              THE COURT:  Yes.

4              MR. SWANSON:  And a *Wallace* decision from the

5    Supreme Court.

6              Quote, "Accrual occurs when the plaintiff has a

7    complete and present cause of action, and that is when the

8    Plaintiff can file suit," close quote.

9              The limitations period for Plaintiff's claim for

10   intentional infliction of severe emotional distress is also

11   three years, citing MCL 600.5805 subsection --

12             THE COURT:  Focus on the *Monell* claims, would you?

13             MR. SWANSON:  Sure.  I think they --

14             THE COURT:  That's the only claim that's asserted

15   against the City.  *Monell* is, right?

16             MR. SWANSON:  *Monell* is the only claim that's

17   asserted.

18             THE COURT:  It's number one in the first amended

19   complaint.

20             MR. SWANSON:  That's right.

21             THE COURT:  What does the City say about the

22   statute of limitations with respect to that claim in their

23   summary judgment motion in the City case -- in the Ricks

24   case?  Anything?

25             MR. SWANSON:  In 1992, there was no bar to play to

1  bringing suit against the City of Detroit and its police

2  officers.  Plaintiff failed to do so, and, therefore, his

3  claims are barred.

4            THE COURT:  And the statute of limitations is how

5  long?

6            MR. SWANSON:  Three years.

7            THE COURT:  The City says?

8            MR. SWANSON:  Yes.

9            THE COURT:  Three years.  Well, what about this

10  concept, is the City simply -- is the City saying the *Monell*

11  claims accrued in 1992 in that brief?

12            MR. SWANSON:  Yes.

13            THE COURT:  It is?  Is there -- what authority is

14  there for that proposition?

15            MR. SWANSON:  It cites *Scott v. Ambani*, 577 F. 3d

16  642, 646, a Sixth Circuit case, 2009.

17            THE COURT:  What about the *Heck* case?

18            MR. SWANSON:  The *Heck* case talks about malicious

19  prosecution.  I don't necessarily think that applies to a

20  *Monell* claim against a municipality.

21            THE COURT:  Okay.  So now are you -- are you now

22  saying that the City, in support of this motion in this

23  Court, is now saying that the *Monell* claims asserted in count

24  1 of the first amended complaint of the City in the Ricks

25  action against the City accrued in 1992?

1               MR. SWANSON:  Yes.

2               THE COURT:  They did.  Okay.  Now that, of course,

3    is not an argument you made in your reply brief.

4               MR. SWANSON:  That's correct.

5               THE COURT:  Or in your motion.  In your reply

6    brief you said accrual isn't the test.

7               MR. SWANSON:  Yeah.  We don't think accrual is the

8    test.

9               THE COURT:  It's fair contemplation.  It's not

10   accrual.

11              MR. SWANSON:  Yeah.

12              THE COURT:  You know, if the -- if the claim

13   actually accrued before the bankruptcy was filed, even under

14   the accrual test, this claim would be barred by the discharge

15   order.  Right?

16              MR. SWANSON:  That's correct.  I think Plaintiff

17   is -- to the City it's really not relevant when the claim

18   accrued, because the Court does not apply the accrual test.

19              The Court looks at the facts and circumstances

20   underlying this claim.  The Court, in its opinion --

21              THE COURT:  Well, if the claim accrued under non-

22   bankruptcy law pre-petition, isn't it always going to be

23   deemed a pre-petition claim under the fair contemplation

24   test?

25              MR. SWANSON:  I think Plaintiff here would argue

1 that even if it accrued it wasn't within Plaintiff's fair

2 contemplation until the conviction was overturned, and

3 thus --

4            THE COURT:  You're not answering my question.

5 They're saying it didn't accrue until the conviction was

6 vacated.  They're saying that, and they're citing *Heck*.

7            But my question is:  Isn't it always going to be

8 the case that if a cause of action actually accrued under

9 applicable non-bankruptcy law before the bankruptcy petition

10 was filed, that claim is going to be deemed a pre-petition

11 claim under the fair contemplation test.

12            MR. SWANSON:  The fair contemplation test does not

13 include as a factor the date that the claim actually accrued.

14 And thus, you know, I haven't thought of --

15            THE COURT:  Well, it includes all relevant

16 circumstances.

17            MR. SWANSON:  Yes.

18            THE COURT:  Right?

19            MR. SWANSON:  I mean, it --

20            THE COURT:  All the circumstances surrounding a

21 particular claim, including the Debtor's conduct, the party's

22 pre-petition relationship, the party's knowledge, elements of

23 the underlying claim.

24            So I would think courts could consider if the

25 claim accrued under non-bankruptcy law, pre-petition,

1   certainly that would be a factor, if not conclusive, very

2   close to being conclusive, in establishing that it's a pre-

3   petition claim under the fair contemplation test, don't you

4   think?

5            MR. SWANSON:  I'm not going to argue with that

6   point.

7            THE COURT:  I'm trying to think.  It's kind of

8   hard for me to think of a situation where that wouldn't be

9   the case.

10            So if the claim really did accrue before the

11   conviction, Mr. Ricks' conviction was vacated, or whatever

12   happened to it, that puts a whole new light on this issue, I

13   think.

14            MR. SWANSON:  It very well might.  In the Court's

15   opinion that I cited in my reply there was, I believe, some

16   uncertainty in terms of whether those claims had accrued

17   under non-bankruptcy law prior to the petition date.  The

18   claims of Tanya Hughes, for one.

19            And this Court wrote, you know, that certainty is

20   not the standard.  It's not the standard that the Plaintiff

21   knew for sure that the claim had accrued or that they for

22   sure had a claim that which could be asserted.

23            The Plaintiff here professed his innocence from

24   day one, and starting in 2011, he employed, or he utilized,

25   the services of an investigator, a paralegal, a team of

1   lawyers, and his previous expert, to prove his innocence.  He

2   was -- he was telling all of these people that he had a claim

3   against the City of Detroit because he was unlawfully

4   convicted.

5            And he was pointing to the same evidence which

6   allegedly resulted in him being freed from prison.  In his

7   own words he had a claim in 2011.  We know it because he said

8   it.

9            Under the fair contemplation test rarely do you

10  get evidence that's this crystal clear that a Plaintiff knew

11  that they had a claim.  I mean, he said it in the letter, and

12  people on his behalf were telling the U.S. District Attorney

13  that he had a claim.  If that's not enough, I don't know what

14  does it.  All of the conduct here, again, occurred in 1992.

15  We have the Plaintiff on record --

16            THE COURT:  Is it enough under the fair

17  contemplation test for a claimant to subjectively think they

18  have a claim, or believe they have a claim, if that belief is

19  not objectively reasonable at the time?

20            MR. SWANSON:  Yes.

21            THE COURT:  You think it is?

22            MR. SWANSON:  I think if the Plaintiff believes

23  that they have a claim against the City that's within their

24  fair contemplation.  I mean, their subjective belief is part

25  of the fair contemplation test.  What do they believe?  Do

1  they believe they have a claim against the City or not?  We

2  don't necessarily need all of the objective evidence to line

3  up before the bar date for this Court to hold that a claim

4  within the Plaintiff's fair contemplation against the City.

5           I mean, as this Court wrote, Congress included the

6  words "contingent," "unmatured," "disputed" within the

7  definition, Section 1015, of the term "claim."

8           This Court also wrote that Congress used those

9  words because it wanted to adopt the broadest definition of

10  claim possible.

11           I don't see how this Court could rule that a

12  plaintiff who was putting down in writing and telling people

13  prior to the City's bankruptcy case that he had a claim

14  against the City, that that claim wasn't within his fair

15  contemplation.  I mean, he was asserting a claim.  He was

16  telling people he had a claim.  I don't know what else,

17  really, could cause the Court to rule that this was within

18  his fair contemplation.

19           Again, Your Honor, certainty is not the standard.

20  What Plaintiff continues to argue is that we have to wait

21  until this claim accrued under their theory of when accrual

22  occurred, and that's not the test.  The test is fair

23  contemplation, and we should take it from Mr. Ricks' own

24  words.  He knew he had a claim before the City filed for

25  bankruptcy.

1          Thank you.

2          THE COURT:  All right.  Thank you, both.  I'm

3   going to rule on this motion now.

4       (Pause)

5          THE COURT:  With respect to jurisdictional

6   matters.  First of all, this Court has subject matter

7   jurisdiction over this bankruptcy case and this contested

8   matter that's represented by the City's current motion and

9   which, of course, is contested by the Ricks plaintiffs.

10          And this is a core proceeding, and all of this is

11   true for the very same reasons that I stated that the matters

12   before me in the published opinion that I'm going to cite

13   were covered by the Court's subject matter jurisdiction and

14   were core proceedings.

15          And also, by the way, proceedings in which the

16   Court reserved jurisdiction to rule in the confirmed Chapter

17   9 plan.

18          The case, the prior case, of course, is the case

19   that the parties are aware of and the City cited in its

20   papers, and that's *In re City of Detroit, Michigan*, reported

21   at 548 Bankruptcy Reporter 748, and in particular the section

22   of that opinion at page 753 to 754 that's labeled Roman

23   numeral II jurisdiction.  I incorporate by reference what I

24   said there in that section, in that prior opinion, in this

25   bench opinion that I'm now giving as the basis for why the

1  Court has subject matter jurisdiction over this contested

2  matter and why this contested matter is a core proceeding.

3          That prior opinion I'll just, I'll refer to it as

4  this Court's 2016 opinion.  That's the opinion that I just

5  cited.

6          And by the way, that was a decision of this Court

7  from 2016.  It's the same opinion that was cited by the U.S.

8  District Court in the *Sanford* case, which the City has

9  attached to its reply brief, and which is reported at 2018

10 Westlaw 6331342, *Sanford versus City of Detroit,* a decision

11 of the U.S. District Court for this District from December 4,

12 2018.  Judge Lawson is the district judge in that case.

13 That's the *Sanford* case, and I may refer to that, as well, in

14 this bench opinion.

15         Going back to my published 2016 opinion and

16 decision, however, I do reiterate and incorporate by

17 reference into this bench opinion, everything I said about

18 the applicable law, that is the law applicable to determining

19 whether a given claim or claims arose for bankruptcy purposes

20 before a bankruptcy petition was filed.  And that discussion

21 is in the 2016 published opinion at 548 Bankruptcy Reporter

22 at pages 761 through 763.

23         In that part of the 2016 opinion, that's where

24 this Court discusses a couple of concepts that are key to the

25 issue before me on the present motion.  And that is, first,

1   the concept and the rule of law, which is that in order to

2   have a pre-petition claim, that is a claim that is deemed to

3   have arisen before the filing of the bankruptcy case.  It is

4   not necessary for the claim to have accrued under an

5   applicable non-bankruptcy law such that a lawsuit could be

6   filed on it and sustained in the sense that all the elements

7   of the cause of action had accrued before the bankruptcy

8   petition was filed.

9        At 548 Bankruptcy Reporter, at 762 to 763, I

10   discussed that.  It's sometimes referred to as the accrual

11   test for determining when a claim arises.  Another name for

12   it sometimes given in the case law is it's sometimes called

13   the, quote, "right to payment," unquote test.  As described

14   in my prior opinion, 548 Bankruptcy Reporter, at 762 to 763,

15   that tests provides that a claim arises for bankruptcy

16   purposes only after each element of the claim has been

17   established.

18        It's essentially an accrual test.  As I said,

19   however, and reiterate now, but as I said in the 2016

20   opinion, that test had been widely rejected.  And this Court

21   rejected it in my 2016 opinion, and I do so now for the same

22   reasons and based on the same authorities that I cited in my

23   prior published opinion from 2016.

24        The second point is that instead of an accrual or

25   right to payment type test, or some other test among possible

1  tests for determining when a claim arises for purposes of --
2  for bankruptcy purposes, the Court adopts -- did adopt, and
3  reiterates now, that the correct test is the so-called fair
4  contemplation test.

5         And as I described it in my prior opinion,
6  including 548 Bankruptcy Reporter at 763, that test looks at,
7  quote:  "Looks at whether there was a pre-petition
8  relationship between the debtor and the creditor, such as
9  contract exposure, impact, or privity, such that a possible
10  claim is within the fair contemplation of the creditor at the
11  time the petition is filed," unquote.  That's at page 763 of
12  my prior opinion, and I'm omitting citations here on that.

13         I further said, and reiterate now, but I further
14  said in the prior opinion the following:  Quote, "Under this
15  test a claim that's considered to have arisen pre-petition if
16  the creditor -- the creditor ascertained through the exercise
17  of reasonable due diligence that it had a claim at the time
18  the petition was filed.  This test, which the Court will
19  refer to as the fair contemplation test, has the advantage of
20  allowing the Court to examine all the circumstances
21  surrounding a particular claim, the Debtor's conduct, the
22  party's prepetition relationship, the party's knowledge, the
23  elements of the underlying claim, and use its best judgment
24  to determine what is fair to the parties in context,"
25  unquote.  That's 548 Bankruptcy Reporter at 763.  And again,

1  I'm omitting citations.

2            Now, in saying this, and in adopting and

3  describing the fair contemplation test, one has to -- the

4  Court bears in mind and reiterates, as I discussed in the

5  prior -- the 2016 opinion, as well, that a claim as defined

6  in the Bankruptcy Code, Section 101, Sub 5, includes a right

7  to payment that is contingent and a right to payment that is

8  unmatured, so that it is possible to have a contingent claim,

9  or an unmatured claim, that still is a claim that has arisen

10 for bankruptcy purposes as of the bankruptcy petition date,

11 even though as of that date the creditor could not have

12 successfully filed suit and prevailed on such a claim under

13 applicable non-bankruptcy law because some event had not yet

14 occurred that had to occur in order for there to be a valid

15 claim that met all the elements under non-bankruptcy law for

16 such a claim.

17            And I discussed that, again, I reiterate what I

18 said in the prior opinion, in particular at pages 548

19 Bankruptcy Reporter, at 761 to 763, about that subject.

20            Now, the Ricks Plaintiffs here, in opposing the

21 City's present motion, have argued, among other things, that

22 under applicable non-bankruptcy law Mr. Ricks, Desmond Ricks,

23 that is, who is the Plaintiff who asserts a claim against the

24 City in Count 1 of the first amended complaint in the U.S.

25 District Court action, did not have any claim that had yet

1    accrued against the City of Detroit when the City of Detroit

2    filed its bankruptcy petition in this Chapter 9 bankruptcy

3    case in July 2013, because as of that time Mr. Ricks'

4    conviction, which he says was a wrongful conviction,

5    essentially was still on the books.

6              It had not been vacated or reversed or in any way

7    successfully challenged as of the date of the bankruptcy

8    petition in this Chapter 9 bankruptcy case, so that he could

9    not at that time, at the time of the bankruptcy petition,

10   have successfully prosecuted a civil claim against the City

11   of Detroit of the type, or types, that are alleged in Count 1

12   of the first amended complaint in the District Court action,

13   so-called *Monell*-type claims against the City.

14             Mr. Ricks argues that that is the applicable non-

15   bankruptcy law, and they, I believe, cite the *Heck* case for

16   that proposition.

17             Now, it develops during -- it develops during,

18   really, the City's reply portion of today's oral argument

19   that the City may now be contending, at least in this Court,

20   that the so-called *Monell* claims that Mr. Ricks is asserting

21   against the City in the District Court action actually

22   accrued much earlier than the date in which Mr. Ricks

23   obtained a vacation, or a reversal, or undoing of some sort,

24   under state law of his conviction, which happened,

25   apparently, in 2017.

1          I will assume for purposes of ruling on the City's

2    motion in this case that Mr. Ricks is correct, his counsel

3    and he are correct, in arguing that he did -- his claim, his

4    *Monell* claims against the City did not accrue under non-

5    bankruptcy law until his conviction was vacated, and that

6    this did not occur until some time in the first half of 2017.

7          So I am assuming for purpose of ruling on the

8    City's present motion, then, that Mr. Ricks did not have any

9    claim, so-called *Monell* claim, against the City of Detroit

10   that had accrued under applicable non-bankruptcy law as of

11   the date the City filed its bankruptcy petition in July 2013.

12         As I indicated, however, that's not the end of the

13   inquiry, because the accrual test, also known as the right to

14   payment test, as I discussed earlier, is not the applicable

15   test to determine when a claim or whether a claim has arisen

16   for bankruptcy purposes.

17         Now, as I further discussed in the 2016 opinion,

18   in detail, and as is true here, if it's undisputed, and it is

19   certainly correct, as the City points out and argues in its

20   motion, that if Mr. Ricks claims that he's asserting in the

21   District Court action against the City of Detroit did, in

22   fact, arise for bankruptcy purposes before the July 2013

23   bankruptcy petition date in this case, then those claims are,

24   in fact, barred by the discharge and by the confirmed plan

25   and by the claims bar date order in this bankruptcy case,

1  which the City cites and quotes from in detail in its opening

2  motion.

3          And so, if Mr. Ricks' claims against the City of

4  Detroit are deemed to have arisen for bankruptcy purposes

5  pre-petition, in other words, before the July 2013 bankruptcy

6  petition date in this case, then those claims are indeed --

7  have indeed been discharged and may not be pursued, and the

8  discharge injunction, and the injunction in the confirmed

9  plan in this case bar Mr. Ricks from pursuing such claims.

10          So back to the fair contemplation test.  The City

11  points to 16 different exhibits, numbered exhibits 1 through

12  16, that are attached to its reply brief filed in this case

13  at docket number 13021, all of which I have reviewed and

14  which the City's counsel talked about in today's hearing, but

15  before the hearing, I did review those, as well.

16          And all of those documents, and certainly those

17  documents when taken in combination, do make clear, in my

18  view, that from -- during the time period June of 2009, or

19  roughly -- or rather, some time in 2009, all the way through

20  and as late as October of 2012 -- I'm sorry, all the way

21  through December of 2012, Mr. Ricks, Desmond Ricks, while he

22  was still in prison under the conviction for murder that was

23  later vacated and the charges which were later dismissed in

24  2017, Mr. Ricks, during this time period, this pre-bankruptcy

25  petition time period 2009 through December 2012, had reason

1  to know and to believe, and had knowledge of facts to know

2  and believe, that he had a claim, albeit a then contingent

3  claim, against the City of Detroit.

4  The type of claims that basically for claims that

5  led to his wrongful conviction and wrongful imprisonment for

6  roughly two decades or more, against the City of Detroit.

7  The claims admittedly were still contingent

8  because Mr. Ricks had not yet, as of the bankruptcy petition

9  date, obtained relief or vindication from his murder

10 conviction in State Court, so the claims had not accrued yet.

11 And that event had to occur before he could successfully

12 pursue the claims.

13 So it was a contingent -- they were contingent

14 claims as of the bankruptcy petition date, but he did have

15 reason.

16 And he could have ascertained through the exercise

17 of reasonable due diligence that he had a claim at the time,

18 existing prior to the time of the filing of the bankruptcy

19 petition in this Chapter 9 case, in July 2013.

20 Of course, all of the conduct, the allegedly

21 wrongful conduct that forms the basis of Mr. Ricks' claims

22 against the City, occurred in 1992. As the City correctly

23 points out, Mr. Ricks certainly knew that.

24 And all of the policies and practices of the City

25 that formed the basis of Mr. Ricks' *Monell* claims existed as

1   of March 1992.  This is all alleged in the first amended

2   complaint of Mr. Ricks in the District Court.

3           And the exhibits submitted by the City show that

4   Mr. Ricks not only believed, but had reason to believe, that

5   he had a valid claim against the City and the police officers

6   involved in the investigation and prosecution of the murder

7   case against him that led to his conviction in 1992, that he

8   had a valid claim and he was working hard and diligently to,

9   as I think to use the term Plaintiff's -- Mr. Ricks' counsel

10  used in hearing today, to build that case, to build that

11  claim, build evidence for that claim.

12          But it was certainly well within his fair

13  contemplation, based upon the conduct of the Debtor that had

14  occurred back in 1992, the parties, the pre-petition

15  relationship between Mr. Ricks and the City and the City's

16  police personnel involved, and the knowledge that Mr. Ricks

17  had before this bankruptcy case was filed, it was certainly,

18  under all those circumstances, it was, in my view, within the

19  fair contemplation of Mr. Ricks that he had a claim, albeit a

20  contingent claim, against the City of Detroit that existed

21  before the bankruptcy, this bankruptcy case was filed.

22          And so the Court does rule, and in my view is

23  constrained to rule give the very broad scope of the

24  definition of claim under the Bankruptcy Code, as I discussed

25  in the 2016 opinion that I published. and the case law under

1   that definition, the Court is constrained to rule that the

2   claims asserted by Mr. Ricks in his first amended complaint,

3   Count 1 against the City in the District Court case, are pre-

4   petition claims, claims that arose for bankruptcy purposes

5   before the bankruptcy case here was filed.

6          As a result, under the confirmed plan and the

7   applicable law and the orders of this Court, Mr. Ricks'

8   claims against the City were discharged, and Mr. Ricks is

9   enjoined from pursuing or prosecuting any such claims by the

10  Court's orders and by the discharge injunction that applies

11  in this Chapter 9 bankruptcy case.

12         And so for those reasons, the City's motion will

13  be granted.  I will enter an order granting that motion now.

14         Mr. Swanson, in looking at the proposed order that

15  was attached to your motion, I guess my first question is:

16  Do you still want the Court to enter the order in the form

17  that was attached to your motion, or do you have any

18  modifications to that proposed order that you want to ask me

19  to make?

20         MR. SWANSON:  Your Honor, we would be fine with

21  this order.  I think we've learned that two of the three

22  Plaintiffs are not asserting any claims against the City, so

23  --

24         THE COURT:  I saw that you said that in your reply

25  brief.

1              MR. SWANSON:  Yeah.

2              THE COURT:  Does that require any change in the

3    order, though?  Or you are saying it doesn't?

4              MR. SWANSON:  No, I don't think it does.

5              THE COURT:  I don't either.

6              MR. SWANSON:  Yeah.

7              THE COURT:  Now, what I will -- one thing I do

8    question or have concern about, and that is paragraph number

9    4 of your proposed order.

10              You go beyond -- in the order, you go beyond

11   requiring the Plaintiffs to dismiss the City from the pending

12   District Court action and enjoining them from asserting

13   claims.

14              In paragraph 4, you have the Court ordering that

15   the three Plaintiffs in the Ricks case are prohibited from

16   sharing in any distribution in this bankruptcy case.

17              Now, you said in your motion that none of these

18   parties have filed any proof of claim in the bankruptcy case,

19   timely or otherwise, and that's still true, I assume?

20              MR. SWANSON:  Yes.

21              THE COURT:  All right.  So there's no possible way

22   given that, that they presently would have any argument to

23   share in any distribution of the bankruptcy case.  So isn't

24   this paragraph 4 unnecessary?

25              MR. SWANSON:  Yes.

1          THE COURT:  All right.  So take it out.  I'll ask

2    you to -- well, here's what I'm going to do in terms of

3    substantive change to the order.

4          Paragraph 2 says, within five days of the entry of

5    this order, the three Ricks parties shall each dismiss, or

6    cause to be dismissed, et cetera, the City from the pending

7    District Court case.

8          The form I want to use is instead of saying five

9    days after order, I want to set a specific calendar date as

10   the deadline for that.  And normally, I would say no later

11   than one week from the day, that would be March 27.  So

12   that's the date I would pick.

13         Now, just logistically, is that, do you think,

14   going to be a problem for you logistically, Mr. Harrington,

15   for your side to comply if the deadline is March 27th?

16         MR. HARRINGTON:  I'm pulling up my calendar, if I

17   may, Your Honor.  If that's okay?

18         THE COURT:  Sure.

19         MR. HARRINGTON:  The 27th is fine.

20         THE COURT:  All right.  And I think that's

21   actually the date on which summary judgment reply briefs are

22   due in the District Court currently, in any case.

23         All right.  So make that change to paragraph 2,

24   Mr. Swanson.  It will say no later than March 27, 2019,

25   Desmond Ricks, et cetera, shall each, and so forth.  You see

 1  that?

 2          MR. SWANSON:  Yes, Your Honor.

 3          THE COURT:  All right.  And you're taking

 4  paragraph 4 out.

 5          MR. SWANSON:  Yes, Your Honor.

 6          THE COURT:  The rest of the order is fine.  I'll

 7  make some non-substantive changes in the first paragraph of

 8  the order to recite the fact that the Court held a hearing

 9  today, and for reasons stated by the Court on the record, and

10  so forth, that sort of stuff.

11          MR. HARRINGTON:  Your Honor?

12          THE COURT:  But I'll take care of that.

13          Now, let me -- I'm going to come to you in a

14  minute.

15          MR. HARRINGTON:  Yes, Your Honor.  Thank you.

16          THE COURT:  Mr. Swanson, do you have any questions

17  about the form of the revised order to submit?

18          MR. SWANSON:  No, Your Honor.  Thank you.

19          THE COURT:  All right.  Now, Mr. Harrington, same

20  question to you, form of the order.

21          MR. HARRINGTON:  Yes, Your Honor.  With respect to

22  this case, there are other individual Defendants, the

23  officers involved, that aren't subject to this Court's ruling

24  and do have indemnity from the City of Detroit.

25          My problem with paragraph 3, it talks about

1  Desmond Ricks, Ms. Cobb, Ms. Ricks, are each permanently

2  barred, estopped, and enjoined, from asserting any claims

3  asserted in the --

4          THE COURT:  I see what you're getting at.

5          MR. HARRINGTON:  So I've got an issue with that.

6          THE COURT:  Yeah.  How would you change that

7  language to narrow that to make clear that this order is --

8  and certainly, I'm not ruling this way, and we're not -- the

9  order is not -- should not be interpreted to mean that these

10 Ricks parties are enjoined from pursuing their claims against

11 the individuals named in the pending action in their

12 individual capacity rather than in their official capacity.

13         MR. HARRINGTON:  Sure.  And it's quite simple.  I

14 don't think paragraph 3 is necessary at all with a dismissal

15 order against the City.  Well, then, it's quite simple.  I

16 can't go take City property, but I can pursue through -- I

17 can pursue the officers, and the officers through their

18 bargaining agreement with the City, has indemnity.

19         So I pursue the officers, but then the City of

20 Detroit satisfies any judgment in the event that we prevail

21 against the officers on the claims.

22         THE COURT:  Well, if the City indemnifies the

23 officers and ends up paying something in the case because

24 they're indemnified, in the capacity of indemnifying the

25 individual Defendants for claims asserted against them in

1   their individual capacity, then that's a matter -- that's not

2   a matter of right that the Plaintiffs have against the City,

3   the Ricks have against the City.  That's, rather, at most, a

4   right that the individuals would have against the City.

5   Right?

6            MR. HARRINGTON:  Right.  But a broad

7   interpretation of paragraph 3 would affect the substantial

8   rights of my client.

9            THE COURT:  Well, let's do this, and you tell me

10  why this doesn't take care of it.

11           I do want to keep an injunction in paragraph 3,

12  but change the wording a bit, and perhaps this.  Paragraph 3

13  now instead would say, list the three individuals, and say,

14  each is -- are each permanently, and we don't need barred and

15  estopped, we'll just say permanently enjoined from asserting

16  claims asserted in the lawsuit -- well, or the rest of it.

17           Or claims arising from or related to the lawsuit

18  against the City of Detroit or the property of the City of

19  Detroit.  That seems to me narrow enough to not create a

20  problem for you, but perhaps we can add a sentence that makes

21  it absolutely clear.

22           MR. HARRINGTON:  I would like that, Your Honor.

23           THE COURT:  How would you propose to word a

24  sentence to add to paragraph 3 to do that?  What language

25  would you like?

1          MR. HARRINGTON:  Why don't we start with, any and

2     all claims made by Plaintiff against the individual officers,

3     David Pauch, Donald Stawiasz, S-T-A-W-I-A-S-Z, and Robert

4     Wilson, are unaffected by this Court's ruling --

5          THE COURT:  Hold on.  Any and all claims made by?

6          MR. HARRINGTON:  Plaintiffs against -- do you need

7     the names of the officers again, Your Honor?

8          THE COURT:  I can get the names from the first

9     amended complaint.

10          MR. HARRINGTON:  Thank you.

11          THE COURT:  Right?  It's the three that are listed

12     in the caption of the first amended complaint, right?

13          MR. HARRINGTON:  Are unaffected by this Court's

14     ruling.

15          THE COURT:  Or how about unaffected by this order?

16          MR. HARRINGTON:  By this order.

17          THE COURT:  Yes.

18          MR. HARRINGTON:  And Plaintiffs may recover any

19     proceeds that would be paid or payable by the City of Detroit

20     through its appropriate collective bargaining agreement, or

21     otherwise indemnity.

22          I mean, it's how it works in all of these 1983

23     cases against the individual officer, because the only claim

24     --

25          THE COURT:  Wait a minute.  Claims unaffected by

1   this order.  I would want to say, any and all claims made by

2   Plaintiffs against the three, and list the three individuals,

3   comma, in their individual capacity, parentheses, as opposed

4   to in their official capacity, are unaffected by this order,

5   period.

6            Now, you want to say more than that, and what's

7   the more than that?  Why do we need to say Plaintiffs may

8   recover anything under the collective bargaining?

9            MR. HARRINGTON:  The only reason that I say that

10  -- the only reason I feel the necessity to say that, is

11  because of how broad paragraph 3 of that order reads by

12  trying to say that we can't recover any City of Detroit

13  property, because in essence the way that this works and the

14  way that this case will go down the track is if we prevail,

15  or if there's a settlement, or if there's any payment to come

16  from these officers, it gets paid by the City.

17           THE COURT:  But not because of -- again, not

18  because the Plaintiffs have any right against the City for

19  that.

20           Any right to indemnity is a right that's enjoyed

21  by the individuals against the City, not a right that the

22  Plaintiffs have against the City.  That's the distinction,

23  right?

24           MR. HARRINGTON:  Right.  Yeah.  Because it's the

25  bargaining agreement that the officers have by being a member

 1  of the police force.  It's like almost an insurance agreement

 2  that they're going to pay for, you know, if they're sued --

 3          THE COURT:  How about this?  Add -- the sentence

 4  we've been talking about is fine up to the point where they

 5  aren't affected by this order.

 6          And then add a sentence that says something like

 7  this, and we can play with the wording, but something like

 8  this.  This order does not -- well, what I want to say is

 9  this order -- essentially, this order does not impair any

10  right to indemnity that the individual officers may have

11  against the City.

12          MR. HARRINGTON:  Fine.  Yeah.  I'm fine with that.

13          THE COURT:  Does that work?

14          MR. HARRINGTON:  Something to that extent.

15          THE COURT:  Does that work for you, Mr. Swanson?

16          MR. SWANSON:  Yes.

17          THE COURT:  All right.  So let me let me get it

18  down and I'll read it all to you and you guys can make sure

19  it's good.

20          MR. SWANSON:  Your Honor?

21          THE COURT:  Just a second.

22          MR. SWANSON:  Sure.

23      (Pause)

24          THE COURT:  All right.  So you want to say

25  something before I read it back to you?

1          MR. SWANSON:  Yes.  Am I responsible for putting

2    this in?  I just want to make sure I take careful notes if I

3    have --

4          THE COURT:  I'm going to read it now --

5          MR. SWANSON:  I will.

6          THE COURT:  -- and then you can comment or

7    question.  How's that?

8          MR. SWANSON:  All right.

9          THE COURT:  Both of you.

10          All right.  So now paragraph 3 will say, I'll try

11    to go through it.  It will say:  Desmond Ricks, Akilah Cobb,

12    and Desire'a Ricks, and then after that put a parenthesis and

13    say the, quote, Plaintiffs with a capital P, because we're

14    going to refer to that term later.  Okay.  Are each

15    permanently enjoined from asserting claims asserted in the

16    lawsuits or claims arising from or related to the lawsuit

17    against the City of Detroit or property of the City of

18    Detroit, period.

19          Then we add this sentence.  Any and all claims

20    made by the Plaintiffs against, and then we'll name the three

21    individuals who are named as defendants in the -- individual

22    defendants in the District Court, Pauch, Stawiasz, Wilson,

23    whatever that is, their names, any and all claims made

24    against, and list those three names, A, B, or C, comma, in

25    their individual capacity, parentheses, rather than in their

1  official capacity, close paren, are unaffected by this order,

2  period.

3          Let me make sure you got that much, Mr. Swanson.

4      (Pause)

5          THE COURT:  Okay.  Then the next sentence will

6  say, it's still on paragraph 3, the next sentence will say,

7  this order does not affect any right to indemnity that the

8  individual officers -- not officers, let's say --

9          MR. HARRINGTON:  The City may owe.

10          THE COURT:  No.  Hold on.  In the sentence before

11  when we list the individuals, the three names, let's define

12  them with parentheses, the capital I, Individual --

13  Individuals, put that in quotes, close paren.  Okay.  So

14  after the three names put paren, the quote capital I,

15  Individuals, close quote and close paren.  All right.

16          Then in the next final sentence it'll say, this

17  order does not affect any right to indemnity that the

18  Individuals, capital I, may have against the City, period.

19          So I'll read through it one more time and then

20  I'll ask for any questions or comments.

21          Paragraph 3.  Desmond Ricks, Akilah Cobb, and

22  Desire'a Ricks, paren capital P, Plaintiffs, in quotes, close

23  paren, are each permanently enjoined from asserting claims

24  asserted in the lawsuit or claims arising from or related to

25  the lawsuit against the City of Detroit or property of the

1  City of Detroit, period.  Any and all claims made by

2  Plaintiffs against, then the three names, A, B, or C, paren,

3  the capital I Individuals, in quotes, close paren, in their

4  individual capacity, paren, as opposed to their official

5  capacity, close paren, are unaffected by this order, period.

6  This order does not affect any right to indemnity that the

7  individuals may have against the City, period.  End of

8  paragraph 3.

9          Now, first question.  Mr. Swanson, did you get all

10 that down?

11         MR. SWANSON:  Yes, Your Honor.

12         THE COURT:  The second question is, did you have

13 any comments or questions about form?

14         MR. SWANSON:  The only comment that I would have

15 is that the first added sentence we have paren, rather than

16 official capacity, close paren.  I would propose to, after

17 that parentheses, define individuals there instead of after

18 their names.

19         THE COURT:  That's okay with me.  What about you,

20 Mr. Harrington?

21         MR. HARRINGTON:  I don't really understand the

22 change.  I think we're all talking about the same thing.

23         And just so we're all a hundred percent clear that

24 the spirit of all of this, whether we're saying potato or

25 potato, the spirit of all of this is that in the event that

1   there is a verdict against any one of these officers that any

2   issue of indemnity won't be encumbered or prohibited or

3   precluded in any way, shape, or form by this Court's ruling

4   on the City of Detroit claims.  I just want to make sure that

5   that's clear.  Right, counsel?

6             THE COURT:  So, Mr. Swanson, why do you need this

7   change you've just asked for?

8             MR. SWANSON:  I just thought it would -- it would

9   make clear that we're talking about the individuals in their

10  individual capacity and not their official capacity.  If the

11  Court prefers, it's like what --

12            THE COURT:  Let's leave it as-is.

13            MR. SWANSON:  Sure.

14            THE COURT:  Anything else?

15            MR. SWANSON:  No.

16            THE COURT:  What about you, Mr. Harrington?

17  Anything else?

18            MR. HARRINGTON:  No, Your Honor.

19            THE COURT:  All right.  So the order, then, will

20  have the change to paragraph 2 that I mentioned, the new

21  paragraph -- the revised paragraph 3 that we talked about.

22  Paragraph 4 comes out.  Paragraph 5 stays in, retaining

23  jurisdiction, that's fine.

24            And I'll ask Mr. Swanson to revise the order,

25  submit it.  I'll wait for the presentment of the revised

1   order, since we've discussed it in detail here.  And of

2   course before I sign it, I will make sure that it fully

3   complies with my ruling and what we've talked about here, and

4   I'll get that entered.

5          So that's it for today and for this matter.  Thank

6   you.

7          MR. HARRINGTON:  Thank you, Your Honor.

8          THE COURT CLERK:  All rise.

9               (Time Noted:  3:41 p.m.)

10                   * * * * *

11                   CERTIFICATE

12      I, RANDEL RAISON, certify that the foregoing is a

13   correct transcript from the official electronic sound

14   recording of the proceedings in the above-entitled matter, to

15   the best of my ability.

16

17

18   _____          October 24, 2023

19   Randel Raison

20

21

22

23

24

25