**Exhibit 14**

**City of Detroit Bankruptcy Case – Doc. Nos. 13691 and 13751**
**(Motions to Enforce Against Chancellor, Order Granting Motion)**
**and Transcript of Hearing**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DARELL CHANCELLOR

The City of Detroit, Michigan ("City") by its undersigned counsel, Miller, Canfield, Paddock and Stone, PLC, files this *Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Darell Chancellor* ("Motion"). In support of this Motion, the City respectfully states as follows:

## I.    Introduction

1.    On June 19, 2020, Darell Chancellor ("Chancellor") filed two lawsuits, one in federal and one in state court, against the City and a police officer of the City (in his representative and individual capacities) seeking monetary damages on account of the same alleged incidents that occurred in 2011 and 2012. The state court lawsuit was removed by the City and the lawsuits were then consolidated by order of the Federal District Court. Chancellor's claims in these lawsuits arose prior to the City's bankruptcy filing in July, 2013. Consequently, the filing of the lawsuits violates the discharge and injunction provisions in the City's confirmed Plan and the Bar Date Order (each as defined below).

2.      The City informed Chancellor of these violations and asked him to voluntarily dismiss the City from his lawsuits, but to no avail.  As a result, the City is left with no choice but to seek an order barring and permanently enjoining Chancellor from asserting and prosecuting the claims described in the federal court action and the state court action against Officer Stephen Geelhood (in his representative capacity), the City, or property of the City and requiring Chancellor to dismiss each court action with prejudice to the extent it seeks any such relief.

## II.     Factual Background

### A.     The City's Bankruptcy Case

3.      On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

4.      On October 10, 2013, the City filed its Motion Pursuant to Section 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof ("Bar Date Motion") [Doc. No. 1146], which was approved by order of this Court on November 21, 2013 ("Bar Date Order").  [Doc. No. 1782].

5.      The Bar Date Order established February 21, 2014, as the deadline for filing claims against the City.  Paragraph 6 of the Bar Date Order states that the

> following entities must file a proof of claim on or before the Bar Date…any entity: (i) whose prepetition claim against the City is not listed in the List of Claims or is listed as disputed, contingent or unliquidated; and (ii) that desires to share in any distribution in this

- 2 -

bankruptcy case and/or otherwise participate in the proceedings in this
bankruptcy case associated with the confirmation of any chapter 9
plan of adjustment proposed by the City…

Bar Date Order ¶ 6.

6.    Paragraph 22 of the Bar Date Order also provides that:

Pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy
Rule 3003(c)(2), any entity that is required to file a proof of claim in
this case pursuant to the Bankruptcy Code, the Bankruptcy Rules or this
Order with respect to a particular claim against the City, but that fails
properly to do so by the applicable Bar Date, shall be forever barred,
estopped and enjoined from: (a) asserting any claim against the City or
property of the City that (i) is in an amount that exceeds the amount, if
any, that is identified in the List of Claims on behalf of such entity as
undisputed, noncontingent and liquidated or (ii) is of a different nature
or a different classification or priority than any Scheduled Claim
identified in the List of Claims on behalf of such entity (any such claim
under subparagraph (a) of this paragraph being referred to herein as an
"Unscheduled Claim"); (b) voting upon, or receiving distributions
under any Chapter 9 Plan in this case in respect of an Unscheduled
Claim; or (c) with respect to any 503(b)(9) Claim or administrative
priority claim component of any Rejection Damages Claim, asserting
any such priority claim against the City or property of the City.

7.    Chancellor did not file a proof of claim.

8.    On October 22, 2014, the City filed its *Eighth Amended Plan of the*

*Adjustment of Debts of the City of Detroit* ("Plan"), which this Court confirmed on

November 12, 2014.  [Doc. Nos. 8045 & 8272].

9.    The discharge provision in the Plan provides:

Except as provided in the Plan or in the Confirmation Order, the rights
afforded under the Plan and the treatment of Claims under the Plan
will be in exchange for and in complete satisfaction, discharge and

release of all Claims arising on or before the Effective Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (ii) the Holder of a Claim based on such debt has accepted the Plan.

Plan, Art. III.D.4, at p.50.

10.     Further, the Plan injunction set forth in Article III.D.5 provides in pertinent part:

**Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a.     all Entities that have been, are or may be holders of Claims against the City…shall be permanently enjoined from taking any of the following actions against or affecting the City or its property…**

**1.     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affect the City of its property…**

**5.     proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

**6.     taking any actions to interfere with the implementation or consummation of the Plan.**

36336370.7/022765.00213

Plan, Article III.D.5, at pp.50-51 (emphasis added).

11.     The Court also retained jurisdiction to enforce the Plan injunction and
to resolve any suits that may arise in connection with the consummation,
interpretation or enforcement of the Plan.  Plan, Art. VII. F, G, I, at p.72.

**B.     Chancellor's Lawsuits Against the City and Officer Stephen
Geelhood**

12.     On June 19, 2020, Chancellor filed a complaint against the City and
Officer Stephen Geelhood (in his individual and representative capacity), in the
United States District Court for the Eastern District of Michigan, commencing case
number 20-11616 ("Federal Court Lawsuit"). On September 23, 2020, Chancellor
filed his Second Amended Complaint ("Second Amended Complaint").  A copy of
the Second Amended Complaint is attached as **Exhibit 6A** and the docket in the
Federal Court Lawsuit is attached as **Exhibit 6B.**

13.     On June 19, 2020, Chancellor filed a complaint ("Removed
Complaint") against the City and Officer Stephen Geelhood (in his individual and
representative capacity), in the Third Judicial Circuit of Michigan, commencing
case number 20-007758-NO ("Removed Lawsuit" and together with the Federal
Court Lawsuit, the "Lawsuits").  A copy of the State Court Complaint is attached
as **Exhibit 6C.**

14.     The State Court Lawsuit was removed to the United States District
Court for the Eastern District of Michigan by notice dated July 27, 2020,

36336370.7/022765.00213

commencing case number 20-11992.  On September 23, 2020, Chancellor filed an amended complaint. On that same day, the District Court entered the Order of Consolidation, which consolidated case 20-11616 with case 20-11992 for all purposes, including trial.  **Exhibit 6D.** The Order of Consolidation also closed case 20-11992 for administrative purposes.  The docket in the Removed Lawsuit is attached as **Exhibit 6E.**

15.     The complaints are substantially similar.

16.     Prior to the conviction at issue here, Chancellor had been convicted of five other crimes as an adult.  **Exhibit 6F,** Darell Chancellor Deposition Transcript, pp. 20-23.[1]

17.     Three of these convictions were for possession of heroin.  Darell Chancellor Deposition Transcript, pp. 20-21.  The other convictions were for receiving and concealing a stolen car and armed robbery.  Darell Chancellor Deposition Transcript, pp. 21-23.  Chancellor spent seven to eight years in prison for the armed robbery conviction and was released in 2010. Darell Chancellor Deposition Transcript, p. 25 §§ 8-14.

18.     After Chancellor was released from prison in 2010, he was paroled. Darell Chancellor Deposition Transcript, p. 25, §§14-17.

---

[1] Chancellor was deposed on April 23, 2021.

36336370.7/022765.00213

19.     In his deposition, Chancellor stated after he was released, he moved into his mother's house at 5023 32nd Street, as he reported to his parole officer. Darell Chancellor Deposition Transcript, p. 35 §§ 22-25.  However, Chancellor alleged that he moved out of his mother's house the following month, in January 2011, and moved in with his girlfriend at 9029 Robinson in violation of his parole. Chancellor alleges that he lied to his parole officer and did not tell him about the alleged move.  *Id.*

20.     The location where Chancellor resided is significant because Chancellor alleges that on November 2, 2011, an affidavit in support of a search warrant was falsified and sworn to by Defendant Officer Geelhood ("Geelhood") before a 36th District Court magistrate in the City of Detroit.  Second Amended Complaint ¶ 8.

21.     Chancellor further alleges that because of the false affidavit, a search warrant was issued by the magistrate for the search of the home of Chancellor's mother. Second Amended Complaint ¶ 9.

22.     According to Chancellor, in 2011, Geelhood falsely alleged that he received information from a confidential informant on October 31, 2011, that a large quantity of heroin was being stored and sold from the home of Chancellor's mother. Second Amended Complaint ¶ 10.

23.    In the affidavit, Geelhood stated that he set up surveillance at Chancellor's mother's home at 5023 32nd street on November 1, 2011, and "personally observed a black male in his '30s [, 5'8''',] 180 lbs.' engaging in a 'suspected narcotics transaction' with buyers." Second Amended Complaint ¶ 11.

24.    On November 2, 2011, the search warrant based on Geelhood's allegedly false affidavit was executed at Chancellor's mother's home. During the execution of the warrant, a quantity of cocaine was found on the premises. No heroin was found. Second Amended Complaint ¶ 13.

25.    Chancellor alleges that he was not at his mother's house when the search warrant was executed. Second Amended Complaint ¶ 14.  Darell Chancellor Deposition Transcript p. 41.  Chancellor was later arrested in May of 2012 and charged with (a) the delivery/manufacture of a controlled substance (450 to 999 grams); (b) possession of a controlled substance (450 to 999 grams); (c) felon in possession of a firearm; and (d) felony firearm. Second Amended Complaint ¶ 14. When Chancellor was arrested, Chancellor stated that he knew that he was innocent.  Darell Chancellor Deposition Transcript, p. 49 §§ 16-18.

26.    Chancellor alleged that the false claims made and sworn to by Geelhood in the search warrant affidavit led directly to the issuance of the search warrant, the raid at Chancellor's mother's home, the seizure of the cocaine, and to Chancellor's subsequent prosecution. Second Amended Complaint ¶ 15.

27.    Further, according to Chancellor, as a direct result of Geelhood's false affidavit in 2011, Chancellor was arrested and held in Wayne County Jail until his trial on November 8, 2012. Second Amended Complaint ¶¶ 16-17.

28.    In 2012, Geelhood was "the prosecution's star witness at trial." He testified to both the seizure of the cocaine during the raid and the events that he claimed had occurred the two previous days. Second Amended Complaint ¶ 18.

29.    During Chancellor's trial in 2012, Chancellor alleges that Geelhood testified falsely when he swore to the affidavit before the 36th District Court magistrate.  Second Amended Complaint ¶ 19.

30.    Chancellor alleges that Geelhood testified falsely at the trial in 2012 about receiving a tip from the confidential informant, conducting surveillance, and falsely identified Chancellor as the person that he observed selling heroin during his surveillance of Chancellor's mother's home. Second Amended Complaint ¶ 20.

31.    Chancellor also alleges:

21. The falseness of Geelhood's testimony regarding the alleged three separate hand-to-hand narcotic transactions during his surveillance is magnified by the fact that he never stopped any of the individuals allegedly involved in the drug buys to verify that one had actually taken place.

22. The falseness of Geelhood's identification of Darell as the person who he allegedly observed selling drugs on November 1, 2011 was further demonstrated by the difference between the description of the alleged seller as 5'8", 180 pounds, no glasses, and the actual size and description of Darell who is 5'11", 250 pounds and has worn prescription glasses his entire adult life.

- 9 -

Second Amended Complaint ¶¶ 21-22.

32.     Indeed, Chancellor challenged the veracity of Geelhood's testimony at

his trial in 2012.  Second Amended Complaint ¶ 24.

33.     In that regard, during his deposition, Chancellor's attorney asked

Chancellor:

> Q.     Without belaboring the point, Darell, what did it feel
>        like to go to trial and be accused of a crime that you
>        didn't commit?
> A.     I mean, it felt terrible. It feels more terrible when
>        you get found guilty of something you ain't commit
>        because it's like the justice system that failed you.
>        You been taught to believe in the justice system, but
>        to get to found guilty for something you ain't do is
>        where the justice going to come from, yeah.

Darell Chancellor Deposition Transcript, p. 78 §§ 10-18.

34.     During his trial, Chancellor testified and proclaimed his innocence.

**Exhibit 6G, Trial Transcript, pp. 78-84.**

35.     On November 8, 2012, Chancellor sent Judge Hathaway – the judge

presiding over his trial – a letter which provided in pertinent part that Chancellor

had been "locked up for 6 months for something I know nothing about" and "the

police got the wrong person."  **Exhibit 6H, Chancellor Letter to Judge**

**Hathaway.**

36.     On November 12, 2012, Chancellor was found guilty of possession of

cocaine. According to Chancellor, Judge Hathaway explicitly relied on Geelhood's

- 10 -

false statements that identified Chancellor as the person who was seen selling

drugs from the target address. Second Amended Complaint ¶ 24.

37.     Chancellor was sentenced on December 12, 2012, to serve a term of

14 years and 3 months to 30 years of imprisonment. Second Amended Complaint ¶

25.

38.     Chancellor began his sentence on December 12, 2012.  **Exhibit 6I,**

**Chancellor Commitment to Department of Corrections.**

39.     Chancellor's attorney asked Chancellor what it felt like to be

"wrongfully convicted":

> Q.     Every single day you're in that prison cell, jail cell,
> precinct cell being accused and ultimately wrongfully
> convicted of doing something you didn't do, Darell,
> every day, all day what did it feel like?
> A.     It feel terrible when you know you ain't do something,
> but you convicted for it. It was --
> Q.     I listened -- did I interrupt you? I'm sorry. If you
> weren't done, go ahead.
> A.     I mean, like I was saying, it's like, like I said, you
> sitting in there looking like where the justice going
> to come from. That's a hard feeling when you know you
> ain't done nothing, but a judge convicted you of
> something and now you stuck in prison trying to figure
> out how you going to get back home for something you
> ain't do. First, you ain't supposed to be here because
> you ain't did nothing. But now that you here, how you
> going to get back home for something you ain't do.
> Q.     So when Counsel went over your previous convictions, I
> didn't hear anything about you ever going to trial
> except for this thing.
> A.     Because I did that. I would never -- if I did
> something, I'm going to let you -- I'll say I did it.

- 11 -

So if I do it --

Q.    You didn't go to trial on those other charges --

A.    No.

Q.    because ultimately you either pled nolo contendere
      or not guilty; right?

A.    Right; right.

Q.    Excuse me. Or guilty.· Sorry.

A.    Right. I pled guilty; right.

Q.    This one you fought and went to trial; right?

A.    Right.

Darell Chancellor Deposition Transcript, pp. 83-84, §§ 2-8.

### C.    Chancellor Appeals His Conviction

40.    On or about January 18, 2013, Chancellor appealed his conviction and

the trial court entered the Claim of Appeal and Order Appointing Counsel. **Exhibit**

**6J, Claim of Appeal and Order Appointing Counsel.**  The docket sheet for

Chancellor's appeal is attached as **Exhibit 6K, Court of Appeals Docket Sheet.**

41.    The Michigan Court of Appeals affirmed the trial court despite

Defendant's argument that he was the victim of mistaken identity. **Exhibit 6L,**

**Decision of the Michigan Court of Appeals.**

42.    On March 24, 2020, Chancellor's conviction was vacated.  Second

Amended Complaint ¶ 34.

### III.    Argument

43.    Chancellor violated the Plan's injunction and discharge provisions

when he filed the Lawsuits to assert pre-petition claims and otherwise seek relief

against the City and Geelhood (in his representative capacity).  And, he continues to violate them by persisting in prosecuting the Lawsuits.

44.     Under the "fair contemplation" test, Chancellor's claims against the City and Geelhood arose pre-petition – *i.e.,* before July 18, 2013 – because before that date, Chancellor "could have ascertained through the exercise of reasonable due diligence that [he] had a claim" against the City, based on the events which occurred in 2011 and 2012, as detailed in the Second Amended Complaint and the other exhibits to this Motion.  *See In re City of Detroit, Michigan*, 548 B.R. 748, 763 (Bankr. E.D. Mich. 2016) (citation omitted); *see also* Doc. No. 11296, 13617; *Burton v. Sanders*, No. 20-11948, 2021 WL 168543, at *9 (E.D. Mich. Jan. 1, 2021), at *4; *Monson v. City of Detroit*, No. 18-10638, 2019 WL 1057306, at *9 (E.D. Mich. March 6, 2019); *Sanford v. City of Detroit*, No. 17-13062, 2018 WL 6331342, at *5-6 (E.D. Mich. Dec. 4, 2018).

45.     Despite holding a pre-petition claim, Chancellor did not file a proof of claim in the City's bankruptcy case.  The Plan's discharge provision states that the "rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date." Plan Art. III.D.4, at p.50.

46.     Consequently, Chancellor does not have a right to a distribution or payment under the Plan on account of the claims asserted in the Lawsuits.  Plan,

Art. III.D.5, at p.50 ("[A]ll entities that have been, are or may be holders of Claims against the City . . . shall be permanently enjoined from . . . proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan."). *See also* Plan, Art. I.A.19, at p.3; Art. I.A.134, at p.11; Art. VI.A.1, at p.67 ("Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim."). Any claims that Chancellor may have had were discharged, and the Plan enjoins Chancellor from pursuing them. The Bar Date Order also forever barred, estopped, and enjoined Chancellor from pursuing the claims asserted in the Lawsuits.

47. Even if Chancellor could somehow seek relief on his claims against Geelhood (in his representative capacity), the City, or its property (which he cannot), the proper and only forum for doing so would be in this Bankruptcy Court. There is therefore no set of circumstances under which Chancellor is, or would have been, permitted to commence and prosecute the Lawsuits against Geelhood (in his representative capacity), the City or its property.

## IV.   Conclusion

48. The City thus respectfully requests that this Court enter an order, in substantially the same form as the one attached as **Exhibit 1**: (a) directing Chancellor to dismiss, or cause to be dismissed, the City and Geelhood in his

representative capacity with prejudice from the Lawsuits; (b) permanently barring,

estopping and enjoining Chancellor from asserting the claims alleged in, or claims

related to, the Lawsuits against Geelhood (in his representative capacity), the City

or property of the City; and (c) prohibiting Chancellor from sharing in any

distribution in this bankruptcy case.  The City sought, but did not obtain,

concurrence to the relief requested in the Motion.

Dated: April 28, 2023

MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com
Attorneys for the City of Detroit

36336370.7/022765.00213

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## EXHIBIT LIST

| | |
|---|---|
| Exhibit 1 | Proposed Order |
| Exhibit 2 | Notice of Opportunity to Object |
| Exhibit 3 | None |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None |
| Exhibit 6A | Second Amended Complaint |
| Exhibit 6B | Federal Court Lawsuit Docket |
| Exhibit 6C | State Court Complaint |
| Exhibit 6D | Order of Consolidation |
| Exhibit 6E | Removed Lawsuit Docket |
| Exhibit 6F | Darell Chancellor Deposition Transcript |
| Exhibit 6G | Trial Transcript |
| Exhibit 6H | Chancellor Letter to Judge Hathaway |
| Exhibit 6I | Chancellor Commitment to Department of Corrections |
| Exhibit 6J | Claim of Appeal and Order Appointing Counsel |

- 16 -

Exhibit 6K          Court of Appeals Docket Sheet

Exhibit 6L          Decision of the Michigan Court of Appeals

36336370.7/022765.00213

**EXHIBIT 1 – PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE**
**ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND**
**CONFIRMATION ORDER AGAINST DARELL CHANCELLOR**

This matter, having come before the Court on the Motion to Enforce Order, Pursuant to Sections 105, 501, and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing of Proofs of Claim and Approving Form and Manner of Notice Thereof Against Darell Chancellor ("Motion"),[1] upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.      The Motion is granted.

2.      Within five days of the entry of this Order, Darell Chancellor shall dismiss, or cause to be dismissed, the City of Detroit and Officer Stephen

---

[1] Capitalized terms used but not otherwise defined in this Order shall have the meanings given to them in the Motion.

Geelhood in his representative capacity with prejudice from the cases captioned as:

(a) *Darell Deon Chancellor, Chancellor, v Officer Stephen Geelhood in his*
*Individual and Representative Capacity, and the City of Detroit, a municipal*
*entity*, *Defendants*, filed in the United States District Court for the Eastern District
of Michigan and assigned Case No. 20-cv-11616 ("Federal Lawsuit"); and (b)
*Darell Chancellor, Chancellor, v Officer Stephen Geelhood in his Individual and*
*Representative Capacity, and the City of Detroit, a municipal entity*, *Defendants*,
as removed to the United States District Court for the Eastern District of Michigan
and assigned Case No. 20-cv-11992 ("Removed Lawsuit", and together with
Federal Lawsuit, the "Lawsuits").

3.      Darell Chancellor is permanently barred, estopped and enjoined from
asserting claims asserted in the Lawsuits or claims arising from or related to the
Lawsuits against Officer Geelhood (in his representative capacity), the City of
Detroit, or property of the City of Detroit.

4.      Darell Chancellor is prohibited from sharing in any distribution in this
bankruptcy case.

5.      The Court shall retain jurisdiction over any and all matters arising
from the interpretation or implementation of this Order.

## **EXHIBIT 2 – NOTICE**

## **UNITED STATES BANKRUPTCY COURT**
## **EASTERN DISTRICT OF MICHIGAN**
## **SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## **NOTICE OF OPPORTUNITY TO OBJECT TO CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DARELL CHANCELLOR**

The City of Detroit has filed papers with the Court requesting the entry of an order enforcing the bar date order and confirmation order against Darell Chancellor.

**Your rights may be affected.  You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order granting the *City Of Detroit's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Darell Chancellor,* within 14 days, you or your attorney must:

1.    File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.  You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.   If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
   Marc N. Swanson (P71149)
   Megan R. Baxter (P81945)
   150 West Jefferson, Suite 2500
   Detroit, Michigan 48226
   Telephone: (313) 496-7591
   Facsimile: (313) 496-8451
   swansonm@millercanfield.com
   baxter@millercanfield.com

Dated:  April 28, 2023

# EXHIBIT 3 – NONE

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 28, 2023, he served a copy of the foregoing **CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DARELL CHANCELLOR** upon counsel for Darell Chancellor, in the manner described below:

Via first class mail and email:

**Madeline M. Sinkovich**
Mike Morse Law Firm
24901 Northwestern Hwy
Ste 700
Southfield, MI 48075
Email: madeline.sinkovich@855mikewins.com


**Ayanna D. Hatchett**
Johnson Law PLC
535 Griswold St.
Suite 2632
Detroit, MI 48226-3687
Email: ahatchett@venjohnsonlaw.com

DATED:  April 28, 2023

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

**EXHIBIT 5 – NONE**

**EXHIBIT 6A**
**Second Amended Complaint**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

DARELL CHANCELLOR,

     Plaintiff,                       Case No. 20-cv-11616

v.                                 Hon. George Caram Steeh

OFFICER STEPHEN GEELHOOD in his
Individual and Representative Capacity,
and the CITY OF DETROIT,
a Municipal entity,

     Defendants.

| VEN R. JOHNSON (P39219) | PATRICK CUNNINGHAM |
|---|---|
| AYANNA D. HATCHETT (P70055) | (P67643) |
| Counsel for Plaintiff | City of Detroit Law Department |
| The Buhl Building | Attorneys for Defendant City of D |
| 535 Griswold, Ste. 2632 | 2 Woodward Ave., Suite 500 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| (313) 324.8300 | (313) 237.5032 |
| vjohnson@venjohnsonlaw.com | cunninghamp@detroitmi.gov |
| ahatchett@venjohnsonlaw.com | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, DARELL CHANCELLOR, through his counsel, JOHNSON LAW, PLC and for this Amended Complaint, against the defendants, states as follows:

1. At all times relevant to this lawsuit, Plaintiff, Darell Chancellor ("Darell") was a resident of Detroit, in Wayne County, Michigan.

1

2. At all times relevant to this lawsuit, Defendant Officer Stephen Geelhood ("Geelhood") was employed as a police officer with the Detroit Police Department.

3. At all times relevant to this lawsuit, Geelhood acted under color of state law and is being sued in his individual and representative capacities.

4. At all times relevant to this lawsuit, Defendant City of Detroit ("The City") was a municipal corporation, duly organized in carrying on governmental functions in the City of Detroit, in Wayne County, Michigan.

5. The amount in controversy exceeds $25, 000.00 exclusive of costs, interest and attorney fees; and jurisdiction is otherwise conferred on this Court pursuant to the United States Constitution as well as 42 U.S.C. §1983.

6. Plaintiff relies on the jury demand that was originally filed in this Court.

## <u>COMMON ALLEGATIONS</u>

7. At all times relevant to this lawsuit, Geelhood was a member of the now-defunct narcotics unit in the police department for the City of Detroit.

8. On November 2, 2011, an affidavit in support of a search warrant was falsified and sworn to by Officer Geelhood before a 36th District Court magistrate in the City of Detroit.

9. As a result of Geelhood's swearing to the false affidavit, a search warrant was issued by the magistrate for the search of *5023 32nd Street* in Detroit, the home of Darell's mother.

10. In the false affidavit, Geelhood alleged that he had received information from a confidential informant (CI) on October 31, 2011 that a large quantity of heroin was being stored at and sold from the 32nd Street home. That allegation was false.

11. In the false affidavit, Geelhood further alleged that he had set up surveillance at 5023 32nd Street on November 1, 2011, and personally observed a black male, described as being in his "30s [, 5'8",] 180 lbs." engaging in a "suspected narcotics transaction" with buyers. That allegation was also false.

12. The affidavit went on to state that based on his 17 years of experience as a police officer and 9 years in the Narcotics Unit, Geelhood believed that there was probable cause that heroin and the individual suspected of making the narcotics transaction would be found on the premises.

13. On November 2, 2011, the search warrant based on Geelhood's false affidavit was executed at 5023 32nd Street in Detroit. During the execution of the warrant, a quantity of cocaine was found on the premises. No heroin was found.

3

14. Darell was not at his mother's house when the search warrant was executed. But he was later arrested in May of 2012 and charge with (a) the delivery/manufacture of a controlled substance (450 to 999 grams); (b) possession of a controlled substance (450 to 999 grams); (c) felon in possession of a firearm; and (d) felony firearm.

15. The false claims made and sworn to b Geelhood in the search warrant affidavit led directly to the issuance of the search warrant, the raid at 5023 32nd Street, the seizure of the cocaine and to Darell's subsequent prosecution.

16. As a direct result of Geelhood's false affidavit, Darell was arrested in May of 2012 and held in Wayne County Jail until his trial date.

17. A bench trial was conducted before the Honorable Daniel Hathaway on November 8, 2012.

18. Geelhood was the prosecution's star witness at trial. He testified to both the seizure of the cocaine during the raid and the events that he falsely claimed had occurred the two previous days.

19. Geelhood testified falsely at trial that he was telling the truth to the magistrate when he swore to the affidavit before the 36th District Court magistrate.

20. Geelhood also testified falsely at trial about receiving a tip from the CI, conducting surveillance, and he further falsely identified Darell as the person

4

that he supposedly observed selling heroin during his alleged surveillance of Darell's mother's home.

21. The falseness of Geelhood's testimony regarding the alleged three separate hand-to-hand narcotic transactions during his surveillance is magnified by the fact that he never stopped any of the individuals allegedly involved in the drug buys to verify that one had actually taken place.

22. The falseness of Geelhood's identification of Darell as the person who he allegedly observed selling drugs on November 1, 2011 was further demonstrated by the difference between the description of the alleged seller as 5'8", 180 pounds, no glasses, and the actual size and description of Darell who is 5'11", 250 pounds and has worn prescription glasses his entire adult life.

23. On November 12, 2012, when Darell was found guilty of possession of cocaine, Judge Hathaway explicitly relied on Geelhood's false statements that identified Darell as the person who was seen selling drugs from the target address.

24. The reliance on Geelhood's false statements was highlighted when Judge Hathaway issued his verdict convicting Darell of possession of cocaine and stated the following:

> "*So it really comes down to the reliability of Officer Geelhood's identification. As I said when [Geelhood] was*

5

*questioned and the discrepancies were pointed out he was
adamant and maintained that the individual he saw that day
through the binoculars was, in fact, the defendant Mr.
Chancellor; that he recognized him from that surveillance
that he did and that he was in fact the person and of course to
me, this comes down to, well, part of it comes down to that
identification.*" (Trial transcript, Vol. 3, pp 31-32)

25. Darell was sentenced on December 12, 2012 to serve a term of 14 years and 3 months to 30 years of imprisonment.

26. The Conviction Integrity Unit (CIU), a division of the Wayne County Prosecutor's Office, became involved in Darell's case as a result of an internal investigation by the Detroit Police Department (DPD) as well as a federal investigation into the department's Narcotics Unit concerning allegations that multiple Detroit police narcotics officers, including Geelhood, had participated in falsifying warrant affidavits, falsely accusing citizens of drug crimes and stealing case, guns and narcotics found during search warrant executions.

27. On information and belief, at the time of Darell's trial in 2012, the City was aware of the existence of the federal investigation and that the DPD had begun its own investigation of the Narcotics Unit.

28. As a result of the DPD's investigation, the Narcotic Unit, which included Geelhood, was disbanded by Detroit Police Chief James Craig in the summer of 2014.

6

29. In 2019, because of the numerous allegations of misconduct against multiple officers in the Narcotics Unit, Darell's conviction was reviewed by the CIU.

30. The CIU's investigation found that the records of the DPD and/or the Narcotics Unit contained no complaints of criminal activity at the 32nd Street address.

31. The CIU also found that there were no records of the tip allegedly provided by the CI to Geelhood as alleged in his false search warrant affidavit.

32. At the conclusion of their investigation, the CIU determined that the allegations contained in the search warrant affidavit and Geelhood's trial testimony could not be corroborated.

33. Likewise, the CIU concluded that the allegations in Geelhood's affidavit that supported the issuance of the search warrant for the home on 32nd Street were false.

34. An order to vacate Darell's conviction was subsequently entered on March 24, 2020.

35. From the time of Darell's false arrest that arose from Geelhood's falsified search warrant and affidavit, up through the time that his conviction was vacated, Darell was incarcerated for eight years.

36. Because of Geelhood and/or the City's negligent, grossly negligent and/or intentional misconduct, Darell was unlawfully arrested, imprisoned,

maliciously prosecuted and deprived of due process, for a crime that Geelhood and/or the City knew Darell did not commit.

## COUNT I:  STATE CLAIM—FALSE ARREST--GEELHOOD

37. Plaintiff reasserts and incorporates each of the allegations stated above.

38. Darell was arrested.

39. Darell was aware of the arrest and it was against his will.

40. Geelhood knew that the search warrant that Darell's arrest was premised upon was not based on true and accurate information and thus didn't provide probable cause for Darell's arrest.

41. Geelhood knew that he had falsified statements in the affidavit to support the search warrant which led to an unlawful search and seizure of the property found at Darell's mother's home on 32nd Street, which ultimately led to Darell's arrest.

42. As the direct and proximate result of Geelhood's misconduct, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

   a. Physical pain and suffering;
   b. Mental anguish;
   c. Fright and shock;
   d. Denial of social pleasure and enjoyments;
   e. Embarrassment, humiliation or mortification;
   f. Lost wages and/or earning capacity;
   g. The legal expense incurred by Darell to defend against the frivolous criminal    charges prosecuted against him; and

8

h.    All other damages learned through the course of discovery and up to the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## COUNT II: STATE CLAIM—MALICIOUS PROSECUTION—GEELHOOD

43. Plaintiff reasserts and incorporates each of the allegations stated above.

44. Geelhood instituted and initiated the allegations of criminal activity against Darell without probable cause and with malice or a with primary purpose other than bringing about justice through the proper adjudication of the claim upon which the proceedings are based.

45. Darell's criminal conviction was vacated in his favor.

46. As the direct and proximate result of Geelhood's misconduct, Darell has suffered damages and will continue to suffer damages in the future, including but not limited to:

a.  Mental anguish;
b.  Embarrassment, humiliation or mortification;
c.  Denial of social pleasure and enjoyment; and
d.  All other damages learned through the course of discovery and up through time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT III:  STATE CLAIM—FALSE IMPRISONMENT--GEELHOOD

47. Plaintiff reasserts and incorporates each of the allegations stated above.

48. Darell was imprisoned by Geelhood when he was arrested without probable cause and thus deprived of his personal liberty and freedom of movement.

49. Such imprisonment was against Darell's will.

50. Geelhood accomplished the imprisonment by actual physical force.

51. Geelhood intended to deprive Darell of his personal liberty or freedom of movement.

52. Such imprisonment was unlawful because the arrest was made without probable cause.

53. The prosecution against Darell was caused by Geelhood.

54. A post-conviction proceeding vacated Darell's underlying conviction for possession which in turn released Darell from serving further time in prison.

55. There was no probable cause for initiating or continuing the proceeding.

56. The initiation or continuation of the proceeding was done with malice or a primary purpose other than that of bringing the offender to justice.

57. As the direct and proximate result of misconduct by Geelhood, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

    a.      Physical pain and suffering;
    b.      Mental anguish;

10

c.    Fright and shock;

d.    Denial of social pleasure and enjoyments;

e.    Embarrassment, humiliation or mortification;

f.    Lost wages and/or earning capacity;

g.    The legal expense that Darell incurred to defend against the wrongfully prosecuted criminal charges; and

h.    All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT IV: STATE CLAIM—GROSS NEGLIGENCE—GEELHOOD

58. Plaintiff reasserts and incorporates each of the allegations stated above.

59. Geelhood had a duty to the general public and in particular to Darell, to refrain from grossly negligent conduct.

60. Geelhood breached that duty and was grossly negligent, or was so reckless as to demonstrate a substantial lack of concern for whether an injury would result when he knowingly falsified the contents of the affidavit that supported the search warrant and knowing executed the search warrant that he knew lacked probable cause.

61. By knowingly falsifying the contents of affidavit and knowingly executing a search that he knew lacked probable cause, Geelhood withheld evidence that exculpated Darell.

11

62. Geelhood's gross negligence was the one most immediate, efficient, and direct cause of the injury or damage, e.g., the proximate cause, of Darell's damages and injuries, including but not limited to:

    a.   False arrest for a crime he did not commit;
    b.   False imprisonment for a crime he did not commit;
    d.   Physical pain and suffering;
    e.   Mental anguish;
    f.   Fright and shock;
    g.   Denial of social pleasure and enjoyment;
    h.   Embarrassment, humiliation or mortification;
    i.   Lost wages and/or earning capacity; and
    j.   All other damages learned through the course of discovery.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## COUNT V: FEDERAL CLAIM-- MUNICIPAL LIABILITY— CITY OF DETROIT

63. Plaintiff reasserts and incorporates each of the allegations stated above.

64. At all times relevant to this lawsuit, Darell had a right under the due process clause of the state and federal constitutions not to be deprived of his life, liberty, or property.

65. Geelhood's acts of falsifying the affidavit in support of the operative search warrant and executing the search warrant that he accordingly knew lacked the requisite probable cause amounts to withholding exculpatory evidence and

12

violated Darell's fundamental constitutional rights under the 4th, 8th and 14th Amendments.

66. At all times relevant to this lawsuit, the City did have a custom or practice of corruption and misconduct within the narcotics' unit that gave rise to routinely falsifying affidavits to support search warrants, falsely accusing citizens of possessing and/or selling drugs, as well as unlawfully stealing and/or seizing property obtained from searches.

67. Those customs and practices of the City's narcotics unit were so pervasive that the narcotics unit was ultimately disbanded by the Detroit Police Department's own police chief.

68. At all times relevant to this lawsuit, the City did have a custom or practice within its narcotics' unit of failing to adequately train and/or supervise its officers.

69. These failures to adequately train and/or supervise were evident by the years and years of officer corruption and misconduct that went unnoticed and undisciplined.

70. The City, by facilitating a custom and/or practice of corruption and misconduct as well as failing to adequately train and/or supervise acted as the "moving force" behind the deprivation of Darell's constitutional rights.

71. There is a direct causal link between the customs and/or practices and the injuries that Darell has suffered.

72. As a direct and proximate result of the City's customs and/or practices and Geelhood's misconduct specifically, Darell has suffered damages and will continue to suffer damages in the future, including but not limited to the following:

   a.    Physical pain and suffering;
   b.    Mental anguish;
   c.    Fright and shock;
   d.    Denial of social pleasure and enjoyments;
   e.    Embarrassment, humiliation or mortification;
   f.    Lost wages and/or earning capacity;
   g.    The legal expense that Darell incurred to defend against wrongfully prosecuted criminal charges; and
   h.    All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.

## <u>COUNT VI: FEDERAL CLAIMS-FALSE ARREST &<br>FALSE IMPRISONMENT--GEELHOOD</u>

73. Plaintiff reasserts and incorporates each of the allegations stated above.

74. Pursuant to 42 U.S.C. § 1983, as well as the 4th, 8th and/or 14th Amendments to the United States Constitution, individuals are protected from detention without legal process.

14

75. Darell was falsely arrested and falsely imprisoned by Geelhood.

76. Geelhood intentionally and deliberately, or with a reckless disregard for the truth, made false statements, material misrepresentations and/or omissions in the search warrant and affidavit to establish probable cause for Darell's arrest and imprisonment.

77. The magistrate would not have found probable cause for the search warrant without Geelhood's false statements, material misrepresentations and/or omissions.

78. The protection from detention without legal process is a clearly established constitutional right of which a reasonable person and/or officer would have known,.

79. Hence, Geelhood's actions are objectively unreasonable considering this clearly established constitutional right.

80. As a direct and proximate result of Geelhood's misconduct, Darell has suffered damages, and will continue to suffer damages in the future, including, but not limited to:

    a.     Physical pain and suffering;
    b.     Mental anguish;
    c.     Fright and shock;
    d.     Denial of social pleasure and enjoyments;
    e.     Embarrassment, humiliation or mortification;
    f.     Lost wages and/or earning capacity;
    g.     The legal expense incurred by Darell to defend against the frivolous criminal charges prosecuted against him; and

h.    All other damages learned through the course of discovery and up to the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT VII: FEDERAL CLAIM—MALICIOUS PROSECUTION—GEELHOOD

81. Plaintiff reasserts and incorporates each of the allegations stated above.

82. Pursuant to 42 U.S.C. § 1983, as well as the 4th, 8th and/or 14th Amendments to the United States Constitution, individuals are protected from criminal prosecution without probable cause.

83. A criminal prosecution was initiated by Geelhood against Darell.

84. Geelhood influenced and/or participated in the prosecution against Darell when he intentionally and deliberately, or with a reckless disregard for the truth, made false statements, material misrepresentations and/or omissions in the search warrant and affidavit.

85. Geelhood's false statements were material in establishing probable cause to prosecute Darell.

86. Darell suffered a deprivation of liberty as a consequence of the legal proceeding because he was imprisoned for over 8 years.

87. The criminal proceedings against Darell were ultimately resolved in his favor when his conviction was vacated.

16

88. The protection from criminal prosecution without probable cause is a clearly established constitutional right of which a reasonable person would have known.

89. Geelhood's actions were objectively unreasonable considering this clearly established constitutional right.

90. As a direct and proximate result of Geelhood's misconduct, Darell has suffered, and will continue to suffer damages in the future, including, but not limited to:

    a.     Physical pain and suffering;
    b.     Mental anguish;
    c.     Fright and shock;
    d.     Denial of social pleasure and enjoyments;
    e.     Embarrassment, humiliation or mortification;
    f.     Lost wages and/or earning capacity;
    g.     The legal expense that Darell incurred to defend against wrongfully prosecuted criminal charges; and
    h.     All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT VIII:  FEDERAL CLAIMS—DENIAL OF DUE PROCESS—GEELHOOD

91.  Plaintiff reasserts and incorporates each of the allegations stated above.

92.  Darell had a right under the due process clause in the federal constitution, as well as the due process clause in Michigan's constitution, not to be deprived of his life, liberty, or property.

93.  At all times relevant to this lawsuit, Geelhood was a state actor and his conduct was subject to 42 U.S.C. §§ 1983, 1985, and 1988.

94.  The search warrant and affidavit that Geelhood falsified and/or his failure to disclose that he falsified the search warrant and affidavit violated Darell's right to due process.

95.  Geelhood willfully or inadvertently falsified the search warrant and affidavit and/or failed to disclose that he falsified the search warrant and affidavit.

96.  Probable cause could not have been established without Geelhood's falsified statements in the search warrant and affidavit and/or without his failure to disclose that he falsified statements in the search warrant and affidavit.

97.  As a result of Geelhood's falsified statements in the search warrant and affidavit and/or Geelhood's failure to disclose that he falsified statements in the search warrant and affidavit Darell was prejudiced.

98.  Geelhood's knowledge that the statements he provided to establish probable cause for the search warrant and affidavit were false was exculpatory.

18

99. Despite having this exculpatory evidence, Geelhood never produced this evidence to the prosecution or defense counsel in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

100. The right to due process is a clearly established constitutional right of which a reasonable person would have known.

101. Geelhood's actions were objectively unreasonable considering this clearly established constitutional right.

102. As a direct and proximate result of Geelhood's misconduct, Darell has suffered damages and will continue to suffer damages in the future, including, but not limited to:

    a.    Physical pain and suffering;
    b.    Mental anguish;
    c.    Fright and shock;
    d.    Denial of social pleasure and enjoyments;
    e.    Embarrassment, humiliation or mortification;
    f.    Lost wages and/or earning capacity;
    g.    The legal expense that Darell incurred to defend against wrongfully prosecuted criminal charges; and
    h.    All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

Respectfully submitted,

**JOHNSON LAW, PLC.**

By:  */s/    Ayanna D. Hatchett*
AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39
Counsel for Plaintiff
The Buhl Building
535 Griswold, Ste.  2632
Detroit, MI  48226
(313) 324.8300

Dated:  September 23, 2020

20

# EXHIBIT 6B

## Federal Court Lawsuit Docket

reassigned

Query    Reports    Utilities    Help    Log Out

# U.S. District Court
## Eastern District of Michigan (Detroit)
### CIVIL DOCKET FOR CASE #: 2:20-cv-11616-GCS-EAS

Chancellor v. Geelhood et al
Assigned to: District Judge George Caram Steeh
Referred to: Magistrate Judge Elizabeth A. Stafford
Demand: $75,000
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 06/19/2020
Jury Demand: Plaintiff
Nature of Suit: 950 Constitutional - State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**Darell Deon Chancellor**                     represented by  **Madeline M. Sinkovich**
Mike Morse Law Firm
24901 Northwestern Hwy
Ste 700
Southfield, MI 48075
248-621-2245
Email:
madeline.sinkovich@855mikewins.com
*ATTORNEY TO BE NOTICED*

**Ayanna D. Hatchett**
Johnson Law PLC
535 Griswold St.
Suite 2632
Detroit, MI 48226-3687
313-324-8300
Email: ahatchett@venjohnsonlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Officer Stephen Geelhood**                   represented by  **Patrick M. Cunningham**
City of Detroit Law Department
2 Woodward Avenue
Suite 500
Detroit, MI 48226
313-237-5032
Fax: 313-224-5505
Email: cunninghamp@detroitmi.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**City of Detroit, a Municipal entity**        represented by  **Patrick M. Cunningham**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/19/2020 | 1 | COMPLAINT *and Jury Demand* filed by Darell Deon Chancellor against All Defendants with Jury Demand. Plaintiff requests summons issued. Receipt No: AMIEDC-7875697 - Fee: $ 400. County of 1st Plaintiff: wayne - County Where Action Arose: Wayne - County of 1st Defendant: wayne. [Previously dismissed case: No] [Possible companion case(s): None] (Hatchett, Ayanna) (Entered: 06/19/2020) |
| 06/19/2020 | 2 | SUMMONS Issued for *City of Detroit, a Municipal entity* (SKra) (Entered: 06/19/2020) |
| 06/19/2020 | 3 | SUMMONS Issued for *Officer Stephen Geelhood* (SKra) (Entered: 06/19/2020) |
| 06/19/2020 | | A United States Magistrate Judge of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form is available for download at http://www.mied.uscourts.gov (SKra) (Entered: 06/19/2020) |
| 07/17/2020 | 4 | ANSWER to Complaint with Affirmative Defenses by City of Detroit, a Municipal entity. (Cunningham, Patrick) (Entered: 07/17/2020) |
| 08/04/2020 | 5 | ANSWER to Complaint with Affirmative Defenses by Officer Stephen Geelhood. (Cunningham, Patrick) (Entered: 08/04/2020) |
| 08/04/2020 | 6 | NOTICE TO APPEAR BY TELEPHONE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** *Plaintiff's counsel shall initiate the conference call to 313-234-5175* ***JOINT DISCOVERY PLAN DUE BY 9/08/2020*** (BSau) (Entered: 08/04/2020) |
| 09/08/2020 | 7 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** (BSau) (Entered: 09/08/2020) |
| 09/11/2020 | 8 | DISCOVERY plan jointly filed pursuant to Federal Rules of Civil Procedure 26(f) (Hatchett, Ayanna) (Entered: 09/11/2020) |
| 09/14/2020 | | Minute Entry for proceedings before District Judge George Caram Steeh: Scheduling Conference held on 9/14/2020. (Court Reporter: None Present, Not on the Record) (BSau) (Entered: 09/14/2020) |
| 09/14/2020 | 9 | SCHEDULING ORDER: **Discovery due by 3/19/2021, Dispositive Motion Cut-off set for 4/23/2021, Final Pretrial Conference for 8/17/2021 at 10:00 AM before District Judge George Caram Steeh, Jury Trial set for 8/31/2021 at 9:00 AM before District Judge George Caram Steeh.** Signed by District Judge George Caram Steeh. (Refer to image for additional dates) (BSau) (Entered: 09/14/2020) |
| 09/23/2020 | 10 | AMENDED COMPLAINT with Jury Demand filed by Darell Deon Chancellor against All Defendants. NO NEW PARTIES ADDED. (Hatchett, Ayanna) (Entered: 09/23/2020) |
| 09/23/2020 | 11 | ORDER of consolidation. Signed by District Judge George Caram Steeh. (DPer) (Entered: 09/23/2020) |
| 09/23/2020 | 12 | Notice to Parties Regarding Consolidated Case: Order of consolidation entered on *09/23/20*. Designated lead case number is *20-11616*. (DPer) (Entered: 09/23/2020) |
| 09/23/2020 | 13 | AMENDED COMPLAINT with Jury Demand *Plaintiff's Second Amended Complaint* filed by Darell Deon Chancellor against All Defendants. NO NEW PARTIES ADDED. (Hatchett, Ayanna) (Entered: 09/23/2020) |

| 10/07/2020 | 14 | ANSWER to Amended Complaint with Affirmative Defenses by City of Detroit, a Municipal entity, Officer Stephen Geelhood. (Cunningham, Patrick) (Entered: 10/07/2020) |
|---|---|---|
| 01/22/2021 | 15 | *Defendants'* WITNESS LIST by City of Detroit, a Municipal entity, Officer Stephen Geelhood (Cunningham, Patrick) (Entered: 01/22/2021) |
| 01/25/2021 | 16 | *PLAINTIFF'S* WITNESS LIST by Darell Deon Chancellor (Hatchett, Ayanna) (Entered: 01/25/2021) |
| 02/25/2021 | 17 | FIRST STIPULATED ORDER to Extend Scheduling Order. **Discovery due by 6/18/2021, Dispositive Motion Cut-off set for 7/23/2021, Final Pretrial Conference reset for 11/16/2021 at 10:00 AM before District Judge George Caram Steeh, Jury Trial reset for 11/30/2021 at 9:00 AM before District Judge George Caram Steeh**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/25/2021) |
| 04/22/2021 | 18 | *Second* WITNESS LIST by City of Detroit, a Municipal entity, Officer Stephen Geelhood (Cunningham, Patrick) (Entered: 04/22/2021) |
| 05/21/2021 | 19 | SECOND STIPULATED ORDER TO EXTEND SCHEDULING ORDER. **Discovery due by 9/16/2021; Dispositive Motion Cut-off reset for 10/21/2021; Final Pretrial Conference reset for 2/15/2022 at 10:00 AM before District Judge George Caram Steeh; and Jury Trial reset for 3/1/2022 at 09:00 AM before District Judge George Caram Steeh**. Signed by District Judge George Caram Steeh. (LHos) (Entered: 05/21/2021) |
| 07/21/2021 | 20 | *Third* WITNESS LIST by All Defendants (Cunningham, Patrick) (Entered: 07/21/2021) |
| 08/30/2021 | 21 | THIRD STIPULATION AND ORDER to Extend Scheduling Order. **Discovery due by 12/14/2021, Dispositive Motion Cut-off set for 1/18/2022, Final Pretrial Conference reset for 5/17/2022 at 10:00 AM before District Judge George Caram Steeh, Jury Trial reset for 5/31/2022 at 9:00 AM before District Judge George Caram Steeh**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 08/30/2021) |
| 10/18/2021 | 22 | *CERTIFICATE OF SERVICE & THIRD AMENDED* WITNESS LIST by All Plaintiffs (Hatchett, Ayanna) (Entered: 10/18/2021) |
| 10/18/2021 | 23 | *FOURTH* WITNESS LIST by All Defendants (Cunningham, Patrick) (Entered: 10/18/2021) |
| 12/10/2021 | 24 | FOURTH STIPULATED ORDER Extending Scheduling Order. **Discovery due by 2/14/2022, Dispositive Motion Cut-off set for 3/18/2022**. Final pretrial and trial dates will be determined after ruling on any dispositive motions. Signed by District Judge George Caram Steeh. (BSau) (Entered: 12/10/2021) |
| 02/03/2022 | 25 | STIPULATED PROTECTIVE ORDER. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/03/2022) |
| 02/11/2022 | 26 | MOTION for Protective Order by City of Detroit, a Municipal entity, Officer Stephen Geelhood. (Attachments: # 1 Exhibit Craig Affidavit) (Cunningham, Patrick) (Entered: 02/11/2022) |
| 02/11/2022 | 27 | MOTION Extend Discovery and Dispositive Motion Cutoff by City of Detroit, a Municipal entity, Officer Stephen Geelhood. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Cunningham, Patrick) (Entered: 02/11/2022) |
| 02/14/2022 | 28 | ORDER Granting Defendants' 27 MOTION Extend Discovery and Dispositive Motion Cutoff. **Discovery due by 4/15/2022, Dispositive Motion Cut-off set for 5/16/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/14/2022) |

| 02/14/2022 |  | Text-Only Order of reassignment from Magistrate Judge R. Steven Whalen to Magistrate Judge Elizabeth A. Stafford pursuant to Administrative Order 21-AO- 013. (JOwe) (Entered: 02/14/2022) |
|---|---|---|
| 02/14/2022 | 29 | ORDER Referring Pretrial Matters Excluding Dispositive Motions to Magistrate Judge Elizabeth A. Stafford Including 26 Motion for Protective Order. Signed by District Judge George Caram Steeh. (BSau) (Entered: 02/14/2022) |
| 02/22/2022 | 30 | NOTICE OF IN PERSON HEARING on 26 MOTION for Protective Order . **Motion Hearing set for 3/22/2022 at 02:00 PM before Magistrate Judge Elizabeth A. Stafford.** (MarW) (Entered: 02/22/2022) |
| 02/25/2022 | 31 | RESPONSE to 26 MOTION for Protective Order *, Brief In Support & Certificate of Service* filed by All Plaintiffs. (Attachments: # 1 Exhibit 1-Correspondences & Deposition Notices, # 2 Exhibit 2-Emails (11-24-2021), # 3 Exhibit 3-Correspondences, NOD & Subpoenas, # 4 Exhibit 4-Order Re Motion Summary Judgment) (Hatchett, Ayanna) (Entered: 02/25/2022) |
| 03/04/2022 | 32 | REPLY to Response re 26 MOTION for Protective Order filed by All Defendants. (Cunningham, Patrick) (Entered: 03/04/2022) |
| 03/21/2022 | 33 | ORDER Canceling Hearing And Denying Defendant's Motion for Protective Order (ECF No. 26 ). Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 03/21/2022) |
| 04/22/2022 | 34 | STIPULATED ORDER Extending Scheduling Order Dates. **Discovery due by 6/13/2022, Dispositive Motion Cut-off set for 7/14/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 04/22/2022) |
| 06/13/2022 | 35 | STIPULATED ORDER Extending Scheduling Order Dates. **Discovery due by 8/12/2022, Dispositive Motion Cut-off set for 9/9/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 06/13/2022) |
| 08/12/2022 | 36 | MOTION to Compel by Darell Deon Chancellor. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit) (Sinkovich, Madeline) (Entered: 08/12/2022) |
| 08/18/2022 | 37 | NOTICE TO APPEAR BY TELEPHONE: **Status Conference regarding Motion to Compel set for 8/23/2022 at 11:00 AM before Magistrate Judge Elizabeth A. Stafford.** See notice for AT&T conference details. (MarW) (Entered: 08/18/2022) |
| 08/22/2022 |  | Set Deadlines/Hearings: **TELEPHONIC Status Conference reset for 8/24/2022 at 11:00 AM before Magistrate Judge Elizabeth A. Stafford.** Counsel shall call (888) 5578511 and enter access code: 1137044 to participate in the telephonic conference. *** Please note that a security code will be emailed separately*** (MarW) (Entered: 08/22/2022) |
| 08/22/2022 | 38 | STIPULATED ORDER Extending Scheduling Order. **Discovery due by 11/10/2022, Dispositive Motion Cut-off set for 12/8/2022**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 08/22/2022) |
| 08/24/2022 |  | Minute Entry for telephonic proceedings before Magistrate Judge Elizabeth A. Stafford: Telephonic Status Conference held on 8/24/2022 (Court Reporter: None Present, Not on the Record) (MarW) (Entered: 08/24/2022) |
| 08/24/2022 | 39 | ORDER About Plaintiff's Motion to Compel (ECF No. 36 ). (**Response due by 8/26/2022; Notice to Court regarding motion to compel due 9/7/2022**). See Order for more details. Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 08/24/2022) |
| 08/26/2022 | 40 | RESPONSE to 36 MOTION to Compel filed by All Defendants. (Cunningham, Patrick) (Entered: 08/26/2022) |

| 09/22/2022 | | TEXT-ONLY ORDER: The Court ordered the plaintiff to, by September 7, 2022, file a notice of whether its motion to compel, ECF No. 36, has become moot. ECF No. 39. If the motion had not become moot, the city was to submit unredacted and redacted copies of the internal affairs report for in camera review by September 12, 2022. *Id.* Plaintiff filed no notice about whether the motion is moot. It must do so no later than September 26, 2022. If the plaintiff still files no notice, the Court will deny the motion to compel as moot. SO ORDERED. Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 09/22/2022) |
|---|---|---|
| 09/23/2022 | 41 | NOTICE by All Plaintiffs re 36 MOTION to Compel (Hatchett, Ayanna) (Entered: 09/23/2022) |
| 09/23/2022 | 42 | ORDER Extending Deadline for Defendant to Produce Documents for In Camera Review. (**Documents for In Camera Review due by 9/30/2022**) Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 09/23/2022) |
| 10/17/2022 | 43 | ORDER Granting in Part and Denying in Part Plaintiff's Motion to Compel (ECF No. 36 ). Signed by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 10/17/2022) |
| 10/24/2022 | 44 | CERTIFICATION OF COMPLETION OF PRETRIAL PROCEEDINGS by Magistrate Judge Elizabeth A. Stafford. (MarW) (Entered: 10/24/2022) |
| 11/10/2022 | 45 | STIPULATED ORDER for Limited Extension of Scheduling Order. **Discovery due by 2/7/2023**, **Dispositive Motion Cut-off set for 3/7/2023**. Signed by District Judge George Caram Steeh. (BSau) (Entered: 11/10/2022) |
| 02/07/2023 | 46 | *Plaintiff's Fourth Amended* WITNESS LIST by All Plaintiffs (Hatchett, Ayanna) (Entered: 02/07/2023) |
| 03/03/2023 | 47 | STIPULATED ORDER FOR LIMITED EXTENSION OF SCHEDULING ORDER: **Discovery due by 4/24/2023 Dispositive Motion Cut-off set for 5/24/2023**. Signed by District Judge George Caram Steeh. (MLan) (Entered: 03/03/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/27/2023 14:36:50 | | |
| **PACER Login:** | mcps3037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-11616-GCS-EAS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**EXHIBIT 6C**

**State Court Complaint**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARELL CHANCELLOR,

     Plaintiff,                  CASE NO.
                                    HON.

-vs-

OFFICER STEPHEN GEELHOOD,
In his individual and representative capacity,
And the CITY OF DETROIT,
A municipal entity,

     Defendants.

| VEN R. JOHNSON (P39219) | PATRICK M. CUNNINGHAM |
|---|---|
| AYANNA D. HATCHETT (P70055) | (P67643) |
| Attorneys for Plaintiff | City of Detroit Law Department |
| 535 Griswold, Ste. 2632 | Attorneys for Defendant City of Detroit |
| Detroit, MI 48226 | 2 Woodward Avenue, Suite 500 |
| (313) 324-8300 | Detroit, MI 48226 |
| vjohnson@venjohnsonlaw.com | (313) 237-5032 |
| ahatchett@venjohnsonlaw.com | cunninghamp@detroitmi.gov |

**A case between these parties arising out of the same incident is currently before this court at Case No. 20-11616.**

**Notice of Removal of Civil Action**

     Under 28 U.S.C. § 1441, Defendant City of Detroit (hereinafter, "City")

removes this civil action predicated upon the following:

1.     On June 19, 2020, plaintiff commenced this action in the Third Judicial

     Circuit of Michigan. This action is now pending before that court.

2.    Defendant was served with the summons and complaint on June 29, 2020. (Exhibit A).

3.    Paragraph 5 of Plaintiff's complaint alleges claims under the United States Constitution as well as money damages under 42 USC § 1983. (Id).

4.    This Court has original jurisdiction of the above-entitled action under 28 U.S.C. § 1331 and removal of the action to this Court is proper under 28 U.S.C. § 1441.

5.    Under 28 U.S.C. § 1441(c) this action is removed in its entirety to this Court.

6.    Copies of all process, pleadings, and orders served upon the defendants in this matter are attached.

7.    This notice is timely, having been filed within thirty days after service of the Amended Complaint upon the defendants, which raises claims under the United States Constitution as well as 42 USC § 1983.

8.    Upon information and belief, no other defendants have been served, and all potential defendants are expected to consent.

9.      The undersigned has prepared a written notice of the removal of this action. Such notice has been provided to counsel for plaintiff and to the clerk of the court from which this matter is removed. Promptly after filing this Notice of Removal of Civil Action, the undersigned will file a copy with the clerk of the court from which this action is removed, and provide a copy to counsel of record by first class mail and email.  Based upon the authorities and facts recited above, defendants remove the above-entitled action to this Court.

CITY OF DETROIT

PATRICK M. CUNNINGAM (P67643)
By:/s/ Patrick M. Cunningham_____
City of Detroit Law Department
Attorney for City of Detroit
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
(313) 237-5032
cunninghamp@detroitmi.gov

July 27, 2020

3

## Certificate of Service

The undersigned certifies that on July 27, 2020, he served the foregoing papers upon the above named counsel of record by U.S. Mail and by email.

/s/ Patrick M. Cunningham

4

# EXHIBIT A

| Approved, SCAO | Original - Court<br>1st Copy- Defendant | 2nd Copy - Plaintiff<br>3rd Copy -Return |
|---|---|---|

| **STATE OF MICHIGAN**<br>**THIRD JUDICIAL CIRCUIT**<br>**WAYNE COUNTY** | **SUMMONS** | **CASE NO.**<br>**20-007758-NO**<br>**Hon.Edward Ewell, Jr.** |
|---|---|---|

| Court address : 2 Woodward Ave., Detroit MI 48226 | Court telephone no.: 313-224-5195 |
|---|---|

| Plaintiff's name(s), address(es), and telephone no(s)<br>CHANCELLOR, DARELL | v | Defendant's name(s), address(es), and telephone no(s).<br>CITY OF DETROIT, a Muncipal entity |
|---|---|---|

Plaintiff's attorney, bar no., address, and telephone no

Ayanna D. Hatchett 70055
535 Griswold St Ste 2632
Detroit, MI 48226-3687

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court,

where it was given case number _____ and assigned to Judge _____.

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk. | **SUMMONS** |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>6/19/2020 | Expiration date*<br>9/18/2020 | Court clerk<br>Carlita McMiller |
|---|---|---|

Cathy M. Garrett- Wayne County Clerk.

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (9/19)      **SUMMONS**      MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105



SUMMONS
Case No. : **20-007758-NO**

## PROOF OF SERVICE

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** **OR** | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint.

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint, together with _____
List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
|  |  |  |
|  |  |  |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
|  |  |  |
|  |  |  |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled $ | Fee $ | | Signature _____ |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled $ | Fee $ | Total fee $ | Name (type or print) _____ |
| | | | | Title _____ |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
Date

My commission expires: _____     Signature: _____
Date                                              Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____.

_____
Signature

**STATE OF MICHIGAN**

**IN THE THIRD CIRCUIT OF WAYNE COUNTY**

DARELL CHANCELLOR,

     Plaintiff,

                                   Case No. 20-     -NO

v.                                           Hon.

OFFICER STEPHEN GEELHOOD in his
Individual and Representative Capacity,
and the CITY OF DETROIT,
a Municipal entity,

     Defendants.

_____

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
Counsel for Plaintiff
The Buhl Building
535 Griswold, Ste. 2632
Detroit, MI 48226
(313) 324.8300
vjohnson@venjohnsonlaw.com
ahatchett@venjohnsonlaw.com

_____

RECEIVED

JUN 29 2020
CITY OF DETROIT
LAW DEPARTMENT

**COMPLAINT & JURY DEMAND**

There are no other pending civil actions arising out
of the transactions or occurrences alleged in this Complaint.

/s/        *Ayanna D. Hatchett*
AYANNA D. HATCHETT (P70055)

NOW COMES Plaintiff, DARELL CHANCELLOR, through his counsel, JOHNSON

LAW, PLC and for his Complaint against the defendants states as follows:

1. At all times relevant to this lawsuit, Plaintiff, Darell Chancellor ("Darell") was a resident

   of Detroit, in Wayne County, Michigan.

1

20-007758-NO FILED IN MY OFFICE  Cathy M. Garrett  WAYNE COUNTY CLERK  6/19/2020 12:49 PM  Carlita McM∦er

2. At all times relevant to this lawsuit, Defendant Officer Stephen Geelhood ("Geelhood") was employed as a police officer with the Detroit Police Department.

3. At all times relevant to this lawsuit, Geelhood acted under color of state law and is being sued in his individual and representative capacities.

4. At all times relevant to this lawsuit, Defendant City of Detroit ("The City") was a municipal corporation, duly organized in carrying on governmental functions in the City of Detroit, in Wayne County, Michigan.

5. The amount in controversy exceeds $25, 000.00 exclusive of costs, interest and attorney fees; and jurisdiction is otherwise conferred on this Court pursuant to the United States Constitution as well as 42 U.S.C. §1983.

## COMMON ALLEGATIONS

6. At all times relevant to this lawsuit, Geelhood was a member of the now-defunct narcotics unit in the police department for the City of Detroit.

7. On November 2, 2011, an affidavit in support of a search warrant was falsified and sworn to by Officer Geelhood before a 36th District Court magistrate in the City of Detroit.

8. As a result of Geelhood's swearing to the false affidavit, a search warrant was issued by the magistrate for the search of *5023 32nd Street* in Detroit, the home of Darell's mother.

9. In the false affidavit, Geelhood alleged that he had received information from a confidential informant (CI) on October 31, 2011 that a large quantity of heroin was being stored at and sold from the 32nd Street home. That allegation was false.

10. In the false affidavit, Geelhood further alleged that he had set up surveillance at 5023 32nd Street on November 1, 2011, and personally observed a black male, described as being in

2

his "30s [, 5'8",] 180 lbs." engaging in a "suspected narcotics transaction" with buyers. That allegation was also false.

11. The affidavit went on to state that based on his 17 years of experience as a police officer and 9 years in the Narcotics Unit, Geelhood believed that there was probable cause that heroin and the individual suspected of making the narcotics transaction would be found on the premises.

12. On November 2, 2011, the search warrant based on Geelhood's false affidavit was executed at 5023 32nd Street in Detroit. During the execution of the warrant, a quantity of cocaine was found on the premises. No heroin was found.

13. Darell was not at his mother's house when the search warrant was executed. But he was later arrested in May of 2012 and charge with (a) the delivery/manufacture of a controlled substance (450 to 999 grams); (b) possession of a controlled substance (450 to 999 grams); (c) felon in possession of a firearm; and (d) felony firearm.

14. The false claims made and sworn to b Geelhood in the search warrant affidavit led directly to the issuance of the search warrant, the raid at 5023 32nd Street, the seizure of the cocaine and to Darell's subsequent prosecution.

15. As a direct result of Geelhood's false affidavit, Darell was arrested in May of 2012 and held in Wayne County Jail until his trial date.

16. A bench trial was conducted before the Honorable Daniel Hathaway on November 8, 2012.

17. Geelhood was the prosecution's star witness at trial. He testified to both the seizure of the cocaine during the raid and the events that he falsely claimed had occurred the two previous days.

3

18. Geelhood testified falsely at trial that he was telling the truth to the magistrate when he swore to the affidavit before the 36th District Court magistrate.

19. Geelhood also testified falsely at trial about receiving a tip from the CI, conducting surveillance, and he further falsely identified Darell as the person that he supposedly observed selling heroin during his alleged surveillance of Darell's mother's home.

20. The falseness of Geelhood's testimony regarding the alleged three separate hand-to-hand narcotic transactions during his surveillance is magnified by the fact that he never stopped any of the individuals allegedly involved in the drug buys to verify that one had actually taken place.

21. The falseness of Geelhood's identification of Darell as the person who he allegedly observed selling drugs on November 1, 2011 was further demonstrated by the difference between the description of the alleged seller as 5'8", 180 pounds, no glasses, and the actual size and description of Darell who is 5'11", 250 pounds and has worn prescription glasses his entire adult life.

22. On November 12, 2012, when Darell was found guilty of possession of cocaine, Judge Hathaway explicitly relied on Geelhood's false statements that identified Darell as the person who was seen selling drugs from the target address.

23. The reliance on Geelhood's false statements was highlighted when Judge Hathaway issued his verdict convicting Darell of possession of cocaine and stated the following:

> "*So it really comes down to the reliability of Officer Geelhood's identification. As I said when [Geelhood] was questioned and the discrepancies were pointed out he was adamant and maintained that the individual he saw that day through the binoculars was, in fact, the defendant Mr. Chancellor; that he recognized him from that surveillance that he did and that he was in fact the person and of course*

4

> *to me, this comes down to, well, part of it comes down to that identification.*" (Trial transcript, Vol. 3, pp 31-32)

24. Darell was sentenced on December 12, 2012 to serve a term of 14 years and 3 months to 30 years of imprisonment.

25. The Conviction Integrity Unit (CIU), a division of the Wayne County Prosecutor's Office, became involved in Darell's case as a result of an internal investigation by the Detroit Police Department (DPD) as well as a federal investigation into the department's Narcotics Unit concerning allegations that multiple Detroit police narcotics officers, including Geelhood, had participated in falsifying warrant affidavits, falsely accusing citizens of drug crimes and stealing case, guns and narcotics found during search warrant executions.

26. On information and belief, at the time of Darell's trial in 2012, the City was aware of the existence of the federal investigation and that the DPD had begun its own investigation of the Narcotics Unit.

27. As a result of the DPD's investigation, the Narcotic Unit, which included Geelhood, was disbanded by Detroit Police Chief James Craig in the summer of 2014.

28. In 2019, because of the numerous allegations of misconduct against multiple officers in the Narcotics Unit, Darell's conviction was reviewed by the CIU.

29. The CIU's investigation found that the records of the DPD and/or the Narcotics Unit contained no complaints of criminal activity at the 32nd Street address.

30. The CIU also found that there were no records of the tip allegedly provided by the CI to Geelhood as alleged in his false search warrant affidavit.

31. At the conclusion of their investigation, the CIU determined that the allegations contained in the search warrant affidavit and Geelhood's trial testimony could not be corroborated.

5

32. Likewise, the CIU concluded that the allegations in Geelhood's affidavit that supported the issuance of the search warrant for the home on 32nd Street were false.

33. An order to vacate Darell's conviction was subsequently entered on March 24, 2020.

34. From the time of Darell's false arrest that arose from Geelhood's falsified search warrant and affidavit, up through the time that his conviction was vacated, Darell was incarcerated for eight years.

35. Because of Geelhood and/or the City's negligent, grossly negligent and/or intentional misconduct, Darell was unlawfully arrested, imprisoned, maliciously prosecuted and deprived of due process, for a crime that Geelhood and/or the City knew Darell did not commit.


**COUNT I:  STATE CLAIM—FALSE ARREST--GEELHOOD**

36. Plaintiff reasserts and incorporates each of the allegations stated above.

37. Darell was arrested.

38. Darell was aware of the arrest and it was against his will.

39. Geelhood knew that the search warrant and affidavit that Darell's arrest was premised upon was not based on true and accurate information and thus did not provide probable cause for Darell's arrest.

40. Geelhood knew that he had falsified statements in the affidavit to support the search warrant which led to an unlawful search and seizure of the property found at Darell's mother's home on 32nd Street, which ultimately led to Darell's arrest.

41. As the direct and proximate result of Geelhood's misconduct, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

6

a.      Physical pain and suffering;

b.      Mental anguish;

c.      Fright and shock;

d.      Denial of social pleasure and enjoyments;

e.      Embarrassment, humiliation or mortification;

f.      Lost wages and/or earning capacity;

g.      The legal expense incurred by Darell to defend against the frivolous criminal charges prosecuted against him; and

h.      All other damages learned through the course of discovery and up to the time of trial.


WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25,000.00 and exclusive of costs, interest, and attorney fees.


### COUNT II: STATE CLAIM—MALICIOUS PROSECUTION—GEELHOOD

42. Plaintiff reasserts and incorporates each of the allegations stated above.

43. Geelhood instituted and initiated the allegations of criminal activity against Darell without probable cause and with malice or a with primary purpose other than bringing about justice through the proper adjudication of the claim upon which the proceedings are based.

44. Darell's criminal conviction was vacated in his favor.

45. As the direct and proximate result of Geelhood's misconduct, Darell has suffered damages and will continue to suffer damages in the future, including but not limited to:

7

a. Mental anguish;

b. Embarrassment, humiliation or mortification;

c. Denial of social pleasure and enjoyment; and

d. All other damages learned through the course of discovery and up through time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT III: STATE CLAIM—FALSE IMPRISONMENT--GEELHOOD

46. Plaintiff reasserts and incorporates each of the allegations stated above.

47. Darell was imprisoned by Geelhood when he was arrested without probable cause and thus deprived of his personal liberty and freedom of movement.

48. Such imprisonment was against Darell's will.

49. Geelhood accomplished the imprisonment by actual physical force.

50. Geelhood intended to deprive Darell of his personal liberty or freedom of movement.

51. Such imprisonment was unlawful because the arrest was made without probable cause.

52. The prosecution against Darell was caused by Geelhood.

53. A post-conviction proceeding vacated Darell's underlying conviction for possession which in turn released Darell from serving further time in prison.

54. There was no probable cause for initiating or continuing the proceeding.

55. The initiation or continuation of the proceeding was done with malice or a primary purpose other than that of bringing the offender to justice.

8

56. As the direct and proximate result of misconduct by Geelhood, Darell suffered, and will continue to suffer, damages in the future, including, but not limited to:

  a.      Physical pain and suffering;

  b.      Mental anguish;

  c.      Fright and shock;

  d.      Denial of social pleasure and enjoyments;

  e.      Embarrassment, humiliation or mortification;

  f.      Lost wages and/or earning capacity;

  g.      The legal expense that Darell incurred to defend against the wrongfully prosecuted criminal charges; and

  h.      All other damages learned through the course of discovery and up through the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

## COUNT IV: STATE CLAIM—GROSS NEGLIGENCE—GEELHOOD

57. Plaintiff reasserts and incorporates each of the allegations stated above.

58. Geelhood had a duty to the general public and in particular to Darell, to refrain from grossly negligent conduct.

59. Geelhood breached that duty and was grossly negligent, or was so reckless as to demonstrate a substantial lack of concern for whether an injury would result when he

9

knowingly falsified the contents of the affidavit that supported the search warrant and knowing executed the search warrant that he knew lacked probable cause.

60. By knowingly falsifying the contents of affidavit and knowingly executing a search that he knew lacked probable cause, Geelhood withheld evidence that exculpated Darell.

61. Geelhood's gross negligence was the one most immediate, efficient, and direct cause of the injury or damage, e.g., the proximate cause, of Darell's damages and injuries, including but not limited to:

a. False arrest for a crime he did not commit;

b. False imprisonment for a crime he did not commit;

d. Physical pain and suffering;

e. Mental anguish;

f. Fright and shock;

g. Denial of social pleasure and enjoyment;

h. Embarrassment, humiliation or mortification;

i. Lost wages and/or earning capacity; and

j. All other damages learned through the course of discovery.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Judgment in his favor and against the defendants in an amount in excess of $25, 000.00 and exclusive of costs, interest, and attorney fees.

Respectfully submitted,

**JOHNSON LAW, PLC.**

10

By:  /s/ Ayanna D. Hatchett
   AYANNA D. HATCHETT (P70055)
   VEN R. JOHNSON (P39
   Counsel for Plaintiff
   The Buhl Building
   535 Griswold, Ste.  2632
   Detroit, MI  48226
   (313) 324.8300

Dated:  June 19, 2020

11

Carlita McMiller    6/19/2020 12:49 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    20-007758-NO FILED IN MY OFFICE

## STATE OF MICHIGAN
## IN THE THIRD CIRCUIT OF WAYNE COUNTY

DARELL CHANCELLOR,

     Plaintiff,

v.

OFFICER STEPHEN GEELHOOD in his
Individual and Representative Capacity,
and the CITY OF DETROIT,
a Municipal entity,

     Defendants.

Case No. 20-    -NO
Hon.

---

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
Counsel for Plaintiff
The Buhl Building
535 Griswold, Ste. 2632
Detroit, MI 48226
(313) 324.8300
vjohnson@venjohnsonlaw.com
ahatchett@venjohnsonlaw.com

---

### JURY DEMAND

    NOW COMES Plaintiff, DARELL CHANCELLOR, through his counsel, JOHNSON

LAW, PLC to respectfully demand a trial by jury.

               Respectfully submitted,

               **JOHNSON LAW, PLC**

      By: /s/ Ayanna D. Hatchett
            AYANNA D. HATCHETT (P70055)
            VEN R. JOHNSON (P39
            Counsel for Plaintiff
            The Buhl Building
            535 Griswold, Ste. 2632
            Detroit, MI 48226
            (313) 324.8300

Dated: June 19, 2020

First Class Mail

Metroplex MI 480 ZIP
THU 25 JUN 2020 PM

US POSTAGE
$ 07.80



# JOHNSON LAW, PLC

ATTORNEYS AND COUNSELORS

Buhl Building . 535 Griswold Street . Suite 2632
Detroit, Michigan 48226

7015 1520 0001 1540 8903

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT

Lawrence Garcia
Mayor's Office
2 Woodward Ave., Suite 1126
Detroit, MI 48226
209359

RECEIVED
JUN 29 2020
CITY OF DETROIT
LAW DEPARTMENT



First Class Mail

# EXHIBIT 6D

# Order of Consolidation

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARELL DEON CHANCELLOR,

                                Case No.  20-11616, 20-11992

      Plaintiff,                Honorable George Caram Steeh

v.

OFFICER STEPHEN GEELHOOD, et al.,

      Defendants.

_____/

## ORDER OF CONSOLIDATION

      To promote convenience and judicial economy, to avoid unnecessary costs and delay, and pursuant to the stipulation of the parties, the Court orders the consolidation of separate cases pursuant to Federal Rule of Civil Procedure 42(a), which provides:

> If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.

      **IT IS THEREFORE ORDERED** that the following case 20-11616 is consolidated with civil number 20-11992 for all purposes, including trial.

      **IT IS FURTHER ORDERED** that **all subsequent papers filed after the date of this order shall be entered on civil number 20-11616**.

      **IT IS FURTHER ORDERED** that civil number 20-11992 is hereby closed for

administrative purposes.

s/George Caram Steeh
United States District Judge

Dated:  September 23, 2020

**EXHIBIT 6E**

**Docket of Removed Lawsuit**

Query    Reports    Utilities    Help    Log Out

CLOSED,reassigned

# U.S. District Court
## Eastern District of Michigan (Detroit)
## CIVIL DOCKET FOR CASE #: 2:20-cv-11992-GCS-RSW

Chancellor v. Detroit, City of et al **\*\*CASE CLOSED - ALL ENTRIES MUST BE MADE IN 20-11616.\*\***
Assigned to: District Judge George Caram Steeh
Referred to: Magistrate Judge R. Steven Whalen
Case in other court: Wayne County Circuit Court, 20-007758-NO
Cause: 28:1983 Civil Rights

Date Filed: 07/27/2020
Date Terminated: 09/23/2020
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Darell Deon Chancellor**                     represented by    **Ayanna D. Hatchett**
Johnson Law PLC
535 Griswold St.
Suite 2632
Detroit, MI 48226-3687
313-324-8300
Email: ahatchett@venjohnsonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Detroit, City of**                     represented by    **Patrick M. Cunningham**
City of Detroit Law Department
2 Woodward Avenue
Suite 500
Detroit, MI 48226
313-237-5032
Fax: 313-224-5505
Email: cunninghamp@detroitmi.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Stephen Geelhood**                     represented by    **Patrick M. Cunningham**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/27/2020 | 1 | NOTICE OF REMOVAL by Detroit, City of from Wayne County Circuit Court, case number 20-007758-NO. Receipt No: AMIEDC-7948809 - Fee: $ 400 [Previously dismissed case: No] [Possible companion case(s): United States District Court for the |

| | | Eastern District of Michigan, 20-11616, Judge Hon. George Caram Steeh] (Cunningham, Patrick) (Entered: 07/27/2020) |
|---|---|---|
| 07/28/2020 | 2 | ORDER REASSIGNING CASE from District Judge Stephen J. Murphy, III and Magistrate Judge David R. Grand to District Judge George Caram Steeh and Magistrate Judge R. Steven Whalen. (NAhm) (Entered: 07/28/2020) |
| 08/03/2020 | 3 | ANSWER to Complaint with Affirmative Defenses by Detroit, City of. (Cunningham, Patrick) (Entered: 08/03/2020) |
| 08/04/2020 | 4 | ANSWER to Complaint with Affirmative Defenses by Stephen Geelhood. (Cunningham, Patrick) (Entered: 08/04/2020) |
| 08/04/2020 | 5 | NOTICE TO APPEAR BY TELEPHONE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** *Plaintiff's counsel shall initiate the conference call to 313-234-5175* ***JOINT DISCOVERY PLAN DUE BY 9/08/2020*** (BSau) (Entered: 08/04/2020) |
| 09/08/2020 | 6 | NOTICE TO APPEAR BY VIDEO CONFERENCE: **Scheduling Conference set for 9/14/2020 at 2:00 PM before District Judge George Caram Steeh.** (BSau) (Entered: 09/08/2020) |
| 09/08/2020 | 7 | DISCOVERY plan jointly filed pursuant to Federal Rules of Civil Procedure 26(f) (Hatchett, Ayanna) (Entered: 09/08/2020) |
| 09/14/2020 | | Minute Entry for proceedings before District Judge George Caram Steeh: Scheduling Conference held on 9/14/2020. (Court Reporter: None Present, Not on the Record) (BSau) (Entered: 09/14/2020) |
| 09/14/2020 | 8 | SCHEDULING ORDER: **Discovery due by 3/19/2021, Dispositive Motion Cut-off set for 4/23/2021, Final Pretrial Conference set for 8/17/2021 at 10:00 AM before District Judge George Caram Steeh, Jury Trial set for 8/31/2021 at 9:00 AM before District Judge George Caram Steeh.** Signed by District Judge George Caram Steeh. (Refer to image for additional dates) (BSau) (Entered: 09/14/2020) |
| 09/23/2020 | 9 | AMENDED COMPLAINT with Jury Demand filed by Darell Deon Chancellor against All Defendants. NO NEW PARTIES ADDED. (Hatchett, Ayanna) (Entered: 09/23/2020) |
| 09/23/2020 | 10 | ORDER of consolidation. Signed by District Judge George Caram Steeh. (DPer) (Entered: 09/23/2020) |
| 09/23/2020 | 11 | Notice to Parties Regarding Consolidated Case: Order of consolidation entered on *09/23/20*. Designated lead case number is *20-11616*. (DPer) (Entered: 09/23/2020) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/27/2023 14:54:12 | | |
| **PACER Login:** | mcps3037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-11992-GCS-RSW |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

**EXHIBIT 6F**

**Darell Chancellor Deposition Transcript**

DARELL   CHANCELLOR
April 23, 2021

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


DARELL CHANCELLOR,

     Plaintiff,


v                                        Case No. 20-11616

                                 HON. GEORGE CARAM STEEH

OFFICER STEPHEN GEELHOOD,

in his individual and representative

capacity, and the CITY OF DETROIT,

a municipal entity,

     Defendants.


                            /


    The Deposition of DARELL CHANCELLOR,

    Taken at Wayne County, Michigan,

    Commencing at 11:38 a.m.,

    Friday, April 23, 2021,

    Before Diane H. Draugelis, CER-2530.

DARELL  CHANCELLOR
April 23, 2021

```
1   REMOTE APPEARANCES:

2

3   VEN R. JOHNSON

4   AYANNA D. HATCHETT

5   Johnson Law, PLC

6   535 Griswold Street

7   Suite 2632

8   Detroit, Michigan 48226

9   313.324.8300

10  vjohnson@venjohnsonlaw.com

11  ahatchett@venjohnsonlaw.com

12       Appearing on behalf of the Plaintiff.

13

14  PATRICK M. CUNNINGHAM

15  City of Detroit Law Department

16  2 Woodward Avenue

17  Suite 500

18  Detroit, Michigan 48226

19  313.237.5032

20  cunninghamp@detroitmi.gov

21       Appearing on behalf of the Defendants.

22

23

24

25
```

DARELL CHANCELLOR
April 23, 2021

```
 1                    TABLE OF CONTENTS

 2

 3   WITNESS                                    PAGE

 4   DARELL CHANCELLOR

 5

 6   EXAMINATION

 7   BY MR. CUNNINGHAM:                            5

 8   BY MR. JOHNSON:                              70

 9   RE-EXAMINATION

10   BY MR. CUNNINGHAM:                           90

11

12

13                      EXHIBITS

14

15   EXHIBIT                                    PAGE

16   (Exhibits retained by Mr. Cunningham.)

17

18   DEPOSITION EXHIBIT 1                         40

19   DEPOSITION EXHIBIT 2                         50

20   DEPOSITION EXHIBIT 3                         50

21

22

23

24

25
```

DARELL  CHANCELLOR
April 23, 2021

```
 1   Wayne County, Michigan

 2   Friday, April 23, 2021

 3   11:38 a.m.

 4

 5              (Witness presented identification.)

 6              THE REPORTER:  The attorneys participating in

 7        this proceeding acknowledge that I am not physically

 8        present in the conference room and that I will be

 9        reporting this proceeding remotely.  They further

10        acknowledge that in lieu of an oath administered in

11        person, the witness will verbally declare his testimony

12        in this matter is under penalty of perjury.  The

13        parties and counsel consent to this arrangement and

14        waive any objections to this manner of reporting.

15        Please indicate your agreement on the record.

16              MR. CUNNINGHAM:  Patrick Cunningham on behalf

17        of the defendants and I agree.

18              MS. HATCHETT:  Ayanna Hatchett on behalf of

19        plaintiff and we have no objection to the statement as

20   read.

21              MR. JOHNSON:  Ven Johnson on behalf of

22        plaintiff as well.  Thanks.

23                   DARELL CHANCELLOR,

24        was thereupon called as a witness herein, and after

25        having first been duly sworn to testify to the truth,
```

DARELL  CHANCELLOR
April 23, 2021

```
 1          the whole truth, and nothing but the truth, was
 2          examined and testified as follows:
 3                         EXAMINATION
 4    BY MR. CUNNINGHAM:
 5    Q.   Good morning, Mr. Chancellor, my name is Patrick
 6          Cunningham and I represent Steven Geelhood and the City
 7          of Detroit in your lawsuit against those two groups.
 8          Have you ever given deposition testimony before?
 9    A.   Yes.
10    Q.   I'm sorry.  The answer is yes?
11    A.   Yes.
12    Q.   How long has it been since you last gave deposition
13          testimony?
14    A.   I think since 2005.
15    Q.   Did you end up coming into the office or are you at
16          home?
17    A.   I'm at home.
18    Q.   Okay.  If you could do your best, I can't really -- I
19          can really only see the top of your forehead there.
20          That's much better.  Thanks.
21                   Is there anybody at home with you there?
22    A.   Not in the room, no.
23    Q.   Okay.  So, I'm sorry, when was the last time you gave
24          deposition testimony?
25    A.   2005.
```

DARELL   CHANCELLOR
April 23, 2021

```
 1    Q.    2005?  Okay.  This is the same thing, but it's a little
 2          bit different, obviously, since we're doing all of this
 3          remotely and everybody is appearing by Zoom.  But the
 4          rules are still the same.  You have sworn to tell the
 5          truth, and Diane is going to be taking down a written
 6          record of the things that you and I say.  And in order
 7          to make it easier on Diane, there are a view things
 8          that I'm going to ask you to do.  The first is to give
 9          verbal answers in words.  In a normal conversation I
10          might ask you a yes or no question and you might nod
11          your head and shake your head and I would know what you
12          meant, but it's difficult for Diane to take down.  So
13          please do your best to answer verbally in words.  Is
14          that fair?
15    A.    Yes.
16    Q.    Okay.  Another thing that's particularly difficult to
17          avoid is uh-huhs and unh-unhs which are difficult to
18          transcribe, so please do your best to answer with
19          yesses and nos.  Is that fair?
20    A.    Yes.
21    Q.    Okay.  The last thing is, and this is particularly true
22          on Zoom, it's difficult to transcribe when more than
23          one person is talking at a time, so please do your best
24          to wait until I've finished asking a question before
25          you start answering a question.  Is that fair?
```

DARELL   CHANCELLOR
April 23, 2021

```
 1    A.    No problem.

 2    Q.    Okay.  And the last thing is if I ask a question and

 3          you give an answer, I will assume that you heard and

 4          understood the question.  Is that fair?

 5    A.    Yes.

 6    Q.    Could you please give me your full name?

 7    A.    Darell Deon Chancellor.

 8    Q.    And what is your current address?

 9    A.    5023 32nd.

10    Q.    And where at that location do you stay?  In a room?

11    A.    Yes.

12    Q.    Where is your room?

13    A.    In the living room.

14    Q.    Do you have a bed that you sleep on?

15    A.    I sleep on my mother couch.

16    Q.    How many bedrooms are in the house at 5023 32nd Street?

17    A.    Three.

18    Q.    Who lives at 5023 32nd Street with you right now?

19    A.    My mother, and my sister and her boyfriend.

20    Q.    And what is your mother's name?

21    A.    Janet Chancellor.

22    Q.    And what is your sister's name?

23    A.    Crystal Chancellor.

24    Q.    And how do you spell Crystal?

25    A.    What is it?  C-y-t -- I mean C-y-s-t-a-l.
```

DARELL CHANCELLOR
April 23, 2021

```
1   Q.   Okay.  And what is your mother's boyfriend's name?

2   A.   Alvin Thomas.

3   Q.   And nobody lives at the house besides you, your mom,

4        your sister and her boyfriend?

5   A.   Yes.

6   Q.   Okay.  What is your Social Security number?

7   A.   ***-**-3013.

8   Q.   Do you have a Michigan driver's license?

9   A.   No.

10  Q.   Do you have a Michigan State ID?

11  A.   Yes.

12  Q.   Do you have it with you?

13  A.   Yes.

14  Q.   Could you read me the number off of it?

15  A.   Which number?

16  Q.   The long one that starts with a letter and ends with a

17       bunch of numbers.

18  A.   C-524-135-139-932.

19  Q.   Could you hold it up to the camera so that I can see

20       it?  I think that's good.  Let me just Zoom in on that.

21       Can you just pull it back a little bit?  Right there is

22       perfect.  What's the weight on that identification

23       card?

24  A.   280.

25  Q.   What's the height?
```

DARELL   CHANCELLOR
April 23, 2021

```
1    A.   5'11".

2    Q.   And when was that issued?

3    A.   Issued -- what's this?

4    Q.   Should be in the top right corner?

5    A.   December 14, 2020.

6    Q.   And below that should be the expiration date.  What's

7         the expiration date?

8    A.   December 7, 2024.

9    Q.   What's your date of birth?

10   A.   12-7-81.

11   Q.   So are you still 5'11"?

12   A.   Yes.

13   Q.   How much do you weigh right now?

14   A.   Like, say about 2-, say about 300 now.

15   Q.   Are you right handed?

16   A.   Yes.

17   Q.   Always been right handed?

18   A.   Yes.

19   Q.   Do you have any names that you have used in the past

20        besides Darell Chancellor?

21   A.   Yes.

22   Q.   What other names have you used?

23   A.   Jason Chancellor, Jason Thomas.

24   Q.   What did you use the name Jason Chancellor for?

25   A.   I don't recall.  I think I had a -- I don't recall.  I
```

DARELL  CHANCELLOR
April 23, 2021

```
1        think I had a dope case and I used the name.

2   Q.   Did you tell the police that your name was Jason

3        Chancellor?

4   A.   Yes.

5   Q.   What about Jason Thomas?  What did you use that name

6        for?

7   A.   Probably the same thing.

8   Q.   Was that a name you gave to the police?

9   A.   Yes.

10  Q.   Are there any other names that you've used in the past

11       besides Darell Chancellor, Jason Chancellor or Jason

12       Thomas?

13  A.   No, not that I know of.

14  Q.   Are you married?

15  A.   No.

16  Q.   Have you ever been married?

17  A.   Yes.

18  Q.   How many times have you been married?

19  A.   Once.

20  Q.   And are you divorced?

21  A.   Yes.

22  Q.   What's the name of your ex-wife?

23  A.   Katrice Butler.

24  Q.   When you were married did she go by Katrice Chancellor?

25  A.   Yes.
```

DARELL  CHANCELLOR
April 23, 2021

```
1    Q.   Did she ever have another last name besides Butler or
2         Chancellor?
3    A.   I don't know.
4    Q.   Not to your knowledge?
5    A.   Not to my knowledge.
6    Q.   Okay.  When you married her, before you married did she
7         go by Katrice Butler?
8    A.   Yes.
9    Q.   Has she remarried since you guys got divorced?
10   A.   Yes.
11   Q.   Do you know if she uses a different last name, a
12        married last name now?
13   A.   I don't know.
14   Q.   Give me one second.  I'm just going to try --
15   A.   No problem.
16   Q.   -- and find a name here.  Katrice Alford, is that
17        Katrice's last now?
18   A.   I don't -- I believe so.
19   Q.   Okay.  Where does Katrice live?
20   A.   I don't know, sir.  I don't know the name of the block.
21        I forget the name of the block.
22   Q.   When you say the name of the block, do you mean the
23        name of the street that she lives on?
24   A.   Yes.
25   Q.   And do you have Katrice's phone number?
```

DARELL  CHANCELLOR
April 23, 2021

```
 1    A.    Yes.

 2    Q.    What's her phone number?

 3    A.    313-828-4115.

 4    Q.    Thank you.  Do you and Katrice have any children?

 5    A.    Yes.

 6    Q.    How many children do you have?

 7    A.    One.

 8    Q.    Do you have a son or a daughter?

 9    A.    A son.

10    Q.    What's your son's name?

11    A.    Darell Chancellor, Jr.

12    Q.    Darell Chancellor, Jr.?  And how old is Darell

13          Chancellor, Jr.?

14    A.    Nine.

15    Q.    Do you have any other children besides Darell

16          Chancellor, Jr.?

17    A.    No.

18    Q.    Do you pay child support for Darell Chancellor, Jr.?

19    A.    No.

20    Q.    Where does Darell Chancellor, Jr. live?

21    A.    His mother.

22    Q.    Does your son ever stay with you?

23    A.    He comes over sometime.

24    Q.    How often?

25    A.    When he want to, whenever he call me and say he want to
```

DARELL  CHANCELLOR
April 23, 2021

```
 1      spend the weekend with me.

 2   Q.   How frequently does that happen?

 3   A.   About -- since I've been home, about four or five

 4        times.

 5   Q.   Does your mom work?

 6   A.   No.

 7   Q.   Does Crystal work?

 8   A.   Yes.

 9   Q.   Where does Crystal work?

10   A.   Don't know.

11   Q.   Does Alvin Thomas work?

12   A.   Not to my knowing.

13   Q.   Is there anyone that depends on you for financial

14        support?

15   A.   Like who?  I might help my son.

16   Q.   Do you help him?

17   A.   I can't right now, do not have a job.

18   Q.   Okay.  So you're not currently employed?

19   A.   No.

20   Q.   Where is the last place you were employed?

21   A.   G&G Market.

22   Q.   Where is G&G Market?

23   A.   It was on Lovett and Warren.

24   Q.   Is it no longer on Lovett and Warren?

25   A.   No.
```

DARELL   CHANCELLOR
April 23, 2021

1   Q.   There's still a gas station there, isn't there?

2   A.   Yes.

3   Q.   Was it the same kind of operation, G&G Market is the

4        gas station that's there now?

5   A.   Yes.

6   Q.   What did you do at G&G Market?

7   A.   Stock, basically.  Yeah, basically stock and whatever

8        else was asked of me.

9   Q.   What else was asked of you besides stocking shelves?

10  A.   I mean make sure it stay clean, try to keep riffraff up

11       out of there.

12  Q.   Who was your boss at G&G Market?

13  A.   Kevin.

14  Q.   What's Kevin's last name?

15  A.   I can't remember.  It was one of them funny last names.

16       He used to own the gas station.

17  Q.   What kind of funny last name?

18  A.   One of them -- not funny, but hard to pronounce.  One

19       of them Arabic --

20  Q.   I understood what you said.  I'm not trying to make it

21       offensive, but I'm just trying to know specifically how

22       was it unusual?

23  A.   One of the Arab last names, so it's hard to pronounce.

24  Q.   Who did you work with at G&G Market?

25  A.   I worked by myself.

DARELL   CHANCELLOR
April 23, 2021

```
 1   Q.   When you were working at G&G Market would you be the

 2        only person there?

 3   A.   I mean, Kevin would be there, but like besides that

 4        it's just mainly me.

 5   Q.   You didn't have any coworkers?

 6   A.   No.

 7   Q.   And when was the last time you worked at G&G Market?

 8   A.   2012; like 2012.

 9   Q.   Do you have a phone number for Kevin?

10   A.   No, I haven't talked to Kevin.

11   Q.   And so Kevin worked there, but he was also the owner of

12        the store?

13   A.   Yes.

14   Q.   What's the last place that you worked before G&G?

15   A.   Before G&G I worked for some temp services.  I don't

16        recall the names, but it was a few temp services.

17   Q.   Did you ever work for Manpower?

18   A.   I don't recall that.  It's probably a temp service or

19        something, but I don't recall the name.

20   Q.   Yeah, I was just asking because Manpower is a popular

21        temp service.

22   A.   Oh, okay.

23   Q.   See if that jogs your memory at all.  What did you

24        do -- what kind of jobs did the temp service have you

25        doing?
```

DARELL CHANCELLOR
April 23, 2021

1    A.   I mean, it's different jobs.  You go to different sites

2         every day.  It's a different job.

3    Q.   Right.  So what were some of the jobs that you were

4         doing?

5    A.   I don't recall, that's why I say, it was before G&G

6         Market, so I don't really recall.

7    Q.   And so you don't recall any jobs that you did for the

8         temp service?

9    A.   No; vaguely.

10   Q.   I know it was before G&G Market, but when was the last

11        time you worked for a temp service?

12   A.   Don't recall, sir.

13   Q.   Have you ever filed a lawsuit before this one?

14   A.   Yes.  Well, I had attorney file.  I never filed one

15        myself.

16   Q.   Sure.  How many lawsuits have you had an attorney file

17        for you?

18   A.   One, before this one, one.

19   Q.   One before this?

20   A.   Yes.

21   Q.   And did you testify at a deposition in connection with

22        that lawsuit?

23   A.   Yes, that's the deposition I told you, yes.

24   Q.   Okay.  Sir, I can only see the top of your head right

25        now, Mr. Chancellor.  There you go, that's much better.

DARELL   CHANCELLOR
April 23, 2021

```
 1        Thank you.
 2                 And who did you sue in that lawsuit, that
 3        prior lawsuit?
 4   A.   The City of Detroit, an Officer Melendez.
 5   Q.   And what was that lawsuit about?
 6   A.   Basically the same things going on now.  Officer
 7        Melendez lied on me.
 8   Q.   What did he say?
 9   A.   He said I had a firearm, which I didn't.
10   Q.   Did Officer Melendez have any involvement in this
11        lawsuit, the one we're talking about right now?
12   A.   No, not to my knowing.  I don't know.
13   Q.   You're not aware of any involvement that he had?
14   A.   No.
15   Q.   And what was the result of that prior lawsuit?
16   A.   It was settled out.
17   Q.   And did you receive a payment?
18   A.   Yes.
19   Q.   How much did you receive?
20                 MS. HATCHETT:  I'm just going to object
21        preliminarily as based on relevance, but go ahead,
22        Darell.
23                 THE WITNESS:  It was 250,000.
24   BY MR. CUNNINGHAM:
25   Q.   What did you do with that $250,000?
```

DARELL   CHANCELLOR
April 23, 2021

```
1    A.   I didn't get a chance to spend it.  I was locked up, so
2         the state took it.
3    Q.   Did the state take it to pay for the cost of your
4         imprisonment?
5    A.   Yes.
6              MS. HATCHETT:  Objection; relevance.
7    BY MR. CUNNINGHAM:
8    Q.   In this case you were convicted of possession of
9         cocaine; right?
10   A.   In this case I was exonerated.
11   Q.   Well, initially you were convicted by the judge; right?
12   A.   Yes.
13   Q.   Before that conviction, how many prior convictions did
14        you have before the one underlying this case?
15             MS. HATCHETT:  I'll just object based off of
16        relevance to this whole line of questioning, if I can
17        have a continuing objection; Patrick, on this one.
18             MR. CUNNINGHAM:  I'll give you a continuing
19        objection on the basis of relevance.
20             MS. HATCHETT:  Thank you.
21             MR. CUNNINGHAM:  Sure.
22             THE WITNESS:  Now you say what?
23   BY MR. CUNNINGHAM:
24   Q.   How many prior convictions did you have before the one
25        underlying this case?  You know, let me start over.
```

DARELL CHANCELLOR
April 23, 2021

```
 1          That's a confusing way to go about it.  I can see that
 2          you're confused.
 3                  What's the first time you were ever convicted
 4          of a crime?
 5   A.     I think -- as a adult?
 6   Q.     Were you convicted before you were an adult?
 7   A.     I had, yes, I had a conviction as a juvenile, yes.
 8   Q.     How old were you when you had a juvenile conviction?
 9   A.     I think I was about 15, 16 at the time.
10   Q.     And what was that conviction for?
11   A.     I think it was like -- I don't know how to put it.  It
12          was like truant, just basic like truancy at school and
13          acting up at home, so my mother decided to award me to
14          the state, if that's like a case.
15   Q.     Did you end up living -- when you say award you to the
16          state, does that mean you stopped living with your mom?
17   A.     Yes, my mother award me to the state, yes.
18   Q.     And where did you go to live?
19   A.     With the state.
20   Q.     What was the name of the place where you lived?
21   A.     It was like St. Thomas or Burton Center.  It was one of
22          those centers, stuff like that.
23   Q.     And how long did you live at one of those centers?
24   A.     Till my grandma came and got me.  My grandma took
25          custody of me, so not that long.  A few months at the
```

DARELL CHANCELLOR
April 23, 2021

```
 1         most.

 2    Q.   And so I guess I'm not clear.  As a juvenile were you

 3         convicted of a crime?

 4    A.   If that's not a crime, I guess not.

 5    Q.   Okay.  Were there any other convictions you had as a

 6         juvenile?

 7    A.   I think I had a possession of marijuana or something

 8         like that.

 9    Q.   How old we're you when you were convicted of possession

10         of marijuana?

11    A.   Around the same, about 15, 16.

12    Q.   When is the first time you were convicted of a crime as

13         an adult?

14    A.   I think like 2000; 2000, 2001, something in there.

15    Q.   You would have been about 20 years old, 21 years old,

16         something like that?

17    A.   Yes.

18    Q.   And what were you convicted of around 2000 or 2001?

19    A.   Under 50, attempted to deliver under 50.

20    Q.   Under 50 grams of what?

21    A.   Heroin.

22    Q.   Did you have a trial for that conviction?

23    A.   No.

24    Q.   Did you plead guilty to that conviction?

25    A.   Yes.
```

DARELL   CHANCELLOR
April 23, 2021

```
1    Q.   Okay.  After 2000 or 2001 when you were convicted of
2         attempted delivery of under 50 grams of heroin, what's
3         the next time you were convicted of a crime?
4    A.   Right after that it was 2001, another under 50.
5    Q.   Under 50 grams of what?
6    A.   Heroin.
7    Q.   Did you have a trial for that charge?
8    A.   No.
9    Q.   Did you plead guilty to that charge?
10   A.   Yes.
11   Q.   After your second conviction of under 50 grams of
12        heroin, what's the next time you got convicted of a
13        crime?
14   A.   It was all around in the same time, so it was like from
15        2000 to 2001 or 2002, it was another under 25 or under
16        50.
17   Q.   Under 25 or 50 grams of what?
18   A.   Heroin.
19   Q.   And did you have a trial in that case?
20   A.   No.
21   Q.   Did you plead guilty in that case?
22   A.   Yes.
23   Q.   After your third conviction of possession of heroin,
24        what's the next time you were convicted of a crime?
25   A.   What was it?  I think I got -- I think it was a
```

DARELL CHANCELLOR
April 23, 2021

```
1        receiving and concealing, receiving and concealing over
2        $1,000.
3   Q.   And did you have a trial in that case?
4   A.   No.
5   Q.   Did you plead guilty in that case?
6   A.   Yes.
7   Q.   What did you plead guilty to receiving and concealing?
8   A.   It was a car.
9   Q.   A stolen car?
10  A.   Yes.
11  Q.   After your conviction of receiving and concealing the
12       car, what's the next time you were convicted of a
13       crime?
14  A.   Armed robbery.  I think it was an armed robbery, 2003
15       armed robbery, felony firearm.
16  Q.   And did you have a trial in that case?
17  A.   No.
18  Q.   Did you plead guilty in that case?
19  A.   Plead no contact (phonetic).
20  Q.   Pled no contest?
21  A.   Yeah.
22  Q.   And what did you do that you pled no contest to armed
23       robbery?
24  A.   What you mean?  I don't understand the question.
25  Q.   Did you rob someplace?
```

U.S. Legal Support | www.uslegalsupport.com 22

DARELL   CHANCELLOR
April 23, 2021

```
 1   A.   A person.

 2   Q.   Who did you rob?

 3   A.   A drug dealer.

 4   Q.   What did you rob this person of?

 5   A.   Some glasses.

 6   Q.   What kind of glasses?

 7   A.   Cartier glasses.

 8   Q.   And were you armed when you robbed this person of

 9        Cartier glasses?

10   A.   Yes.

11   Q.   What were you armed with?

12   A.   A gun.

13   Q.   What kind of gun?

14   A.   A .357.

15   Q.   Was that a .357 Magnum?

16   A.   I don't remember the make and the model -- I mean the

17        model.

18   Q.   Where did you get a .357 from?

19              MS. HATCHETT:  Object to relevance.  Go

20        ahead.

21              THE WITNESS:  I don't recall.

22   BY MR. CUNNINGHAM:

23   Q.   After armed robbery and felony firearm, what's the next

24        thing you were convicted of?

25   A.   There's no convictions after that.  I was convicted of
```

DARELL CHANCELLOR
April 23, 2021

1        this what I have been exonerated from, that was it.

2   Q.   In 2001 when you were convicted of under 50 grams of

3        heroin, were you imprisoned after that conviction?

4   A.   What you mean, imprisoned?

5   Q.   Did they put you in jail?

6   A.   No.

7   Q.   Did you get probation?

8   A.   Yes.

9   Q.   Okay.  After the second conviction in 2001 under 50

10       grams of heroin, did they put you in jail after that?

11  A.   No.

12  Q.   Did you get probation?

13  A.   Yes, I didn't go to prison for none of them

14       convictions.

15  Q.   Okay.  I appreciate you trying to save me some time,

16       but just for completeness sake I'm going to go through

17       them.

18              For the third conviction in 2002, under 25

19       grams of heroin, did you get probation for that?

20  A.   Yes.

21  Q.   And were you in jail for that at all?

22  A.   No.

23  Q.   Okay.  The conviction of receiving and concealing over

24       $1,000, did you get probation for that?

25  A.   Yes.

DARELL  CHANCELLOR
April 23, 2021

1    Q.   And did you go to jail at all for that?

2    A.   No.

3    Q.   And for the armed robbery, felony firearm conviction,

4         were you sentenced to probation for that?

5    A.   No.

6    Q.   Were you sentenced to prison for that?

7    A.   Yes.

8    Q.   All right.  And was your sentence for the armed

9         robbery, felony firearm?

10   A.   7 to 15, 5 for the armed robbery, 2 for the gun, so

11        altogether it was 7 to 15.

12   Q.   And how long did you actually serve in prison?

13   A.   Like 7-1/2 years, 8 years.

14   Q.   So that was from 2003 to about 2010; is that right?

15   A.   Yes.

16   Q.   And when you were released in 2010, you were paroled?

17   A.   Yes.

18   Q.   Since you have been let out of prison in this case have

19        you been charged with any other crimes?

20   A.   No.

21   Q.   Did you ever receive medical care when you were in

22        prison?

23   A.   Like what?

24   Q.   Like seeing a doctor or seeing a nurse or anything like

25        that?

DARELL   CHANCELLOR
April 23, 2021

1   A.   I mean, yes, if I was sick I went to the doctor, yes.

2   Q.   Okay.  And do they have a doctor at the prison or do

3        you leave the prison to go see a doctor somewhere else?

4   A.   I mean, they got a doctor at the prison.

5   Q.   And I see that you're wearing glasses; right?

6   A.   Yes.

7   Q.   And I always find this question difficult to ask.  Why

8        do you wear glasses?  Because I need them to see.

9        That's always the answer and it makes sense, but what

10       kind of vision problems do you have without your

11       glasses that your glasses correct for you?

12  A.   Without my glasses, I can't see.  It's blurry.  I --

13  Q.   Go ahead.  I'm sorry.

14  A.   I can't function without my glasses.

15  Q.   Are things close to you blurry or are things far away

16       from you blurry or are both of them blurry?

17  A.   It's all blurry.

18  Q.   Do you have an eye doctor that you go see?

19  A.   Not out here.

20  Q.   Did you see an eye doctor in prison?

21  A.   Yes.

22  Q.   Do you wear contact lenses?

23  A.   No.

24  Q.   Have you ever owned contact lenses?

25  A.   No.

DARELL   CHANCELLOR
April 23, 2021

1   Q.   Have you ever had a doctor prescribe contact lenses?

2   A.   No.

3   Q.   Do you have any kind of hearing impairment?

4   A.   No.

5   Q.   Do you have a recollection of the day of November 1st,

6        2011?

7   A.   Could you repeat the date?

8   Q.   Sure, November 1st, 2011.

9   A.   Yes.

10  Q.   What do you remember about November 1st, 2011?

11  A.   I mean, what do you mean what do I remember?

12  Q.   Well, you woke up that morning; is that true?

13  A.   Yes.

14  Q.   Where were you when you woke up?

15  A.   I was at home.

16  Q.   Where was home?

17  A.   9209 Robison.

18  Q.   And was anyone there with you?

19  A.   Yes, my wife, Katrice.

20  Q.   Anyone else?

21  A.   My son was just newborn at the time.

22  Q.   Was there anyone there with you besides Katrice and

23       your son?

24  A.   No.

25  Q.   Okay.  So November 1st, 2011, you wake up.  What time

27

DARELL CHANCELLOR
April 23, 2021

```
1        did you wake up?

2   A.   Early.  I had to go to work.

3   Q.   How early is early, approximately?

4   A.   About 8:00.  I woke up about 7:30.

5   Q.   And what time did you go to work?

6   A.   I made it to work about 9:00, something like that,

7        8:45; about 8:45, 9:00 o'clock.

8   Q.   And how did you get to work?

9   A.   I drove my car.

10  Q.   What kind of car did you have?

11  A.   It was a purple, like a purple Cavalier.

12  Q.   Chevy Cavalier?

13  A.   Yes.

14  Q.   And how long were you at work?

15  A.   I was at work all day.

16  Q.   What time did your shift end?

17  A.   My shift end about -- say about -- it really is when

18       he's done with me.  I can be there all day, but it

19       depends on when he's done, you know, if we done working

20       for the day.

21  Q.   Well, when were you done working that day?

22  A.   About that day at about 5:00; about 5:00, 6:00,

23       something like that.

24  Q.   And then what did you do at 5:00 o'clock when you were

25       done working?
```

DARELL   CHANCELLOR
April 23, 2021

```
 1    A.    I went home.

 2    Q.    And where was home?

 3    A.    Robison, 9209 Robison.

 4    Q.    And when you got home was anyone else there?

 5    A.    Besides my wife and my kid, no.

 6    Q.    And what did you do when you got home?

 7    A.    I didn't do nothing.  I watched T.V.  The day was over

 8          with.

 9    Q.    Did you leave the house again after you got home from

10          work?

11    A.    No.

12    Q.    Okay.  Do you have a recollection of the day November

13          2nd, 2011?

14    A.    What do you mean?

15    Q.    Do you remember that day?  Can you remember that day?

16    A.    Yes.

17    Q.    Okay.  And what do you remember about that day?

18    A.    I don't understand the question.

19    Q.    Okay.  Just like we did with the day before, you woke

20          up that morning; right?

21    A.    Right.

22    Q.    And where were you?

23    A.    At home.

24    Q.    And where was home?

25    A.    9209 Robison.
```

29

DARELL   CHANCELLOR
April 23, 2021

1    Q.    And who was there?

2    A.    The same person that was there the day before.

3    Q.    That's your wife and your son?

4    A.    Yes.

5    Q.    And no one else there?

6    A.    No.

7    Q.    And did you work on November 2nd, 2011?

8    A.    Yes.

9    Q.    And what time did you start work?

10   A.    About the same, about 8:00; about 8:45, 9:00.

11   Q.    And how did you get to work?

12   A.    My car.

13   Q.    And that's the purple Chevy Cavalier?

14   A.    Yes.

15   Q.    And what time did you get off work?

16   A.    Around the same.  It was around the same, about 5:00 or

17         6:00.

18   Q.    So you started work around 9:00 and you got off around

19         5:00; is that right?

20   A.    About 5:00, 6:00.

21   Q.    So were you at work from 9:00 a.m. to 5:00 p.m.?

22   A.    Yes.

23   Q.    And then around 5:00 or 6:00 you are done working and

24         what did you do?

25   A.    I went home to Robison.

DARELL   CHANCELLOR
April 23, 2021

1    Q.    And who was there?

2    A.    My wife and my son.

3    Q.    Anyone else?

4    A.    No.

5    Q.    So November 1st was coming up on 10 years ago; right?

6    A.    Uh-huh.

7    Q.    Why do you remember that day?

8    A.    Why do I remember that day?

9    Q.    Yeah.

10   A.    Because I -- I mean why wouldn't I remember that day?

11         I just spent 8 years in prison over that day.   If

12         something traumatic happened to you, you remember that

13         day, too.

14   Q.    Okay.  And did anything out of the ordinary happen on

15         November 1st, 2011 to you?

16   A.    What you mean, that date?

17   Q.    Yes, November 1st, 2011.  Anything out of the ordinary

18         happen to you that day?

19   A.    No, not that day.

20   Q.    Okay.  What about on November 2nd, 2011, did anything

21         out of the ordinary happen to you that day?

22   A.    No.

23   Q.    Did you talk to your mother that day?

24   A.    I talked to my mother, yes, that night.

25   Q.    And what did you talk about?

DARELL CHANCELLOR
April 23, 2021

1    A.   She told me that the police had raided her house.

2    Q.   Did you have a cell phone on November 2nd, 2011?

3    A.   Yes.

4    Q.   Do you still have that cell phone?

5    A.   No.

6    Q.   What happened to it?

7    A.   I don't recall.

8    Q.   Who was your cell phone carrier on November 2nd, 2011?

9    A.   I don't recall.  I don't recall.

10   Q.   Where were you when your mother called you on November

11        2nd, 2011?

12   A.   I was at home.

13   Q.   And what did you do after you talked to your mom?

14   A.   What you mean, what did I do about what?

15   Q.   About anything.  But what did you do?  You hung up the

16        phone and then what happened after that?

17   A.   Nothing happened after that.  I hung up the phone and

18        that was that.

19   Q.   Did you leave the house that night after you got off

20        the phone with your mom?

21   A.   No.

22   Q.   So your mom's house is 5023 32nd Street; right?

23   A.   Yes

24   Q.   And that's the house you're at right now; right?

25   A.   No, I'm not right there right now, no.

DARELL   CHANCELLOR
April 23, 2021

```
 1   Q.   Where are you now?

 2   A.   I'm over a friend house right now.

 3   Q.   Oh, I assumed that you were.

 4   A.   Do I have to be at home to do this call?

 5   Q.   No, I asked you earlier where you were and you told me

 6        that you were at 5023 32nd Street.

 7              MS. HATCHETT:  Actually, I think you may have

 8        asked him specifically where he was living.

 9              MR. CUNNINGHAM:  Correct.  Well, I asked him

10        that, too.

11              THE WITNESS:  Yeah.

12   BY MR. CUNNINGHAM:

13   Q.   Okay.  I asked you -- maybe I misunderstood.  Where are

14        you right now?

15   A.   Do I got to answer that?

16   Q.   Yeah.  I wouldn't -- you're testifying remotely from a

17        location.  I would like to know the location where

18        you're testifying from remotely.

19              MR. JOHNSON:  Please answer, Darell.  Thank

20        you.

21              THE WITNESS:  Okay.  I'm over at my

22        girlfriend house.

23   BY MR. CUNNINGHAM:

24   Q.   All right.  And what's the address there?

25   A.   It's 15040 Robison.
```

DARELL   CHANCELLOR
April 23, 2021

```
1    Q.    1504?

2    A.    Yeah, zero, Robison.

3    Q.    I'm sorry.  15040 Robison?  Did I get it right?

4    A.    Say it again for me.

5    Q.    Sure.  15040?

6    A.    Yes; Robison.  I mean not Robison, Ferguson.

7    Q.    Ferguson?

8    A.    Yeah; Ferguson.

9    Q.    And what's your girlfriend's name?

10   A.    Davanek Rogers.

11   Q.    Can you spell her first name for me?

12   A.    D-a-v-a-n-e-k.  Davanek.

13   Q.    And is Rogers R-o-g-e-r-s?

14   A.    Yes.

15   Q.    So 5023 32nd Street, that's your mom's house?

16   A.    Yes.

17   Q.    Is that still your mom's house?

18   A.    Yes.

19   Q.    Okay.  Have you lived there in the past?

20   A.    What you mean, in the past?

21   Q.    Did you ever live at that house?

22   A.    Yes.

23   Q.    When is the last time you lived there?

24   A.    I stay there now.

25   Q.    And when did you start living there this time, if that
```

DARELL   CHANCELLOR
April 23, 2021

```
 1        makes sense?
 2   A.   When I got out of prison.
 3   Q.   And when was that?
 4   A.   March 26, 2020.
 5   Q.   Okay.  On March 26. 2020 you got out of prison and you
 6        started living at 5023 32nd Street?
 7   A.   Yes.
 8   Q.   And have you lived anywhere else in between March 26,
 9        2020 and now?
10   A.   No.
11   Q.   All right.  Before March 26 of 2020 had lived at 5023
12        32nd Street before that?
13   A.   You said before March 2020?  I was locked up.
14   Q.   Correct.  Ever in the past, did you ever live at that
15        address before?
16   A.   Yes; yes.
17   Q.   And when is the last time you lived at that address
18        before, before you moved back in in March 26, 2020?
19   A.   I was at that location when I got out of prison the
20        first time, in December.  December 14 -- I mean
21        December 15, 2010 I stayed there.
22   Q.   Okay.  So December 15, 2010 you got out of prison and
23        you moved --
24   A.   Yes.
25   Q.   -- into your mom's house?
```

35

DARELL CHANCELLOR
April 23, 2021

```
 1    A.    Yes.

 2    Q.    And when did you move out of your mom's house?

 3    A.    The next month when my utilities, when my lights was on

 4          on my house on Robison, I moved into Robison.

 5    Q.    And that would have been January 2011?

 6    A.    Yes.

 7    Q.    When you were living at -- on 32nd Street, when I say

 8          the 32nd street house, I'm going to mean your mom's

 9          house; is that fair?

10    A.    Okay.  Yes; yes; yes.

11    Q.    All right.  When you were living at the 32nd Street

12          house in December of 2010, who lived there with you?

13    A.    The same people and my brother.

14    Q.    So your mom?

15    A.    My mother, her boyfriend, that's my sister.

16    Q.    Alvin?

17    A.    Alvin, and Antonio.

18    Q.    And Antonio, was your brother?

19    A.    Yes.

20    Q.    Also last name Chancellor?

21    A.    Yes.

22    Q.    So in December of 2010, did anybody live there besides

23          you, your mom, Crystal, Alvin and Antonio?

24    A.    No, that was it.

25    Q.    Okay.  After you moved out in January of 2011, did
```

36

DARELL   CHANCELLOR
April 23, 2021

```
1          anybody else move into the 32nd Street house?
2    A.    I don't think -- I don't know.  I don't recall.
3    Q.    Did you have any cousins that lived there?
4    A.    I don't recall.
5    Q.    Did Ronald Durrell live there?
6    A.    I don't recall.
7    Q.    All right.  In January of 2011 -- let's see.  Well, I
8          guess it's between December and January, December of
9          2010 and January of 2011, when you were living at the
10         32nd Street house, where did you sleep?
11   A.    On the couch.
12   Q.    Is it the same couch you're sleeping on now?
13   A.    No.
14   Q.    Is the couch the same location?
15   A.    Yes.
16   Q.    Is it on the first floor or the second floor?
17   A.    The first floor.
18   Q.    After you moved out, did you ever stay over or stay the
19         night at the 32nd Street house?
20   A.    No.
21   Q.    Did you keep any of your belongings at the 32nd Street
22         house after you moved out?
23   A.    No.
24   Q.    And there are only three bedrooms in the 32nd Street
25         house?
```

37

DARELL   CHANCELLOR
April 23, 2021

```
 1    A.    Yes.

 2    Q.    How many beds?

 3    A.    Should be three.  Yes, I say three.

 4    Q.    Okay.  At the trial in this case, remember the trial in

 5          this case, the criminal trial?

 6    A.    Yes.

 7    Q.    Okay.  There was a document introduced into evidence

 8          from the Michigan Department of Treasury, do you

 9          remember that?

10    A.    Yes.

11    Q.    What was that document?

12    A.    It was -- it was something from my parole officer, a

13          payment or something.  If I ain't mistaken, it was some

14          type of payment thing from my parole officer.

15    Q.    You told your parole officer that you lived at 5023

16          32nd Street right?

17    A.    Yes.

18    Q.    And your parole officer came to visit you at that

19          location; right?

20    A.    Yes

21    Q.    And did she visit you there after January of 2011?

22    A.    No, not to my -- I don't recall.  I don't recall seeing

23          her after that.

24    Q.    Did you ever tell your parole officer that you moved to

25          Robison?
```

DARELL CHANCELLOR
April 23, 2021

1    A.    No.

2    Q.    So when you told your parole officer that you lived at

3          32nd Street, you really lived at Robison; is that

4          right?

5    A.    Yes, sir.

6    Q.    So you were lying to her when you told her that; right?

7    A.    Yes.

8    Q.    Did you tell your parole officer that you lived

9          upstairs at 32nd Street?

10   A.    No.

11   Q.    So if she testified that you told her that you lived

12         upstairs, she would be lying?

13   A.    Yes.

14               MR. CUNNINGHAM:  Hey, Ayanna, I have a few

15         exhibits I'm going to show him.  I'm going to e-mail

16         them to you right now.

17               MS. HATCHETT:  Okay.  Thank you.

18               MR. CUNNINGHAM:  Just give me one minute, Mr.

19         Chancellor.

20               MR. JOHNSON:  If you can, e-mail them to me,

21         too, sir.

22               MR. CUNNINGHAM:  I will.

23               MR. JOHNSON:  I appreciate it.  Thanks.

24               MR. CUNNINGHAM:  Bear with me.  My computer

25         is not cooperating with me.

DARELL   CHANCELLOR
April 23, 2021

```
 1   BY MR. CUNNINGHAM:

 2   Q.   All right.  Mr. Chancellor, I'm going to share a

 3        document on your screen.  You should be able to see it

 4        on your phone, I hope.  So we'll see how this goes.

 5        Okay.  Can you see that, Mr. Chancellor?

 6   A.   Yes, a little bit.

 7   Q.   I'll try and make it a little bit bigger.

 8   A.   Okay.

 9   Q.   Can you see what it says at the top there?

10   A.   Parole conditions.

11   Q.   If I highlight it, can you see the highlighting?

12   A.   Yeah.

13   Q.   Okay.  Parole conditions.  All right.

14   A.   Yeah.

15   Q.   And number 2 here, can you see that?

16   A.   Yes.

17   Q.   And could you read that for me?

18   A.   Hold on one second.  You must not change residence

19        without prior permission of your agent, your field

20        agent.

21   Q.   And I'm just going to zoom out a little bit so you can

22        it's one whole document.  Is that your signature at the

23        bottom?

24   A.   Yes.

25   Q.   Okay.  I'm going to mark that as Exhibit 1.  And then
```

DARELL CHANCELLOR
April 23, 2021

1      I'm going to ask you to look at this also, Mr.

2      Chancellor.  Is that your writing?

3   A.  Yes.

4   Q.  And is that your signature at the bottom?

5   A.  Yes.

6   Q.  That's it for the moment.

7              All right.  Are you aware that on November

8      2nd, 2011 cocaine was found at your mom's house at 5023

9      32nd Street?

10  A.  Could you repeat the question?

11  Q.  Sure.  Are you aware that on November 2nd, 2011 cocaine

12      was found at your mother's house at 5023 32nd Street?

13  A.  Yeah, I'm aware they say something found there.

14  Q.  I'm sorry.  You aware what?

15  A.  I'm aware that something was found there they say.

16  Q.  At your trial do you remember your attorney stipulating

17      that what they found was cocaine?

18  A.  Yes.

19  Q.  So would you disagree with me when I say that what they

20      found there was cocaine?

21  A.  I don't know what they found there.  I wasn't there,

22      sir.

23  Q.  Was that your cocaine?

24  A.  No.

25  Q.  Do you know how that cocaine got there?

Rebel Legal Support Services · 41

DARELL   CHANCELLOR
April 23, 2021

1    A.    No.

2    Q.    Well, it wasn't your mother's cocaine; right?

3    A.    Not to my knowing.

4    Q.    So do you know whether it was your mother's cocaine?

5              MS. HATCHETT:  Objection; relevance.

6    BY MR. CUNNINGHAM:

7    Q.    I'm sorry.  I couldn't hear your response.

8    A.    No, I don't know who cocaine it was.

9    Q.    Was it Ronald Durrell's cocaine?

10   A.    Don't know, sir.

11   Q.    Was it Alvin Thomas' cocaine?

12   A.    Don't know, sir.

13             MS. HATCHETT:  Objection; asked and answered,

14       lack of foundation.

15   BY MR. CUNNINGHAM:

16   Q.    Was it Crystal's cocaine?

17             MS. HATCHETT:  Same objection.

18   BY MR. CUNNINGHAM:

19   Q.    Did it belong to one of your cousins?

20   A.    Don't know, sir.  Ain't belong to me.

21   Q.    Okay.  And so you don't know how it got there?

22   A.    No, sir.

23   Q.    All right.  Your house on Robison, it's 9209?  That's

24       right, isn't it, 9209?

25   A.    9209, yes.

DARELL   CHANCELLOR
April 23, 2021

1    Q.   Okay.  Why did you purchase that house?

2    A.   I don't understand the question.

3    Q.   Were you in prison when you purchased that house?

4    A.   Yes.

5    Q.   So what did you need a house for?

6    A.   Just because I was coming home and I wanted a house to

7         live in.

8    Q.   When did you purchase that house?

9    A.   I don't recall.  I don't recall.  I think it was -- I

10        don't recall, sir.

11   Q.   Okay.  Who did you purchase it from?

12   A.   What do you mean, who I purchase it from?

13   Q.   Did you pay money to somebody to get the house?

14   A.   I had a, yes, my friend Roxsanna Collins.

15   Q.   So you bought the house from Roxsanna?

16   A.   No, she bought it for me.  I was incarcerated, so I

17        couldn't, you know, sign deeds and all that, so she

18        bought the house for me, and when I was coming home I

19        was getting the house from her.

20   Q.   Who did she buy the house from?

21   A.   I don't know, sir.

22   Q.   And so I think what you're telling me is she bought it

23        from somebody else, you're not sure who, and then you

24        bought it from her?  Really you were just kind of using

25        her as a go-between between whoever owned it before she

43

DARELL   CHANCELLOR
April 23, 2021

1      owned it and yourself?

2  A.   Yes.

3  Q.   So Roxsanna never lived there?

4  A.   No.

5  Q.   And how do you know Roxsanna?  What's your relationship

6      with her?

7  A.   I took her to her prom like years ago, way, way years

8      ago.  Used to be my girlfriend.

9  Q.   Where does Roxsanna live?

10 A.   Don't know.

11 Q.   And, I'm sorry, Roxsanna's last name is Collins; is

12     that right?

13 A.   Yes.

14 Q.   And Roxsanna by the way is R-o-x-s-a-n-n-a?

15 A.   Yes.

16 Q.   And what's Roxsanna's phone number?

17 A.   I got to go through my phone to get it.

18 Q.   Okay.  If you could do that, please.

19 A.   I'm kind of scared.

20 Q.   It's touch and go with that, isn't it?  Right.  Let's

21     hold off on that for the time being.

22 A.   Right.

23 Q.   We might not want to risk that.

24 A.   Right.

25 Q.   All right.  I'm going to try to remember at the end and

DARELL CHANCELLOR
April 23, 2021

```
 1        then I'll ask you again, and then if we lose our
 2        connection, so be it.
 3   A.   All right.
 4   Q.   Okay.  How much did you pay for 9209 Robison?
 5   A.   I don't recall.  I don't remember.  I don't remember.
 6   Q.   Where did you get the money to buy it?
 7                MS. HATCHETT:  Objection to relevance.  You
 8        can go ahead, Mr. Chancellor, if you can recall.
 9                THE WITNESS:  I don't.  I don't recall.  It
10        was -- I don't recall.
11   BY MR. CUNNINGHAM:
12   Q.   On Robison did anybody ever live there with you and
13        your wife and your son besides the --
14   A.   No.
15   Q.   -- three of you?
16   A.   No.  Well, her kids.
17   Q.   When did her kids live there?
18   A.   When they came -- I guess when they came over.
19   Q.   So they didn't live there, but they would stay with you
20        sometimes?
21   A.   Yes, from her and her mother, yes.
22   Q.   And what's Katrice's mother's name?
23   A.   Linda, I think.
24   Q.   And what's Linda's last name?
25   A.   Butler.
```

DARELL CHANCELLOR
April 23, 2021

```
 1   Q.   And where does Linda live?

 2   A.   Don't know, sir.

 3   Q.   What's Linda's phone number?

 4   A.   Don't know, sir.

 5   Q.   Is Linda's number in your phone?

 6   A.   No.

 7   Q.   Before you moved into the house on Robison, who lived

 8        there?

 9   A.   Don't know, sir.

10   Q.   Now, I've seen a utility bill from DTE for that

11        address.  You know what I'm talking about?

12   A.   I can't -- I don't know what you're talking about.  I

13        can't see it.

14   Q.   Okay.  Let me see if I can find it.  I can't put my

15        fingers on it right now.  Did you have electric service

16        at the house at Robison when you lived there?

17   A.   Yes.

18   Q.   Did you have other utilities besides electricity?

19   A.   Like heat?

20   Q.   Yes.

21   A.   Yes.

22   Q.   And was that also through DTE?

23   A.   Yes.

24   Q.   Did you have water?

25   A.   Yes.
```

DARELL CHANCELLOR
April 23, 2021

1    Q.   And was that through Detroit Water & Sewerage

2         Department?

3    A.   Yes, I think so.

4    Q.   Did you have cable T.V.?

5    A.   Yes.

6    Q.   Who did you get your cable T.V. from?

7    A.   I don't know.  I didn't pay no cable bills.

8    Q.   Did you have Comcast cable?

9    A.   Don't know, sir.

10   Q.   Did you have AT&T cable?

11   A.   Don't know, sir.

12   Q.   I'm going to show you another document.  Can you see

13        that document, Mr. Chancellor?

14   A.   Yeah.

15   Q.   And is this your signature at the bottom?

16   A.   Yeah.

17   Q.   All right.  And this document says dated this February

18        8, 2008; you see where it says that?

19   A.   Yes.

20   Q.   Was that the date you signed this document?

21   A.   I don't recall.

22   Q.   And did Roxsanna sign her name or did you sign her

23        name?

24   A.   She had to sign on her own name.

25   Q.   Okay.  And do you see this identification card here at

DARELL   CHANCELLOR
April 23, 2021

```
1        the bottom?

2   A.   Yes.

3   Q.   Is that your identification card?

4   A.   Yes.

5   Q.   It's also got your signature at the bottom?

6   A.   Yes.

7   Q.   And that's a picture of you?

8   A.   Yes.

9   Q.   Where were you on February 8th, 2008?

10  A.   I was locked up.

11  Q.   Did Roxsanna ever come to the prison to see you?

12  A.   Unh-unh.

13  Q.   Is that a no?

14  A.   I don't recall, sir, no.

15  Q.   Did you ever have a notary come to the prison where you

16       were to sign this deed?

17  A.   I don't recall.

18  Q.   Who recorded this deed?

19  A.   I don't recall, sir.

20  Q.   When were you arrested for this case?

21  A.   May 2nd, 2012.

22  Q.   And where were you when you were arrested?

23  A.   I was driving.  I was pulled over.

24  Q.   And was that in the city of Detroit?

25  A.   Yes.
```

48

DARELL  CHANCELLOR
April 23, 2021

```
1   Q.   And where did they take you when they arrested you?

2   A.   The jail.

3   Q.   Was that the Detroit Detention Center or was that

4        before the Detroit Detention Center?

5   A.   That was before the Detroit Detention Center.

6   Q.   So which jail was it?

7   A.   If I can recall, it was the precinct, the 2nd Precinct.

8   Q.   And how long were you at the 2nd Precinct?

9   A.   For a couple days.

10  Q.   And then what happened after a couple days?

11  A.   I went to Wayne County.

12  Q.   And how long we're you at Wayne County Jail?

13  A.   To trial, till I lost the trial.

14  Q.   Never bonded out?

15  A.   No.

16  Q.   When you were arrested did you believe that you were

17       innocent?

18  A.   I know I was innocent.

19  Q.   I'm going to show you another document.  Can you see

20       that document, Mr. Chancellor?

21  A.   Yes.

22  Q.   Do you recognize that document?

23  A.   Yes.

24  Q.   That document was -- I think it was the Defense Exhibit

25       A in your trial; right?
```

DARELL   CHANCELLOR
April 23, 2021

1   A.   I don't recall what exhibit it was.

2   Q.   Okay.  But you were aware of that at the time of trial,

3        this document?

4   A.   I'm aware of this, yes.

5   Q.   I know you were aware of it now, but back then you were

6        aware of it, too; right?

7   A.   Yes.

8   Q.   And at the time of your trial did you believe that the

9        statements in this affidavit were false?

10  A.   Could you repeat the question?

11  Q.   Sure.  Let's take a look at the -- part of the search

12       warrant.  I'm sorry.  I'd like to mark this as Exhibit

13       3, and I'd like to mark the deed we looked at before as

14       Exhibit 2, which I failed to mention.

15            Okay.  Can you see the part where it says --

16       I'm going to try and highlight it here -- on November

17       1st, 2011 affiant set up a fixed surveillance?

18  A.   Yes.

19  Q.   Okay.  And during the course of 30 minutes, affiant

20       observed at least three persons separately go to the

21       above address, knock on the door of 5023 32nd, engage

22       in a short conversation with the person matching the

23       above seller description.  Then the suspected buyer

24       would stay outside and the above-described seller

25       returned and made a suspected narcotic transaction with

50

DARELL CHANCELLOR
April 23, 2021

```
1        the buyer in which money was exchanged for suspected
2        heroin.  Affiant has seen this type of activity several
3        times in the past and finds this type of activity to be
4        consistent with ongoing narcotic activity.
5               Do you believe that's a true statement?
6   A.   I believe --
7               MR. JOHNSON:  First of all, hold on.  It's
8        affiant, first of all, but go ahead.
9               THE WITNESS:  I believe I ain't got nothing
10       to do nothing in this statement, so I don't true or
11       guess who, I don't know who you're talking about.
12  BY MR. CUNNINGHAM:
13  Q.   Okay.  I guess then my question is do you know whether
14       that statement is true or not?
15  A.   No, I don't know nothing about nothing in this
16       statement.
17  Q.   Okay.  Now, all right, Mr. Chancellor, I'm going to ask
18       you to look at another paragraph.  It says on October
19       31st, 2011, affiant received information from a
20       credible and reliable informant.  The CI stated to
21       affiant that he/she knows there is a large amount of
22       heroin at the above location which is being stored and
23       sold at this location.  The affiant has sued the CI in
24       over three occasions resulting in three arrests for
25       VSCA with cases pending in 36th District and Third
```

DARELL   CHANCELLOR
April 23, 2021

```
1          Circuit resulting in the confiscation of quantities of
2          marijuana, cocaine and firearms proving the CI is
3          familiar with narcotics and it's packaging.  Do you
4          know if that statement is true?
5    A.    I don't know nothing about none of that.
6    Q.    Okay.  Do you own a motor vehicle?
7    A.    No.
8    Q.    Have you owned a motor vehicle since the purple Chevy
9          Cavalier that you used to own?
10   A.    Yes.
11   Q.    What other motor vehicle have you owned?
12   A.    I had a -- what was it? -- a Crown Victoria and a
13         Trailblazer.
14   Q.    When did you own a Crown Victoria?
15   A.    Like, I want to say the end of 2011, beginning of 2012.
16   Q.    What color was the Crown Victoria?
17   A.    Gold, brownish gold.
18   Q.    Okay.  Did you own that gold Crown Victoria on November
19         1st, 2011?
20   A.    What was the date?
21   Q.    November 1st, 2011.
22   A.    No, not that I can recall.
23   Q.    Have you ever spoken to Stephen Geelhood before?
24   A.    No.
25   Q.    Have you ever spoken to him on the telephone?
```

DARELL   CHANCELLOR
April 23, 2021

```
 1   A.   No.

 2   Q.   Had you ever met Stephen Geelhood before November 1st

 3        of 2011?

 4   A.   No.

 5   Q.   Do you know of any reason why he would make up a fake

 6        affidavit and come to search your mom's house on

 7        November 1st, 2011?

 8   A.   No, don't have the slightest idea.

 9   Q.   Do you currently receive any government benefits?

10   A.   No.  What do you mean?

11   Q.   Sure.  Medicaid?   Do you get Medicaid?

12   A.   I got a Medicaid card.  I haven't used it or nothing.

13   Q.   And you're not Medicare eligible, are you?

14   A.   What you mean?

15   Q.   Medicare is usually for people 65 and older, but also

16        for some people with chronic health conditions.

17   A.   No.

18   Q.   It's that red, white and blue card that says Medicare

19        on it if you're eligible.

20   A.   No.

21   Q.   Do you receive any kind of Social Security benefits?

22   A.   No.

23   Q.   Do you get food stamps or a Bridge card or anything

24        like that?

25   A.   Get a Bridge card.
```

53

DARELL   CHANCELLOR
April 23, 2021

```
1    Q.   Other than Medicaid, do you have any other kind of
2         health insurance?
3    A.   No, not to my knowing.
4    Q.   Do you have any kind of automobile insurance?
5    A.   No.
6    Q.   Any other kind of insurance?
7    A.   No.
8    Q.   All right.  I have one more document to look at.  Okay.
9         Can you see that document, Mr. Chancellor?
10   A.   Yeah.
11   Q.   Do you recognize that document?
12   A.   Not right offhand.
13   Q.   Well, I'm going to suggest to you that this is a
14        document -- actually, I don't even know if this is
15        true, so let me ask you a question about this document.
16        It looks to me like a document that the CIU sent to you
17        and had you provide them information and you sent it
18        back to them.  Does that sound right to you?
19   A.   No, I don't recall.
20   Q.   Okay.  I'm going to ask you to look at this.  Is that
21        your handwriting?
22   A.   Yes.
23   Q.   And what about this part, this is my new evidence?  Is
24        that your handwriting?
25   A.   Yeah.
```

54

DARELL   CHANCELLOR
April 23, 2021

1   Q.   And is this what you believe was new evidence in your

2        criminal case?

3   A.   I believe it was just evidence that wasn't looked at.

4   Q.   Okay.  I'm going to ask you to look at this handwritten

5        number 10 here.  It says, please tell us of the new

6        evidence which supports your claim that you are

7        innocent of the crimes of conviction.  You see that?

8   A.   Yes.

9   Q.   Now, here you have a whole section of evidence, and

10       then here you have another section that says, my new

11       evidence.  And is this evidence that you thought was

12       new evidence that shows your innocence?

13  A.   I thought this was evidence that wasn't submitted at

14       trial.

15  Q.   Okay.  Okay.  Fair enough.  And so new evidence you

16       have listed here, my original state ID card that shows

17       my height and weight, which is your height is 5'11" and

18       your weight is 220 pounds, do you see that?

19  A.   Right.

20  Q.   And you thought that was something that should have

21       been considered at trial but was not?

22  A.   Right.

23  Q.   Correct?

24  A.   Yes.

25  Q.   Yeah.  Okay.  And then the second one was my quit claim

DARELL   CHANCELLOR
April 23, 2021

1        deed to the house I stayed at.  Is that also evidence

2        that you -- was not considered at your criminal trial

3        that you thought should have been considered?

4   A.   Yes.

5   Q.   And that's the quit claim deed that we just looked at;

6        right?

7   A.   Yes.

8   Q.   The third thing here is my detainee input sheet to show

9        my weight before I got to jail.  That's also something

10       that you thought should have been considered at your

11       trial but wasn't?

12  A.   Yes.

13  Q.   Okay.  The next thing is my DTE energy bill.  That's

14       evidence that you thought should have been considered

15       at your trial but wasn't?

16  A.   Yes.

17  Q.   And that's -- the DTE bill I was referring to earlier,

18       but I can't seem to put my fingers on now.

19           Chapter 5.  Affidavit for Janet Chancellor to

20       testify.  That's Janet Chancellor is your mom; right?

21  A.   Yes.

22  Q.   And so you thought she was going to give some testimony

23       that she didn't offer at trial; right?

24  A.   That she -- yes.

25  Q.   Okay.  Besides this new evidence that you listed here,

56

DARELL CHANCELLOR
April 23, 2021

```
 1        is there any other new evidence that you think should

 2        have been considered at your criminal trial that wasn't

 3        considered?

 4                MR. JOHNSON:  Calls for a legal conclusion.

 5        Go ahead.

 6                THE WITNESS:  Like, could you repeat that

 7        question?

 8                MR. CUNNINGHAM:  Yes.

 9   BY MR. CUNNINGHAM:

10   Q.   So you made a list of things and you said I think these

11        things should have been considered at my criminal

12        trial, but they weren't.  I want to make sure that if

13        there's anything else that you think should have been

14        on this list, what else is it?

15                MR. JOHNSON:  Calls for a legal conclusion.

16        Go ahead.

17                THE WITNESS:  No, I think everything is on

18        there.

19   BY MR. CUNNINGHAM:

20   Q.   So you can't think of another document that you have

21        that you wish the court to consider --

22                MR. JOHNSON:  Same --

23                MR. CUNNINGHAM:  -- in your --

24                MR. JOHNSON:  Sorry.  I apologize, Patrick.

25        Same objection.  I apologize.
```

DARELL CHANCELLOR
April 23, 2021

```
 1              MR. CUNNINGHAM:  No problem.

 2              THE WITNESS:  No.

 3  BY MR. CUNNINGHAM:

 4  Q.   Here.  I'm going to as the question real slow.  Give

 5       Mr. -- give your lawyer an opportunity to object, and

 6       then if you could answer.  All right, Mr. Chancellor?

 7  A.   Go ahead.

 8  Q.   Okay.  Besides the stuff you listed that we just went

 9       over, is there any other document that you know of that

10       you wish had been admitted into evidence at your

11       criminal trial?

12              MR. JOHNSON:  Calls for legal conclusion.  Go

13       ahead, please, Darell.

14              THE WITNESS:  Not right now.

15  BY MR. CUNNINGHAM:

16  Q.   Okay.  And, again, let's do the same thing.  I'll ask

17       real slow.  Give your attorney an opportunity to object

18       and then please answer.

19              Are there any other witnesses -- like you

20       said my mom, Janet Chancellor would testify.  Are there

21       any other witnesses besides your mom, Janet Chancellor,

22       who you thought should have testified at your criminal

23       trial, but didn't?

24              MR. JOHNSON:  Same objection.  Go ahead,

25       Darell.
```

DARELL   CHANCELLOR
April 23, 2021

```
1              THE WITNESS:  No.

2    BY MR. CUNNINGHAM:

3    Q.   Okay.  Have you seen a doctor since you were released

4         from prison?

5    A.   Yes.  What type of doctor?

6    Q.   Any type of doctor.

7    A.   Yes.

8    Q.   What doctors have you seen since you were released from

9         prison?

10   A.   I've seen a doctor, I just left a doctor.  I was

11        getting checked for COVID.

12   Q.   Okay.  And besides getting checked for COVID, have you

13        seen a doctor for any other reason since you were

14        released from prison?

15   A.   Yes.

16   Q.   What other reasons have you seen a doctor for?

17   A.   I seen a doctor, I forget his name.  I forget the name.

18   A.   What did you see him for?

19   A.   Because I been going through a lot of stuff since I've

20        been released from prison.

21   Q.   Have you seen a psychiatrist since you got released

22        from prison?

23   A.   Yes.

24   Q.   What psychiatrist have you seen?

25   A.   I forget his name.  I forget his name.
```

DARELL CHANCELLOR
April 23, 2021

```
 1   Q.    How many times have you seen him?

 2   A.    Once.

 3              MR. JOHNSON:  Darell, are you talking about

 4         Dr. Shiner?  S-h-i-n-e-r.

 5              THE WITNESS:  That's him.

 6   BY MR. CUNNINGHAM:

 7   Q.    Have you seen any other psychiatrist besides Dr.

 8         Shiner?

 9   A.    No.

10   Q.    And you only saw him one time?

11   A.    Yes.

12   Q.    Have you seen a psychologist since you were released

13         from prison?

14   A.    No.

15   Q.    Do you have any kind of physical ailment that you link

16         to your time in prison?

17   A.    I mean, what do you mean?

18   Q.    Like, so you see a psychiatrist I guess for mental

19         issues.  Do you have any physical issues that you see a

20         doctor for?

21   A.    No, no physical issue.

22   Q.    And how long were you in prison?

23   A.    Eight years.

24   Q.    Is that the longest stretch of prison time you've done?

25   A.    Yes.
```

DARELL   CHANCELLOR
April 23, 2021

```
 1   Q.   How long is the next longest time?

 2   A.   For the armed robbery.

 3   Q.   And what did you talk about with Dr. Shiner?

 4   A.   I told him what was going on with me.  I don't like --

 5        I'm really -- how I feel.  I don't feel safe really

 6        going outside or being, really, I don't feel safe in

 7        the law enforcements no more.  You know, I stay -- I

 8        tell him I stay in the house nowadays because I don't

 9        want another episode to happen.  I don't know what will

10        happen next.  That's what we talked about.  I tell him

11        I don't want to go outside, really.

12   Q.   Are you taking any kind of medication?

13   A.   No.

14   Q.   Are you doing any kind of talk therapy where you go

15        talk to a doctor, or a social worker or a psychologist?

16   A.   No.

17   Q.   What do you want to tell me about your time in prison?

18   A.   It was long, hard and terrible.  I mean you see things

19        you not supposed to see in prison.

20   Q.   Things like what?

21   A.   Like I had a bunkie used to get butt naked in middle of

22        the night and jack off while I'm laying there.  Like I

23        had 300-pound bunkie wanted to fight and --

24   Q.   I'm sorry.  You cut out on me a little bit.  You had a

25        300-pound bunkie that what?
```

DARELL  CHANCELLOR
April 23, 2021

```
 1   A.   Wanted to fight every night.

 2   Q.   He wanted to fight you?

 3   A.   He wanted to fight.  He didn't care who it was.  I was

 4        just locked in the room with him.

 5   Q.   Did you ever have any fights while you were in prison?

 6   A.   I had a lot of fights when I was in prison.

 7   Q.   How many fights?

 8   A.   More than I can count.

 9   Q.   More than 10 fights?

10   A.   I don't recall the number of fights.

11   Q.   Well, can you put like a ballpark estimate on it?

12   A.   I just said I had a bunkie that woke up, wanted to

13        fight.  I don't recall the nights or how many nights in

14        a row that he woke up, wanted to do this, but it was a

15        lot of nights.

16   Q.   What was his name?

17   A.   I don't recall.  I really didn't want to know his name.

18   Q.   How long was he your bunkie?

19   A.   For months, for about six months.

20   Q.   Did you get a GED while you were in prison?

21   A.   Yes.

22   Q.   Was that the first stretch or the second stretch?

23   A.   The first stretch.

24   Q.   Did you do any education in prison during the second

25        stretch?
```

DARELL   CHANCELLOR
April 23, 2021

```
 1   A.   No.

 2   Q.   Did you have a job at the prison during the second

 3        stretch?

 4   A.   Yes.

 5   Q.   What was your job?

 6   A.   I was a porter.

 7   Q.   What does a porter do?

 8   A.   Clean up doo-doo.  Clean up after everybody.  Like the

 9        people use the bathroom, you got to go in there and

10        clean it when they done.  If there was doo-doo on the

11        floor or pee on the floor, you got to clean that up.

12   Q.   You just told me you got your GED.  Did you ever attend

13        a high school?

14   A.   Yes.

15   Q.   What high school did you attend?

16   A.   Chadsey.

17   Q.   Where is that?

18   A.   It's on Martin and McGraw.  Well, yeah, between Martin

19        and McGraw.

20   Q.   And that's a Detroit Public School high school?

21   A.   Yes.

22   Q.   What's the last grade you attended?

23   A.   The 11th.

24   Q.   Did you complete the 11th grade?

25   A.   No.
```

63

DARELL   CHANCELLOR
April 23, 2021

1   Q.   So you completed 10th grade and part of 11th grade?

2   A.   Yes.

3   Q.   We talked about your bunkies in prison.  Is there

4        anything else you want to tell me about prison?

5   A.   Don't go.

6   Q.   Sound advice.

7             Are there any other experiences you had

8        during this stretch of prison that stick out in your

9        memory?

10  A.   No.  Like I said, worst is seeing another man jack off

11       in front of you.  That's a terrible feeling.

12  Q.   I can understand that.  Have you filed a lawsuit under

13       the Wrongful Imprisonment Compensation Act?

14  A.   I don't know, what's the name of it?

15  Q.   I think it's actually incarceration.  The state --

16             MR. JOHNSON:  WICA; WICA.  W-I-C-A.

17  BY MR. CUNNINGHAM:

18  Q.   Are you familiar with that, Mr. Chancellor, at all?

19  A.   No, I ain't.  No, I haven't.

20  Q.   Okay.

21             MR. JOHNSON:  We have not filed as of now.

22  BY MR. CUNNINGHAM:

23  Q.   What injuries have you suffered as a result of your

24       imprisonment?

25  A.   What you mean, physically?  I don't know what you mean.

64

DARELL   CHANCELLOR
April 23, 2021

```
1   Q.   Any kind, physical or emotional.

2   A.   Like I'm very paranoid now.  Like I told you, I don't

3        want to go outside.  I don't.  I can't even spend like

4        time with my son like I want to outside because I'm

5        scared.  I don't know what can happen next.  Like I

6        say, it ain't -- I don't know, I don't trust the

7        police.  I can't just go outside like that.  I mean

8        there's more than Geelhood.  I don't trust none of

9        them.  I can't -- I don't want to go outside.  Like I

10       say, I don't go outside.  I don't sleep well.  It's

11       just it's a total -- it's totally different.

12  Q.   Do you have any financial expense that you've incurred

13       as a result of your imprisonment?  Did it cost you any

14       money?

15  A.   That what cost me any money?

16  Q.   Being in prison.

17                  MR. JOHNSON:  Foundation.  Go ahead.

18                  THE WITNESS:  Yes.  I mean, I spent money on

19       lawyers, I lost my house due to me being in prison and

20       I was -- I was, what was it? -- had to pay restitution

21       while I was in prison.

22  BY MR. CUNNINGHAM:

23  Q.   What lawyers did you pay?

24  A.   I had Ronnie Cromer and Ray Paige.

25  Q.   Ray Paige was your trial attorney at the criminal
```

DARELL   CHANCELLOR
April 23, 2021

```
 1       trial; right?

 2   A.  Yes.

 3   Q.  What did Ronnie Cromer do for you?

 4   A.  Ronnie, he was my first lawyer before.  He's the one I

 5       had before trial.  Ray just stepped in at trial.

 6   Q.  Did you have to pay any lawyers besides Ronnie Cromer

 7       and Ray Paige?

 8   A.  Pay them for what?

 9   Q.  Fair question.  Did you have to pay any lawyers as a

10       result of your imprisonment other than Ronnie Cromer or

11       Ray Paige?

12   A.  No.

13   Q.  You said you lost your house.  Why did you lose your

14       house?

15   A.  The mortgage.  It wasn't going to pay itself.  If I'm

16       locked up, I'm the one paying the bills there.

17   Q.  Did you have a mortgage on your house?

18   A.  I mean not -- no, I did not have a mortgage.  Excuse

19       me.

20   Q.  Okay.

21   A.  But the taxes.  Excuse me.

22   Q.  Taxes?  Okay.  Was the house foreclosed on?

23   A.  Yes.

24   Q.  And how much restitution did you pay?

25   A.  I think they made me pay like $1,000 for victim fees or
```

DARELL   CHANCELLOR
April 23, 2021

1          something.  I don't --

2    Q.    Aside from what we just talked about, are there any

3          other expenses that incurred, money that you had to pay

4          out as a result of your imprisonment?

5    A.    No.

6    Q.    Have you ever met Valerie Newman?

7    A.    Yes.

8    Q.    When did you meet Valerie Newman?

9    A.    I met Valerie Newman like when I got released.  I think

10         it was a month or so after I got released.

11   Q.    Did she ever come to talk to you while you were in

12         prison?

13   A.    No.

14   Q.    Do you know Pat Little?

15   A.    Pat Little?  No.

16   Q.    Do you know Carol Stanyar?

17   A.    No.

18   Q.    Do you know Tim Ewald?

19   A.    I know Tim Ewald, yes.

20   Q.    How do you know Tim Ewald?

21   A.    Tim, I had -- Tim came, talked to me.

22   Q.    When is the first time you met Tim?

23   A.    Well, I knew Tim since Officer Melendez case.

24   Q.    That was like the year 2000, is that about right or is

25         that not the right time frame?

DARELL   CHANCELLOR
April 23, 2021

```
 1   A.   No, like 2000 and -- yeah.  No, about 2003, something

 2        like that, 2002.

 3   Q.   Around 2002, 2003?  And how did you know Tim Ewald in

 4        around 2002 or 2003?

 5   A.   Officer Melendez.

 6   Q.   What was Tim's role in that situation?

 7   A.   I guess he was on Officer Melendez case.

 8   Q.   And what kind of involvement did you have with Tim?

 9   A.   Like during my case he just had me really point out

10        Officer Melendez in the lineup and all that.

11   Q.   Was he a police officer investigating Melendez?

12   A.   I don't recall.  I don't know.

13   Q.   Okay.  Did you keep in touch with Tim after the

14        Melendez --

15   A.   No, I haven't seen him since.

16   Q.   Did you ever speak to him on the phone?

17   A.   No.

18   Q.   After you moved out of your mom's house on 32nd Street,

19        how often would you go over there?

20   A.   What days?   What time you talking?

21   Q.   I'm talking about after you moved out in January of

22        2011.

23   A.   Oh, I mean I go over there like -- like I go over there

24        about probably -- I used to go probably three, four

25        times out the week, check on my mother.
```

DARELL  CHANCELLOR
April 23, 2021

| | |
|---|---|
| 1 | Q.   Were you over there on November 1st, 2011? |
| 2 | A.   No.  November 1st?  No. |
| 3 | Q.   You didn't go over to check on your mother that day? |
| 4 | A.   No. |
| 5 | Q.   Are there any other injuries that you suffered or |
| 6 |      damages that you incurred that you want to tell me |
| 7 |      about that we didn't already talk about? |
| 8 | A.   No. |
| 9 |            MR. JOHNSON:  Foundation.  Go ahead.  Sorry. |
| 10 | BY MR. CUNNINGHAM: |
| 11 | Q.   Is there any other kind of treatment you've sought |
| 12 |      since you got released from prison other than with Dr. |
| 13 |      Shiner? |
| 14 | A.   No. |
| 15 | Q.   Is there a Katie Chancellor in your family? |
| 16 | A.   A who? |
| 17 | Q.   Katie Chancellor? |
| 18 | A.   No, I never heard the name. |
| 19 |            MR. CUNNINGHAM:  Okay.  All right.  I think |
| 20 |      that's all I have. |
| 21 |            MS. HATCHETT:  Okay.  We don't have any other |
| 22 |      questions.  We don't have any follow-up questions, |
| 23 |      Patrick. |
| 24 |            MR. JOHNSON:  Wait a minute, Hatchett.  Wait |
| 25 |      a minute. |

69

DARELL CHANCELLOR
April 23, 2021

```
 1              MS. HATCHETT:  Oh, sorry.

 2              MR. JOHNSON:  What's this "we: stuff?

 3                        EXAMINATION

 4  BY MR. JOHNSON:

 5  Q.   I'm going to ask you a couple questions about the

 6       search warrant that Counsel asked you about, Exhibit 3,

 7       if my notes are at all legible and correct.

 8                 At the time of November 2, 2011, were you

 9       5'8" and 1800 pounds?

10  A.   No.

11  Q.   Okay.  Now, we've seen some documents and so forth

12       around that time that said how tall you were.  If you

13       weren't 5'8", how tall were you?

14  A.   5'11".

15  Q.   So three inches taller than 5'8"?

16  A.   Right.

17  Q.   And 180 pounds.  How much were you -- did you weigh on

18       November 2, 2011?

19  A.   220.

20  Q.   So 40 pounds more?

21  A.   Right.

22  Q.   Okay.  Do you even know when is the last time you

23       weighed only 180 pounds?

24  A.   No.

25  Q.   Has it been, shall I say, a lot of years?
```

DARELL   CHANCELLOR
April 23, 2021

1    A.   Yeah, it's been a lot of years.

2    Q.   No offenses, brother, me, too, but I'm just asking.

3    A.   Right.

4    Q.   So if in the search warrant Officer Geelhood was

5         describing a black male, 30s -- let me ask you that.

6         How old were you back on November 2 of 2011, roughly?

7    A.   I think I want 29.

8    Q.   All right.  So at least if that's true, he says 30s,

9         you'd be within a year or so of that; right?

10   A.   Right.

11   Q.   All right.  So if he's talking about a black male who

12        is in his 30s, 5'8", 180, that is not you, a black male

13        5'11", 220?

14   A.   Correct, that is not me.

15   Q.   So do you have any knowledge if he says he, Geelhood in

16        his affidavit, that on October 31, 2011 someone that

17        looked like that was inside the home at 5023 32nd

18        Street, Detroit, Michigan, that was allegedly seen by a

19        confidential informant --

20   A.   You talking?

21   Q.   Yeah, I know.  Sorry.  The hamster is on the wheel

22        though still, brother, so give me a minute.

23   A.   Okay.  Go ahead.

24   Q.   Where he knew that there was a large -- the

25        confidential informant, that he knew there was a large

DARELL   CHANCELLOR
April 23, 2021

1           amount of heroin stored and sold at that location, do

2           you have any information about that?

3    A.    No.

4    Q.    Did you have any large amount of heroin stored and sold

5           at that location on October 31, 2011?

6    A.    No.

7    Q.    Did the confidential informant in any way testify at

8           your trial?

9    A.    No.

10   Q.    Was the confidential informant ever revealed to you or

11          your counsel that you're aware of as to who that person

12          is?

13   A.    No.

14   Q.    If, according to Geelhood -- excuse me -- Officer

15          Geelhood on November 1, 2011, the day before you were

16          arrested, he claims that 5023 32nd Street, over the

17          course of 30 minutes he observed three people

18          separately go into the address, knock on the door and

19          engage in short conversation with a person matching the

20          above-seller description, first of all, is 5'8", 180,

21          is that matching your description, yes or no?

22   A.    No.

23   Q.    So if Geelhood claims to have seen that on November 1,

24          was it you?

25   A.    No.

DARELL CHANCELLOR
April 23, 2021

```
 1   Q.   You said you weren't even at the house on November 1;
 2        correct?
 3   A.   Correct.
 4   Q.   The suspected buyer would stay outside and
 5        above-described seller returned and made suspected
 6        narcotic transition.  Any idea who that is or what
 7        they're doing?
 8   A.   No.
 9   Q.   And then there was alleged money exchanged for
10        suspected heroin.  Okay?  Was that you?
11   A.   No.
12   Q.   What were you charged with on November 2, the next day?
13   A.   I wasn't charged the next day.  It was -- I wasn't -- I
14        didn't get arrested on this thing.  I got charged --
15        what was it? -- May 2nd, 2012, and they charged --
16   Q.   What were you charged with?
17   A.   I was charged with attempt to deliver.
18   Q.   Of what?
19   A.   450 grams.
20   Q.   Of what?
21   A.   Of cocaine.
22   Q.   Okay.  Well, this affidavit said heroin.
23   A.   Right.
24   Q.   Do you have any information --
25   A.   No.
```

DARELL   CHANCELLOR
April 23, 2021

1   Q.   -- as to why Geelhood would say that there was activity

2        on November 1 relative to suspected heroin if

3        ultimately you were charged with cocaine?

4   A.   No, I do not.

5   Q.   Are you aware at all of Officer Geelhood's record with

6        the Detroit Police Department in terms of how many

7        times he's been investigated or written up for

8        suspected criminal activity related to him being a

9        narcotics officer?

10  A.   No, I don't know nothing about it.

11  Q.   You mentioned Melendez many times today.  You sued that

12       officer; correct?

13  A.   Correct.

14  Q.   Apparently you were successful at least in terms of

15       getting a settlement; true?

16  A.   Correct.

17  Q.   I think I heard you say 250 grand; right?

18  A.   Yes; yes.

19  Q.   And so you told us that that money was in the bank and

20       that's in part what the state took after you were

21       improperly and illegally arrested and charged with

22       this; right?

23  A.   Right.

24  Q.   And did they take all that money?

25  A.   Yes, basically.  They took half.

DARELL   CHANCELLOR
April 23, 2021

1   Q.   I need to know how much money did they take out of the

2        money that you had while you were in prison on this

3        charge in this case.

4   A.   No, not on this case.  They took it when I was locked

5        up for armed robbery.

6   Q.   I apologize.  My bad.  Got it.

7             On November 2 were you at your mom's house?

8   A.   No.

9   Q.   On October 31, 2011 were you at your mom's house?

10  A.   No.

11  Q.   Going back to my question about Melendez.  What

12       happened, when did that lawsuit settle, to the best of

13       your memory, Darell?

14  A.   I think it was 2006.

15  Q.   Do you know what, if anything, happened to Melendez?

16  A.   Unh-unh.

17  Q.   Did he remain a police officer?  Did he get in trouble?

18       Do you have any idea?  If you don't know, tell me.

19  A.   I just -- well, recently when I was coming home on this

20       case, I mean I just got exonerated on this case, I

21       think he just got locked up for something else.  I'm

22       not for sure though.

23  Q.   Okay.  And do you know when he last worked with DPD?

24  A.   Unh-unh; no.

25  Q.   Are you aware of any issue at all between Geelhood and

DARELL   CHANCELLOR
April 23, 2021

1         your mom?

2    A.   No.

3    Q.   So in terms of the activities that are identified in

4         this November 2, 2011 search warrant by Geelhood,

5         number one, had nothing to do with you?

6    A.   Nothing to do with me.

7    Q.   Not you?

8    A.   No.

9    Q.   Correct?

10   A.   Correct; not me.

11   Q.   How long was your trial, Darell?

12   A.   I think my trial was two days.

13   Q.   Okay.  So you told us you got arrested on this May 2,

14        2012; correct?

15   A.   Correct.

16   Q.   So about six months after the affidavit we're talking

17        about; right?

18   A.   Right.

19   Q.   Did you have any knowledge that you were about to be

20        arrested?

21   A.   No, I got pulled over on a routine traffic stop.

22   Q.   And then did they ultimately tell you that they charged

23        you based on this affidavit of search warrant and what

24        they found in your mom's house from six months earlier?

25   A.   They just told me I had a warrant.

DARELL CHANCELLOR
April 23, 2021

```
 1    Q.   And that's when you found out it was for this?

 2    A.   I found out that -- I didn't find out what it was for

 3         until I went to my -- to court to have a hearing.

 4    Q.   Your mom told you that they raided the house; right?

 5    A.   Right.

 6    Q.   When did she tell you that?

 7    A.   The same day, the day they raided.

 8    Q.   November 2, 2011?

 9    A.   Right.

10    Q.   Did she tell you that they found anything?

11    A.   No, she just told me that they -- the police searched

12         her house.

13    Q.   Did she tell you that they confiscated any drugs?

14    A.   No.

15    Q.   Did she tell you that they are asking about you and

16         whether you lived there or anything like that?

17    A.   No, she only thing she said they asked who stayed at

18         the house.

19    Q.   And you may not know this, do you know what your mom

20         told them?

21    A.   No.

22    Q.   So from May 2, 2012, you getting arrested, you said a

23         couple days in the precinct in that jail, then went to

24         Wayne County Jail; right?

25    A.   Right.
```

DARELL  CHANCELLOR
April 23, 2021

```
 1    Q.    Remained there through trial?

 2    A.    Right.

 3    Q.    Trial was when?

 4    A.    Trial was November 12, 2012.

 5    Q.    November 12, 2012?

 6    A.    2012, yeah.

 7    Q.    About a year after this search warrant we've been

 8          talking about; right?

 9    A.    Right.

10    Q.    Without belaboring the point, Darell, what did it feel

11          like to go to trial and be accused of a crime that you

12          didn't commit?

13    A.    I mean, it felt terrible.  It feels more terrible when

14          you get found guilty of something you ain't commit

15          because it's like the justice system that failed you.

16          You been taught to believe in the justice system, but

17          to get to found guilty for something you ain't do is

18          where the justice going to come from, yeah.

19    Q.    Did you have a jury or was it just Judge Hathaway?

20    A.    Just Judge Hathaway.

21    Q.    Did you ever any experience with Judge Dan Hathaway

22          before?

23    A.    Never, never, never in life.

24    Q.    When you heard him say the word guilty --

25    A.    Huh.
```

DARELL CHANCELLOR
April 23, 2021

1   Q.   And you just made a sound, didn't you?

2   A.   Yeah.

3   Q.   Darell, you can still feel it?

4   A.   Yeah, I'm guilty, yeah, when you hear guilty, I mean

5        it's like there's nothing else come after that.  That's

6        the last say-so, guilty.  So --

7   Q.   And from --

8   A.   Yes, sir.

9   Q.   -- that day all the way through March 26th, of 2020 you

10       remained jailed and then ultimately in prison?

11  A.   I remained in prison, yes.

12  Q.   Obviously, the entire time that you're in jail, whether

13       it's the precinct, Wayne County or prison, you ain't

14       working at G&G?

15  A.   No.

16  Q.   Or anywhere else?

17  A.   I'm a porter.  Like I just told, I'm cleaning people

18       feces that just got to use the bathroom.

19  Q.   At the jail prison; right?

20  A.   At the jail prison.

21  Q.   My question though is when you're in jail or prison,

22       you're not able to work an outside job?

23  A.   No.

24  Q.   And earn any wages?

25  A.   Correct.

DARELL   CHANCELLOR
April 23, 2021

```
 1    Q.    That otherwise you'd be able to earn?

 2    A.    Correct.

 3    Q.    You tell us that you last worked for G&G in 2012.  I

 4          thought that's what I heard.  Am I wrong about that?

 5    A.    Correct; you're correct.

 6    Q.    So, in other words, you were working at G&G when you

 7          got arrested on May 2, 2012?

 8    A.    Yes.

 9    Q.    Roughly, if you know, Darell, how much money were you

10          making at G&G?

11    A.    It wasn't -- it was like $10 an hour, something like

12          that.

13    Q.    But it was a job?

14    A.    But it was a job.

15    Q.    When you were working, Counsel asked you about some of

16          your temporary agency jobs.  Really what he's trying to

17          ask you, Darell, is can you tell us not necessarily the

18          names of places and stuff, but the type of work you

19          were doing.  In other words, were you being a stock guy

20          and putting stuff at a grocery store, were you stamping

21          parts with a press at a, you know, at a stamping

22          facility?

23    A.    Right.

24    Q.    Can you think back at all and let us better understand

25          while you were working for any type of temp agency what
```

DARELL CHANCELLOR
April 23, 2021

1    types of work you were doing?

2  A.  Like -- well, like I told you with the temp service,

3      one day you can be stocking, one day you could be

4      stamping.

5  Q.  And that's what we want to hear about.  Tell us what

6      you can think of.  Again, we'll talk about where it was

7      later, and if you remember, you do, you don't, but we

8      want to know what type of jobs, please.

9  A.  It was like with the temp service, it's mainly -- like

10     you say, it's mainly packing and -- it's mainly packing

11     with temp services.

12 Q.  Packing like what?

13 A.  Like produce, or whatever, whatever they bring in that

14     got to be packed.  It can be produce.  You can pack

15     sugar.  You can pack whatever they got to be packed,

16     got to be packed.

17 Q.  By the way, when they arrested you on May 2, 2012, you

18     didn't have the unregistered gun on you, did you?

19 A.  No; no.

20 Q.  All right.  You told us you were making roughly 10

21     bucks an hour at G&G.  When you were working your jobs

22     through the temp agencies, what was your hourly rate,

23     approximately?

24 A.  $8, $9, you know, the job varies.

25 Q.  Yeah.

DARELL CHANCELLOR
April 23, 2021

```
 1   A.   So wherever the temp service, whatever they pay, that
 2        what you working for that day.
 3   Q.   Were you and Katrice still married then when you got
 4        arrested?
 5   A.   Yeah.
 6   Q.   When did you all get a divorce?
 7   A.   I mean, when we -- too much time, I'll just say that.
 8        I had too much time to do.
 9   Q.   So she divorced you?
10   A.   Yeah.
11   Q.   While you were in prison for this thing that you didn't
12        do?
13   A.   Yes.
14   Q.   Approximately when?
15   A.   Let me see.  It was -- I think it was 2016.
16   Q.   So about four years or so after you were wrongfully
17        convicted?
18   A.   Yeah.  She looked at like four years after, 10 more to
19        go.
20   Q.   Yeah.  And I should have asked you that.  So when you
21        were convicted the sentence the judge gave, Judge
22        Hathaway --
23   A.   Yeah.
24   Q.   -- was what?
25   A.   14; 14 to 30.  14 years, 3 -- it was 14 years, 3 months
```

DARELL CHANCELLOR
April 23, 2021

```
 1        to 30 years.
 2   Q.   Every single day you're in that prison cell, jail cell,
 3        precinct cell being accused and ultimately wrongfully
 4        convicted of doing something you didn't do, Darell,
 5        every day, all day what did it feel like?
 6   A.   It feel terrible when you know you ain't do something,
 7        but you convicted for it.  It was --
 8   Q.   I listened -- did I interrupt you?  I'm sorry.  If you
 9        weren't done, go ahead.
10   A.   I mean, like I was saying, it's like, like I said, you
11        sitting in there looking like where the justice going
12        to come from.  That's a hard feeling when you know you
13        ain't done nothing, but a judge convicted you of
14        something and now you stuck in prison trying to figure
15        out how you going to get back home for something you
16        ain't do.  First, you ain't supposed to be here because
17        you ain't did nothing.  But now that you here, how you
18        going to get back home for something you ain't do.
19   Q.   So when Counsel went over your previous convictions, I
20        didn't hear anything about you ever going to trial
21        except for this thing.
22   A.   Because I did that.  I would never -- if I did
23        something, I'm going to let you -- I'll say I did it.
24        So if I do it --
25   Q.   You didn't go to trial on those other charges --
```

DARELL   CHANCELLOR
April 23, 2021

```
 1    A.    No.

 2    Q.    -- because ultimately you either pled nolo contendere

 3          or not guilty; right?

 4    A.    Right; right.

 5    Q.    Excuse me.  Or guilty.  Sorry.

 6    A.    Right.  I pled guilty; right.

 7    Q.    This one you fought and went to trial; right?

 8    A.    Right.

 9    Q.    Unfortunately, lost.

10    A.    Exactly.

11    Q.    So you lost your wife -- right, Darell -- from this?

12    A.    Yes; yes.

13    Q.    You didn't just lose her though, you lost somebody else

14          really important in your life, too?

15    A.    I lost a lot -- to death, yes, I lost a lot of people

16          to death due to me being locked up.  I lost my auntie.

17    Q.    I'm talking about your son.

18    A.    I lost eight, nine years, the first nine years of his

19          life, eight years of his life.

20    Q.    That's where I'm going, brother.

21    A.    So, yeah, I mean, yeah, I lost that.

22    Q.    What's his date of birth?

23    A.    8-25th, that's the day, birthday.

24    Q.    August 25?

25    A.    Yes.  Excuse me.  Yes, it's August 25th.
```

DARELL   CHANCELLOR
April 23, 2021

```
 1    Q.    Why are you putting the phone down?

 2    A.    Because, like you say, I mean, it's emotional.

 3    Q.    You're crying?

 4    A.    Basically.  It's emotional.  I -- it's emotional.

 5    Q.    And what ultimately you're crying about is when I asked

 6          you questions about the time you missed with your son?

 7    A.    Right.  I mean, it's hard to -- you can't get that

 8          back.

 9    Q.    Was he born on August 25, 2011?

10    A.    Yes.

11    Q.    So about three months before this false affidavit?

12    A.    Right.  You can't get that back.

13    Q.    So when he was born, where did Katrice have your son?

14    A.    Huh?

15    Q.    Where did she have him?  What hospital?

16    A.    At Children's.

17    Q.    And were you with her when she delivered?

18    A.    Yes.

19    Q.    When you brought the baby home, where did you all live?

20    A.    On Robison.

21    Q.    You, Katrice and your son, brand new son?

22    A.    Yes.

23    Q.    Every day for the rest of that year throughout 2011

24          you, Katrice and the son lived there on Robison?

25    A.    Yes.
```

DARELL CHANCELLOR
April 23, 2021

 1  Q.  Your son did not live with anybody at 5023 32nd Street

 2      ever, did he?

 3  A.  No.

 4  Q.  I think I heard you tell Counsel the last time you

 5      lived at that house was in early I think January 2011?

 6  A.  Yes.

 7  Q.  And you lived there then why?

 8  A.  Because my electricity wasn't on at my house.

 9  Q.  At Robison?

10  A.  Right.

11  Q.  And the only way you could live in Robison, obviously,

12      if the utilities are working?

13  A.  Exactly.

14  Q.  And you got those working approximately when?

15  A.  The next month I was released from prison.

16  Q.  Which is when?

17  A.  Was January.

18  Q.  2011?

19  A.  2011, yes.

20  Q.  Why did you list 5023 32nd Street on any of the

21      documents about parole and all that other stuff?

22  A.  The G&G Market and the parole office is literally six

23      to seven blocks apart.  So if I got to report, I could

24      still -- it won't bother my work.  I can leave work and

25      literally go report and be back at work in less than 20

DARELL  CHANCELLOR
April 23, 2021

1         minutes.  That's why.

2    Q.   How often did you have to report?

3    A.   Every two weeks.

4    Q.   And did you report?

5    A.   Every two weeks.

6    Q.   And did you have any problem at all with your parole

7         officer?

8    A.   I didn't have a problem at all.

9    Q.   But why tell them that the 5023 address if you were

10        really living on Robison?

11   A.   Because if I was to tell them to change the address

12        they would change my parole officer to a parole

13        building that's so -- it's totally out of the way.  The

14        other parole office was on 8 Mile and something at the

15        time.

16   Q.   Okay.  You were simply trying to keep your job at G&G?

17   A.   Basically.

18   Q.   Did your parole officer, to the best of your

19        knowledge -- if you remember, great, if you don't, tell

20        us -- write you up for anything that you're aware of

21        from when you got out of prison in January 2011 up

22        until the time that you were arrested in May of 2012?

23   A.   No, she didn't write me up for nothing.  I went back to

24        prison.  She didn't wrote me up anything.

25   Q.   That's why I asked.

DARELL CHANCELLOR
April 23, 2021

```
 1              So I asked you for the rest of 2011 about
 2        where you lived with your baby and your wife.  But now
 3        January 1, 2012 up until the time you were arrested on
 4        May 2, 2012, for those five months -- actually, four
 5        full months and two days -- where did you live?
 6   A.   On Robison.
 7   Q.   With your wife and your son?
 8   A.   With my wife and my son.
 9   Q.   Is that the last time where you actually lived with
10        either one of them?
11   A.   Yes.
12   Q.   So from May 2, 2012, the time you were jailed, did your
13        wife, Katrice, ever bring your son up to the prison or
14        the jail?
15   A.   I seen him like twice.
16   Q.   Did you ask her to bring him more often?
17   A.   Yes.  She, I mean, yeah, but you can't make nobody do
18        nothing.
19   Q.   I hear you, man, but did you ask?
20   A.   Yes, I asked.  You know, I asked.  I wanted to see him,
21        but, you know, she had other plans.
22   Q.   Let me ask you.  Roles reversed, can you blame her not
23        wanting to bring a baby, a brand new baby up to a
24        prison to visit somebody he doesn't even know?
25   A.   I'm not mad at her.  To this day I'm not mad at her.
```

Legal Court Reporting Service · Page 88

DARELL   CHANCELLOR
April 23, 2021

1   Q.   But if anybody truly wants to know about you and what

2        you've gone through, a huge part of you is that young

3        man?

4   A.   Yes.

5   Q.   That's been taken from you, Darell?

6   A.   Yeah.

7   Q.   How do you get that time back?

8   A.   You can't.  That's time gone.

9   Q.   All right.  In any regard, you told us about Tim Ewald.

10       E-w-a-l-d.  Is that the gentleman who is an

11       investigator for the feds?

12  A.   Yes.

13  Q.   Did you ever talk to anybody from Wayne County at all

14       other than Val Newman after your exoneration and

15       release from prison?

16  A.   No.

17  Q.   I said Wayne County.  City of Detroit, too?  Same

18       question, City of Detroit.

19  A.   No.

20  Q.   Other than what information you got from -- well, Val

21       Newman is on behalf of the County, so my question is

22       has anybody from the city ever written you, talked to

23       you, apologized to you for any of this?

24  A.   No; no.  No one.

25               MR. JOHNSON:  Appreciate your time.  Thank

89

DARELL   CHANCELLOR
April 23, 2021

 1      you, sir.  I've got no more questions.

 2                  MR. CUNNINGHAM:  I just have two follow-ups.

 3                        RE-EXAMINATION

 4   BY MR. CUNNINGHAM:

 5   Q.   Have you filed state or federal tax returns in the

 6        past, Mr. Chancellor?

 7   A.   No.

 8   Q.   Never?

 9   A.   Not -- no, not that I know of.

10   Q.   Okay.  So nothing you can recall?

11   A.   Not that I can recall.

12   Q.   And when you were arrested, that wasn't Officer

13        Geelhood who placed you under arrest; right?

14   A.   Correct.

15                  MR. CUNNINGHAM:  That's all I have.

16                  MR. JOHNSON:  No more questions.  Thank you

17        very much.

18                  (Deposition concluded at 2:19 p.m.

19                  Signature of the witness was not requested by

20                  counsel for the respective parties hereto.)

21

22

23

24

25

90

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                        ) SS

4    COUNTY OF WAYNE    )

5

6              I, DIANE H. DRAUGELIS, certify that this

7        deposition was taken before me on the date

8        hereinbefore set forth; that the foregoing

9        questions and answers were recorded electronically

10       and transcribed by me; that this is a true, full,

11       and correct transcript of my recording so taken;

12       and that I am not related to, nor of counsel to,

13       either party nor interested in the event of this

14       cause.

15

16

17

18

19

20              _Diane H. Draugelis_

21              DIANE H. DRAUGELIS, CER-2530

22              Notary Public,

23              Wayne County, Michigan.

24       My Commission expires:  December 12, 2022

25

DARELL   CHANCELLOR
April 23, 2021

**$**

**$1,000**
  22:2 24:24
  66:25
**$10**
  80:11
**$250,000**
  17:25
**$8**
  81:24
**$9**
  81:24

**-**

**-**-3013
  8:7

**1**

**1**
  40:25 72:15,
  23 73:1 74:2
  88:3
**10**
  31:5 55:5
  62:9 81:20
  82:18
**10th**
  64:1
**11:38**
  4:3
**11th**
  63:23,24
  64:1
**12**
  78:4,5
**12-7-81**
  9:10
**14**
  9:5 35:20
  82:25
**15**
  19:9 20:11

  25:10,11
  35:21,22
**1504**
  34:1
**15040**
  33:25 34:3,5
**16**
  19:9 20:11
**180**
  70:17,23
  71:12 72:20
**1800**
  70:9
**1st**
  27:5,8,10,25
  31:5,15,17
  50:17 52:19,
  21 53:2,7
  69:1,2

**2**

**2**
  25:10 40:15
  50:14 70:8,
  18 71:6
  73:12 75:7
  76:4,13
  77:8,22 80:7
  81:17 88:4,
  12
**2-**
  9:14
**20**
  20:15 86:25
**2000**
  20:14,18
  21:1,15
  67:24 68:1
**2001**
  20:14,18
  21:1,4,15
  24:2,9
**2002**
  21:15 24:18
  68:2,3,4

**2003**
  22:14 25:14
  68:1,3,4
**2005**
  5:14,25 6:1
**2006**
  75:14
**2008**
  47:18 48:9
**2010**
  25:14,16
  35:21,22
  36:12,22
  37:9
**2011**
  27:6,8,10,25
  29:13 30:7
  31:15,17,20
  32:2,8,11
  36:5,25
  37:7,9 38:21
  41:8,11
  50:17 51:19
  52:15,19,21
  53:3,7 68:22
  69:1 70:8,18
  71:6,16
  72:5,15 75:9
  76:4 77:8
  85:9,23
  86:5,18,19
  87:21 88:1
**2012**
  15:8 48:21
  52:15 73:15
  76:14 77:22
  78:4,5,6
  80:3,7 81:17
  87:22 88:3,
  4,12
**2016**
  82:15
**2020**
  9:5 35:4,5,
  9,11,13,18
  79:9
**2021**
  4:2

**2024**
  9:8
**21**
  20:15
**220**
  55:18 70:19
  71:13
**23**
  4:2
**25**
  21:15,17
  24:18 84:24
  85:9
**250**
  74:17
**250,000**
  17:23
**25th**
  84:25
**26**
  35:4,5,8,11,
  18
**26th**
  79:9
**280**
  8:24
**29**
  71:7
**2:19**
  90:18
**2nd**
  29:13 30:7
  31:20 32:2,
  8,11 41:8,11
  48:21 49:7,8
  73:15

**3**

**3**
  50:13 70:6
  82:25
**30**
  50:19 72:17
  82:25 83:1
**300**
  9:14

1

**300-pound**
61:23,25
**30s**
71:5,8,12
**31**
71:16 72:5
75:9
**313-828-4115**
12:3
**31st**
51:19
**32nd**
7:9,16,18
32:22 33:6
34:15 35:6,
12 36:7,8,11
37:1,10,19,
21,24 38:16
39:3,9 41:9,
12 50:21
68:18 71:17
72:16 86:1,
20
**357**
23:14,15,18
**36th**
51:25

**4**

**40**
70:20
**450**
73:19

**5**

**5**
25:10 56:19
**5'11"**
9:1,11 55:17
70:14 71:13
**5'8"**
70:9,13,15
71:12 72:20
**50**
20:19,20

**21:2,4,5,11,**
16,17 24:2,9
**5023**
7:9,16,18
32:22 33:6
34:15 35:6,
11 38:15
41:8,12
50:21 71:17
72:16 86:1,
20 87:9
**5:00**
28:22,24
30:16,19,20,
21,23

**6**

**65**
53:15
**6:00**
28:22 30:17,
20,23

**7**

**7**
9:8 25:10,11
**7-1/2**
25:13
**7:30**
28:4

**8**

**8**
25:13 31:11
47:18 87:14
**8-25th**
84:23
**8:00**
28:4 30:10
**8:45**
28:7 30:10
**8th**
48:9

**9**

**9209**
27:17 29:3,
25 42:23,24,
25 45:4
**9:00**
28:6,7
30:10,18,21

**A**

**a.m.**
4:3 30:21
**above-
described**
50:24 73:5
**above-seller**
72:20
**accused**
78:11 83:3
**acknowledge**
4:7,10
**Act**
64:13
**acting**
19:13
**activities**
76:3
**activity**
51:2,3,4
74:1,8
**address**
7:8 33:24
35:15,17
46:11 50:21
72:18 87:9,
11
**administered**
4:10
**admitted**
58:10
**adult**
19:5,6 20:13
**advice**

64:6
**affiant**
50:17,19
51:2,8,19,
21,23
**affidavit**
50:9 53:6
56:19 71:16
73:22 76:16,
23 85:11
**agencies**
81:22
**agency**
80:16,25
**agent**
40:19,20
**agree**
4:17
**agreement**
4:15
**ahead**
17:21 23:20
26:13 45:8
51:8 57:5,16
58:7,13,24
65:17 69:9
71:23 83:9
**ailment**
60:15
**Alford**
11:16
**alleged**
73:9
**allegedly**
71:18
**altogether**
25:11
**Alvin**
8:2 13:11
36:16,17,23
42:11
**amount**
51:21 72:1,4
**answering**
6:25
**answers**
6:9

U.S. Legal Support · www.uslegalsupport.com    2

DARELL   CHANCELLOR
April 23, 2021

Antonio
  36:17,18,23
apologize
  57:24,25
  75:6
apologized
  89:23
Apparently
  74:14
appearing
  6:3
approximately
  28:3 81:23
  82:14 86:14
April
  4:2
Arab
  14:23
Arabic
  14:19
armed
  22:14,15,22
  23:8,11,23
  25:3,8,10
  61:2 75:5
arrangement
  4:13
arrest
  90:13
arrested
  48:20,22
  49:1,16
  72:16 73:14
  74:21 76:13,
  20 77:22
  80:7 81:17
  82:4 87:22
  88:3 90:12
arrests
  51:24
assume
  7:3
assumed
  33:3
AT&T
  47:10

attempt
  73:17
attempted
  20:19 21:2
attend
  63:12,15
attended
  63:22
attorney
  16:14,16
  41:16 58:17
  65:25
attorneys
  4:6
August
  84:24,25
  85:9
auntie
  84:16
automobile
  54:4
avoid
  6:17
award
  19:13,15,17
aware
  17:13 41:7,
  11,13,14,15
  50:2,4,5,6
  72:11 74:5
  75:25 87:20
Ayanna
  4:18 39:14

_____

_____

B

baby
  85:19 88:2,
  23
back
  8:21 35:18
  50:5 54:18
  71:6 75:11
  80:24 83:15,
  18 85:8,12
  86:25 87:23
  89:7

bad
  75:6
ballpark
  62:11
bank
  74:19
based
  17:21 18:15
  76:23
basic
  19:12
basically
  14:7 17:6
  74:25 85:4
  87:17
basis
  18:19
bathroom
  63:9 79:18
Bear
  39:24
bed
  7:14
bedrooms
  7:16 37:24
beds
  38:2
beginning
  52:15
behalf
  4:16,18,21
  89:21
belaboring
  78:10
belong
  42:19,20
belongings
  37:21
benefits
  53:9,21
bigger
  40:7
bill
  46:10 56:13,
  17
bills
  47:7 66:16

birth
  9:9 84:22
birthday
  84:23
bit
  6:2 8:21
  40:6,7,21
  61:24
black
  71:5,11,12
blame
  88:22
block
  11:20,21,22
blocks
  86:23
blue
  53:18
blurry
  26:12,15,16,
  17
bonded
  49:14
born
  85:9,13
boss
  14:12
bother
  86:24
bottom
  40:23 41:4
  47:15 48:1,5
bought
  43:15,16,18,
  22,24
boyfriend
  7:19 8:4
  36:15
boyfriend's
  8:1
brand
  85:21 88:23
Bridge
  53:23,25
bring
  81:13 88:13,
  16,23

3

brother
  36:13,18
  71:2,22
  84:20
brought
  85:19
brownish
  52:17
bucks
  81:21
building
  87:13
bunch
  8:17
bunkie
  61:21,23,25
  62:12,18
bunkies
  64:3
Burton
  19:21
Butler
  10:23 11:1,7
  45:25
butt
  61:21
buy
  43:20 45:6
buyer
  50:23 51:1
  73:4

_____

C

C-524-135-
139-932
  8:18
C-Y-S-T-A-L
  7:25
C-Y-T
  7:25
cable
  47:4,6,7,8,
  10
call
  12:25 33:4

called
  4:24 32:10
Calls
  57:4,15
  58:12
camera
  8:19
car
  22:8,9,12
  28:9,10
  30:12
card
  8:23 47:25
  48:3 53:12,
  18,23,25
  55:16
care
  25:21 62:3
Carol
  67:16
carrier
  32:8
Cartier
  23:7,9
case
  10:1 18:8,
  10,14,25
  19:14 21:19,
  21 22:3,5,
  16,18 25:18
  38:4,5 48:20
  55:2 67:23
  68:7,9 75:3,
  4,20
cases
  51:25
Cavalier
  28:11,12
  30:13 52:9
cell
  32:2,4,8
  83:2,3
Center
  19:21 49:3,
  4,5
centers
  19:22,23

Chadsey
  63:16
chance
  18:1
Chancellor
  4:23 5:5
  7:7,21,23
  9:20,23,24
  10:3,11,24
  11:2 12:11,
  12,13,16,18,
  20 16:25
  36:20 39:19
  40:2,5 41:2
  45:8 47:13
  49:20 51:17
  54:9 56:19,
  20 58:6,20,
  21 64:18
  69:15,17
  90:6
change
  40:18 87:11,
  12
Chapter
  56:19
charge
  21:7,9 75:3
charged
  25:19 73:12,
  13,14,15,16,
  17 74:3,21
  76:22
charges
  83:25
check
  68:25 69:3
checked
  59:11,12
Chevy
  28:12 30:13
  52:8
child
  12:18
children
  12:4,6,15

Children's
  85:16
chronic
  53:16
CI
  51:20,23
  52:2
Circuit
  52:1
city
  5:6 17:4
  48:24 89:17,
  18,22
CIU
  54:16
claim
  55:6,25 56:5
claims
  72:16,23
clean
  14:10 63:8,
  10,11
cleaning
  79:17
clear
  20:2
close
  26:15
cocaine
  18:9 41:8,
  11,17,20,23,
  25 42:2,4,8,
  9,11,16 52:2
  73:21 74:3
Collins
  43:14 44:11
color
  52:16
Comcast
  47:8
commit
  78:12,14
Compensation
  64:13
complete
  63:24

completed
 64:1
completeness
 24:16
computer
 39:24
concealing
 22:1,7,11
 24:23
concluded
 90:18
conclusion
 57:4,15
 58:12
conditions
 40:10,13
 53:16
conference
 4:8
confidential
 71:19,25
 72:7,10
confiscated
 77:13
confiscation
 52:1
confused
 19:2
confusing
 19:1
connection
 16:21 45:2
consent
 4:13
considered
 55:21 56:2,
 3,10,14
 57:2,3,11
consistent
 51:4
contact
 22:19 26:22,
 24 27:1
contendere
 84:2
contest
 22:20,22

continuing
 18:17,18
conversation
 6:9 50:22
 72:19
convicted
 18:8,11
 19:3,6 20:3,
 9,12,18
 21:1,3,12,24
 22:12 23:24,
 25 24:2
 82:17,21
 83:4,7,13
conviction
 18:13 19:7,
 8,10 20:22,
 24 21:11,23
 22:11 24:3,
 9,18,23 25:3
 55:7
convictions
 18:13,24
 20:5 23:25
 24:14 83:19
cooperating
 39:25
corner
 9:4
correct
 26:11 33:9
 35:14 55:23
 70:7 71:14
 73:2,3
 74:12,13,16
 76:9,10,14,
 15 79:25
 80:2,5 90:14
cost
 18:3 65:13,
 15
couch
 7:15 37:11,
 12,14
counsel
 4:13 70:6
 72:11 80:15
 83:19 86:4

90:20
count
 62:8
County
 4:1 49:11,12
 77:24 79:13
 89:13,17,21
couple
 49:9,10 70:5
 77:23
court
 57:21 77:3
cousins
 37:3 42:19
COVID
 59:11,12
coworkers
 15:5
credible
 51:20
crime
 19:4 20:3,4,
 12 21:3,13,
 24 22:13
 78:11
crimes
 25:19 55:7
criminal
 38:5 55:2
 56:2 57:2,11
 58:11,22
 65:25 74:8
Cromer
 65:24 66:3,
 6,10
Crown
 52:12,14,16,
 18
crying
 85:3,5
Crystal
 7:23,24
 13:7,9 36:23
Crystal's
 42:16
Cunningham
 4:16 5:4,6

17:24 18:7,
 18,21,23
 23:22 33:9,
 12,23 39:14,
 18,22,24
 40:1 42:6,
 15,18 45:11
 51:12 57:8,
 9,19,23
 58:1,3,15
 59:2 60:6
 64:17,22
 65:22 69:10,
 19 90:2,4,15
current
 7:8
custody
 19:25
cut
 61:24

_____

D

_____

D-A-V-A-N-E-K
 34:12
damages
 69:6
Dan
 78:21
Darell
 4:23 7:7
 9:20 10:11
 12:11,12,15,
 18,20 17:22
 33:19 58:13,
 25 60:3
 75:13 76:11
 78:10 79:3
 80:9,17 83:4
 84:11 89:5
date
 9:6,7,9 27:7
 31:16 47:20
 52:20 84:22
dated
 47:17

DARELL   CHANCELLOR
April 23, 2021

daughter
  12:8
Davanek
  34:10,12
day
  16:2 27:5
  28:15,18,20,
  21,22 29:7,
  12,15,17,19
  30:2 31:7,8,
  10,11,13,18,
  19,21,23
  69:3 72:15
  73:12,13
  77:7 79:9
  81:3 82:2
  83:2,5 84:23
  85:23 88:25
days
  49:9,10
  68:20 76:12
  77:23 88:5
dealer
  23:3
death
  84:15,16
December
  9:5,8 35:20,
  21,22 36:12,
  22 37:8
decided
  19:13
declare
  4:11
deed
  48:16,18
  50:13 56:1,5
deeds
  43:17
defendants
  4:17
Defense
  49:24
deliver
  20:19 73:17
delivered
  85:17

delivery
  21:2
Deon
  7:7
Department
  38:8 47:2
  74:6
depends
  13:13 28:19
deposition
  5:8,12,24
  16:21,23
  90:18
describing
  71:5
description
  50:23 72:20,
  21
detainee
  56:8
Detention
  49:3,4,5
Detroit
  5:7 17:4
  47:1 48:24
  49:3,4,5
  63:20 71:18
  74:6 89:17,
  18
Diane
  6:5,7,12
difficult
  6:12,16,17,
  22 26:7
disagree
  41:19
District
  51:25
divorce
  82:6
divorced
  10:20 11:9
  82:9
doctor
  25:24 26:1,
  2,3,4,18,20
  27:1 59:3,5,

6,10,13,16,
  17 60:20
  61:15
doctors
  59:8
document
  38:7,11
  40:3,22
  47:12,13,17,
  20 49:19,20,
  22,24 50:3
  54:8,9,11,
  14,15,16
  57:20 58:9
documents
  70:11 86:21
doo-doo
  63:8,10
door
  50:21 72:18
dope
  10:1
DPD
  75:23
driver's
  8:8
driving
  48:23
drove
  28:9
drug
  23:3
drugs
  77:13
DTE
  46:10,22
  56:13,17
due
  65:19 84:16
duly
  4:25
Durrell
  37:5
Durrell's
  42:9

_____

E

e-mail
  39:15,20
E-W-A-L-D
  89:10
earlier
  33:5 56:17
  76:24
early
  28:2,3 86:5
earn
  79:24 80:1
easier
  6:7
education
  62:24
electric
  46:15
electricity
  46:18 86:8
eligible
  53:13,19
emotional
  65:1 85:2,4
employed
  13:18,20
end
  5:15 19:15
  28:16,17
  44:25 52:15
ends
  8:16
energy
  56:13
enforcements
  61:7
engage
  50:21 72:19
entire
  79:12
episode
  61:9
estimate
  62:11

DARELL CHANCELLOR
April 23, 2021

evidence
  38:7 54:23
  55:1,3,6,9,
  11,12,13,15
  56:1,14,25
  57:1 58:10
Ewald
  67:18,19,20
  68:3 89:9
ex-wife
  10:22
EXAMINATION
  5:3 70:3
examined
  5:2
exchanged
  51:1 73:9
excuse
  66:18,21
  72:14 84:5,
  25
exhibit
  40:25 49:24
  50:1,12,14
  70:6
exhibits
  39:15
exonerated
  18:10 24:1
  75:20
exoneration
  89:14
expense
  65:12
expenses
  67:3
experience
  78:21
experiences
  64:7
expiration
  9:6,7
eye
  26:18,20

─────────

## F

facility
  80:22
failed
  50:14 78:15
fair
  6:14,19,25
  7:4 36:9
  55:15 66:9
fake
  53:5
false
  50:9 85:11
familiar
  52:3 64:18
family
  69:15
February
  47:17 48:9
feces
  79:18
federal
  90:5
feds
  89:11
feel
  61:5,6 78:10
  79:3 83:5,6
feeling
  64:11 83:12
feels
  78:13
fees
  66:25
felony
  22:15 23:23
  25:3,9
felt
  78:13
Ferguson
  34:6,7,8
field
  40:19

fight
  61:23 62:1,
  2,3,13
fights
  62:5,6,7,9,
  10
figure
  83:14
file
  16:14,16
filed
  16:13,14
  64:12,21
  90:5
financial
  13:13 65:12
find
  11:16 26:7
  46:14 77:2
finds
  51:3
fingers
  46:15 56:18
finished
  6:24
firearm
  17:9 22:15
  23:23 25:3,9
firearms
  52:2
fixed
  50:17
floor
  37:16,17
  63:11
follow-up
  69:22
follow-ups
  90:2
food
  53:23
foreclosed
  66:22
forehead
  5:19
forget
  11:21 59:17,

25
fought
  84:7
found
  41:8,12,13,
  15,17,20,21
  76:24 77:1,
  2,10 78:14,
  17
foundation
  42:14 65:17
  69:9
frame
  67:25
frequently
  13:2
Friday
  4:2
friend
  33:2 43:14
front
  64:11
full
  7:6 88:5
function
  26:14
funny
  14:15,17,18

─────────

## G

G&g
  13:21,22
  14:3,6,12,24
  15:1,7,14,15
  16:5,10
  79:14 80:3,
  6,10 81:21
  86:22 87:16
gas
  14:1,4,16
gave
  5:12,23 10:8
  82:21
GED
  62:20 63:12

U.S. Legal Support · (313) 962-1176    7

DARELL CHANCELLOR
April 23, 2021

Geelhood
  5:6 52:23
  53:2 65:8
  71:4,15
  72:14,15,23
  74:1 75:25
  76:4 90:13
Geelhood's
  74:5
gentleman
  89:10
girlfriend
  33:22 44:8
girlfriend's
  34:9
give
  6:8 7:3,6
  11:14 18:18
  39:18 56:22
  58:4,5,17
  71:22
glasses
  23:5,6,7,9
  26:5,8,11,
  12,14
go-between
  43:25
gold
  52:17,18
good
  5:5 8:20
government
  53:9
grade
  63:22,24
  64:1
grams
  20:20 21:2,
  5,11,17
  24:2,10,19
  73:19
grand
  74:17
grandma
  19:24
great
  87:19

grocery
  80:20
groups
  5:7
guess
  20:2,4 37:8
  45:18 51:11,
  13 60:18
  68:7
guilty
  20:24 21:9,
  21 22:5,7,18
  78:14,17,24
  79:4,6 84:3,
  5,6
gun
  23:12,13
  25:10 81:18
guy
  80:10
guys
  11:9

_____

H

half
  74:25
hamster
  71:21
handed
  9:15,17
handwriting
  54:21,24
handwritten
  55:4
happen
  13:2 31:14,
  18,21 61:9,
  10 65:5
happened
  31:12 32:6,
  16,17 49:10
  75:12,15
hard
  14:18,23
  61:18 83:12
  85:7

Hatchett
  4:18 17:20
  18:6,15,20
  23:19 33:7
  39:17 42:5,
  13,17 45:7
  69:21,24
  70:1
Hathaway
  78:19,20,21
  82:22
he/she
  51:21
head
  6:11 16:24
health
  53:16 54:2
hear
  42:7 79:4
  81:5 83:20
  88:19
heard
  7:3 69:18
  74:17 78:24
  80:4 86:4
hearing
  27:3 77:3
heat
  46:19
height
  8:25 55:17
hereto
  90:20
heroin
  20:21 21:2,
  6,12,18,23
  24:3,10,19
  51:2,22
  72:1,4
  73:10,22
  74:2
Hey
  39:14
high
  63:13,15,20
highlight
  40:11 50:16

highlighting
  40:11
hold
  8:19 40:18
  44:21 51:7
home
  5:16,17,21
  13:3 19:13
  27:15,16
  29:1,2,4,6,
  9,23,24
  30:25 32:12
  33:4 43:6,18
  71:17 75:19
  83:15,18
  85:19
hope
  40:4
hospital
  85:15
hour
  80:11 81:21
hourly
  81:22
house
  7:16 8:3
  29:9 32:1,
  19,22,24
  33:2,22
  34:15,17,21
  35:25 36:2,
  4,8,9,12
  37:1,10,19,
  22,25 41:8,
  12 42:23
  43:1,3,5,6,
  8,13,15,18,
  19,20 46:7,
  16 53:6 56:1
  61:8 65:19
  66:13,14,17,
  22 68:18
  73:1 75:7,9
  76:24 77:4,
  12,18 86:5,8
huge
  89:2

8

hung
    32:15,17

_____

**I**

ID
    8:10 55:16
idea
    53:8 73:6
    75:18
identificatio
n
    4:5 8:22
    47:25 48:3
identified
    76:3
illegally
    74:21
impairment
    27:3
important
    84:14
imprisoned
    24:3,4
imprisonment
    18:4 64:13,
    24 65:13
    66:10 67:4
improperly
    74:21
incarcerated
    43:16
incarceration
    64:15
inches
    70:15
incurred
    65:12 67:3
    69:6
informant
    51:20 71:19,
    25 72:7,10
information
    51:19 54:17
    72:2 73:24
    89:20

initially
    18:11
injuries
    64:23 69:5
innocence
    55:12
innocent
    49:17,18
    55:7
input
    56:8
inside
    71:17
insurance
    54:2,4,6
interrupt
    83:8
introduced
    38:7
investigated
    74:7
investigating
    68:11
investigator
    89:11
involvement
    17:10,13
    68:8
issue
    60:21 75:25
issued
    9:2,3
issues
    60:19

_____

**J**

jack
    61:22 64:10
jail
    24:5,10,21
    25:1 49:2,6,
    12 56:9
    77:23,24
    79:12,19,20,
    21 83:2
    88:14

jailed
    79:10 88:12
Janet
    7:21 56:19,
    20 58:20,21
January
    36:5,25
    37:7,8,9
    38:21 68:21
    86:5,17
    87:21 88:3
Jason
    9:23,24
    10:2,5,11
job
    13:17 16:2
    63:2,5 79:22
    80:13,14
    81:24 87:16
jobs
    15:24 16:1,
    3,7 80:16
    81:8,21
jogs
    15:23
Johnson
    4:21 33:19
    39:20,23
    51:7 57:4,
    15,22,24
    58:12,24
    60:3 64:16,
    21 65:17
    69:9,24
    70:2,4 89:25
    90:16
Jr
    12:11,12,13,
    16,18,20
judge
    18:11 78:19,
    20,21 82:21
    83:13
jury
    78:19
justice
    78:15,16,18

83:11
juvenile
    19:7,8 20:2,
    6

_____

**K**

Katie
    69:15,17
Katrice
    10:23,24
    11:7,16,19
    12:4 27:19,
    22 82:3
    85:13,21,24
    88:13
Katrice's
    11:17,25
    45:22
Kevin
    14:13 15:3,
    9,10,11
Kevin's
    14:14
kid
    29:5
kids
    45:16,17
kind
    14:3,17
    15:24 23:6,
    13 26:10
    27:3 28:10
    43:24 44:19
    53:21 54:1,
    4,6 60:15
    61:12,14
    65:1 68:8
    69:11
knew
    67:23 71:24,
    25
knock
    50:21 72:18
knowing
    13:12 17:12
    42:3 54:3

DARELL CHANCELLOR
April 23, 2021

**knowledge**
11:4,5 71:15
76:19 87:19

---

**L**

**lack**
42:14
**large**
51:21 71:24,
25 72:4
**law**
61:7
**lawsuit**
5:7 16:13,22
17:2,3,5,11,
15 64:12
75:12
**lawsuits**
16:16
**lawyer**
58:5 66:4
**lawyers**
65:19,23
66:6,9
**laying**
61:22
**leave**
26:3 29:9
32:19 86:24
**left**
59:10
**legal**
57:4,15
58:12
**legible**
70:7
**lenses**
26:22,24
27:1
**letter**
8:16
**license**
8:8
**lied**
17:7

**lieu**
4:10
**life**
78:23 84:14,
19
**lights**
36:3
**Linda**
45:23 46:1
**Linda's**
45:24 46:3,5
**lineup**
68:10
**link**
60:15
**list**
57:10,14
86:20
**listed**
55:16 56:25
58:8
**listened**
83:8
**literally**
86:22,25
**live**
11:19 12:20
19:18,23
34:21 35:14
36:22 37:5
43:7 44:9
45:12,17,19
46:1 85:19
86:1,11 88:5
**lived**
19:20 34:19,
23 35:8,11,
17 36:12
37:3 38:15
39:2,3,8,11
44:3 46:7,16
77:16 85:24
86:5,7 88:2,
9
**lives**
7:18 8:3
11:23

**living**
7:13 19:15,
16 33:8
34:25 35:6
36:7,11 37:9
87:10
**location**
7:10 33:17
35:19 37:14
38:19 51:22,
23 72:1,5
**locked**
18:1 35:13
48:10 62:4
66:16 75:4,
21 84:16
**long**
5:12 8:16
19:23,25
25:12 28:14
49:8,12
60:22 61:1,
18 62:18
76:11
**longer**
13:24
**longest**
60:24 61:1
**looked**
50:13 55:3
56:5 71:17
82:18
**lose**
45:1 66:13
84:13
**lost**
49:13 65:19
66:13 84:9,
11,13,15,16,
18,21
**lot**
59:19 62:6,
15 70:25
71:1 84:15
**Lovett**
13:23,24
**lying**

39:6,12

---

**M**

**mad**
88:25
**made**
28:6 50:25
57:10 66:25
73:5 79:1
**Magnum**
23:15
**make**
6:7 14:10,20
23:16 40:7
53:5 57:12
88:17
**makes**
26:9 35:1
**making**
80:10 81:20
**male**
71:5,11,12
**man**
64:10 88:19
89:3
**manner**
4:14
**Manpower**
15:17,20
**March**
35:4,5,8,11,
13,18 79:9
**marijuana**
20:7,10 52:2
**mark**
40:25 50:12,
13
**Market**
13:21,22
14:3,6,12,24
15:1,7 16:6,
10 86:22
**married**
10:14,16,18,
24 11:6,12
82:3

Martin
  63:18
matching
  50:22 72:19,
  21
matter
  4:12
Mcgraw
  63:18,19
meant
  6:12
Medicaid
  53:11,12
  54:1
medical
  25:21
Medicare
  53:13,15,18
medication
  61:12
meet
  67:8
Melendez
  17:4,7,10
  67:23 68:5,
  7,10,11,14
  74:11 75:11,
  15
memory
  15:23 64:9
  75:13
mental
  60:18
mention
  50:14
mentioned
  74:11
met
  53:2 67:6,9,
  22
Michigan
  4:1 8:8,10
  38:8 71:18
middle
  61:21
Mile
  87:14

minute
  39:18 69:24,
  25 71:22
minutes
  50:19 72:17
  87:1
missed
  85:6
mistaken
  38:13
misunderstood
  33:13
model
  23:16,17
mom
  8:3 13:5
  19:16 32:13,
  20 36:14,23
  56:20 58:20,
  21 76:1
  77:4,19
mom's
  32:22 34:15,
  17 35:25
  36:2,8 41:8
  53:6 68:18
  75:7,9 76:24
moment
  41:6
money
  43:13 45:6
  51:1 65:14,
  15,18 67:3
  73:9 74:19,
  24 75:1,2
  80:9
month
  36:3 67:10
  86:15
months
  19:25 62:19
  76:16,24
  82:25 85:11
  88:4,5
morning
  5:5 27:12
  29:20

mortgage
  66:15,17,18
mother
  7:15,19
  12:21 19:13,
  17 31:23,24
  32:10 36:15
  45:21 68:25
  69:3
mother's
  7:20 8:1
  41:12 42:2,4
  45:22
motor
  52:6,8,11
move
  36:2 37:1
moved
  35:18,23
  36:4,25
  37:18,22
  38:24 46:7
  68:18,21

---

**N**

naked
  61:21
names
  9:19,22
  10:10 14:15,
  23 15:16
  80:18
narcotic
  50:25 51:4
  73:6
narcotics
  52:3 74:9
necessarily
  80:17
newborn
  27:21
Newman
  67:6,8,9
  89:14,21
night
  31:24 32:19

37:19 61:22
  62:1
nights
  62:13,15
nod
  6:10
nolo
  84:2
normal
  6:9
nos
  6:19
notary
  48:15
notes
  70:7
November
  27:5,8,10,25
  29:12 30:7
  31:5,15,17,
  20 32:2,8,10
  41:7,11
  50:16 52:18,
  21 53:2,7
  69:1,2 70:8,
  18 71:6
  72:15,23
  73:1,12 74:2
  75:7 76:4
  77:8 78:4,5
nowadays
  61:8
number
  8:6,14,15
  11:25 12:2
  15:9 40:15
  44:16 46:3,5
  55:5 62:10
  76:5
numbers
  8:17
nurse
  25:24

**O**

**oath**
4:10
**object**
17:20  18:15
23:19  58:5,
17
**objection**
4:19  18:6,
17,19  42:5,
13,17  45:7
57:25  58:24
**objections**
4:14
**observed**
50:20  72:17
**occasions**
51:24
**October**
51:18  71:16
72:5  75:9
**offenses**
71:2
**offensive**
14:21
**offer**
56:23
**offhand**
54:12
**office**
5:15  86:22
87:14
**officer**
17:4,6,10
38:12,14,15,
18,24  39:2,8
67:23  68:5,
7,10,11  71:4
72:14  74:5,
9,12  75:17
87:7,12,18
90:12
**older**
53:15

**ongoing**
51:4
**operation**
14:3
**opportunity**
58:5,17
**order**
6:6
**ordinary**
31:14,17,21
**original**
55:16
**owned**
26:24  43:25
44:1  52:8,11
**owner**
15:11

**P**

**p.m.**
30:21  90:18
**pack**
81:14,15
**packaging**
52:3
**packed**
81:14,15,16
**packing**
81:10,12
**Paige**
65:24,25
66:7,11
**paragraph**
51:18
**paranoid**
65:2
**parole**
38:12,14,15,
18,24  39:2,8
40:10,13
86:21,22
87:6,12,14,
18
**paroled**
25:16

**part**
50:11,15
54:23  64:1
74:20  89:2
**participating**
4:6
**parties**
4:13  90:20
**parts**
80:21
**past**
9:19  10:10
34:19,20
35:14  51:3
90:6
**Pat**
67:14,15
**Patrick**
4:16  5:5
18:17  57:24
69:23
**pay**
12:18  18:3
43:13  45:4
47:7  65:20,
23  66:6,8,9,
15,24,25
67:3  82:1
**paying**
66:16
**payment**
17:17  38:13,
14
**pee**
63:11
**penalty**
4:12
**pending**
51:25
**people**
36:13  53:15,
16  63:9
72:17  79:17
84:15
**perfect**
8:22

**perjury**
4:12
**permission**
40:19
**person**
4:11  6:23
15:2  23:1,4,
8  30:2  50:22
72:11,19
**persons**
50:20
**phone**
11:25  12:2
15:9  32:2,4,
8,16,17,20
40:4  44:16,
17  46:3,5
68:16  85:1
**phonetic**
22:19
**physical**
60:15,19,21
65:1
**physically**
4:7  64:25
**picture**
48:7
**place**
13:20  15:14
19:20
**places**
80:18
**plaintiff**
4:19,22
**plans**
88:21
**plead**
20:24  21:9,
21  22:5,7,
18,19
**pled**
22:20,22
84:2,6
**point**
68:9  78:10
**police**
10:2,8  32:1

12

DARELL CHANCELLOR
April 23, 2021

65:7 68:11
74:6 75:17
77:11
**popular**
15:20
**porter**
63:6,7 79:17
**possession**
18:8 20:7,9
21:23
**pounds**
55:18 70:9,
17,20,23
**precinct**
49:7,8 77:23
79:13 83:3
**preliminarily**
17:21
**prescribe**
27:1
**present**
4:8
**presented**
4:5
**press**
80:21
**previous**
83:19
**prior**
17:3,15
18:13,24
40:19
**prison**
24:13 25:6,
12,18,22
26:2,3,4,20
31:11 35:2,
5,19,22 43:3
48:11,15
59:4,9,14,
20,22 60:13,
16,22,24
61:17,19
62:5,6,20,24
63:2 64:3,4,
8 65:16,19,
21 67:12

69:12 75:2
79:10,11,13,
19,20,21
82:11 83:2,
14 86:15
87:21,24
88:13,24
89:15
**probation**
24:7,12,19,
24 25:4
**problem**
7:1 11:15
58:1 87:6,8
**problems**
26:10
**proceeding**
4:7,9
**produce**
81:13,14
**prom**
44:7
**pronounce**
14:18,23
**provide**
54:17
**proving**
52:2
**psychiatrist**
59:21,24
60:7,18
**psychologist**
60:12 61:15
**Public**
63:20
**pull**
8:21
**pulled**
48:23 76:21
**purchase**
43:1,8,11,12
**purchased**
43:3
**purple**
28:11 30:13
52:8

**put**
19:11 24:5,
10 46:14
56:18 62:11
**putting**
80:20 85:1

---

**Q**

**quantities**
52:1
**question**
6:10,24,25
7:2,4 22:24
26:7 29:18
41:10 43:2
50:10 51:13
54:15 57:7
58:4 66:9
75:11 79:21
89:18,21
**questioning**
18:16
**questions**
69:22 70:5
85:6 90:1,16
**quit**
55:25 56:5

---

**R**

**R-O-G-E-R-S**
34:13
**R-O-X-S-A-N-
N-A**
44:14
**raided**
32:1 77:4,7
**rate**
81:22
**Ray**
65:24,25
66:5,7,11
**RE-
EXAMINATION**
90:3

**read**
4:20 8:14
40:17
**real**
58:4,17
**reason**
53:5 59:13
**reasons**
59:16
**recall**
9:25 15:16,
18,19 16:5,
6,7,12 23:21
32:7,9 37:2,
4,6 38:22
43:9,10
45:5,8,9,10
47:21 48:14,
17,19 49:7
50:1 52:22
54:19 62:10,
13,17 68:12
90:10,11
**receive**
17:17,19
25:21 53:9,
21
**received**
51:19
**receiving**
22:1,7,11
24:23
**recently**
75:19
**recognize**
49:22 54:11
**recollection**
27:5 29:12
**record**
4:15 6:6
74:5
**recorded**
48:18
**red**
53:18
**referring**
56:17

U.S. Legal Support · www.uslegalsupport.com

13

DARELL   CHANCELLOR
April 23, 2021

regard
  89:9
related
  74:8
relationship
  44:5
relative
  74:2
release
  89:15
released
  25:16 59:3,
  8,14,20,21
  60:12 67:9,
  10 69:12
  86:15
relevance
  17:21 18:6,
  16,19 23:19
  42:5 45:7
reliable
  51:20
remain
  75:17
remained
  78:1 79:10,
  11
remarried
  11:9
remember
  14:15 23:16
  27:10,11
  29:15,17
  31:7,8,10,12
  38:4,9 41:16
  44:25 45:5
  81:7 87:19
remotely
  4:9 6:3
  33:16,18
repeat
  27:7 41:10
  50:10 57:6
report
  86:23,25
  87:2,4

REPORTER
  4:6
reporting
  4:9,14
represent
  5:6
requested
  90:19
residence
  40:18
respective
  90:20
response
  42:7
rest
  85:23 88:1
restitution
  65:20 66:24
result
  17:15 64:23
  65:13 66:10
  67:4
resulting
  51:24 52:1
returned
  50:25 73:5
returns
  90:5
revealed
  72:10
reversed
  88:22
riffraff
  14:10
risk
  44:23
rob
  22:25 23:2,4
robbed
  23:8
robbery
  22:14,15,23
  23:23 25:3,
  9,10 61:2
  75:5
Robison
  27:17 29:3,

25 30:25
33:25 34:2,
3,6 36:4
38:25 39:3
42:23 45:4,
12 46:7,16
85:20,24
86:9,11
87:10 88:6
Rogers
  34:10,13
role
  68:6
Roles
  88:22
Ronald
  37:5 42:9
Ronnie
  65:24 66:3,
  4,6,10
room
  4:8 5:22
  7:10,12,13
  62:4
roughly
  71:6 80:9
  81:20
routine
  76:21
row
  62:14
Roxsanna
  43:14,15
  44:3,5,9,14
  47:22 48:11
Roxsanna's
  44:11,16
rules
  6:4

          S

S-H-I-N-E-R
  60:4
safe
  61:5,6

sake
  24:16
save
  24:15
say-so
  79:6
scared
  44:19 65:5
school
  19:12 63:13,
  15,20
screen
  40:3
search
  50:11 53:6
  70:6 71:4
  76:4,23 78:7
searched
  77:11
section
  55:9,10
Security
  8:6 53:21
seller
  50:23,24
  73:5
sense
  26:9 35:1
sentence
  25:8 82:21
sentenced
  25:4,6
separately
  50:20 72:18
serve
  25:12
service
  15:18,21,24
  16:8,11
  46:15 81:2,9
  82:1
services
  15:15,16
  81:11
set
  50:17

settle
  75:12
settled
  17:16
settlement
  74:15
Sewerage
  47:1
shake
  6:11
share
  40:2
sheet
  56:8
shelves
  14:9
shift
  28:16,17
Shiner
  60:4,8 61:3
  69:13
short
  50:22 72:19
show
  39:15 47:12
  49:19 56:8
shows
  55:12,16
sick
  26:1
sign
  43:17 47:22,
  24 48:16
signature
  40:22 41:4
  47:15 48:5
  90:19
signed
  47:20
simply
  87:16
single
  83:2
sir
  11:20 16:12,
  24 39:5,21
  41:22 42:10,

12,20,22
43:10,21
46:2,4,9
47:9,11
48:14,19
79:8 90:1
sister
  7:19 8:4
  36:15
sister's
  7:22
sites
  16:1
sitting
  83:11
situation
  68:6
sleep
  7:14,15
  37:10 65:10
sleeping
  37:12
slightest
  53:8
slow
  58:4,17
social
  8:6 53:21
  61:15
sold
  51:23 72:1,4
someplace
  22:25
son
  12:8,9,22
  13:15 27:21,
  23 30:3 31:2
  45:13 65:4
  84:17 85:6,
  13,21,24
  86:1 88:7,8,
  13
son's
  12:10
sought
  69:11

sound
  54:18 64:6
  79:1
speak
  68:16
specifically
  14:21 33:8
spell
  7:24 34:11
spend
  13:1 18:1
  65:3
spent
  31:11 65:18
spoken
  52:23,25
St
  19:21
stamping
  80:20,21
  81:4
stamps
  53:23
Stanyar
  67:16
start
  6:25 18:25
  30:9 34:25
started
  30:18 35:6
starts
  8:16
state
  8:10 18:2,3
  19:14,16,17,
  19 55:16
  64:15 74:20
  90:5
stated
  51:20
statement
  4:19 51:5,
  10,14,16
  52:4
statements
  50:9

station
  14:1,4,16
stay
  7:10 12:22
  14:10 34:24
  37:18 45:19
  50:24 61:7,8
  73:4
stayed
  35:21 56:1
  77:17
Stephen
  52:23 53:2
stepped
  66:5
Steven
  5:6
stick
  64:8
stipulating
  41:16
stock
  14:7 80:19
stocking
  14:9 81:3
stolen
  22:9
stop
  76:21
stopped
  19:16
store
  15:12 80:20
stored
  51:22 72:1,4
street
  7:16,18
  11:23 32:22
  33:6 34:15
  35:6,12
  36:7,8,11
  37:1,10,19,
  21,24 38:16
  39:3,9 41:9,
  12 68:18
  71:18 72:16
  86:1,20

DARELL   CHANCELLOR
April 23, 2021

| | | | |
|---|---|---|---|
| **stretch** | **taking** | **testified** | **time** |
| 60:24 62:22, | 6:5 61:12 | 5:2 39:11 | 5:23 6:23 |
| 23,25 63:3 | **talk** | 58:22 | 15:7 16:11 |
| 64:8 | 31:23,25 | **testify** | 19:3,9 20:12 |
| **stuck** | 61:3,14,15 | 4:25 16:21 | 21:3,12,14, |
| 83:14 | 67:11 69:7 | 56:20 58:20 | 24 22:12 |
| **stuff** | 81:6 89:13 | 72:7 | 24:15 27:21, |
| 19:22 58:8 | **talked** | **testifying** | 25 28:5,16 |
| 59:19 70:2 | 15:10 31:24 | 33:16,18 | 30:9,15 |
| 80:18,20 | 32:13 61:10 | **testimony** | 34:23,25 |
| 86:21 | 64:3 67:2,21 | 4:11 5:8,13, | 35:17,20 |
| **submitted** | 89:22 | 24 56:22 | 44:21 50:2,8 |
| 55:13 | **talking** | **therapy** | 60:10,16,24 |
| **successful** | 6:23 17:11 | 61:14 | 61:1,17 65:4 |
| 74:14 | 46:11,12 | **thing** | 67:22,25 |
| **sue** | 51:11 60:3 | 6:1,16,21 | 68:20 70:8, |
| 17:2 | 68:20,21 | 7:2 10:7 | 12,22 79:12 |
| **sued** | 71:11,20 | 23:24 38:14 | 82:7,8 85:6 |
| 51:23 74:11 | 76:16 78:8 | 56:8,13 | 86:4 87:15, |
| **suffered** | 84:17 | 58:16 73:14 | 22 88:3,9,12 |
| 64:23 69:5 | **tall** | 77:17 82:11 | 89:7,8,25 |
| **sugar** | 70:12,13 | 83:21 | **times** |
| 81:15 | **taller** | **things** | 10:18 13:4 |
| **suggest** | 70:15 | 6:6,7 17:6 | 51:3 60:1 |
| 54:13 | **taught** | 26:15 57:10, | 68:25 74:7, |
| **support** | 78:16 | 11 61:18,20 | 11 |
| 12:18 13:14 | **tax** | **Thomas** | **today** |
| **supports** | 90:5 | 8:2 9:23 | 74:11 |
| 55:6 | **taxes** | 10:5,12 | **told** |
| **supposed** | 66:21,22 | 13:11 19:21 | 16:23 32:1 |
| 61:19 83:16 | **telephone** | **Thomas'** | 33:5 38:15 |
| **surveillance** | 52:25 | 42:11 | 39:2,6,11 |
| 50:17 | **telling** | **thought** | 61:4 63:12 |
| **suspected** | 43:22 | 55:11,13,20 | 65:2 74:19 |
| 50:23,25 | **temp** | 56:3,10,14, | 76:13,25 |
| 51:1 73:4,5, | 15:15,16,18, | 22 58:22 | 77:4,11,20 |
| 10 74:2,8 | 21,24 16:8, | 80:4 | 79:17 81:2, |
| **sworn** | 11 80:25 | **till** | 20 89:9 |
| 4:25 6:4 | 81:2,9,11,22 | 19:24 49:13 | **top** |
| **system** | 82:1 | **Tim** | 5:19 9:4 |
| 78:15,16 | **temporary** | 67:18,19,20, | 16:24 40:9 |
| | 80:16 | 21,22,23 | **total** |
| | **terms** | 68:3,8,13 | 65:11 |
| | 74:6,14 76:3 | 89:9 | **totally** |
| **T** | **terrible** | **Tim's** | 65:11 87:13 |
| | 61:18 64:11 | 68:6 | **touch** |
| **T.V.** | 78:13 83:6 | | 44:20 68:13 |
| 29:7 47:4,6 | | | |

U.S. Legal Support | www.uslegalsupport.com                    16

DARELL CHANCELLOR
April 23, 2021

traffic
  76:21
Trailblazer
  52:13
transaction
  50:25
transcribe
  6:18,22
transition
  73:6
traumatic
  31:12
Treasury
  38:8
treatment
  69:11
trial
  20:22 21:7,
  19 22:3,16
  38:4,5 41:16
  49:13,25
  50:2,8
  55:14,21
  56:2,11,15,
  23 57:2,12
  58:11,23
  65:25 66:1,5
  72:8 76:11,
  12 78:1,3,4,
  11 83:20,25
  84:7
trouble
  75:17
truancy
  19:12
truant
  19:12
true
  6:21 27:12
  51:5,10,14
  52:4 54:15
  71:8 74:15
trust
  65:6,8
truth
  4:25 5:1 6:5

type
  38:14 51:2,3
  59:5,6
  80:18,25
  81:8
types
  81:1

_____

**U**

_____

Uh-huh
  31:6
uh-huhs
  6:17
ultimately
  74:3 76:22
  79:10 83:3
  84:2 85:5
underlying
  18:14,25
understand
  22:24 29:18
  43:2 64:12
  80:24
understood
  7:4 14:20
Unh-unh
  48:12 75:16,
  24
unh-unhs
  6:17
unregistered
  81:18
unusual
  14:22
upstairs
  39:9,12
utilities
  36:3 46:18
  86:12
utility
  46:10

_____

**V**

_____

vaguely

  16:9
Val
  89:14,20
Valerie
  67:6,8,9
varies
  81:24
vehicle
  52:6,8,11
Ven
  4:21
verbal
  6:9
verbally
  4:11 6:13
victim
  66:25
Victoria
  52:12,14,16,
  18
view
  6:7
vision
  26:10
visit
  38:18,21
  88:24
VSCA
  51:25

_____

**W**

_____

W-I-C-A
  64:16
wages
  79:24
wait
  6:24 69:24
waive
  4:14
wake
  27:25 28:1
wanted
  43:6 61:23
  62:1,2,3,12,
  14 88:20

wanting
  88:23
warrant
  50:12 70:6
  71:4 76:4,
  23,25 78:7
Warren
  13:23,24
watched
  29:7
water
  46:24 47:1
Wayne
  4:1 49:11,12
  77:24 79:13
  89:13,17
wear
  26:8,22
wearing
  26:5
week
  68:25
weekend
  13:1
weeks
  87:3,5
weigh
  9:13 70:17
weighed
  70:23
weight
  8:22 55:17,
  18 56:9
wheel
  71:21
white
  53:18
WICA
  64:16
wife
  27:19 29:5
  30:3 31:2
  45:13 84:11
  88:2,7,8,13
witnesses
  58:19,21

DARELL CHANCELLOR
April 23, 2021

**woke**
  27:12,14
  28:4 29:19
  62:12,14
**word**
  78:24
**words**
  6:9,13 80:6,
  19
**work**
  13:5,7,9,11
  14:24 15:17
  28:2,5,6,8,
  14,15 29:10
  30:7,9,11,
  15,18,21
  79:22 80:18
  81:1 86:24,
  25
**worked**
  14:25 15:7,
  11,14,15
  16:11 75:23
  80:3
**worker**
  61:15
**working**
  15:1 28:19,
  21,25 30:23
  79:14 80:6,
  15,25 81:21
  82:2 86:12,
  14
**worst**
  64:10
**write**
  87:20,23
**writing**
  41:2
**written**
  6:5 74:7
  89:22
**wrong**
  80:4
**Wrongful**
  64:13

**wrongfully**
  82:16 83:3
**wrote**
  87:24

---

### Y

**year**
  67:24 71:9
  78:7 85:23
**years**
  20:15 25:13
  31:5,11 44:7
  60:23 70:25
  71:1 82:16,
  18,25 83:1
  84:18,19
**yesses**
  6:19
**young**
  89:2

---

### Z

**zoom**
  6:3,22 8:20
  40:21

# EXHIBIT 6G

# Trial Transcript

STATE OF MICHIGAN
IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE                          Case No. 12-4974-01
STATE OF MICHIGAN

vs.

DARELL DEON CHANCELLOR,
        Defendant.
-------------------------/

WAIVER TRIAL
        Proceedings had in the above-entitled cause before

the Honorable DANIEL A. HATHAWAY, Judge of the Circuit Court for

the County of Wayne at 1441 St. Antoine Street, Detroit,

Michigan, on Thursday, November 8, 2012.


APPEARANCES:

For the People              STEPHANIE L. ZEIGER, ESQ.  P66019
                            Assistant Prosecuting Attorney
                            Wayne County Prosecutor's Office
                            1441 St. Antoine Street
                            Detroit, Michigan  48226
                            Telephone (313) 224-5761


For the Defendant           RAY A. PAIGE, ESQ.  P41848
                            615 Griswold Suite 1308
                            Detroit, Michigan  48226
                            Telephone (313) 510-3335


            - - -      - - -      - - -


Reported by                 ZELDA HARRIS RELEFORD, CSR 4897
                            Official Court Reporter

## TABLE OF CONTENTS

WITNESSES:  For the People                                     PAGE

BRIAN ANTHONY JOHNSON
        Direct Examination by Ms. Zeiger                  5
        Cross-Examination by Mr. Paige                   14
        Redirect Examination by Ms. Zeiger              21
        Re-cross Examination by Mr. Paige               22
STEVEN GEELHOOD
        Direct Examination by Ms. Zeiger                 26
        Cross-Examination by Mr. Paige                   37
        Redirect Examination by Ms. Zeiger              44
        Re-cross Examination by Mr. Paige               46
        Redirect Examination by Ms. Zeiger              55
        Re-cross Examination by Mr. Paige               60
CYNDI IZUMI
        Direct Examination by Ms. Zeiger                 63
        Cross-Examination by Mr. Paige                   66
TOMMY BELL
        Direct Examination by Ms. Zeiger                 69
        Cross-Examination by Mr. Paige                   75


WITNESSES:  For the Defendant

DARELL DEON CHANCELLOR
        Direct Examination by Mr. Paige                  78
        Cross-Examination by Ms. Zeiger                  84


Matter adjourned                                            93

## E X H I B I T S

|              | Identified | Admitted | Stipulated |
|--------------|------------|----------|------------|
| People's 1   | 13         | 14       | --         |
| People's 2   | --         | --       | 62         |
| People's 4   | 74         | 74       | --         |
| People's 5   | 73         | 73       | --         |
| People's 6   | 44         | 45       | --         |
| Defendant's A | --        | 20       |            |

```
 1              Detroit, Michigan

 2              Thursday, November 8, 2012

 3              Afternoon Session

 4              ---      ---      ---

 5              COURT CLERK:  Calling Case No. 12-4974, People

 6    vs. Darell Chancellor.  Here for a continuation of a trial.

 7              MS. ZEIGER:  Good afternoon, your Honor.

 8              Stephanie Zeiger, on behalf of the People.

 9              THE COURT:  Good afternoon.

10              MR. PAIGE:  May it please the Honorable Court,

11    Ray Paige, on behalf of the Defendant, your Honor.

12              Today is the date set for a waiver trial,

13    your Honor.

14              THE COURT:  Okay.

15              MR. PAIGE:  I've had the occasion to be given a

16    letter that's --

17              THE COURT:  Yeah, it just came in from the

18    Defendant addressed to me.  So I wanted to make sure that

19    you knew what had been sent to me.  That you've got a copy,

20    and that the People got a copy.

21              MR. PAIGE:  Yeah.  And I'm just now reading it,

22    Your Honor.  I was not aware of this.

23              THE COURT:  Honestly, I wasn't either until

24    literally thirty seconds before I walked out.  So there we

25    have it.
```

3

1          MS. ZEIGER:  Your Honor, the People will be

2    moving for a sequestration motion with the exception to my

3    officer-in-charge, Sergeant Joe Tucker, Jr., who will not

4    be testifying.  The individual sitting behind me is my

5    intern, your Honor, David Klein (ph.).  He's not a witness

6    at all.

7          THE COURT:  Okay.  I'm issuing a mutual order of

8    sequestration.  If there's anyone in the courtroom who

9    intends to testify in this matter, you're instructed to

10   remove yourself from the courtroom until such time as you

11   are called as a witness.  Then when you're called as a

12   witness, you're free to stay in the courtroom.  I'm making

13   an exception for the officer-in-charge.

14         MS. ZEIGER:  Thank you.

15         MR. PAIGE:  One moment, your Honor.

16         THE COURT:  Okay.

17         All right.  Do you wish to make an opening

18   statement, at this time, Ms. Zeiger?

19         MS. ZEIGER:  No, your Honor.  The People will

20   continue with our waiver of opening statement, if there's

21   no objection.

22         THE COURT:  All right.  Any objection?

23         MR. PAIGE:  No, objection, your Honor.

24         THE COURT:  All right.

25         MR. PAIGE:  We reserve the right to make one,

4

```
 1     your Honor.

 2              THE COURT:   All right.  You reserve.  All right.

 3     Thank you.

 4              Then, Ms. Zeiger, do you want to call your first

 5     witness?

 6              MS. ZEIGER:  Yes, your Honor.  The People will

 7     call Officer Brian Johnson.

 8              COURT CLERK:   Would you come and spell your name

 9     for her, please.

10              OFFICER JOHNSON:  Yes.

11              Brian Anthony Johnson, B-R-I-A-N   A-N-T-H-O-N-Y

12     J-O-H-N-S-O-N.

13              COURT CLERK:  Do you solemnly swear or affirm the

14     testimony you're about to give to the Court will be the

15     truth so help you God?

16              OFFICER JOHNSON:  I do.

17              THE COURT:   Have a seat, please.

18              MS. ZEIGER:  May I proceed, your Honor?

19              THE COURT:   Please.

20              MS. ZEIGER:  Thank you.

21              B R I A N    A N T H O N Y    J O H N S O N,

22     having been duly sworn was examined and testified as

23     follows:

24                        DIRECT EXAMINATION

25     BY MS. ZEIGER:
```

5

```
 1   Q   Good afternoon, sir.

 2   A   Good afternoon, ma'am.

 3   Q   Could you please state your name for the record.

 4   A   Brian Anthony Johnson.  I'm a Detroit Police Officer,

 5       currently assigned to the narcotics division for the last

 6       eleven years.

 7   Q   How long have you been a police officer total, Officer

 8       Johnson?

 9   A   Fifteen years.

10   Q   I'm going to direct your attention back to November 2nd,

11       2011 at about 5:30 in the afternoon.  Were you working on

12       that day and at that time?

13   A   Yes, ma'am.

14   Q   And did you have occasion to go to an address of 5023

15       32nd Street in the City of Detroit, County of Wayne?

16   A   Yes, ma'am.

17   Q   What was your reason for going to that address?

18   A   To execute a narcotic search warrant.

19   Q   What is at that address?

20   A   A home.

21   Q   Did you go there with other members of the narcotics unit?

22   A   Yes, ma'am.

23   Q   And when you got to that home, did you, in fact, execute

24       that search warrant on that home?

25   A   Yes, ma'am.
```

6

```
1   Q   What role did you play in executing that search warrant?

2   A   The shotgun man.

3   Q   What is the shotgun man?

4   A   The shotgun man is the first one to enter the location.  My

5       duties is to encounter and neutralize any possible threat

6       to myself or the crew.

7   Q   And do you remember -- was presence and purpose announced

8       that day?

9   A   Yes, ma'am.

10  Q   And was entry forced into that home or were you let in, if

11      you remember?

12  A   May I refer to my PCR?

13  Q   Will that refresh your recollection?

14  A   Yes, ma'am.

15          We went in through an open front door.

16  BY MS. ZEIGER:

17  Q   So the front door was open.  That means you don't have to

18      breach any doors?

19  A   Correct.

20          THE COURT:   But did someone let you in, or it

21      was just open?

22          THE WITNESS:   It was unlocked, sir.  The door

23      was closed, but it was unlocked.

24          THE COURT:   All right.   Thank you.

25  BY MS. ZEIGER:
```

7

| | | |
|---|---|---|
| 1 | Q | When you execute a search warrant, do you always check |
| 2 | | first to see if a door is unlocked or locked? |
| 3 | A | I always check and make sure to see if the door is open. |
| 4 | Q | Did you go into the home? |
| 5 | A | Yes, ma'am. |
| 6 | Q | Did you encounter anyone in that home? |
| 7 | A | Well, we encountered someone on the front porch. |
| 8 | Q | On the front porch? |
| 9 | A | Detained that person, and entered the location and |
| 10 | | encountered a female inside. |
| 11 | Q | The person on the front porch male or female? |
| 12 | A | Male. |
| 13 | Q | So when you first got to that location, was that person |
| 14 | | already on the porch? |
| 15 | A | Yes, ma'am. |
| 16 | Q | Did one of your crew members deal with him or did you deal |
| 17 | | with him? |
| 18 | A | I gave him some verbal orders. I said, get down. He got |
| 19 | | down. And I proceeded inside of the location. So one of |
| 20 | | my crew members detained him. |
| 21 | Q | You said there was a black female in the home; is that |
| 22 | | correct? |
| 23 | A | Yes, ma'am. |
| 24 | Q | Where was that black female at? |
| 25 | A | She was in the dining room. |

8

```
 1  Q    Do you see that black female any where here in court today?

 2  A    Yes, ma'am.

 3  Q    Where is she at?

 4  A    Sitting in the last row of the courtroom.

 5  Q    Was there anybody else in the home at that time besides the

 6       black female?

 7  A    No, ma'am.

 8              THE COURT:   Can we know who it is he's talking

 9       about?   Who is he talking about?

10              MS. ZEIGER:  Sorry, your Honor.

11              THE COURT:   Okay.

12              (Lady in audience acknowledged her presence)

13              THE COURT:   Thank you, ma'am.  I appreciate it.

14              MS. ZEIGER:  Sorry, your Honor.  I didn't realize

15       there was more than one black female in the back.  Thank

16       you.

17              THE COURT:   Thanks.

18  BY MS. ZEIGER:

19  Q    Can you describe for us the inside of this home.  How it's

20       broken down.

21  A    You enter like a living room area.  Then a dining room.

22       Going straight back is a kitchen.  And then a stairwell

23       leading upstairs.  Going in it would be -- the bedrooms

24       would be to the right -- to the left, I'm sorry.

25  Q    Upstairs -- was there a kitchen upstairs?
```

9

```
 1 | A   Yes, ma'am.

 2 | Q   And there was a kitchen downstairs?

 3 | A   Yes, ma'am.

 4 | Q   Two kitchens in this house?

 5 | A   Yes, ma'am.

 6 | Q   Was this a two -- was it a two-family flat?

 7 | A   No, ma'am.

 8 | Q   It was a one -- it was a one family home?

 9 | A   It had one address, yes, ma'am.

10 | Q   Were there bedrooms upstairs and downstairs?

11 | A   Yes, ma'am.

12 | Q   How many entrance doors did this home have?

13 | A   A front door and, I believe, there was a back door.

14 | Q   So in the front there was only one door?

15 | A   Yes, ma'am.

16 | Q   It wasn't set up like a flat where there would have been

17 |     two entrances?

18 | A   No, ma'am.

19 | Q   Would there have been a way for you to get to the upstairs

20 |     from the front foyer area of the home.

21 | A   No, ma'am.

22 | Q   Would the only way to get upstairs was through the main

23 |     floor living area on the first floor?

24 | A   Yes, ma'am.

25 | Q   Did you go upstairs and search?
```

10.

```
 1    A    After the location was cleared, yes, ma'am.

 2    Q    Did you find anybody upstairs?

 3    A    No, ma'am.

 4    Q    Did you search the entire home, top and bottom?

 5    A    I didn't, no, ma'am.

 6    Q    Do you know if crew members searched the entire home, top

 7         and bottom?

 8    A    Yes, ma'am.

 9    Q    Did you assist in searching?

10    A    Yes, ma'am.

11    Q    Where did you search?

12    A    I searched upstairs.

13    Q    Did you seize anything when you searched?

14    A    Yes.  After the location was cleared, I seized some POR,

15         off the kitchen table.

16    Q    What's P --

17                   COURT REPORTER:  I'm sorry.  Repeat that.  You

18         retrieved something off the table.

19                   THE WITNESS:  Some POR, proof of residence.

20                   COURT REPORTER:  Thank you.

21    BY MS. ZEIGER:

22    Q    Proof of residence.  What exactly did you seize?

23    A    It was State of Treasury mail in the name of Darell

24         Chancellor.

25    Q    Did it have an address associated with it?
```

11

```
 1   A     Yes, ma'am.

 2   Q     What address was that?

 3   A     The address of that location, ma'am.

 4   Q     502 --

 5   A     5023, yes, ma'am.

 6   Q     32nd Street?

 7   A     Yes, ma'am.

 8   Q     Officer Johnson, was that letter opened or closed when you

 9         found it?

10   A     It was open.

11               THE COURT:   Where exactly did you say you found

12         it?

13               THE WITNESS:   On the kitchen table.

14               THE COURT:   The kitchen upstairs --

15               THE WITNESS:   Upstairs.

16               THE COURT:   -- or downstairs?

17               THE WITNESS:   The upstairs kitchen table.

18               THE COURT:   Upstairs kitchen table.

19         Thank you.

20               MS. ZEIGER:   Your Honor, may I approach the

21         witness?

22               THE COURT:   Yes.

23               (People's proposed Exhibit No. 1 marked for

24                 identification)

25   BY MS. ZEIGER:
```

12

```
 1   Q    Officer Johnson, I'm going to show you what's been marked

 2        as People's proposed Exhibit No. 1.  And actually let me

 3        just ask you a question before that.  The item, the proof

 4        of residency, that you've testified that you seized did you

 5        place that under evidence tag number?

 6   A    Yes, ma'am.

 7   Q    Do you remember that evidence tag number off of your

 8        memory?

 9   A    No, ma'am.

10   Q    Do you need your report to refresh your recollection as to

11        that number?

12   A    Yes, ma'am.

13             MR. PAIGE:   Stipulate.  I'll stipulate to it.

14   BY MS. ZEIGER:

15   Q    I'm going to hand you what's been marked as People's

16        proposed Exhibit No. 1.  Is that the -- can you tell us

17        what is inside of that item?

18   A    From the outside of the envelope it states:

19             "Michigan Department of Treasury."

20             It's addressed to a Darell Deon Chancellor.

21        The date on the outside of the envelope is 11/1/11.

22             Inside it says:

23             "Department of Treasury."

24             And it's dated -- again, addressed to a

25        Mr. Darell Chancellor, with a date on it of 11/5/11.
```

13

```
 1              MS. ZEIGER:  Your Honor, we ask for the admission
 2      of People's proposed Exhibit No 1.
 3              THE COURT:   Any objection?
 4              MR. PAIGE:   No, objection, your Honor.
 5              THE COURT:   All right.  People's 1 is admitted.
 6              (People's Exhibit 1 admitted into evidence.)
 7              MS. ZEIGER:  Thank you, your Honor.
 8   BY MS. ZEIGER:
 9   Q    Officer Johnson, did you seize anything else from the
10        residence that day, either upstairs or downstairs?
11   A    No, ma'am.
12              MS. ZEIGER:  Nothing further, your Honor.
13              THE COURT:   Okay.  Cross-examine.
14              MR. PAIGE:   Just a few questions with the
15        Court's permission?
16              THE COURT:   Sure.
17                    CROSS-EXAMINATION
18   BY MR. PAIGE:
19   Q    Officer Johnson, I just want to be clear about a couple
20        things because I plan to argue this at the end of the day.
21        One is that this gentleman was not on the premises when you
22        got there, right?
23   A    That's correct, sir.
24              THE COURT:   And when he says -- for the record,
25        when he says, "this gentleman," he's talking about the
```

14

```
 1          Defendant.

 2    BY MR. PAIGE:

 3    Q     The Defendant, right?

 4    A     That's correct, sir.

 5    Q     And, so that I'm clear, this dwelling appeared to be

 6          occupied, meaning that there were lights on?

 7    A     Yes, sir.

 8    Q     There was furniture in the house?

 9    A     Yes, sir.

10    Q     Bedrooms?

11    A     Yes, sir.

12    Q     Upstairs and downstairs?

13    A     Yes, sir.

14    Q     Refrigerator?

15    A     There were appliances.

16    Q     Appliances.

17                A person detained on the porch?

18    A     Yes, sir.

19    Q     Black female?

20    A     Inside the location, yes, sir.

21                THE COURT:   She was inside.   There was a

22          different person on the porch.

23    BY MR. PAIGE:

24    Q     Black female, who is present in the courtroom today, right?

25    A     That was inside the location, yes, sir.
```

15

```
 1   Q   Right.  All right.  And there was a black male that was on
 2       the porch?
 3   A   Yes, sir.
 4   Q   What was his name?
 5   A   I don't have that in my report, sir.
 6   Q   You don't?
 7   A   No, sir.
 8   Q   Can you give me a description of that person?
 9   A   Black male, probably '5 9", '5 10".  I think I have that --
10       it's on my sergeant's PCR.
11               THE COURT:  Do you remember if you were able to
12       determine whether that particular person that was on the
13       porch was a resident of that location or not?
14               THE WITNESS:  He was not a resident, sir.  He
15       stated he was there doing some work for the lady that owned
16       the residence.
17               THE COURT:  Okay.
18   BY MR. PAIGE:
19   Q   And you took that to be -- you believed that, right?
20   A   Yes, sir.
21   Q   Did you investigate that?  Did you talk to the lady of the
22       -- whoever the lady purportedly was supposed to be of the
23       residence as to whether that person was doing some work for
24       her or not?
25   A   Yes, sir.
```

16

```
 1   Q    All right.   And did you submit that to a writing?

 2   A    No, sir.

 3   Q    Okay.  And this is your report here.

 4             Before you got to the premises, you had a search

 5        warrant, right?

 6             This is your report?

 7   A    No, that's Sergeant Tucker's report.

 8             MS. ZEIGER:  I thought you wanted Sergeant

 9        Tucker's report.  I'm sorry.

10             THE WITNESS:   I was saying that the name of the

11        gentleman on the porch --

12             THE COURT:  Yeah, that report has the name of

13        the --

14             THE WITNESS:   -- was on Sergeant Tucker's

15        report.

16             THE COURT:  -- or the description of the person

17        that's on the porch.

18   BY MR. PAIGE:

19   Q    Okay.  The description is on his report, right?  This is

20        the report you were referring to, right?

21   A    Yes, sir.

22   Q    Okay.  That will refresh your memory as far as the height

23        and weight, right?

24   A    We have the name, and the birthdate, and the address of the

25        gentleman that was detained on the porch.
```

                                                                    17

| | | |
|---|---|---|
| 1 | Q | Does it have the height on it? |
| 2 | A | No, sir. |
| 3 | Q | Does it have the weight on it? |
| 4 | A | No, sir. |
| 5 | Q | Do you have a recollection of -- you've already told us the |
| 6 | | person was approximately '5 8", '5 9", right? |
| 7 | A | Probably about '5 9", '5 10", slim build. |
| 8 | Q | Slim build. |
| 9 | | Okay. When you -- before you got to the |
| 10 | | premises -- and I'm going to move on -- you were armed with |
| 11 | | a search warrant, right? |
| 12 | A | Yes. sir. |
| 13 | Q | And in the search warrant, there was a description of a |
| 14 | | person to be searched, right? |
| 15 | A | Yes, sir. |
| 16 | Q | And the description of the person to be searched was |
| 17 | | approximately '5 9", and a hundred and sixty something |
| 18 | | pounds, right? |
| 19 | A | Officer Geelhood gave that, and -- |
| 20 | Q | I'm just asking does that comport with your recollection? |
| 21 | A | I can't recall, sir. |
| 22 | Q | Okay. Do you have a recollection of -- were you -- you |
| 23 | | were interested in searching a person when you got to the |
| 24 | | premises, right? |
| 25 | A | Yes, sir. |

18

```
 1   Q    And is there anything that can refresh your memory relative

 2        to who was the person to be searched or the description of

 3        the person?

 4   A    We're briefed off the search warrant.

 5   Q    I understand that.

 6   A    So the search warrant would refresh my memory.

 7                 MR. PAIGE:   This is the original, ma'am?

 8                 MS. ZEIGER:  It's the original copied.  I made a

 9        copy of the original.

10                 THE COURT:   It's the closest she has.

11                 MS. ZEIGER:  It's all I've got.

12   BY MR. PAIGE:

13   Q    After looking at the search warrant, does this refresh your

14        memory of the description of the person to be searched?

15   A    Yes, sir.

16   Q    And what was that?

17   A    The person of interest was a black male, 30s, '5 8", 180

18        pounds.

19   Q    Okay.  No mention of glasses, right?

20   A    No, sir.

21                 MR. PAIGE:   Stand up, Mr. Chancellor.

22   BY MR. PAIGE:

23   Q    How much would you say he weighs?

24   A    I'd probably say on the plus side of 200.

25   Q    200 and if I told you about 220 -- I'm just -- I'm just
```

19

```
 1      saying.

 2  A   Yeah.

 3  Q   About 220.  All right.  And if I were to tell you he's

 4      about '5 11".

 5  A   I would probably have to stand next to him, sir.

 6  Q   You can stand next to him.  You want to?

 7  A   Yeah.

 8  Q   Because we -- this is a search for the truth.  You know,

 9      this is not a -- we just trying to get it where it's at.

10  A   Probably.

11  Q   Okay.  You want to be as close to '6 0" tall as you can be,

12      huh?

13  A   Yes, sir.

14              MR. PAIGE:   May I mark this into evidence, if

15      there's no objection?

16              THE COURT:   Any objection to the search warrant

17      being placed into evidence?

18              MS. ZEIGER:   No, your Honor, that's fine.

19              THE COURT:   All right.   So that's going to be

20      Defense A.  Defense A, the copy of the search warrant, is

21      admitted.

22              (Defense Exhibit A admitted into evidence.)

23              MR. PAIGE:   Nothing further.

24      Thank you, sir.

25              THE COURT:   Redirect?
```

                                                                    20

```
 1              MS. ZEIGER:  Yes, your Honor.

 2              Thank you:

 3              May I approach the witness?

 4              THE COURT:   Yes.

 5              MS. ZEIGER:  Thank you.

 6                      REDIRECT EXAMINATION

 7  BY MS. ZEIGER:

 8  Q    Officer Johnson, you were just shown Sergeant Tucker's

 9       report.  Can you tell us the name of the individual that

10       was on the porch?

11  A    Mr. Ronald Durhall (ph.), black male, birthdate 12/1/58,

12       of 4981 32nd Street.

13  Q    So that would have been down the street then from the

14       location that you were at?

15  A    Yes, ma'am.

16  Q    And he was born in 1958?

17  A    1958.

18  Q    Thank you.

19              Also, you were asked whether the house was

20       furnished.  Was the upstairs furnished?

21  A    Yes, ma'am.

22  Q    Did it appear to be currently being lived in, in your

23       opinion?

24  A    Yes, ma'am.

25              MS. ZEIGER:  Nothing further, your Honor.
```

21

```
 1                THE COURT:  Anything based upon that, Mr. Paige?
 2                      RECROSS-EXAMINATION
 3  BY MR. PAIGE:
 4  Q    Were you aware that -- do you see the Durhall (ph.) that
 5       -- do you see him in the courtroom?   The person that you
 6       detained?
 7  A    No, sir.
 8                MR. PAIGE:  Mr. Durhall, would you stand up.
 9       Just stand up.
10  BY MR. PAIGE:
11  Q    Is this the person that you detained?
12  A    It could be.  Without seeing his name, or his ID, I
13       couldn't tell you, sir.
14                THE COURT:  You can't tell from looking at him
15       now?
16                THE WITNESS:  No, sir.
17                MR. PAIGE:  If you can -- come closer, sir.
18  BY MR. PAIGE:
19  Q    Is this the person --
20                Just stay right there.  Don't be too excited.
21  BY MR. PAIGE:
22  Q    Is the person that you detained, was he approximately his
23       height?
24  A    He was similar to his height.
25  Q    And was he approximately his weight?
```

1  A    I couldn't tell you that, sir.

2  Q    I mean, is it --

3  A    He was slim build.  I don't know how much that gentleman

4       weighs.

5  Q    Well, would you consider --

6            Take your jacket off.

7  BY MR. PAIGE:

8  Q    Would you consider him slim build?

9  A    Yes, sir.

10 Q    All right.

11           Have a seat.

12 BY MR. PAIGE:

13 Q    And this  --  okay, if I were to tell you that this person,

14      Mr. Durhall (ph.), was not a handy man, but he lived there,

15      and was the boyfriend of Mr. Chancellor's mother, could you

16      refute that?

17 A    Only thing I can tell you is that that gentleman and the

18      lady inside the location lied to me that day then.

19 Q    Okay.  And people do -- it's not unusual to lie to the

20      police, is it?

21 A    Not at all.

22 Q    All right.

23           Did you search every bedroom in the house?

24 A    No, sir.

25 Q    Did you go through the drawers in the bedrooms to look for

```
 1    proof of residencies for whatever reason?

 2  A    I didn't, sir, no.

 3  Q    Have you to this date did a record search to make a

 4       determination of who owned the house?

 5  A    I didn't, no, sir.

 6  Q    To this date, your role as it relates to an officer --

 7       you're a sergeant, right?

 8  A    No, sir.

 9  Q    You should be.

10       Yeah, but you've been a law enforcement officer

11       for a while, right?

12  A    Yes, sir.

13  Q    Did you trace any proceeds from what purports -- this is a

14       drug raid, right?

15  A    Yes, sir.

16  Q    Did you seize any cars or monies from Defendant Chancellor?

17  A    No, sir.

18  Q    Airplanes, boats?

19  A    No, sir.

20            MR. PAIGE:   Nothing further -- no, no.

21  BY MR. PAIGE:

22  Q    Were you aware that Defendant Chancellor has a brother that

23       lived in that house?

24  A    No, sir.

25  Q    That is about '5 10" and slim build, were you aware of
```

24

```
 1        that?

 2    A   No, sir.

 3    Q   Were you aware that there was a cousin who lived in that

 4        house by the name of Willie Chancellor that was similarly

 5        build as Antonio Chancellor, the Defendant's brother?

 6        Just yes or no.

 7    A   No, sir.

 8    Q   And so that it's clear -- and I know the Judge knows this

 9        and you know it, but I just want to put it on the record

10        you don't know if Defendant Chancellor ever opened that

11        mail, do you?

12    A   No, sir.

13    Q   And notwithstanding whether he did or not -- I'll leave

14        that alone.

15                   MR. PAIGE:   Nothing further.

16                   MS. ZEIGER:  Nothing further, your Honor.

17                   THE COURT:   All right.

18                   Thank you, officer.

19                   THE WITNESS:  Thank you, sir.

20                   (Witness excused.)

21                   MS. ZEIGER:  Your Honor, the People would call

22        Officer Steven Geelhood next.

23                   THE COURT:   All right.

24                   COURT CLERK:  Can you spell your name for her.

25                   OFFICER GEELHOOD:  Steven with a V, last name
```

25-

```
 1        G-E-E-L-H-O-O-D.

 2                    COURT REPORTER:  Thank you.

 3                    COURT CLERK:  Do you solemnly swear or affirm the

 4        testimony you're about to give to the Court will be the

 5        truth so help you God?

 6                    OFFICER GEELHOOD:  Yes.

 7                    THE COURT:    Have a seat, please.

 8                    MS. ZEIGER:  May I proceed, your Honor?

 9                    THE COURT:    Please.

10                    MS. ZEIGER:  Thank you.

11                    S T E V E N     G E E L H O O D,

12        having been duly sworn was examined and testified as

13        follows:

14                        DIRECT EXAMINATION

15   BY MS. ZEIGER:

16   Q    Good afternoon, sir.

17   A    Good afternoon.

18   Q    Can you please state your name for the record.

19   A    Steven Geelhood.

20   Q    And, sir, how are you employed?

21   A    City of Detroit for 18 years.

22   Q    Are you currently assigned to a unit within the Detroit

23        Police Department?

24   A    Yes.

25   Q    What is that?
```

26

```
 1   A   Narcotics.

 2   Q   How long have you been with narcotics?

 3   A   Over ten years.

 4   Q   I'm going to direct your attention to November 2nd, 2011

 5       were you at 5023 32nd Street in the City of Detroit, County

 6       of Wayne around 5:30 in the afternoon?

 7   A   Yes.

 8   Q   What was your reason for going to that location?

 9   A   Execute a search warrant.

10   Q   What is at that address?

11   A   Single family dwelling.

12   Q   And did you go to that location with other members of the

13       narcotics unit?

14   A   I did.

15   Q   When you got to that home, did you make entry into that

16       home?

17   A   Yes.

18   Q   Do you remember what role you played during execution of

19       that search warrant?

20   A   I would have been on the entry team.

21   Q   And, as you were entering into that home, did you see

22       anybody outside on the front porch?

23   A   I did.

24   Q   Who -- do you know who that person was?

25   A   He said -- he stated he worked on the house or something.
```

27

```
 1   Q    You said, "he".  Was it a male?

 2   A    It was a male.

 3   Q    And can you tell us what ethnicity he is?

 4   A    He was black.

 5   Q    Did you have any dealings with him?

 6   A    He was talked to, yes.

 7   Q    By yourself or by somebody else in your crew?

 8   A    Crew members.  I don't think I had interest.

 9   Q    When you -- did you go inside the home?

10   A    Yes.

11   Q    Was anybody inside the home?

12   A    There was.

13   Q    Who was that?

14   A    It was a woman in the home.

15   Q    Do you know what her name was?

16   A    I don't have recollection.  It was the mother of the

17        Defendant.

18   Q    And when you say, "the Defendant" are you referring to

19        Darell Chancellor?

20   A    I am.

21   Q    Where did you encounter this woman at?

22   A    The front room.

23   Q    Was anybody else in the home?

24   A    No.

25   Q    Can you tell us how this home was set up?
```

28

```
 1  A    When you go into the house, there was a living room, and
 2       then like a dining room, and then the kitchen.  The
 3       bedrooms would be to your left.  Then the upstairs would be
 4       through the back.  Kitchen area, up the stairs, and the
 5       same way reversed.  Kitchen, dining room, living room.
 6  Q    So there was, it seems as though, a separate home or
 7       separate living quarters upstairs?
 8  A    Yes.
 9  Q    Did it appear to you as though somebody was currently
10       living in that area?
11  A    Yes, there was clothes there.
12  Q    Could you tell what type of clothes?  Were they men's or
13       women's, children?
14  A    Men's clothes.
15            THE COURT:   I'm sorry.  Did you say there was
16       one bedroom upstairs?
17            THE WITNESS:   I recall one for sure that there
18       was a bed in, and there might have been two rooms that were
19       -- could have been bedrooms.
20            THE COURT:   You don't recall for sure.  I'm just
21       wondering where did you say you saw the men's clothing?
22            THE WITNESS:   It would have been in the kitchen.
23            THE COURT:   Oh, in the kitchen?
24            THE WITNESS:   Yes.
25            THE COURT:   Okay.
```

1  BY MS. ZEIGER:

2  Q    Let's talk about that.  Where did you find men's clothing

3       in the kitchen?

4  A    In the hamper in the kitchen under the kitchen table.

5             THE COURT:    Officer, there's a clothes hamper in

6       the kitchen?

7             THE WITNESS:    Yes.

8  BY MS. ZEIGER:

9  Q    Was there anything else in that clothes hamper besides male

10      clothing?

11 A    Yes, I made a confiscation of narcotics from that hamper.

12 Q    And, specifically, what type of narcotics?

13 A    It would have been cocaine.

14 Q    Did you place that cocaine on a lock sealed folder number?

15 A    I did.

16 Q    What was that?

17 A    Referring to my PCR, --

18 Q    Will that refresh your recollection?

19 A    It would.

20 Q    Please do so.

21 A    Nancy 03346711.

22            MS. ZEIGER:    May I approach, your Honor?

23            THE COURT:    Yes.

24            MS. ZEIGER:    Thank you.

25 BY MS. ZEIGER:

30

```
 1   Q    Officer, I'm going to show you what's marked as People's
 2        proposed Exhibit No. 2.
 3              MR. PAIGE:    I'll stipulate that that's it.
 4              MS. ZEIGER:   Okay.  But I'm going to ask him some
 5        follow up questions.
 6   BY MS. ZEIGER:
 7   Q    Is that the lock sealed folder number that you just read
 8        off to us as being the lock sealed folder number that you
 9        placed the cocaine on that day?
10   A    It is.
11   Q    And how many -- did you find more than one bag of cocaine?
12   A    There was one bag with four bags inside.
13   Q    The way that the cocaine is today, is that the way that it
14        was when you found it back on November 2nd, 2011?
15   A    No.
16   Q    Can you describe it the way it looked back on November 2nd?
17   A    It would have been all white chunks of cocaine.
18   Q    And would you agree with me that that's liquified --
19   A    It has.
20   Q    -- inside?   Okay.  Was that the way that you seized it
21        that day?
22   A    No.
23   Q    Okay.  Does it have a stench to it?
24   A    Very much so.
25              THE COURT:   Is that normal?  Is that what
```

31

1      happens to it when it sits in a bag?

2                  THE WITNESS:   If it sits too long in the heat.

3                  MS. ZEIGER:   Your Honor, we have someone from the

4      Michigan State Police who can explain why this is like

5      this.

6                  THE COURT:   Okay.   I've never seen that before.

7                  MS. ZEIGER:   Yes.

8                  THE COURT:   I was just more curious than

9      anything.

10     BY MS. ZEIGER:

11     Q    And, Officer Geelhood, was that a small amount of cocaine?

12     A    Very large amount.

13     Q    And in your training and experience this amount of cocaine

14          is that indicative of anything to you?

15     A    Yes, dealing of cocaine.   Major dealing of cocaine.

16     Q    Did you have a further conversation with the -- you

17          described her as the Defendant's mother?

18     A    Yes.

19     Q    Did you order her or ask her to do anything for you?

20     A    I asked her to contact the Defendant.

21     Q    Did she comply?

22     A    She did.

23     Q    How did she make contact with him?

24     A    With a -- with her cell phone.

25     Q    Did you observe her talk to anybody?

                                                                    32

```
 1   A    I did.

 2   Q    Did you talk to anybody?

 3   A    I did.

 4   Q    Can you tell us the person you talked to was that male or

 5        female?

 6   A    It was a male.

 7   Q    Can you tell us what your side of the conversation was?

 8   A    It would have been that we would like to make contact and

 9        talk about what happened during the raid.

10   Q    Did you ask that person to come to the home at all?

11   A    I did.

12   Q    Did that person ever come to that home?

13   A    No.

14   Q    Had you been to that house before November 2nd, 2011 or in

15        the area of that home of 5023 32nd Street?

16   A    I had.

17   Q    When was that?

18   A    During my pre-raid surveillance.

19   Q    And do you remember specifically what date that was?

20   A    I would have to refer to my search warrant.

21             MS. ZEIGER:   Your Honor, --

22             THE COURT:    No, I don't have it.

23             THE WITNESS:    There is a copy right here.   I can

24        see it.

25             THE COURT:    Ms. Zeiger, do you want to give it
```

33

```
 1      to the witness?

 2                    MS. ZEIGER:  Yes.

 3   BY MS. ZEIGER:

 4   Q     And this has been marked, I believe, as Defense --

 5                    MR. PAIGE:   1.

 6                    THE COURT:   Defense A.

 7                    MR. PAIGE:   Oh, it's A?

 8                    MS. ZEIGER:  Defense A.

 9                    THE COURT:   Yeah.  People 1, Defense A.

10                    MS. ZEIGER:  Yes.

11   BY MS. ZEIGER:

12   Q     So we have marked this already, and it has been admitted as

13         Defense A.

14   A     I was there the day before the raid.

15   Q     So that would have been November 1st, 2011?

16   A     Correct.

17   Q     And what was your reason for being around that location on

18         November 1st?

19   A     I had received information on the 31st of October that

20         there was drugs being sold by -- at this location.

21   Q     Do you remember what time of day it was that you were in

22         that area on November 1st?

23   A     It would have been later in the evening.

24   Q     Did you observe anything?

25   A     I did.
```

34

```
 1   Q    What did you observe?

 2   A    Referring to my search warrant --

 3   Q    Would that refresh your recollection?

 4   A    It would.

 5                 Within thirty minutes, I observed three people

 6        independently go into the front door of that house having

 7        conversation with the described Defendant seated here, and

 8        making purchases of suspected heroin.

 9   Q    You just pointed to somebody.  Who did you point to?

10   A    The gentleman sitting in front of the defense table with

11        the blue shirt, black pants.

12   Q    Thank you.

13                 MS. ZEIGER:  May the record reflect that the

14        witness has identified the Defendant Mr. Darell Chancellor?

15                 THE COURT:  Yes, it will.

16                 MS. ZEIGER:  Thank you.

17   BY MS. ZEIGER:

18   Q    Where did you exactly see the Defendant?

19   A    At the front of the -- at the door of that house of the

20        house that we raided.

21   Q    You described it it seems as though this home is broken up

22        into two living spaces.  Did this home have more than one

23        front door?

24   A    No.

25   Q    Were there any lights on in the front of this house?
```

35

1    A    When we hit it?

2    Q    No, on November 1st.  Excuse me.

3    A    I could visually see, yes, that it was this person sitting

4         at this table right here.  I could see him.  It was lit

5         enough for me to see him.

6              THE COURT:  Was it daylight or night?

7              THE WITNESS:  It would have been towards the

8         evening hours, but I could see.  It probably would have

9         been around 5:00 or 6:00, but it was October so it was

10        late.

11             THE COURT:  Okay.

12             THE WITNESS:  Dark.

13   BY MS. ZEIGER:

14   Q    I see that you're wearing glasses today.

15   A    Yes.

16   Q    Are those reading glasses or are those prescription

17        glasses?

18   A    Readers.

19   Q    On November 1st, 2011 when you were outside doing

20        surveillance were you using anything to assist you in your

21        ability to see?

22   A    I had binoculars in the vehicle.  I was using those, yes.

23   Q    You were using your binoculars, okay.

24             And, approximately, how far away from the

25        home were you set up conducting your surveillance with your

36

```
 1      binoculars?

 2   A  I'd say, approximately, three to four hundred feet.

 3   Q  Are these binoculars that you use on a daily basis doing

 4      surveillance?

 5   A  All the time when I'm on surveillance, yes.

 6              MS. ZEIGER:  Nothing further at this time, your

 7      Honor.

 8              THE COURT:  Okay.  Cross-exam.

 9              CROSS-EXAMINATION

10   BY MR. PAIGE:

11   Q  How do you pronounce your last name?

12   A  Geelhood.

13   Q  Geelhood?

14   A  Geelhood.

15   Q  Geelhood.  Listen, I think you're the key to this case.  So

16      I'm going to spend a little bit of time with you, but not

17      that much, all right?

18   A  Yes, sir.

19   Q  All right.  You was the affiant on the search warrant,

20      right?

21   A  Yes.

22   Q  All right.  And when you gave information to a magistrate,

23      were you telling the truth then about the description --

24   A  Yes, sir.

25   Q  -- of the person?
```

37

```
 1   A    Yes.

 2   Q    And in that description, you indicated that the person was

 3        approximately '5 --

 4   A    If I can refer to my paperwork?

 5   Q    Yes, please do.

 6   A    I put he was '5 8", a 180 pounds.

 7   Q    '5 8" and a 180 pounds.

 8             You never said anything about glasses, did you?

 9   A    No, sir.

10             MR. PAIGE:    Stand up, Mr. Chancellor.

11   BY MR. PAIGE:

12   Q    How much do you say he weighs right here?

13   A    Probably 210.

14   Q    210, 220?

15   A    I guess, yes.

16   Q    Yeah.  So are you normally 40 pounds --

17             Have a seat.

18   BY MR. PAIGE:

19   Q    Are you normally -- would you agree with me the difference

20        between 220 and 180 would put a person from a description

21        of mainly a slim build to a -- would you consider him a

22        medium build?

23   A    Would I consider him a medium build?

24   Q    A medium build, right.

25   A    No, he's on the heavier side.
```

38

```
 1  Q    So you would say on a heavier side?

 2  A    Correct.

 3  Q    You would call him heavy build then?  I'm just trying to

 4       get the vernacular right.

 5  A    Yes, sir.

 6  Q    In your description of the person in the search warrant,

 7       in your every day vernacular, would you say that a person

 8       '5 8", '5 9", and a 180 pounds is heavy build?

 9  A    No.

10  Q    Have you ever been wrong before?

11  A    Yes, sir.

12  Q    And would you not agree that identification evidence is

13       probably the most unreliable evidence?

14            MS. ZEIGER:  Objection, argumentative.

15            MR. PAIGE:   Well, I'll just say this.

16  BY MR. PAIGE:

17  Q    Have you ever made a mistake about identifying someone

18       before thinking that you know someone, and then all of a

19       sudden you say, oh, that's not the person that I thought it

20       was?  Has that ever happened to you?

21  A    Not like this, sir, no.

22  Q    Well, no.  I'm not saying like this.

23            I'm just saying have you ever made a mistake

24       in identification?

25  A    No, sir.  I'm quite positive this was the gentleman at the
```

39

```
 1        house.

 2   Q    No, you -- no, no, no, no.  See you -- you're trying to

 3        protect yourself, and I'm not beating you up.

 4              I'm saying have you ever made a mistake about

 5        identification about -- for any reason?

 6              MS. ZEIGER:  Your Honor, this has been asked and

 7        answered.

 8              MR. PAIGE:   I'll move on.

 9              THE COURT:   Yeah.

10   BY MR. PAIGE:

11   Q    Did you see --

12              Stand up, sir.

13   BY MR. PAIGE:

14   Q    Did you see this person on the premises on the date that

15        you executed the search warrant?

16   A    It could have been him, yes.

17   Q    It could have been him.

18              Come closer, again.

19        How would you describe him?

20   A    What his build is?

21   Q    Yes.

22   A    From a distance, probably '5 10", 170.

23   Q    Bingo.

24              Have a seat.

25   BY MR. PAIGE:
```

40

| | | |
|---|---|---|
| 1 | Q | So you can get it right. |
| 2 | | So were you aware that the Defendant had a |
| 3 | | brother on the premises that was named Antonio? Were you |
| 4 | | aware of that, that lived there? |
| 5 | A | I wasn't aware of that, no. |
| 6 | Q | And that he was -- he is described as about '5 10", '5 11", |
| 7 | | a 170, 180 pounds. Are you aware of that? |
| 8 | A | No, sir. |
| 9 | Q | Are you aware that there was another black male, his |
| 10 | | cousin, living on those premises? |
| 11 | A | No, sir. |
| 12 | Q | November of last year, right? |
| 13 | A | A year ago, yes. |
| 14 | Q | What was the date, November what? |
| 15 | A | It was the 2nd. |
| 16 | Q | November 2nd around election time, right? |
| 17 | A | Correct. |
| 18 | Q | Okay. And it was about what time in the evening? |
| 19 | A | Like I said earlier, about 5:00 or 6:00, maybe. |
| 20 | Q | 5:00 or 6:00, all right. |
| 21 | | THE COURT: You're talking about the |
| 22 | | surveillance or the execution of the warrant? |
| 23 | | MR. PAIGE: The surveillance. |
| 24 | | THE COURT: Okay. That was the 1st, not the |
| 25 | | 2nd, right? |

41

1          THE WITNESS:    That was the 1st, yes.

2   BY MR. PAIGE:

3   Q     Okay.   About what time was the surveillance?

4   A     About 5:00 or 6:00.

5   Q     About 5:00 or 6:00.

6              Now, listen, when I asked this man to stand up,

7        he's approximately how far away from you right now?

8              You don't have to stand up again.

9   BY MR. PAIGE:

10  Q     How far away would you say he's from you?

11  A     Sixty feet.

12  Q     Sixty feet.

13             And you had to ask me to have him come closer to

14       you, did you not?

15             No, I'm not laughing.

16  A     Did I have him come closer?

17  Q     I -- I had him come closer to you.

18  A     I did not ask for him to come closer, no.  You did.

19  Q     No, I did for you -- so you could --

20  A     Thank you for that, yeah.

21  Q     But I brought him closer to you --

22  A     You did bring him closer, yes.

23  Q     -- because you couldn't really make a determination from

24       where he was at, at that point, right?

25  A     Yes.

```
 1  Q    So it's nighttime.  It's nighttime November 1st
 2       at about 6:00.  It's nighttime, right?
 3  A    Yes.  Evening time, yes.
 4  Q    Evening, nighttime.
 5            Was the person -- strike that.  And I've already
 6       gotten it out.
 7            Did you describe the person in the search warrant
 8       wearing glasses?
 9  A    No, I didn't.
10  Q    And if I were to tell you that this man has a heavy
11       prescription because he has problems, like me, and maybe
12       not like you because you got reading glasses, right?
13  A    Yes, sir.
14  Q    If I were to tell you that he has a heavy prescription, you
15       couldn't refute that, could you?
16  A    If what now?  If he had a prescription?
17  Q    I mean --
18  A    I wouldn't have any idea whether he has a prescription.
19  Q    All right.  Well, it wasn't -- a guy didn't have a cane
20       and a dog, a blind man, you know.  That's not necessary.
21            MR. PAIGE:  Nothing further.
22            THE COURT:  Redirect.
23            MS. ZEIGER:  Thank you, your Honor.
24            May I approach, your Honor?
25            THE COURT:  Yes.
```

43

```
 1                    MS. ZEIGER:  Thank you.
 2                    REDIRECT EXAMINATION
 3   BY MS. ZEIGER:
 4   Q    Officer, I'm going to show you what's been marked as
 5        People's proposed Exhibit No. 6.  Can you tell me what that
 6        is.
 7   A    It's the Defendant.
 8   Q    And is that a picture of the Defendant?
 9   A    It is.
10   Q    And do you know when that was taken?
11   A    Let's see 11/2 of '11 -- no, that's when it was run.
12   Q    Yes.
13             Is that a Secretary of State document?
14   A    Oh, expires on 12/7/14.  It was effective on 1/10/11.
15   Q    And is the Defendant wearing glasses in that picture?
16   A    He is not.
17   Q    And is that the picture that Mr. Chancellor would have been
18        -- had taken for his driver's license?
19   A    It is.
20   Q    And what address is associated with that?
21   A    5023 32nd.
22   Q    Thank you.
23             MS. ZEIGER:  Your Honor, we ask for the admission
24        of People's proposed Exhibit No. 6.
25             MR. PAIGE:  No objection.
```

44

```
 1                THE COURT:   People's 6 is admitted.

 2                MS. ZEIGER:   Thank you.

 3                (People's Exhibit No. 6 admitted into evidence.)

 4   BY MS. ZEIGER:

 5   Q    The person that you saw outside on November 1st, 2011 --

 6   A    Yes.

 7   Q    -- this is the person that you described as doing

 8        hand-to-hand transactions?

 9   A    Yes.

10   Q    Was that person wearing glasses?

11   A    No.

12   Q    When you were using your binoculars, did you have any

13        troubles viewing that individual?

14   A    None.

15   Q    And was that the Defendant?

16   A    Absolutely.

17   Q    Does the Defendant look the same way today as he did a year

18        ago?

19   A    He's heavier.

20   Q    And I'm going to show you People's Exhibit No. 6.  Is he

21        heavier now than what he was in this photograph?  Looking

22        at the picture as comparison.

23   A    Yes.  It appears to me that he's thinner here than he is

24        here.

25   Q    Okay.  He's thinner where?
```

45

```
 1   A      In this picture.

 2   Q      Okay.   Than he is seating --

 3   A      Correct.

 4   Q      -- sitting here today?

 5   A      Yes.

 6   Q      Okay.

 7                  THE COURT:   And did we determine the picture was

 8          taken in January of 2011?  Is that what it says?

 9                  THE WITNESS:  Yes, sir.

10                  THE COURT:   Okay.  Thank you.

11   BY MS. ZEIGER:

12   Q      Are you aware of any other family member living at that

13          home besides the Defendant and the Defendant's mother?

14   A      No.

15   Q      The person that was brought up to you and you were asked to

16          look at, do you know if that was the person who was on the

17          porch that day?  And when I say "that day," I mean the day

18          of the raid?

19   A      It appears that he is, yes.

20   Q      Was that the person that you saw the day before when you

21          were doing your surveillance on December -- November 1st,

22          2011?

23   A      No.

24                  MS. ZEIGER:  Nothing further, your Honor.

25                  RECROSS-EXAMINATION
```

46

BY MR. PAIGE:

1   

2  Q  You told your Honor that this picture was taken from the

3      Secretary of State --

4  A  Yes.

5  Q  -- to get a driver's license?

6  A  Yes.

7  Q  How do you know that?

8  A  It says it on the top.

9  Q  Just point to it because I can't see where.

10 A  That's what this means.

11 Q  You said, "that's what this means?"

12 A  Yes.

13 Q  It doesn't say driver's license on that, does it?

14 A  To me it does.

15         THE COURT:  What does it say?  Tell me what it

16     says.

17 BY MR. PAIGE:

18 Q  It's a code, right?

19 A  That's what it means, sir.

20 Q  Well, let me tell you what I think it means.  I think it

21     means that he was getting a state ID.  So, I think that's

22     a difference.  Because I want to -- this is a search for

23     the truth.  Are you telling me that on this particular date

24     that this man was getting a driver's license and not

25     complying with the requirement to get a state ID?

47

```
 1   A    That's him going to the Secretary of State and getting an

 2        ID of some sort from the Secretary of State.

 3   Q    Now, it's some sort.

 4             MS. ZEIGER:  I didn't understand what you yelled

 5        out.

 6   BY MR. PAIGE:

 7   Q    Now, it's some sort of ID, right?

 8   A    It has to be done through the Secretary of State of

 9        Michigan.  That's what that document states.

10   Q    That's not the question I asked you under oath.

11             I asked you did you tell this Court that

12        this man was getting a driver's license, specifically?

13        Did you tell your Honor, Judge Hathaway, that this man was

14        getting a driver's license picture?  Did you say that?

15   A    Yes.

16   Q    And now I'm going to ask you another question.  When you

17        got that search warrant, what day was that on?

18   A    It was on the 2nd.

19   Q    The 2nd.

20             Did you -- and I don't mean to insult you.

21   A    Please don't.

22   Q    Did you pull a picture of Darell Chancellor prior to

23        getting that search warrant?  Yes or no.

24   A    Prior to, no.

25   Q    Did you -- when did this become in your possession?
```

48

```
 1   A    After the search warrant.  It probably was --

 2   Q    What -- when?

 3   A    Probably when we were doing the paperwork.

 4   Q    No, I don't want to know probably.  Because if you had this

 5        -- did you -- did you pull his picture and then go and make

 6        a false affidavit about this man?  Did you do that?

 7   A    No, sir.

 8   Q    Because his lower torso is not published in this purported

 9        picture, right?

10   A    It doesn't appear to be, sir.

11   Q    And so it gives opportunity for error for the description

12        as far as his body weight, does it not?

13   A    What are you asking me?

14   Q    I'm telling you that you can't tell how much this man

15        weighs based on this picture.

16   A    She asked me my opinion of his weight.  That's what I

17        answered.

18   Q    No.  It ain't she talking to you now.

19             I said, you cannot determine this man's weight by

20        this picture, can you?  Can you?

21   A    I believe that I can.  That he looks smaller there than he

22        does when he's sitting here.

23   Q    Would you make a guesstimate about his weight without

24        knowing his weight in using this -- as far as talking to a

25        judge and --
```

49

```
 1  A   I could not give a total weight from that picture, no, sir.
 2  Q   And what if I were to tell you that as a requirement of a
 3      state ID, he was told to take his glasses off.
 4  A   I was not there, sir.
 5  Q   Of course you were not.
 6              Big dope transaction, right?  Big dope
 7      transaction.  That's a lot of dope.  You've already told us
 8      that, right?  That's a question,  It's a lot of dope,
 9      right?
10  A   What question are you asking me the transaction or the
11      amount of the dope?
12  Q   The amount of the dope.
13  A   It's a lot of dope, yes, sir.
14  Q   Yes.  And what would be the value of that dope?
15  A   I believe that it's about $400.00 a gram, and it was over
16      600 grams.
17  Q   So give me a guesstimate.  You're good with numbers.
18  A   Approximately $240,000.00.
19  Q   How much?
20  A   Approximately $240,000.00.
21  Q   $240,000.00?
22  A   Yes.
23  Q   Okay.  Did you do any trace -- traces to make a
24      determination of what kind of assets this man owned on/or
25      about November 1st or 2nd of 2011?  Did you do any trace
```

50

```
 1        evidence on that?  You.

 2   A    I had another address from the mother that she'd given me

 3        at the house.

 4   Q    I'm asking you a question, sir.  Did you do --

 5   A    And I'm trying to answer it, sir.

 6   Q    So what did you determine?

 7   A    Whether he lived at the other house that she gave me.

 8   Q    I'm not asking you that question.  I'm asking you did you

 9        make a determination of what his net worth was on November

10        1st or 2nd of 2011?

11             MS. ZEIGER:  And, your Honor, I'm going to

12        object at this point.  If I may be allowed to redirect

13        again based upon this questioning?  Because I think this

14        goes outside the scope of my redirect.  If I can --

15             THE COURT:  It does go outside the scope, but

16        I'll allow it with the understanding that you can reopen --

17             MS. ZEIGER:  Thank you.

18             THE COURT:  -- your redirect.

19             MS. ZEIGER:  Thank you, your Honor.

20   BY MR. PAIGE:

21   Q    Did you do any trace evidence on this guy to make a

22        determination what his assets -- what his net worth was?

23   A    No, sir.

24   Q    The dope that you found was not in plain view?

25   A    Correct.
```

51

```
 1   Q    And, in fact, the dope was covered up by clothing, right?

 2   A    Yes.

 3   Q    That's what you put in your report, did you not?

 4   A    I said, yes.

 5   Q    And it was pushed under a table?

 6   A    I didn't know who pushed it there or why it was pushed

 7        there.   It was under a table.   That's why I confiscated

 8        it.

 9   Q    I didn't ask you --

10             THE COURT:   The hamper was under a table?

11             THE WITNESS:   Yes, sir.

12             THE COURT:   Okay.

13   BY MR. PAIGE:

14   Q    There is no fingerprints on the dope that is traced back to

15        him, right?

16   A    I didn't believe we got any back, no.

17   Q    No latent prints, right?

18   A    I didn't get any back.

19   Q    You never saw him touch that dope, did you?

20   A    Not that particular bag that we confiscated, no.

21   Q    Did you ever confiscate a bag of dope that he purportedly

22        sold?   Did you ever confiscate a bag that he sold?

23   A    No.

24   Q    Did you detain the people who you thought were making drug

25        transactions?
```

52

```
 1    A    No, sir.

 2    Q    Did you go into all the bedrooms?

 3    A    Yes.

 4    Q    You went in everyone of the bedrooms in that house?

 5    A    I went over the whole house, yes.

 6    Q    So how many bedrooms did you go into?

 7    A    Approximately four.

 8    Q    Sir, if I tell you it's three bedrooms downstairs and three

 9         upstairs, you might have missed two?

10    A    I told you I went into approximately four.  I went into

11         every room in that house.

12    Q    So you don't really know how many you went into.  That

13         would be a better answer.  It could be --

14    A    I'm trying to answer you, sir.  Some of the rooms didn't

15         have beds in them.

16    Q    So if -- some of the rooms didn't have beds in them?

17    A    Right.

18    Q    So you didn't call them bedrooms then.  There were rooms

19         that appeared to be bedrooms, but they didn't have beds

20         in them, and so you didn't -- you won't call them

21         bedrooms?

22    A    I'll answer by saying I went in every room in the house.

23    Q    All right.  Were the lights on?

24    A    Where?

25    Q    Were the lights on in the house?
```

53

```
 1   A    Some of the rooms, not all of the rooms.

 2   Q    Did you get an electricity bill?  That's all I'm trying to

 3        get.  Did you get an electricity bill?

 4   A    Did I get an electricity bill?

 5   Q    Yes, out of the house?

 6   A    Did I, no.

 7   Q    Did you get a cable bill?

 8   A    You're asking me if I got one?

 9   Q    Yes.

10   A    No.

11   Q    Did anybody in your crew get one, if you know?

12   A    There's other confiscations.  I did not make them.

13   Q    Okay.  Did you get any other proof of residency in the

14        house?

15   A    I did not get any other proof of residency.

16   Q    You saw a female in the house, right?

17   A    Yes.

18   Q    Is she in the courtroom today?

19   A    Yes.

20   Q    Did you get any proof of residency from her?

21   A    I --

22   Q    Did you check her for ID?

23   A    I made a confiscation of the dope.  That's all I made.

24               MR. PAIGE:    Stand up.

25   BY MR. PAIGE:
```

54

```
 1   Q   Did you check her for ID?

 2   A   I did not.

 3   Q   You weren't looking for proof of residency from her?

 4   A   I did not.

 5   Q   The person that was detained on the porch, that you don't

 6       know if this was the man or not, did you get proof of

 7       residency or check his -- that person's driver's license?

 8   A   You're asking me if I did, I did not.

 9   Q   And do you know if anybody in your crew did?

10   A   They would have.

11   Q   They would have?

12   A   Yes.

13   Q   Well, we've already had one person to testify and said that

14       he -- claimed that he did not.

15           MS. ZEIGER:  Your Honor, I'm going to object.

16       He cannot tell what one person's testimony is.  That's the

17       whole purpose of the sequestration.

18           THE COURT:  I'll sustain the objection.

19           MR. PAIGE:  Correct.  I got it.

20           THE COURT:  Go ahead, Ms. Zeiger.

21           MS. ZEIGER:  Thank you.

22                    REDIRECT EXAMINATION

23   BY MS. ZEIGER:

24   Q   Officer Geelhood, did you have this picture of People's

25       Exhibit No. 6 with you before you executed a search
```

55

```
 1        warrant?

 2    A   No.

 3    Q   Did you know the Defendant's name before you executed the

 4        search warrant?

 5    A   No.

 6    Q   Did you put a name into your search warrant?

 7    A   No.

 8    Q   Had you had a name, would you have put that into the search

 9        warrant?

10    A   Yes.

11    Q   Where did you learn the name of Darell Chancellor from?

12                MR. PAIGE:   Objection to hearsay.

13                MS. ZEIGER:  Your Honor, he went on and on about

14        how my officer knew who this person was ahead of time, and

15        lied in the search warrant, lied to the magistrate, and did

16        it based upon this document.

17                MR. PAIGE:   I never said he lied.  I asked him

18        the question did he lie.  And it's still hearsay.

19                THE COURT:   All right.  What was the question

20        again?

21                MS. ZEIGER:  Your Honor, I asked him where it was

22        that he got the name of Darell Chancellor from.

23                THE COURT:   Well, I -- I don't think that that's

24        hearsay unless it's -- the answer to it is that someone

25        told him.  If the answer is that someone told him, then it
```

56

```
 1    would be hearsay.

 2              MR. PAIGE:    That's what --

 3              THE COURT:    But if he gets some form of

 4    identification from someone or something, then I don't

 5    think that's hearsay.   That's something that he obtained as

 6    part of his police work.

 7              MS. ZEIGER:   And I would agree that he got

 8    identification from someone.

 9              THE COURT:    Okay.  Then I'm going to allow it.

10    BY MS. ZEIGER:

11    Q    Who did you get the name of Darell Chancellor from that

12         day?

13    A    We got it from POR that was upstairs, and we also got it

14         from the mother.

15    Q    And the mother this is the woman standing -- sitting in the

16         back?

17    A    Yes.

18              MR. PAIGE:    Your Honor, I ask that the mother's

19    information be stricken because it's hearsay.

20              THE COURT:    Well, --

21              MR. PAIGE:    It's not a big deal, but it is

22    hearsay.

23              THE COURT:    Yeah, I will -- I'll allow it to be

24    stricken as hearsay.   But I just thought that there was

25    from Officer Johnson that that came out without objection.
```

57

```
 1        I don't know.  Maybe I'm not remembering his testimony
 2        properly.  But I'll allow that that be stricken, and go on
 3        the basis of the fact that he got it from the proof of
 4        residence.
 5              Go ahead, please.
 6   BY MS. ZEIGER:
 7   Q    But you didn't have that name before you got to the house
 8        that day?
 9   A    Correct.
10   Q    Okay.  You were asked about the assets of the Defendant.
11        After you were at this house executing the search warrant,
12        did you end up going to another location?
13   A    I did.
14   Q    What location is that?
15   A    It would have been on the west side.  I'm trying to recall
16        the address.  I'm -- the mother gave it to me at the scene.
17   Q    What was your reason for going to that location?
18   A    She gave me that location that he also --
19              MR. PAIGE:  Objection to the hearsay.
20              THE COURT:  All right.  I'll sustain that.
21   BY MS. ZEIGER:
22   Q    Were you checking out another home?
23   A    Yes.
24   Q    And when you got to that home, did you see any vehicles
25        outside?
```

58

```
1   A   I did.

2   Q   What vehicles did you see outside?

3   A   The same one I saw during the surveillance that the

4       Defendant was driving, a later model either an Aurora or a

5       Riviera.

6   Q   So you saw this Aurora or Riviera on November 1st, 2011 at

7       5023 32nd Street when you were conducting your

8       surveillance?

9   A   Yes.

10  Q   And then you also saw this Riviera or Aurora at another

11      location on the west side?

12  A   Correct.

13              THE COURT:    Where did you see it when you were

14      doing the surveillance on the 1st?

15              THE WITNESS:    It was in front of the house.

16              THE COURT:    Okay.

17              THE WITNESS:    The 50 --

18              THE COURT:    Parked on the street in front of the

19      house?

20              THE WITNESS:    Yes.

21  BY MS. ZEIGER:

22  Q   Where did you see it in relationship to this other address

23      on the 2nd?

24  A   In the driveway.

25  Q   The height on People's Exhibit No. 6 what is that listed
```

59

```
 1        at?
 2    A    '5 11".
 3    Q    And what height did you have in your search warrant?
 4    A    Referring to my document it's '5 8".
 5    Q    And, again, you did not have this picture before the search
 6         warrant?
 7    A    No.
 8    Q    Was the description that you put in the search warrant
 9         based upon your observations on November 1st?
10    A    Yes.
11              MS. ZEIGER:  Nothing further, your Honor.
12              THE COURT:    All right.   Thank you.
13              Re-cross limited to the area that she covered.
14              MR. PAIGE:    Let's try to get through this
15         because I know we're trying to get this in.
16                    RECROSS-EXAMINATION
17    BY MR. PAIGE:
18    Q    The Riviera did you run a license plate check on it?  Did
19         you?
20    A    I would have.  I don't recall what came back.
21    Q    If you would have, then that would be evidence, right?
22         I mean, that would be -- you would have memorialized that,
23         right?
24    A    Yes.
25    Q    Is there any where in your records you can refresh your
```

60

```
 1       memory?

 2   A   I would have ran the plate that was in front of the house.

 3       Whether it came back to that gentleman or not, I can't

 4       recall.

 5   Q   Well, wouldn't you put that in your notes that you ran the

 6       plate and it came back to John or Jane Doe?

 7   A   I would have run the plate to ensure it was run.  I do not

 8       know who it came back to.  It is not in front of me.

 9               MR. PAIGE:   All right.  Nothing further.

10               THE COURT:   Okay.

11               Thank you.

12               MS. ZEIGER:  Nothing further, your Honor.

13               THE COURT:   All right.  You're all set.  Thank

14       you, officer.

15               (Witness excused.)

16               MS. ZEIGER:  We're going to put a stipulation on

17       the record.

18               THE COURT:   Okay.

19               MS. ZEIGER:  As it relates to People's Exhibit

20       No. 2, the cocaine that was found by Officer Geelhood and

21       in lock sealed folder N, as in Nancy 03346711.  Officer

22       Geelhood testified that the cocaine was not in the manner

23       that it is today.  Today it is now melted, for lack of a

24       better word, I'm using a non-scientific word.  But he

25       testified that it was not like this.  That is was a hard
```

61

```
 1   substance on November 2nd, 2011.

 2            And we also have a laboratory analysis that was

 3   offered by Holli Proulx, her last name is spelled

 4   P-R-O-U-L-X.  Her first name is Holli, H-O-L-L-I.  She is a

 5   Forensic Scientist in the Control Substances Unit in the

 6   Michigan State Police.  She received one sealed plastic bag

 7   N, as in Nancy 03346711 containing one plastic bag

 8   containing four knotted plastic bags containing off white

 9   material.  She analyzed two of the bags.  She came up with

10   a weight of 516.65 grams.  It was a Schedule II cocaine

11   base was the substance identified within the bag.

12            So stipulated?

13            MR. PAIGE:   So stipulated.

14            THE COURT:   Okay.

15            MS. ZEIGER:  And, your Honor, --

16            THE COURT:   That stipulation is made a part of

17   the record then.

18            MS. ZEIGER:  And, your Honor, at this time I do

19   have Ms. Proulx in court, and I'm going to be releasing her

20   as a result of this stipulation.

21            THE COURT:   Okay.

22            MS. ZEIGER:  Thank you.

23            THE COURT:   That's fine.

24            Thanks for being here.

25            MS. ZEIGER:  And I'll grab my next witness.
```

62

```
1              THE COURT:    Give the court reporter the spelling
2       of your name, please.
3              MS. IZUMI:    Cyndi C-Y-N-D-I.  Last name Izumi,
4       I-Z-U-M-I.
5              COURT REPORTER:  Thank you.
6              THE COURT:    All right, ma'am.
7              Would you raise your right hand, please.
8              Do you swear or affirm that the testimony
9       you're about to give in this matter shall be the truth so
10      help you God?
11             MS. IZUMI:  Yes.
12             THE COURT:    Have a seat, please.
13             MS. ZEIGER:  May I proceed, your Honor?
14             THE COURT:    Yes.
15             MS. ZEIGER:  Thank you.
16                  C Y N D I   I Z U M I ,
17      having been duly sworn was examined and testified as
18      follows:
19                        DIRECT EXAMINATION
20   BY MS. ZEIGER:
21   Q    Could you please state your name for the record.
22   A    Cyndi Izumi.
23   Q    And, Ms. Izumi, are you a police officer?
24   A    No.
25   Q    Are you familiar with someone by the name of Darell
```

63

```
 1        Chancellor?
 2   A    Yes.
 3   Q    Do you see Mr. Chancellor here in court today?
 4   A    Yes.
 5   Q    Can you point to him and tell me what he's wearing.
 6   A    He's wearing black pants and a gray shirt.
 7   Q    Thank you.
 8              MS. ZEIGER:  May the record reflect that the
 9        witness has identified the Defendant Mr. Darell Chancellor.
10              THE COURT:   It will reflect that.
11              MS. ZEIGER:  Thank you.
12   BY MS. ZEIGER:
13   Q    Ms. Izumi, have you ever been to a location or home at
14        5023 32nd Street in the City of Detroit, County of Wayne?
15   A    Yes.
16   Q    And approximately how many times have you been there?
17   A    Three times.
18   Q    Have you ever been there when the Defendant has been
19        present?
20   A    Yes.
21   Q    How many times?
22   A    I believe two of the three times.
23   Q    Do you remember when the first time was that you were at
24        the home and the Defendant was there?
25              Are you referring to some notes?
```

64

```
 1   A    Yes, I am.

 2   Q    And would that refresh you recollection?

 3   A    Yes.

 4   Q    Thank you.

 5   A    It was 7/19/11.

 6   Q    And when he was there, did he represent that home as his

 7        home?

 8   A    Yes.

 9   Q    Did he indicate whether he lived there with anybody else?

10   A    His mother and, I believe, his sister.

11   Q    Do you see -- do you know his mom?

12   A    Yes.

13   Q    Do you see her in court at all here today?

14   A    Yes.

15   Q    Where is she at?

16   A    She's on the back row with the glasses.

17   Q    Dressed in black?

18   A    Yes.

19   Q    Thank you.

20              THE COURT:    Just for the record, it's the same

21        woman that was earlier identified as Defendant's mother.

22              MS. ZEIGER:   Thank you, your Honor.

23   BY MS. ZEIGER:

24   Q    That was on July 19th, 2011?

25   A    Yes.
```

65

```
 1   Q    When was the next time that you were at the home?

 2   A    It was March 21st, 2012.

 3   Q    Was the Defendant present then?

 4   A    Yes.

 5   Q    And was he representing that as his home at that time, as

 6        well?

 7   A    Yes.

 8   Q    Was the mother present there?

 9   A    She was in the backyard, but she was still at the home.

10   Q    Was anybody else present?

11   A    Not that I was aware of.

12   Q    Okay.

13             MS. ZEIGER:  Nothing further, your Honor.

14             THE COURT:  Okay.

15                     CROSS-EXAMINATION

16   BY MR. PAIGE:

17   Q    Did he tell you, for instance, where did he sleep in the

18        house?   Did he tell you he slept on the couch?

19   A    No, we never discussed  --

20   Q    You never talked about that?

21   A    I believe it was the upper level, but he never specified

22        whether he slept on a couch or on a bed or whatnot.

23   Q    But you never -- you never went into an area of where he

24        purportedly lived to his bedroom or anything?

25   A    Me, myself, no, sir.
```

66

```
 1   Q    Isn't it true that as a -- one of the requirements is that

 2        you have to have two good addresses?

 3   A    What requirement?

 4              THE COURT:    Requirement to what?

 5   BY MR. PAIGE:

 6   Q    Well, you were visiting for a state agency, right?

 7   A    Yes, sir.

 8   Q    And as a condition, did you have two addresses on him?

 9        Yes or no.

10   A    No.

11   Q    You just had that one address?

12   A    Yes.

13   Q    Okay.  Are you aware of a person by the name of Mr. Durhall

14        (ph.) that lived at that address?

15   A    No.

16   Q    Are you aware of how many siblings the Defendant had at the

17        time that you visited him at that address?  Whether he had

18        brothers or sisters or cousins that were living there?

19   A    I was just aware of the sister living there.

20   Q    Did you know about his brothers?

21   A    No.

22   Q    Did you do any -- have you ever done an asset run on him to

23        make a determination of what his net worth was?

24   A    No.

25   Q    Do you know if he was receiving any state aid?
```

67

```
 1   A    As far as I know, he told me he was receiving a Bridge

 2        Card.

 3   Q    He was receiving a Bridge Card?

 4   A    Yes.

 5                  MR. PAIGE:   All right.  Nothing further.

 6                  MS. ZEIGER:  Nothing further, your Honor.

 7                  THE COURT:   Okay.  I just want to make sure I

 8        understood one thing.  Did you say he told you he lived in

 9        the upstairs?  Is that what I heard you testify?

10                  THE WITNESS:   His sleeping area.

11                  THE COURT:   I'm not understanding.  He told you

12        his sleeping area was upstairs; is that what you're telling

13        me?

14                  THE WITNESS:   I don't know offhand either him or

15        his mother when I did the initial investigation --

16                  THE COURT:   Someone told you?

17                  THE WITNESS:   Yes.

18                  THE COURT:   Okay.  You don't remember

19        specifically who?

20                  THE WITNESS:   I do not.

21                  THE COURT:   Okay.  Anything based upon my

22        additional question?

23                  MR. PAIGE:   No.

24                  MS. ZEIGER:  No, your Honor.

25                  THE COURT:   All right.  Thanks.
```

68

```
1              Thanks, ma'am.

2              THE WITNESS:   Thank you.

3              (Witness excused)

4              MS. ZEIGER:  Your Honor, I have one more witness

5    to call.

6              THE COURT:   Okay.

7              Sir, give the court reporter the spelling of your

8    name, please.

9              OFFICER BELL:  Tommy T-O-M-M-Y  Bell, B-E-L-L.

10             COURT REPORTER:  Thank you.

11             OFFICER BELL:  You're welcome.

12             THE COURT:   Mr. Bell, could you raise your right

13   hand.

14             Do you swear or affirm the testimony you're about

15   to give in this matter shall be the truth so help you God?

16             OFFICER BELL:  Yes, sir, I do.

17             THE COURT:   All right.

18             Have a seat, please.

19             MS. ZEIGER:  May I proceed, your Honor?

20             THE COURT:   Please.

21             MS. ZEIGER:  Thank you,

22             T O M M Y    B E L L ,

23   having been duly sworn was examined and testified as

24   follows:

25             DIRECT EXAMINATION
```

69

1    BY MS. ZEIGER:

2    Q    Good afternoon, sir.

3    A    Good afternoon.

4    Q    Could you please state your name for the record.

5    A    Tommy Bell.

6    Q    And, sir, how are you employed?

7    A    Police Officer for the City of Detroit.

8    Q    Are you assigned to a specific unit within the City of

9         Detroit?

10   A    Assigned to the narcotics division.

11   Q    How long have you been a police officer?

12   A    Police officer for over 25 years; narcotics division for

13        over 13 years.

14   Q    Directing your attention back to November 2nd, 2011 at 5:30

15        in the afternoon were you at 5023 32nd Street in the City

16        of Detroit, County of Wayne?

17   A    Yes.

18   Q    Why were you at that location?

19   A    To execute a search warrant.

20   Q    And what is at that address?

21   A    A single family dwelling.

22   Q    What was your role in executing the search warrant?

23   A    Initial at the house I was outside security.

24   Q    And did you encounter somebody on the porch that day when

25        you were executing the search warrant?

70

```
 1  A    It was somebody, yes.

 2  Q    And when you say "it was somebody," were they male or

 3       female?

 4  A    It was a male.

 5  Q    Do you see that person any where here in court today, if

 6       you remember?

 7  A    I don't recall what he was -- looked like.

 8  Q    Okay.  Did you ever end up going inside of the location?

 9  A    Yes.

10  Q    And was that after entry was made by the entry team?

11  A    That's correct.

12  Q    Did you assist in the clearing of the home, or did you go

13       in after the house was cleared?

14  A    I went into the home after the house was cleared.

15  Q    Did you assist in searching at all?

16  A    Yes.

17  Q    And can you tell us how this house is set up?

18  A    It's a regular house.  Bedrooms, kitchen, living room

19       downstairs.  You go to the rear of the house going from

20       front to the back of the house facing the door you go to

21       the back it's an upstairs area also has a kitchen, dining

22       room, living room, bedrooms upstairs.

23  Q    Would it be fair to say that it was set up as a two family

24       flat, but yet it only had one address and one front door?

25  A    Correct.
```

71

```
 1   Q   Did you search either the top or the bottom of that home?

 2   A   The upstairs.

 3   Q   And did you seize anything upstairs?

 4   A   Yes.

 5   Q   Specifically, where did seize something from?

 6   A   A clothes hamper?

 7   Q   And where was that clothes hamper at?

 8   A   It was in the upstairs area I would define as in the

 9       kitchen.

10   Q   And did you observe Officer Geelhood seize anything from

11       the same hamper?

12   A   Yes.

13   Q   What was that?

14   A   Suspected narcotics.

15   Q   What did you seize from this hamper?

16   A   Two handguns.

17   Q   Can you tell me about the first one that you seized?

18   A   If I may refer to my report?

19   Q   Will that refresh your recollection?

20   A   Yeah.

21   Q   Please do so.

22   A   It was a .40 caliber glock, blue steel automatic, loaded

23       with nine live rounds.

24   Q   Did you put that one on an evidence tag number?

25   A   That's correct.
```

72

```
 1   Q     Okay.  What evidence tag number was that?

 2   A     Referring to my report that would be evidence tag 371904

 3         -- E371904.

 4               MS. ZEIGER:  Your Honor, may I approach the

 5         witness?

 6               THE COURT:  Yes.

 7               MS. ZEIGER:  Thank you.

 8   BY MS. ZEIGER:

 9   Q     I'm going to show you what's been marked as People's

10         proposed Exhibit No. 5.

11               MS. ZEIGER:  And, your Honor, for the record,

12         this gun has been checked by your deputy.

13               THE COURT:  Thank you.

14   BY MS. ZEIGER:

15   Q     Is that the evidence tag that correlates with that item?

16   A     That's correct.

17   Q     And what is inside that?

18   A     It's a glock handgun.

19   Q     Okay.  Thank you.

20               MS. ZEIGER:  We would ask the admission of

21         People's proposed Exhibit No. 5.

22               MR. PAIGE:  No objection.

23               THE COURT:  People's 5 is admitted.

24               (People's Exhibit No. 5 admitted into evidence.)

25   BY MS. ZEIGER:
```

73

```
 1   Q    Did you seize anything else?

 2   A    A .9mm Ruger handgun.

 3   Q    Was that glock that I just showed you and admitted into

 4        evidence, was that loaded?

 5   A    Yes, it was.

 6   Q    How many times?

 7   A    Nine live rounds.

 8   Q    Okay.  That Ruger was that loaded, as well?

 9   A    Fifteen live rounds.

10   Q    I'm going to show you what's been marked as People's

11        proposed Exhibit No. 4.  Can you look at that item.  And

12        what is that?

13   A    It's a blue steel automatic .9mm Ruger with magazine,

14        nine rounds.

15   Q    Is that the item that you seized from the hamper --

16   A    That's correct.

17   Q    -- along with the .40 caliber glock?

18   A    Yes, ma'am.

19   Q    Thank you.

20             MS. ZEIGER:  We ask the admission of People's

21        proposed Exhibit No. 4.

22             THE COURT:  Any objection?

23             MR. PAIGE:  No objection.

24             THE COURT:  People's 4 is admitted.

25             (People's Exhibit No. 4 admitted into evidence.)
```

74

```
 1   BY MS. ZEIGER:

 2   Q    Officer Bell, the clothing that was in that hamper, can you

 3        describe that for us.

 4   A    As far as my recollection, it was just jeans.  I would say

 5        men's jeans, shirts, underwear, socks.

 6   Q    It was all male clothing?

 7   A    Yes.

 8   Q    Did you seize anything else that day?

 9   A    No, I did not.

10              MS. ZEIGER:  Nothing further, your Honor.

11              THE COURT:   Okay.  Cross-examine.

12              MR. PAIGE:   Real quick.

13                      CROSS-EXAMINATION

14   BY MR. PAIGE:

15   Q    One gun was in the hamper, right?

16   A    Both guns, sir.

17   Q    Oh, both guns were in the hamper?

18   A    Yes, sir.

19              MR. PAIGE:   Nothing further.

20              THE COURT:   Okay.

21              You're all set.  Thank you, sir.

22              THE WITNESS:   Thank you, sir.

23              (Witness excused.)

24              MS. ZEIGER:  Your Honor, at this time there's a

25        stipulation between defense counsel and the People that
```

75

1    back on November 2nd, 2011 the Defendant had previously

2    been convicted of a felony and was ineligible to possess a

3    firearm.  So stipulated, Mr. Paige?

4              MR. PAIGE:    Yes, it is.

5              MS. ZEIGER:   Thank you.

6              THE COURT:    All right.   That stipulation is made

7    a part of the record in this case.

8              MS. ZEIGER:   Thank you, your Honor.

9              The People would rest at this time.

10             THE COURT:    Okay.   Defense witnesses?

11             MR. PAIGE:    Your Honor, I'm going to reserve the

12   right to make a directed verdict motion.

13             THE COURT:    Okay.

14             MR. PAIGE:    And do it all at one time.

15             THE COURT:    All right.

16             MR. PAIGE:    But I'm not giving up that right --

17             THE COURT:    Sure.   Yeah, absolutely.

18             MR. PAIGE:    -- to make a motion for directed

19   verdict.

20             May I counsel with my client just for one second?

21             THE COURT:    Sure.

22             MR. PAIGE:    Two minutes in the box so I can --

23             THE COURT:    Yeah, we'll take a brief recess.

24   We'll come back in three minutes.

25             MR. PAIGE:    Yes, thank you.

76

```
1                    MS. ZEIGER:  Thank you, your Honor.

2                    (Matter in recess)

3                    (Matter reconvened)

4                    THE COURT:  Okay.  How do you wish to proceed at

5          this time, Mr. Paige?

6                    MR. PAIGE:   Your Honor, the defense -- the

7          Defendant wants to testify.

8                    THE COURT:  Okay.

9                    MR. PAIGE:  Can I voir dire him real quick --

10                   THE COURT:  Absolutely, yeah.

11                   MR. PAIGE:  -- on this?

12                   THE COURT:  Yes.

13                   Stand up, please.

14                   MR. PAIGE:  You know you have the absolute right

15         not to testify?

16                   THE DEFENDANT:  Yes.

17                   MR. PAIGE:  And if you do not testify, your

18         Honor would instruct himself like he would instruct a jury

19         that he can't use that against you?  You understand that?

20                   THE DEFENDANT:  Yes.

21                   MR. PAIGE:  And I've had the occasion to talk to

22         you about this?

23                   THE DEFENDANT:  Yes.

24                   MR. PAIGE:  And I've given you the admonishment

25         that it's been my experience a lot of times when defendants
```

77

```
 1        take the stand they hang themselves?

 2                    THE DEFENDANT:    Yes.

 3                    MR. PAIGE:    And so we understand what's at risk?

 4                    THE DEFENDANT:    Yes.

 5                    MR. PAIGE:    You swear to tell the truth?

 6                    THE DEFENDANT:    Yes.

 7                    MR. PAIGE:    I can't do all the Judge's work.

 8                    THE COURT:    Yeah.  I'll do the swearing in.

 9              Okay.  Can you raise your right hand.

10              Do you swear or affirm the testimony you're

11        about to give in this matter shall be the truth so help you

12        God?

13                    THE DEFENDANT:    Yes.

14                    THE COURT:    All right.  Have a seat, please,

15        Mr. Chancellor.

16              D A R E L L    D E O N    C H A N C E L L O R,

17        sworn by the Court, was examined and testified as follows:

18                          DIRECT EXAMINATION

19   BY MR. PAIGE:

20   Q    Mr. Chancellor, just, again, for the record your name.

21   A    Darell Deon Chancellor.

22   Q    Could you speak up.

23   A    Darell Deon Chancellor.

24   Q    And how old are you?

25   A    I'm 30.
```

78

```
 1   Q    You're 30 years old?

 2   A    Yes.

 3   Q    And how tall are you?

 4   A    I'm '5 11".

 5   Q    And how much do you weigh?

 6   A    250.

 7   Q    250?

 8   A    Yes.

 9              THE COURT:   Two five 0?

10              THE WITNESS:   Yes, sir.

11   BY MR. PAIGE:

12   Q    You're not just putting those numbers up so you can get

13        away from the 180, are you?

14   A    No, sir.  We can get a scale.

15   Q    How about on November 2nd -- November 1st of last year how

16        much did you weigh?

17   A    I was 245.

18   Q    245?

19   A    Yes.

20   Q    First of all, where did you live on November 2nd, of 2011?

21   A    I lived on 9209 Robson.

22   Q    Okay.  What's your mother's address?

23   A    5023 32nd.

24   Q    Okay.  You heard a person on the stand indicate that she

25        visited you three times at the second address, right?
```

79

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Was that true? |
| 3 | A | She visit me, yes, once in the inside and once on the |
| 4 | | outside. |
| 5 | Q | And did you give the state that address? |
| 6 | A | Yes. |
| 7 | Q | And when you gave them that information, was that |
| 8 | | information true? |
| 9 | A | At the time it was.  Because when I first came home, she |
| 10 | | asked me where -- was that my location?  I told her, yes. |
| 11 | | But my lights was cut off on Robson.  So I had to parole to |
| 12 | | that house. |
| 13 | Q | Okay.  Now the house on Robson give us that address again. |
| 14 | A | 9209 Robson. |
| 15 | Q | Okay.  The majority of your clothing, if all, was where at |
| 16 | | on November 2nd, 2011? |
| 17 | A | All my clothes was on Robson. |
| 18 | Q | Who did you live with on Robson, if anyone? |
| 19 | A | My wife and my son, my newborn. |
| 20 | Q | Your wife's name is what? |
| 21 | A | Katrice Chancellor. |
| 22 | Q | On November 2nd, 2011 were you working? |
| 23 | A | Yes. |
| 24 | Q | And where did you work? |
| 25 | A | G and G Market. |

80

```
 1    Q    And what is G and G Market?

 2    A    It's, like, a gas station/market where -- it was, like, a

 3         grocery store/gas station.

 4    Q    And what hours did you work?

 5    A    From like 8:00 to 4:00, 8:00 to 5:00 or whenever he called.

 6         Whenever he needed me.

 7    Q    Okay.  And on November 2nd, of 2011, did you own your own

 8         home?

 9    A    Yes.

10    Q    Where was that?

11    A    On Robson.

12    Q    Okay.  And what was the value of that house?

13    A    I think $3,500.00.

14    Q    $3,500.00?

15    A    Yes.

16    Q    Okay.  You didn't live out in Farmington Hills in a

17         $400,000.00 house?

18    A    No, sir.

19    Q    How many new Eldorado Cadillacs did you own on November

20         2nd?

21    A    None.

22    Q    How many fur coats?

23    A    None.

24    Q    Those glasses is that a prop for court today?

25    A    No, sir.
```

81

```
 1   Q    Are those prescription glasses?

 2   A    Yes, sir.

 3   Q    Without those glasses you would be a version of Stevie

 4        Wonder?

 5   A    Without these glasses, I probably can't walk out of the

 6        courtroom.

 7   Q    And how long have you worn glasses?

 8   A    All my life.

 9   Q    The house on 32nd who lived there on November 2nd, if you

10        know, of 2011?

11   A    My mother, my sister, my cousin.

12   Q    What's your cousin's name?

13   A    Willie Chancellor.

14   Q    Who else lived there, if you know?

15   A    Antonio Chancellor.

16   Q    Who is that?

17   A    My brother.

18   Q    Can you describe him.

19   A    He's about '5 9", 165, 170.

20   Q    Okay.  Your cousin -- strike that.

21             Did Mr. Durhall (ph.) live there -- stay there

22        sometimes?

23   A    Yes.

24   Q    Okay.  Do you see him in the courtroom?

25   A    Yes.
```

82

```
 1   Q   Okay.  And could you just point him out for the record.

 2       He's already been put into the record, but could you point

 3       him out.

 4   A   He's in the back row.  He's the only guy in the back row.

 5   Q   Yeah, I can even see that.

 6               And what's his relationship to your family?

 7   A   He's my mother's boyfriend.

 8   Q   Okay.  I guess that makes him a handy man.  He does some

 9       work around the house sometimes?

10   A   He better, if he want to still stay there.

11   Q   All right.  Did you have any clothing upstairs?

12   A   No.

13   Q   What size shoe do you wear?  You look like you've got big

14       feet.

15   A   11.

16   Q   They not that big.  11?

17   A   Okay.

18   Q   And your pant size?

19   A   44.

20   Q   44?

21   A   Yes.

22   Q   And your shirt size?

23   A   5X.

24   Q   5X.  If I looked in that collar right now, I'll see a 5X?

25   A   Yes, sir.
```

83

```
 1   Q   5X large.  You're not even helping yourself out.  It says
 2       5X large; is that right?
 3   A   Yes, sir.
 4   Q   So you've been locked up for a while, right?
 5   A   Yes.
 6   Q   We got a judge.  We don't have a jury.  You've been locked
 7       up for a while.  You didn't get fat on the prison food did
 8       you -- or jail food, did you?
 9   A   No, sir, they didn't feed us enough.
10   Q   Whose dope is it?
11   A   I don't know.
12   Q   Is it your dope?
13   A   No, sir.
14   Q   Is it your guns?
15   A   No, sir.
16   Q   What were you doing with your life on November 2nd, 2011?
17       What were you doing with your life?  If Judge Hathaway had
18       to get a synopsis of what you were doing with your life,
19       what were you doing with your life?
20   A   I was working.  I was taking care of my family.
21               MR. PAIGE:   Nothing further.
22               THE COURT:   All right.  Thank you.
23               Cross-examine.
24               MS. ZEIGER:   Thank you.
25                    CROSS-EXAMINATION
```

84

1   BY MS. ZEIGER:

2   Q    Good afternoon, Mr. Chancellor.

3   A    Good afternoon.

4   Q    When did you start working at G and G Market?

5   A    I'd say around the summertime of 2011.

6   Q    And did you have to get that job as a condition of your

7        parole?

8   A    Yes.  I had to maintain a job, yes.

9   Q    Okay.  And you had to prove to Agent Izumi that you have a

10       job, correct?

11  A    Yes.

12  Q    A legitimate job?

13  A    Yes.

14  Q    How much money did you make an hour?

15  A    Like $7.50.

16  Q    How many hours did you work a week?

17  A    It varies.

18  Q    Give me a range.

19  A    Like a week probably thirty five; forty hours.

20  Q    You get taxes taken out or is it under the table?

21  A    It's under the table.

22  Q    Does your wife work, Katrice?

23  A    Yes.

24  Q    What does she do?

25  A    She worked at -- what's the clothing store name?  Forman

85

```
 1        Mills.  But right now she work at Family Dollar.

 2   Q    When did she work at Forman Mills?

 3   A    This was, like, when I first came home.

 4   Q    When was that?

 5   A    2010, December 2010.

 6   Q    How long did she -- when did she stop working at Forman

 7        Mills?

 8   A    She stopped working there about I'd say February.  She got

 9        pregnant so she stopped working.

10   Q    February of 2011?

11   A    Yes.

12   Q    When was your son born?

13   A    My son was born in August, August 25th.

14   Q    Of 2011?

15   A    Yes.

16   Q    Okay.  When did she go to work at the Family Dollar?

17   A    Last year sometime.

18   Q    So since you've been in?

19   A    No, it was right before I got locked up.

20   Q    Are those Cartiers that you're wearing?

21   A    Yes.

22   Q    How expensive are those glasses?

23   A    About $300.00, $400.00.

24   Q    Okay.  Your address 9209 Robson is Robson R-O-B-S-O-N?

25   A    Yes.
```

86

| | | |
|---|---|---|
| 1 | Q | How long have you owned that house? |
| 2 | A | I was incarcerated when I bought that house. |
| 3 | Q | You were incarcerated when you bought that house? |
| 4 | A | Yes. |
| 5 | Q | Okay. Did they bring the documents to you in jail to have |
| 6 | | you sign? |
| 7 | A | No. I went through another person. She bought the house, |
| 8 | | and it was mine. |
| 9 | Q | Is the house legally deeded in your name? |
| 10 | A | Yes. |
| 11 | Q | Okay. When did that happen? |
| 12 | A | Like November of 2010 right before I got out. Right before |
| 13 | | I was to get out. |
| 14 | Q | Okay. So right when you got out, you had a home to live |
| 15 | | in? |
| 16 | A | I didn't have no lights. |
| 17 | Q | Okay. When did you get lights? |
| 18 | A | January of 2011. |
| 19 | Q | All right. Fair to say that Agent Izumi came out July 19th |
| 20 | | 2011 and you represented your mom's house as your house; |
| 21 | | isn't that correct? |
| 22 | A | Yes. |
| 23 | Q | Okay. Did you have lights at the Robson address then? |
| 24 | A | Yes. |
| 25 | Q | Okay. When you didn't have lights, where were you living |

87

```
 1        at?

 2   A    I was staying with my mother.

 3   Q    How long did you not have lights for?

 4   A    I came home in December.  The next month I had lights.

 5   Q    Was Katrice staying with you then, also?

 6   A    On Robson?

 7   Q    No, at your mom's house when you first came out?

 8   A    No.

 9   Q    How long have you and Katrice been married?

10   A    Since 2008.  I got married when I was incarcerated.

11   Q    Okay.  And Agent Izumi she was back out there in March

12        of 2012, as well, too, correct?

13   A    Yes.

14   Q    And you were there?

15   A    Yes.

16   Q    And you represented that home to her, again, as your home?

17   A    Yes.

18   Q    Were you embarrassed of your Robson house?

19   A    No.

20   Q    Were you hiding that house from her?

21   A    No.

22   Q    Why were you lying to her?

23   A    Because I worked -- my job is closer to my mother's house.

24        If I would have told her I had a different address, she

25        would have switched offices and it would have made me go way
```

88

```
 1        on Eight Mile to report when it's out the way of my job.
 2   Q    So the whole reason why you were lying was that you could
 3        stay at the office where Agent Izumi is?
 4   A    Yes.  Because the parole office is right down the street
 5        from my job.
 6   Q    Where is the G and G Market?
 7   A    On Eleven and Warren.
 8   Q    And it's fair to say that lying to your parole agent is a
 9        violation of your parole about where you're living?
10   A    Yes.
11   Q    Okay.  Now you said that on 11 -- on November 2nd, 2011 you
12        were working between 8:00 and 4:00, 8:00 and 5:00, correct?
13   A    Yes.
14   Q    Okay.  But you were not present at your mom's house when
15        the search warrant was executed?
16   A    No, sir -- no, ma'am.
17   Q    It's okay.  You received a phone call from a police officer
18        that day, didn't you?
19   A    No.
20   Q    No.  You never talked to officer Geelhood?
21   A    No.
22   Q    What were you doing on November 1st, 2011?  Do you
23        remember?
24   A    No, ma'am.
25   Q    Mr. Durhall (ph.) does he also live down the street?
```

89

```
 1           Does he have an address down the street of 4981 32nd

 2      Street?

 3   A  No, not to my knowledge.

 4   Q  No, okay.  How long have he and your mom been boyfriend and

 5      girlfriend?

 6   A  For a long time.

 7   Q  Your brother Antonio Chancellor how old is he?

 8   A  He's 36 -- 37.

 9   Q  Your cousin Willie how old is he?

10   A  He's 34.

11   Q  And you're testifying that they all stay with your mom?

12   A  Yes.

13   Q  What's your sister's name?

14   A  Crystal Chancellor.

15   Q  Now, can you stand up for me so that I can see your

16      clothing.  It's fair to say that you're clothing is a

17      little bit baggie, correct?

18   A  Yes.

19   Q  What was that?

20   A  Yes.

21   Q  Yes, it is baggie.

22   A  Yes.

23   Q  Okay.  And you can sit down.  Thank you.

24           And you have access to snacks and things of that

25      nature in the jail, correct?
```

90

```
1   A      What at Dickerson?

2   Q      Dickerson.

3   A      Yes.

4   Q      Okay.

5                 MS. ZEIGER:  Nothing further, your Honor.

6                 THE COURT:  All right.

7                 MR. PAIGE:  No further questions.

8                 THE COURT:  Thank you, Mr. Chancellor.  You're

9   all set.  Step down, sir.

10                All right.  Any additional witnesses or evidence

11  on behalf of defense?

12                MS. ZEIGER:  Not on behalf of the People, your

13  Honor.

14                MR. PAIGE:  Neither on behalf of the defense.

15                THE COURT:  Okay.  So at this point, the defense

16  rest?

17                MR. PAIGE:  Yes, your Honor.

18                THE COURT:  All right.  Defense rest.  So do you

19  want to make a closing argument at this time?  The reason

20  I'm bringing that up is I'm not going to be prepared to

21  make a decision on this case today.  Because I want to give

22  some thought to the evidence that's been presented.  I

23  don't want to rush it.  I want to give some thought to

24  this.  So I'm saying that because I'm happy to have closing

25  arguments now, and then have you come back in the morning,
```

91

```
1     and I'll deliberate and make a decision.  Or, if you

2     prefer, you can come first thing in the morning and do

3     closing, and then I'll deliberate at that time, as well.

4          MS. ZEIGER:  Is there any way that we can come at

5     like 8:30?  I have to be at the airport at 11:00, and I

6     have a motion in front of Judge Bill with Danny Blanc that

7     I'm going to try and get done between --

8          MR. PAIGE:  Will you be here Monday?

9          MS. ZEIGER:  Yes, I will be here Monday.

10          THE COURT:  Do you want to just do it Monday

11     morning?

12          MR. PAIGE:  Yes.

13          MS. ZEIGER:  You want to do it Monday morning?

14          MR. PAIGE:  Yes, your Honor, yes.

15          THE COURT:  Because 8:30 does present a problem

16     for us.

17          MS. ZEIGER:  I understand.

18          THE COURT:  We're trying to get our Friday

19     docket put together --

20          MS. ZEIGER:  Gotcha.

21          THE COURT:  -- and when we do that, it makes it

22     more difficult on everybody.

23          MS. ZEIGER:  Just knowing that I'm with Mr. Blanc

24     I know that it's going to be a lengthy motion.

25          THE COURT:  Yeah.  So let's plan on 9:00 a.m. --
```

92

```
 1                MS. ZEIGER:  Okay.

 2                THE COURT:   -- Monday morning.  We'll get

 3     finished up.  We'll have closing argument, and then I'll

 4     deliberate at that time.

 5                MS. ZEIGER:  Thank you, your Honor.

 6                MR. PAIGE:   Thank you, your Honor.

 7                MS. ZEIGER:  Your Honor, would you want me to

 8     bring any of the guns and the drugs?

 9                THE COURT:   Leave the guns and the cocaine.

10                MS. ZEIGER:  Okay.  I'll keep the paper documents

11     with me.

12                THE COURT:   Right.

13                MS. ZEIGER:  Okay.  Sounds good.

14                THE COURT:   Just make sure you bring them back

15     --

16                MS. ZEIGER:  Will do.

17                THE COURT:   -- so that I'll have them when I

18     deliberate.

19                MS. ZEIGER:  Will do.  I'll make sure I do that.

20                (Matter adjourned)

21                ---        ---        ---

22

23

24

25
```

93

CERTIFICATE OF COURT REPORTER

    I certify that this transcript, consisting of
94 pages, is a complete, true, and correct transcript of the
proceedings and testimony taken in this case on Thursday,
November 8, 2012.


ZELDA HARRIS RELEFORD, CSR 4897
Official Court Reporter

94

# EXHIBIT 6H

## Chancellor Letter to Judge Hathaway

12-005 4474-01

Dear Honorable Judge D Hathaway

My name is [name] [name] — I start trial November 8 in front of you case # 201270 12416. — I didn't want a jury trial because I'm fighting for my life, and [?] [?] in the court room know the laws and can read the facts better then you. — I been locked up 6 months for something I know nothing about. Me and my wife had my first baby — I missed his first birthday and it its killing me. — I know what I'm about to say you hear it all the time, but the police got the wrong person you will see that by the discription they got do not match me at all. — I know I'm facing alot of time if I get found guilty so please believe me if I did or knew anything I wouldn't be taking this chance of trial. The evidence and the facts will show that I haven't did anything.

P.S
Thank You Kindly For Your Time

# EXHIBIT 6I

## Chancellor Commitment to Department of Corrections

| | | 1ˢᵗ copy – Corrections | | 4ᵗʰ copy – Defendant |
| | | 2ⁿᵈ copy – Corrections (for return | | 5ᵗʰ copy – Prosecutor |
| Approved, SCAO | Original – Court | 3ʳᵈ copy – Michigan State Police CJIC | | 6ᵗʰ copy - Cashier |

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | JUDGMENT OF SENTENCE<br>COMMITMENT TO DEPARTMENT OF CORRECTIONS<br>☐ Amended | CASE NO.<br>12-004974-01-FH |

| ORI MI – 821095J Court Address | 1441 St. Antoine, Detroit, MI 48226 | Courtroom 604* | Court Telephone No. | 313-224-2441 |

Police Report No.

THE PEOPLE OF THE STATE OF MICHIGAN

v

Defendant name, address, and telephone no.
Darell Chancellor  12 - 10620
Alias(es) -   DIV-III  351588  B/M

| CTN/TCN | SID 2082932H | DOB |
| 12701246-01 | | 12/07/1981 |

| Prosecuting attorney name | Bar no. | Defendant attorney name | Bar no. |
| Stephanie L. Zeiger | 66019 | Ray A. Paige | 41848 |

**THE COURT FINDS:**

1. The defendant was found guilty on 11/12/2012 _____ of the crime(s) stated below:

| Count | CONVICTED BY | | | DISMISSED BY* | CRIME | CHARGE CODE (S)<br>MCL citation/PACC Code |
| | Plea* | Court | Jury | | | |
| 1 | | 0 | | | POSS NARC 450-999 G | 333.74032A2 |
| | | | | | ENH SENT 4 OFF | 769.12 |

*For plea: insert "G" for guilty plea, "NC" for nolo contendere, or "MI" for guilty but mentally ill, For dismissal; insert "D" for dismissed by court or "NP" for dismissed by prosecutor/plaintiff.

☐ 2. The conviction is reportable to the Secretary of State under MCL 257.625(21)(b).

☐ 3. HIV testing and sex offender registration is completed.  Defendant's driver license number

☐ 4. The defendant has been fingerprinted according to MCL 28.243.

**IT IS ORDERED:**

☐ 5. Probation is revoked.

6. Participating in a special alternative incarceration unit is ☐ prohibited. ☐ permitted.

7. Defendant is sentenced to custody of Michigan Department of Corrections. This sentence shall be executed immediately.

| Count | SENTENCE DATE | MINIMUM | | | MAXIMUM | | DATE SENTENCE BEGINS | JAIL CREDIT | | OTHER INFORMATION |
| | | Years | Mos. | Days | Years | Mos. | | Mos. | Days | |
| 1 | 12/12/2012 | 14 | 3 | 0 | 30 | 0 | 12/12/2012 | 0 | 0 | |

☒ 8. Sentence(s) to be served consecutively to: (if this item is not checked, the sentence is concurrent)
☐ each other. ☒ case numbers PAROLE.

9. Defendant shall pay as follows:

| State Minimum | Crime Victim | Restitution | Court Costs | Attorney Fees | Fine | Other Costs | Total |
| $ 68.00 x 1=68 | $ 130 | $ 0 | $ 600 | $ 0 | $ 0 | $ 0 | $ 798 |

The due date for payment is at sentencing . Fine, costs, and fees not paid within 56 days of the due date are subject to a 20% late penalty on the amount owed.

10. The concealed weapon board shall     suspend for _____ days     permanently revoke     the concealed weapon license, permit number _____     issued by _____     County.

☐ 11. The defendant is subject to lifetime monitoring pursuant to MCL 750.520n.

12. Court recommendation:

12/12/2012 _____     P48434

Date     Judge     Hon Daniel A. Hathaway     Bar no.

I certify that this is a correct and complete abstract from the original court records. The sheriff shall, without needless delay, deliver defendant to the Michigan Department of Corrections at a place designated by the department.

(SEAL)     _____
Deputy court clerk

MCL 765.15(2), MCL 769.1k, MCL 769.16a, MCL 775.22,

CC 219b-3CC – (4/2009) JUDGMENT OF SENTENCE, COMMITMENT TO DEPARTMENT OF CORRECTIONS     MCL 780.766 MCR 6.427

# EXHIBIT 6J

# Claim of Appeal and Order Appointing Counsel

<table>
<tr><td colspan="2">STATE OF MICHIGAN<br>3rd JUDICIAL CIRCUIT<br>WAYNE COUNTY</td><td>CLAIM OF APPEAL AND<br>ORDER APPOINTING COUNSEL</td><td>CASE NO. AND SUFFIX<br>12-4974    01</td></tr>
</table>

Court Address
1441 ST. ANTOINE, ROOM 917 DETROIT, MI 48226

Court Telephone No.
(313) 224-6222

**People of THE STATE OF MICHIGAN**

v

Date of Birth, address, Inmate Number (if known)
CHARLES EGELER RECEPTION & GUIDANCE CENTER
3855 COOPER STREET
JACKSON, MI 49201-7518

12/07/1981
351588

Defendant Name, Last | First | Middle
CHANCELLOR | DARELL | DEON

| Offense Information | | | | | | | | Terms of Incarceration | | | | | | | | | | Intermediate Sanctions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Minimum | | | Maximum | | | | | | Probation | | | | | | | |
| Date | Description | PACC Code | H | C | A | S | Y | M | D | Y | M | D | K | P | J | Y | M | D | R | F | O |
| | CON SUB/POSS. NARC/COCAI | 333.74032A2 | 4 | | | | 14 | 3 | | 30 | | | X | X | | | | | | | |

H=Habitual C=Conspiracy A=Attempt S=Solicitation Y=Year M=Month D=Day K=Consecutive P=Prison J=Jail R=Restitution F=Fine O=Other

The defendant claims an appeal from a final judgment or order entered on 12/12/2012 in the 3rd Circuit Court, WAYNE County, Michigan by Judge DANIEL A. HATHAWAY 48434.  Copies of the final judgment or order being appealed and docket entries are attached for the Court of Appeals, appointed counsel, and Michigan Appellate Assigned Counsel System.

On 01/02/2013 the defendant filed a request for appointment of counsel and a declaration of indigency.
IT IS ORDERED:

STATE APPELLATE DEFENDER OFFICE
Name of Appellate Counsel

DETROIT. MI 48226
City, State, Zip

645 GRISWOLD. PENOBSCOT BLDG. SUITE 3300
Address

313-256-9833
Telephone No.

1
Bar No.

Is appointed counsel for the defendant in post-conviction proceedings.  If appointed counsel can not or will not accept this appointment, he/she shall notify the court immediately.

The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts checked below and any other transcripts requested by counsel in this case not previously transcribed.  Transcripts shall be filed within 28 days for pleas or 91 days for trials from the date ordered or requested [MCR7.210(B)].  Reporter(s)/recorder(s) shall be paid as provided by law.

| Transcripts Ordered | | Previously Ordered | Filed | Number | Date(s) of Proceeding |
|---|---|---|---|---|---|
| SENTENCE | GARY COURY | | | | 12/12/2012 |
| BENCH OR WAIVER TRIAL | GARY COURY | | | | 11/12/2012 |
| BENCH OR WAIVER TRIAL | ZELDA HARRIS-RELEFORD | | | | 11/08/2012 |
| BENCH OR WAIVER TRIAL | GARY COURY | | | | 10/30/2012 |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they become available. The clerk shall forward documents upon request by counsel [MCR 6.433].

Date

VIRGIL SMITH
Judge

20714
Bar No.

**CERTIFICATE OF MAILING**

I certify that on this date I mailed a copy of this claim of appeal to appointed counsel, defendant, court reporter(s)/recorder(s), prosecutor, Court of Appeals, and Michigan Appellate Assigned Counsel System (MAACS).  I also mailed a copy of the final judgment or order being appealed and the docket entries to appointed counsel, the Court of Appeals, and MAACS.  I also mailed a copy of the defendant's request for appointment of counsel to appointed counsel, the prosecutor, and MAACS.

1/18/2013
Date

Signature

CC403 (12/96)

Page 1 of 1

# EXHIBIT 6K

## Court of Appeals Docket Sheet

COA 314437
MSC 150944

PEOPLE OF MI V DARELL CHANCELLOR
Lower Court/Tribunal
WAYNE CIRCUIT COURT
Judge(s)
HATHAWAY DANIEL A

 Docket    Case Documents

---

# Case Information                                    ✕

## Case Header

Case Number

COA #314437    MSC #150944

**Case Status**

**MSC**    Closed

**COA**    Case Concluded; File Archived

---

# Parties & Attorneys to the Case – Court of Appeals

### 1

## PEOPLE OF MI
Plaintiff - Appellee

Attorney(s)

STEER VALERIE M
#38489, Prosecutor

---

### 2

## CHANCELLOR DARELL
Defendant - Appellant

Attorney(s)

PAGAC CHRISTINE A
#67095, State Appellate Defender

# Parties & Attorneys to the Case – Supreme Court

### 1

## PEOPLE OF MI
Plaintiff

Attorney(s)

Valerie M Steer
#38489

---

### 2

## CHANCELLOR DARELL

Defendant

Attorney(s)

Christine A. Pagac
#67095

---

COLLAPSE ALL     EXPAND ALL

---

| 01/23/2013 | 1  Claim of Appeal - Criminal | ✕ |

Attorney
STATE APPELLATE DEFENDER
#1284

Service Date
01/18/2013

Fee Code
Prisoner Indigent

---

| 12/12/2012 | 2  Order Appealed From | ✕ |

Trial Court
WAYNE CIRCUIT COURT

Case Number
12-004974-FH

Trial Court Judge
HATHAWAY DANIEL A
#48434

Nature Of Case
Control Subs - PWID
Habitual Offender 3rd or Higher

Comments
Cir Ct #12-004974-01-FH

| 01/23/2013 | 3 Transcript Ordered By Trial Court | ✕ |

Document Date
01/18/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
12/12/2012
11/12/2012
10/30/2012

Comments
Please see evt 1 for scanned document

| 01/26/2013 | 4 Steno Certificate - Tr Request Received | ✕ |

Document Date
01/18/2013

Reporter
RELEFORD ZELDA H #4897

Timely
Yes

Hearing Dates
11/08/2012

| 02/05/2013 | 5 Invol Dismissal Warning - No Steno Cert | ✕ |

Attorney
STATE APPELLATE DEFENDER
#1284

Related Reporters

COURY GARY #3827

Related Events
3. Transcript Ordered By Trial Court

Due Date
02/26/2013

Comments
No Steno Cert for Transcripts in Event 3

| 02/06/2013 | 6 Steno Certificate - Tr Request Received | ✕ |

Document Date
01/18/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
11/08/2012
11/12/2012
12/12/2012

| 02/06/2013 | 7 Transcript Not Taken By Steno | ✕ |

Document Date
02/04/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
10/30/2012

02/11/2013    8   Transcript Ordered By Trial Court     ✕

Document Date
02/06/2013

Reporter
ABDULLAH WYLENE N #3400

Timely
Yes

Hearing Dates
10/30/2012

Comments
Amended - correct court reporter

02/11/2013    9   Correspondence Received     ✕

Party
2. CHANCELLOR DARELL

Attorney
SACKS JONATHAN R
#67389

Service Date
02/08/2013

Comments
Aty reqst trs 5/29/12; 8/17/12; 8/20/12 & 10/9/12

02/11/2013    10   Correspondence Received     ✕

Party
2. CHANCELLOR DARELL

Attorney
SACKS JONATHAN R
#67389

Service Date
02/08/2013

Comments
Reqst steno cert from reporter Abdullah

---

| 02/12/2013 | 1 1 Steno Certificate - Tr Request Received | ✕ |

Document Date
02/06/2013

Reporter
ABDULLAH WYLENE N #3400

Timely
Yes

Hearing Dates
10/30/2012

---

| 02/19/2013 | 1 2 Transcript Ordered By Trial Court | ✕ |

Document Date
02/14/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
10/09/2012
08/20/2012
08/17/2012
05/29/2012

---

| 02/20/2013 | 1 3 Notice Of Filing Transcript | ✕ |

Document Date

02/19/2013

Reporter
ABDULLAH WYLENE N #3400

Timely
Yes

Hearing Dates
10/30/2012

| 03/14/2013 | 14 Notice Of Filing Transcript | ✕ |

Document Date
03/13/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
12/12/2012
11/12/2012

| 04/22/2013 | 15 Notice Of Filing Transcript | ✕ |

Document Date
04/19/2013

Reporter
RELEFORD ZELDA H #4897

Timely
Yes

Hearing Dates
11/08/2012

04/23/2013          16  Transcript Overdue - Notice to Reporter                    ✕

Reporter
COURY GARY #3827

Comments
Hearing Date 11/8/12 (Docket Event 6)

04/26/2013          17  Steno Certificate - Tr Request Received                    ✕

Document Date
02/14/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
10/09/2012
08/20/2012
08/17/2012
05/29/2012

05/07/2013          18  Telephone Contact                                          ✕

Reporter
COURY GARY #3827

Comments
Per Rptr Coury; He Erroneously Listed 11/8/12 Hrng on his Steno Cert - Will Fax an Amd Steno Cert

05/07/2013          19  Transcript Not Taken By Steno                              ✕

Document Date
05/07/2013

Reporter
COURY GARY #3827

Hearing Dates
11/08/2012

Comments
See T/C in Event 18

| 05/28/2013 | 2 0 Notice Of Filing Transcript | ✕ |

Document Date
05/22/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
10/09/2012

| 05/28/2013 | 2 1 Notice Of Filing Transcript | ✕ |

Document Date
05/22/2013

Reporter
COURY GARY #3827

Timely
Yes

Hearing Dates
05/29/2012
08/17/2012
08/20/2012

| 07/16/2013 | 2 2 Motion: Extend Time - Appellant | ✕ |

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
07/16/2013

Answer Due
07/23/2013

Fee Code
Prisoner Indigent

Requested Extension
09/10/2013

| 07/23/2013 | 2 3 | Submitted on Administrative Motion Docket | ✕ |

Submitted Events
22. Motion: Extend Time - Appellant

| 07/25/2013 | 2 4 | Order: Extend Time - Appellant Brief - Grant | ✕ |

Related Events
22. Motion: Extend Time - Appellant

Panel
Gleicher Elizabeth L.

Attorney
PAGAC CHRISTINE A
#67095

Amount
$0.00

Extend To
09/10/2013

**VIEW ORDER** →

| | | | |
|---|---|---|---|
| 09/10/2013 | 25 | Motion: Extend Time - Appellant | ✕ |

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
09/10/2013

Answer Due
09/17/2013

Fee Code
Prisoner Indigent

Requested Extension
10/08/2013

Comments
Extraordinary extension

| | | | |
|---|---|---|---|
| 09/17/2013 | 26 | Submitted on Administrative Motion Docket | ✕ |

Submitted Events
25. Motion: Extend Time - Appellant

| | | | |
|---|---|---|---|
| 09/18/2013 | 27 | Order: Extend Time - Appellant Brief - Grant with Invol Warning | ✕ |

Related Events
25. Motion: Extend Time - Appellant

Panel

Gleicher Elizabeth L.

Attorney
PAGAC CHRISTINE A
#67095

Amount
$0.00

Extend To
10/08/2013

Comments
Clerk shall place matter on invl dsmsl dkt w/o furtr notice to ptys if AT brf not fl'd by 10/8/13

**VIEW ORDER →**

| 10/08/2013 | 2 8 Brief: Appellant | ✕ |
|---|---|---|

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
10/08/2013

Oral Argument Requested
Yes

Joint Parties

Timely
Yes

| 11/13/2013 | 2 9 Noticed | ✕ |
|---|---|---|

Date Sent
11/18/2013

---

| 12/05/2013 | 3 0 Stipulation: Extend Time - AE Brief | ✕ |

Party
1. PEOPLE OF MI

Attorney
STEER VALERIE M
#38489

Extend To
12/10/2013

---

| 12/11/2013 | 3 1 Record Request | ✕ |

Date Sent
12/11/2013

Agency
WAYNE CIRCUIT COURT

---

| 12/12/2013 | 3 2 Record Filed | ✕ |

Comments
file;trs(8)

---

| 02/13/2014 | 3 4 Prosecutor Advisory - No Brief | ✕ |

Attorney
WAYNE COUNTY PROSECUTOR
#1182

| 02/20/2014 | 37 Brief: Appellee | ✕ |

Party
1. PEOPLE OF MI

Attorney
STEER VALERIE M
#38489

Service Date
02/20/2014

Joint Parties

Timely
No

| 04/16/2014 | 46 Motion: Extend Time - Standard 4 - Appointed Attorney | ✕ |

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
04/16/2014

Answer Due
04/23/2014

Fee Code
Prisoner Indigent

Comments
Brief filed w/motion

| 04/16/2014 | 47 Submitted on Motion Docket Affecting Call | ✕ |

Submitted Events
46. Motion: Extend Time - Standard 4 - Appointed Attorney

04/16/2014        5 1  Brief: Standard 4                                          ✕

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
04/16/2014

Joint Parties

Comments
Allowed per 4/17/14; Brf attached to motion

04/17/2014        4 9  Order: Extend Time - Standard 4 - Grant                   ✕

Related Events
46. Motion: Extend Time - Standard 4 - Appointed Attorney

Panel
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

Attorney
PAGAC CHRISTINE A
#67095

Amount
$0.00

Comments
Responsive brf may be filed by 5/1/14

VIEW ORDER →

04/17/2014      5 0  Verbal Order to Parties-Phone                    ✕

Comments
Read content of order to aty Steer and secretary to aty Pagac

05/07/2014      4 4  Submitted on Case Call                           ✕

05/07/2014      5 2  Oral Argument Audio                              ✕

08/15/2014      5 3  Telephone Contact                                ✕

Comments
W:joycelynn sharpe@wcc req peo's exh 6

08/19/2014      5 4  Material Received by Record Room                 ✕

Comments
exh(6)

09/30/2014      6 3  Opinion - Per Curiam - Unpublished               ✕

Result
L/Ct Judgment/Order Affirmed

Panel
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

Pages
3

READ OPINION →

09/30/2014    6 4  Opinion - Dissent    ✕

Author
Shapiro Douglas B.

Pages
5

READ OPINION →

10/21/2014    6 5  Motion: Reconsideration of Opinion    ✕

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Service Date
10/21/2014

Answer Due
11/04/2014

Fee Code
Prisoner Indigent

11/18/2014    6 6  Submitted on Reconsideration Docket    ✕

Submitted Events
65. Motion: Reconsideration of Opinion

12/04/2014   6 7   Order: Reconsideration - Grant - Vacate Opinion   ✕

**Related Events**
65. Motion: Reconsideration of Opinion

**Panel**
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

**Attorney**
PAGAC CHRISTINE A
#67095

**Amount**
$0.00

**Comments**
A new opinion is attached to order

VIEW ORDER →

12/04/2014   6 8   Opinion - On Reconsideration - Per Curiam - Unpublished   ✕

**Result**
L/Ct Judgment/Order Affirmed

**Panel**
Murray Christopher M.
Jansen Kathleen
Shapiro Douglas B.

**Pages**
3

READ OPINION →

12/04/2014   6 9   Opinion - Dissent   ✕

**Author**

Shapiro Douglas B.

Pages
5

[ **READ OPINION** → ]

---

01/29/2015        7 0  Application for Leave to SCt                                    ✕

Supreme Court Number
150944

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

---

01/29/2015        7 1  Supreme Court Motion: Miscellaneous                             ✕

Party
2. CHANCELLOR DARELL

Attorney
PAGAC CHRISTINE A
#67095

Comments
to file pro per supplement; supplement attached

---

02/19/2015        7 2  Supreme Court - File & Record Sent To                           ✕

Comments
sc#150944 lcf;8 tr;env(exh)

---

02/20/2015        7 3  COA and TCt Received                                            ✕

---

8 tr; 1 exh; 1 files;

| 03/13/2015 | 7 4 Supreme Court: Answer - SCt Application/Complaint | ✕ |

Party
1

Attorney
STEER VALERIE M
#38489

| 05/28/2015 | 7 5 Supreme Court Order: Deny Application/Complaint | ✕ |

Comments
Grant motion to file pro per supplement.

VIEW ORDER →

| 06/04/2015 | 7 6 File Closed-Out | ✕ |

**EXHIBIT 6L**

**Decision of the Michigan Court of Appeals**

## Court of Appeals, State of Michigan

## ORDER

People of MI v Darell Chancellor

Docket No.    314437

LC No.    12-004974-FH

Christopher M. Murray
Presiding Judge

Kathleen Jansen

Douglas B. Shapiro
Judges

The Court orders that the motion for reconsideration is GRANTED, and this Court's opinion issued September 30, 2014 is hereby VACATED. A new opinion is attached to this order.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

DEC 0 4 2014
Date

Chief Clerk

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 4, 2014

Plaintiff-Appellee,

v

No. 314437
Wayne Circuit Court
LC No. 12-004974-FH

DARELL CHANCELLOR,

Defendant-Appellant.

## ON RECONSIDERATION

Before: MURRAY, P.J., and JANSEN and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his conviction after a bench trial of possession of 450 to 999 grams of cocaine, MCL 333.7403(2)(a)(ii). The trial court sentenced defendant, as a fourth habitual offender, MCL 769.12, to a term of 14 years and 3 months to 30 years' imprisonment.[1] We affirm.

This case arises out of a search of a house and seizure of 516.65 grams of cocaine. On November 1, 2011, Detroit police surveilled a house at 5023 32nd Street during which Officer Steven Geelhood observed a black male engage in three independent hand-to-hand transactions of suspected drugs at the front door of the house. The next day, police executed a search warrant. Upon searching a second-floor kitchen area, police found a bag containing four smaller bags of cocaine and two loaded handguns. The items were inside a clothes hamper that was tucked under a kitchen table. On top of the kitchen table, police found an open letter sent from the Michigan Department of Treasury and addressed to defendant at 5023 32nd Street. Police detained defendant's mother and a man during the search. Defendant was not then present at the house, but was later arrested.

---

[1] Defendant was also charged with possession with intent to deliver 450 to 999 grams of cocaine, MCL 333.7401(2)(a)(ii), felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, but was acquitted of those other charges.

-1-

Defendant raises a single issue on appeal, arguing that there was insufficient evidence presented at trial to support his conviction of possessing cocaine under a constructive possession theory. When reviewing a claim of insufficient evidence, this Court reviews the record de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We review the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

Possession of a controlled substance requires a showing of "dominion or right of control over the drug with knowledge of its presence and character." *People v Meshell*, 265 Mich App 616, 621; 696 NW2d 754 (2005), quoting *People v Nunez*, 242 Mich App 610, 615; 619 NW2d 550 (2000), in turn quoting *People v Maliskey*, 77 Mich App 444, 453; 258 NW2d 512 (1977). Possession can be actual or constructive. *People v Wolfe*, 440 Mich 508, 520; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Constructive possession exists when the totality of the circumstances indicates a sufficient nexus between the defendant and the controlled substance. *Id*. at 521; see also, *People v Konrad*, 449 Mich 263, 271; 536 NW2d 517 (1995), citing *People v Germaine*, 234 Mich 623, 627; 208 NW 705 (1926) (analyzing whether the defendant had sufficient dominion or control to support a conviction based on constructive possession). By itself, a defendant's presence at a location where drugs are found is insufficient to establish possession. *Wolfe*, 440 Mich at 520.

Defendant contends that he was not the person police observed during the surveillance and that he did not live at 5023 32nd Street at the time of the search. But viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that defendant constructively possessed the seized cocaine. Officer Geelhood testified at trial that he was "[a]bsolutely" certain defendant was the person he saw involved in the suspected drug transactions at the front door of the house. Although defendant argues that he is the victim of mistaken identity – citing his heavier weight at the time of trial and reliance on prescription glasses – Officer Geelhood testified that he had a clear view of defendant during the surveillance. The prosecution also introduced as a trial exhibit a Secretary of State document depicting defendant as thinner and not wearing glasses. The trial court found Officer Geelhood's testimony concerning his identification of defendant to be reliable, and those questions of credibility are left to the trier of fact to resolve. *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009).

Also, police found the cocaine in the second-floor living quarters, and sufficient evidence suggested defendant occupied or had control over that area. The cocaine was in a clothes hamper that held male clothing, and police seized the letter addressed to defendant from the table under which the cocaine was found. Additionally, defendant's parole agent, Cyndi Izumi, testified that she visited defendant at 5023 32nd Street and that defendant told her he lived there. Indeed, defendant admitted that he told Izumi that he lived at the house and that he had, in fact, lived there for a time. The Secretary of State document listed defendant's address as 5023 32nd Street, and Officer Geelhood testified that during the search, defendant's mother directed him to a second residence where he could find defendant. Officer Geelhood went there and observed a vehicle that had been parked in front of 5023 32nd Street during the surveillance.

On this record, there was sufficient evidence to link defendant to both the house (through identification of him as the person involved in the front-door transactions and his admission that he at times lived there)[2] and that he had control over the area where police found the cocaine (through the evidence of the mail and clothing). Though there was no direct evidence that defendant actually possessed the drugs found inside the house (though there certainly was direct evidence of him possessing drugs at the front door), circumstantial evidence and the reasonable inferences that arise from the evidence can constitute satisfactory proof of the elements of a crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). And, all conflicts in the evidence must be resolved in favor of the prosecution. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). The prosecution was not required to show that defendant was the only person with access to or control over the cocaine. Possession may be joint, with more than one person actually or constructively possessing a controlled substance. *Konrad*, 449 Mich at 271, citing *Wolfe*, 440 Mich at 520. Under these circumstances, there was sufficient evidence of the required nexus between defendant and the cocaine to reasonably find constructive possession beyond a reasonable doubt.[3]

Our dissenting colleague argues that the trial court's factual findings were not sufficient to support defendant's conviction. Defendant, however, does not argue or raise this issue in his counsel's brief nor in his own Standard 4 brief. Therefore, it is not an issue properly before us. In any event, "[a]lthough the circuit court's findings were brief, they established that it was aware of the relevant issues in the case and correctly applied the law . . . ." *People v Smith*, 211 Mich App 233, 235; 535 NW2d 248 (1995). See, also, MCR 6.403 and MCR 2.517(A)(2). The main issue was whether defendant could be connected to the cocaine—and the trial court made findings that (1) defendant resided at the house and (2) defendant's residence was "upstairs" (where the cocaine was located) such that he constructively possessed the cocaine. Given the evidence as outlined above, the trial court's findings—albeit brief—were sufficient enough for us to conclude that the trial court was aware of the relevant issues and made findings on those issues that were supported by the evidence.

Affirmed.

/s/ Christopher M. Murray
/s/ Kathleen Jansen

---

[2] In his Standard 4 brief, defendant argues that he received the ineffective assistance of counsel when his trial counsel did not present defendant's wife and mother as witnesses who could testify that defendant did not live at this house, and when failing to object to "liquid formed narcotics" at trial. Even assuming those acts were ineffective, defendant is not entitled to relief because in light of the facts presented to the court, he has not established prejudice. *People v Corbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001).

[3] Defendant suggests that that trial court rendered inconsistent rulings with respect to the cocaine and firearm possession charges. The requirement that a firearm be readily accessible distinguishes the firearm possession charges from the drug possession charge. See, *People v Williams (After Remand)*, 198 Mich App 537, 541; 499 NW2d 404 (1993).

-3-

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

DARELL CHANCELLOR,

        Defendant-Appellant.

UNPUBLISHED
December 4, 2014

No.  314437
Wayne Circuit Court
LC No.  12-004974-FH

Before:  MURRAY, P.J., and JANSEN and SHAPIRO, JJ.

SHAPIRO, J. (*dissenting*).

I respectfully dissent.  This case concerns a bench trial with highly controverted proofs. The majority reviews the most inculpatory proofs, and based upon them, concludes that there was sufficient evidence to convict.  I would agree with the majority's conclusion if the trial court had made factual findings adopting those proofs or even if it provided a clear indication that it based defendant's conviction upon them even without formal fact-finding.  However, the trial court did not do so and so it cannot be determined whether defendant's conviction was based on the facts referenced by the majority or by a conclusion on the part of the trial court that defendant could be convicted of possession of cocaine solely on the basis of a finding that he resided in the relevant house, a finding which by itself would not be sufficient.  Accordingly, I would reverse defendant's conviction and remand for a new trial.

## I. FACTS

Defendant was charged with both possession and possession with intent to deliver 450 to 999 grams of cocaine, MCL 333.7401(2)(a)(*ii*) (possession with intent to deliver); MCL 333.7403(2)(a)(*ii*) (possession), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.  After a bench trial, the court acquitted defendant of possession with intent to deliver and felony-firearm.  However, the court convicted defendant of possession. Defendant was sentenced as a fourth habitual offender, MCL 769.12, to the statutory 30-year maximum term and to a minimum term of 170 months, the lowest term within the relevant sentencing guidelines range.

The charges arose out of a search of a home on 32nd Street in Detroit at approximately 5:30 p.m. on November 2, 2011.  Three police officers and defendant's parole officer testified in the prosecution's case-in-chief.  Defendant testified on his own behalf.

Officer Geelhood testified that on October 31, 2011, he received information that heroin was being sold from the 32nd Street house.  The following evening, he watched the house and within 30 minutes saw three people independently go to the front door, have a conversation with a black man (who he later identified as the "seller" in his search warrant affidavit), and make purchases of what he believed to be heroin.  He testified that he observed these activities from about 400 feet away, using binoculars, and although it was dark, there was a light on at the front of the house.  Geelhood testified, consistent with the description he set forth in the search warrant affidavit, that the seller he saw during this period of observation was a black male, 5'7" to 5'8" tall, 170-180 pounds, and of slim build.  He also testified that the man was not wearing glasses.

Geelhood testified that he was "absolutely certain" that the man he observed was defendant.  However, he conceded that defendant was 5'11" tall and of "heavy build," weighing, in his estimation, between 210 and 220 pounds.  Given the clear divergence between his description of the seller and defendant's actual appearance, Geelhood was asked if his description of the seller in the affidavit could have been mistaken.  He denied any error and reaffirmed his description of the seller as a man as much as 4 inches shorter and up to 50 pounds lighter than defendant appeared to him at trial.

All three officers testified that defendant was not present at the 32nd Street house when the warrant was executed.  Present at the home were defendant's mother and a black male in his 50s, about 5'9" tall and of slim build, weighing approximately 170 pounds.  This individual told the officers that he was working on the house, but that he did not live there.  He was apparently not pursued as a suspect.

The officers testified that the 32nd Street house had at least four bedrooms – two on the first floor and two on the second.  There were kitchens on both the first and second floors, though the second floor could only be accessed by stairs from the first floor, i.e., there was no separate entrance or private stairs to the second floor.  There was a table in the upstairs kitchen. Beneath the table was a clothes hamper in which the officers found men's clothing, the large quantity of cocaine at issue, and two guns.  None of the clothes were offered as evidence and the officers did not further describe the type or size of the clothing.

One of the officers testified that he found an envelope on the table in the upstairs kitchen that had been opened and contained a letter from the State of Michigan addressed to defendant at the 32nd Street address.  The officer testified that prior to the discovery of this letter they did not have a name associated with the suspected seller.  An officer asked defendant's mother where they could find defendant and she provided the officers with a different address.  An officer testified that he went to that address and observed a car in the driveway that had been seen at the 32nd Street house the night before during surveillance.  He ran the license plate and learned that the vehicle belonged to defendant.  When defendant was later arrested, he was not in possession of any drugs.

Defendant's parole officer also testified.  She stated that she had met with defendant on two occasions at the 32nd Street address and that he told her that he lived there.

Defendant testified on his own behalf and stated that neither the cocaine nor the guns found at the 32nd Street house belonged to him. He testified that at the time of trial he was 30 years old, 5'11" tall, and weighed 250 pounds. He testified that on the date of the search, he weighed 245 pounds. He testified that he always wore the glasses he was wearing in the courtroom and could not function without them. He testified that he wore size 44 waist pants and it was shown that the shirt he was wearing was 5XL, though he conceded that the clothes were baggy.

The prosecution speculated in argument that defendant probably gained weight (apparently 40-60 lbs) due to eating jail food while awaiting trial.[1] In addition, the prosecution introduced a Secretary of State photo of defendant's head and shoulders taken in January 2011 in which he was not wearing glasses. Geelhood testified that, in his opinion, defendant appeared thinner in the photo than he did at trial.

Defendant testified that he lived on Robson Street with his wife and son at the time of the search and kept all of his clothes there. He testified that he had lived at his mother's home on 32nd Street when he was initially released from prison in November 2010, i.e., when he gave that address to the parole officer. He stated that after moving to the Robson address, he continued to represent to his parole officer that he lived at the 32nd Street house. He testified that he misrepresented his address to the parole officer because his workplace was near his mother's home and if he reported the change in address, he would have been reassigned to a parole office located a greater distance away. He testified that on the date of the search, the persons living at the 32nd Street house were his mother, his brother, his sister, and a male cousin. He described his brother as 37 years old, 5'9" tall, and weighing approximately 165-170 pounds. He described his cousin as 34 years old. He stated that another person, the man present at the house at the time of the search, was his mother's boyfriend, who lived in the house.

After hearing proofs and argument, the trial court delivered its findings and verdict. It found defendant guilty of constructively possessing the cocaine, but not acquitted him of possession with intent to deliver and felony-firearm.

## II. ANALYSIS

Where a criminal case is bench tried, it is not sufficient for the court to simply state a verdict. Under MCR 6.403, "[t]he court must find the facts specially . . . . The court must state its findings and conclusions on the record or in a written opinion made part of the record." "[I]n criminal cases . . . a judge who sits without a jury is obligated to articulate the reasons for his decision in findings of fact. Findings of fact in a nonjury case serve a function paralleling the judge's charge in a jury case, that of revealing the law applied by the fact finder." *People v Jackson*, 390 Mich 621, 627; 212 NW2d 918 (1973). In other words, the requirement that the trial court make factual findings is not to require that the court resolve each and every factual

---

[1] Contrary to this argument, when defendant was admitted to the jail, a "detainee input sheet" was prepared that listed defendant's weight at 240 lbs. Admittedly, this document, while in the lower court record, was not admitted into evidence.

dispute, but to assure that the court correctly applied the law. See *People v Armstrong*, 175 Mich App 181, 184; 437 NW2d 343 (1989). Further, a trial judge sitting as fact-finder in a bench trial is not permitted to reach "compromise" verdicts. *Wayne Co Prosecutor v Detroit Recorder's Court Judge*, 177 Mich App 762, 765; 442 NW2d 771 (1989), citing *People v Burgess*, 419 Mich 305, 310-311; 353 NW2d 444 (1984).

In this case, the trial court's findings were inadequate to determine the factual basis for defendant's conviction and to determine whether the trial court properly applied the law in reaching its verdict.

The trial court's factual findings and conclusions of law as to the relevant charge read in their entirety as follows:

> [O]n Count II, I do find that there was sufficient basis to show proof beyond a reasonable doubt that the defendant did in fact possess the cocaine that was found in the laundry hamper and that it did exceed 450 grams or more; that the proof of residence was established beyond a reasonable doubt for [defendant]; that the fact that the mail was found in the upstairs location indicates to me that the residence was upstairs and that in fact there is a sufficient basis for me to find constructive possession by [defendant] of that cocaine, and I find him guilty of Count II, controlled substance possession, cocaine.

It is reasonable to infer from the trial court's findings that the conviction may have been based solely on the court's conclusion that defendant resided at the 32nd Street house. However, "[i]t is well established that a person's presence, by itself, at a location where drugs are found is insufficient to establish constructive possession." *People v Wolfe*, 440 Mich 508, 520; 441 Mich 1201 (1992). While residence at the subject house is certainly relevant to the question of constructive possession, the legal standard is not satisfied by residence alone, but rather whether that the defendant exercised "*dominion or right of control* over the drug with knowledge of its presence and character." *People v McKinney*, 258 Mich App 157, 165; 670 NW2d 254 (2003) (quotation marks and citations omitted).

Beyond mere presence or possible residence, demonstrating dominion and control requires additional circumstances, albeit ones that may vary from case to case. *Wolfe*, 440 Mich at 520 ("some additional connection between the defendant and the contraband must be shown."); see also *id*. at 522-524 (the defendant attempted to destroy drugs when police arrived, was found in possession of $5 used to purchase cocaine by an undercover officer, and possessed the only key to the apartment where the drugs were discovered); *McKinney*, 258 Mich App at 166 (the defendant claimed ownership of $3,000 discovered by police and shared the bedroom where the drugs were discovered); *People v Nunez*, 242 Mich App 610, 615-616; 619 NW2d 550 (2000) (possession established where police found utility bills addressed to the defendant, the defendant had a key to the apartment, and a witness testified that the defendant resided in the apartment).

In the instant case, the prosecution did not assert that defendant lived alone in the 32nd Street home and the defense presented evidence that at least two other men resided there. Finding the proofs sufficient is even more difficult, given that the contraband was found in a

common area, i.e., a room in the house accessible to all residents and as to which defendant, if he did live there, had no special or exclusive dominion. Thus, even if only one member of the household had dominion and control over the contraband and the others never exercised any control over it, by definition, each member of the household shared a "nexus" with the contraband, by virtue of their residence in the home where it was found. However, this does not answer the question of which of the residents had dominion and control over the drugs. It is not a crime to merely live in a house in which someone else possesses drugs. And again, "[i]t is well established that a person's presence, by itself, at a location where drugs are found is insufficient to prove constructive possession." *Wolfe*, 440 Mich at 520.

The court did note that the letter addressed to defendant was found on a table and the drugs were found in a clothing hamper under that table. I agree that the location of the letter is of some relevance, but it was not found in the hamper along with the drugs and no drugs were on the table. I do not agree that the mere presence of the letter in the same common room as the hidden drugs is sufficient to establish defendant's dominion and control over the drugs. See *Nunez*, 242 Mich App at 615-616 (in addition to utility bills addressed to the defendant, police found defendant in possession of a key, and a witness testified explicitly that defendant resided there). Indeed, the letter was the sole object in the house identified as belonging to defendant. No other items were linked to the defendant. There were four bedrooms, none of which were identified as belonging to defendant or containing any of his possessions. There was no evidence that any items found in any bedrooms or closets belonged to defendant and the clothes in the hamper were not linked to him other than by the fact that they were men's clothes. I would agree that the fact that they were men's clothes would have been sufficient had the trial court concluded that no other men lived in the house, but it did not.

In my view, a conviction based solely on the letter would rest on insufficient evidence. Thus, the critical question is whether the man Geelhood observed the night before the search, making suspect transactions, was defendant. However, the trial court made no findings in this regard and its absence of such a finding is critical. Had the court found that the man seen the night before was defendant, I would defer to that finding and affirm the conviction as the events of the night before would link him to the drugs.[2] However, if the trial court found that the man seen the night before was not defendant, then he could not be properly found to have exercised dominion and control over the drugs found in the house.

In sum, the trial court did not render sufficient factual findings for a reviewing court to determine whether it properly applied the law. *Jackson*, 390 Mich at 627. The proper remedy in such a case is to reverse the conviction and remand for a new trial. Accordingly, I would reverse defendant's conviction and remand for a new trial.

/s/ Douglas B. Shapiro

---

[2] Of course, if the trial court found that defendant was the man the police observed, it would lead to the conclusion that defendant was guilty of possession with intent to distribute.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DARELL CHANCELLOR

This case is before the Court on the motion entitled "City of Detroit's Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Darell Chancellor" (Docket # 13691, the "Motion").[1]  The Court held a telephonic hearing on the Motion on October 4, 2023.  For the reasons stated by the Court on the record during the hearing, the Court enters this Order.

**IT IS ORDERED THAT:**

1.    The Motion is granted.

2.    No later than October 12, 2023, Darell Chancellor must dismiss, or cause to be dismissed, the City of Detroit and Officer Stephen Geelhood in his representative capacity with prejudice from the cases captioned as: (a) *Darell Deon Chancellor, Chancellor, v Officer Stephen Geelhood in his Individual and Representative Capacity, and the City of Detroit, a municipal entity*, *Defendants*,

---

[1]  Capitalized terms used but not otherwise defined in this Order have the meanings given to them in the Motion.

filed in the United States District Court for the Eastern District of Michigan and assigned Case No. 20-cv-11616 (the "Federal Lawsuit"); and (b) *Darell Chancellor, Chancellor, v Officer Stephen Geelhood in his Individual and Representative Capacity, and the City of Detroit, a municipal entity*, *Defendants*, as removed to the United States District Court for the Eastern District of Michigan and assigned Case No. 20-cv-11992 (the "Removed Lawsuit", and together with the Federal Lawsuit, the "Lawsuits").

3.      Darell Chancellor is permanently barred, estopped and enjoined from asserting claims asserted in the Lawsuits or claims arising from or related to the Lawsuits against Officer Geelhood in his representative capacity, the City of Detroit, or property of the City of Detroit.

4.      Darell Chancellor is prohibited from sharing in any distribution in this bankruptcy case.

5.      This Order does not apply to the assertion or prosecution by Darell Chancellor of any claims against Officer Geelhood solely in his individual capacity.

6.      The Court will retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

**Signed on October 4, 2023**



/s/ Thomas J. Tucker

**Thomas J. Tucker**
**United States Bankruptcy Judge**

1        UNITED STATES BANKRUPTCY COURT
              EASTERN DISTRICT OF MICHIGAN
2                   SOUTHERN DIVISION

3

IN RE:                    .   Case No. 2:13-53846-tjt
4                          .   Chapter 9
CITY OF DETROIT, MICHIGAN,   .
5                          .
        Debtor.            .
6                          .
. . . . . . . . . . . . . . .
7

8

9


**TRANSCRIPT OF HEARING ON CITY OF DETROIT'S MOTION FOR ENTRY
10   OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION
             ORDER AGAINST DARELL CHANCELLOR**
11

12

13

14
           BEFORE THE HONORABLE THOMAS J. TUCKER
15            UNITED STATES BANKRUPTCY JUDGE

16         WEDNESDAY, OCTOBER 4, 2023
                DETROIT, MICHIGAN
17

18

19

20

21

22

23

24

25

1   APPEARANCES:

2   For the Debtor:                  Miller Canfield Paddock &
                                       Stone, PLC
3                                    By:  Marc N. Swanson*
                                     150 West Jefferson Street
4                                    Suite 2500
                                     Detroit, MI  48226
5                                    (313) 496-7591

6   For Darell Chancellor:           Ven Johnson Law, PLC
                                     By:  Ven Johnson*
7                                    535 Griswold
                                     Suite 2600
8                                    Detroit, MI  48226
                                     (313) 324-8300
9
    Court Recorder:                  LaShonda Bryant
10                                   Clerk's Office
                                     U.S. Bankruptcy Court
11                                   211 West Fort Street
                                     Detroit, MI  48226
12
    Transcription Service:           Randel Raison
13                                   APLST, Inc.
                                     6307 Amie Lane
14                                   Pearland, TX  77584
                                     (713) 637-8864
15

16

17

18

19

20

21

22

23  *Appeared via AT&T Conference Call.

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

```
 1                    (Time Noted:  1:30 p.m.)

 2              THE COURT CLERK:  Judge Tucker presiding.

 3              THE COURT:  Good afternoon to everyone.  This is

 4   Judge Tucker on the phone.

 5              Let's call our case that's scheduled for 1:30

 6   p.m., please.

 7              THE COURT CLERK:  We'll call the matter of the

 8   City of Detroit, Michigan, case number 13-53846.

 9              THE COURT:  All right.  Good afternoon again.

10   Let's begin by having entries of appearance for today's

11   hearing, first of all the attorney or attorneys for the City

12   of Detroit.

13              MR. SWANSON:  Good afternoon, Your Honor.  Marc

14   Swanson from Miller Canfield on behalf of the City of

15   Detroit.

16              THE COURT:  All right.  Good afternoon to you.

17              And the attorney for the Respondent, Darell

18   Chancellor, please?

19              MR. JOHNSON:  Good afternoon, Judge.  Ven Johnson

20   on behalf of Mr. Chancellor.

21              THE COURT:  All right.  Good afternoon to you.

22   And let me ask for the record, is there anyone else on the

23   phone who wants to enter an appearance in this case today?

24         (No response)

25              THE COURT:  I hear nothing.  So good afternoon.
```

1  This is the further continued hearing, continued from a week

2  ago to today, Wednesday afternoon of last week, regarding the

3  City of Detroit's motion for entry of an order enforcing the

4  bar date order and confirmation order against Darell

5  Chancellor.

6          For the record, that motion is filed at docket

7  number 13691 on the Court's docket in this case.

8          I have reviewed the motion, the response filed to

9  the motion by Mr. Chancellor, and the reply brief, or reply

10  filed by the City in support of the motion, plus the exhibits

11  that were filed with those papers.

12          So good afternoon.  Let's hear from each side.

13  I'll begin with counsel for the moving party, Mr. Swanson.

14          MR. SWANSON:  Thank you, Your Honor.  Marc

15  Swanson, Miller Canfield, on behalf of the City.

16          Your Honor, the Plaintiff raises two arguments in

17  response to the City's motion, both of which fail.

18          The first argument is that the claim arose pre-

19  petition under the fair contemplation test.  Plaintiff's

20  response in paragraphs 43 and 44 are the only two substantive

21  responses to the City's assertion that the fair contemplation

22  test applies and that the claim arose under it prepetition.

23          Plaintiff's response, however, is based on the

24  accrual test.  In paragraphs 43 and 44 of the response,

25  Plaintiff argues that the accrual test applies and that the

1  Plaintiff could not have filed a claim until the conviction

2  was vacated in 2020.

3          Now, Plaintiff's argument for the accrual test,

4  and the argument that a claim did not arise until a

5  conviction was vacated, have been rejected by this Court in

6  prior opinions and by the District Court here.

7          District Court Judge Michelson in *Monson,* District

8  Court Judge Borman and Burton, District Court Judge Lawson

9  and Sanford, and also in the *General Motors* bankruptcy case,

10  which I believe was cited in the *Sanford* opinion.

11          In each of those cases, with very similar facts,

12  the District Court held that the claim was discharged.

13          Now, with respect to the facts in this case, all

14  of the key events occurred prior to the City's bankruptcy

15  case.

16          On November 1 of 2011, Chancellor alleges that he

17  was not there when surveillance was performed on, allegedly,

18  his mother's house.

19          He also says on that date, you know, the

20  description was way off.  The person -- he weighed 180

21  pounds.  The person -- or the person allegedly surveilled

22  weighed 180 pounds.  He wore -- he weighed 245 pounds and had

23  glasses on.

24          November 2, 2011, is the date of the alleged false

25  affidavit.

1          May of 2012 is the date when Chancellor was

2   arrested.

3          Chancellor was tried in November of 2012.  He was

4   convicted in November of 2012.  He was sentenced in December

5   of 2012.  He began his sentence in December of 2012.

6          And in 2013, before the City filed for bankruptcy,

7   Mr. Chancellor also filed an appeal.

8          All along the way, Chancellor was proclaiming his

9   innocence, as evidenced by court filings and deposition

10  testimony.  And let's go through some of those court filings

11  and some of that evidence.

12          So when Chancellor was arrested, Chancellor stated

13  that he knew he was innocent.  And how do we know that?

14  Because we can go to his deposition transcript, which was

15  attached as exhibit 6F to the City's motion.

16          He was asked during his deposition, "When you were

17  arrested, did you believe that you were innocent?"

18          His response, "I know I was innocent."

19          This is on Page 49 of the deposition transcript,

20  lines 16 through 18.

21          In that regard, during his deposition,

22  Chancellor's attorney asked him:

23          Question, "Without belaboring the point, Darell,

24  what did it feel like to go to trial and be accused of a

25  crime that you didn't commit?"

1               Answer, "I mean, it felt terrible.  It feels more

2    terrible when you get found guilty of something you ain't

3    commit because it's like the justice system has failed you."

4               And that's his deposition transcript page 78,

5    lines 10 through 18.

6               During his trial, Chancellor testified and

7    proclaimed his innocence.  And how do we know that?  We can

8    turn to exhibit 6B, which is the trial transcript.  He said

9    that the drugs were not his.  He said that the guns were not

10   his.  And he said it couldn't have been him because the

11   person who was identified in the affidavit was not him

12   because he was shorter and heavier.  And that's page 78

13   through 84 of the trial transcript.

14              Mr. Chancellor also sent a letter to the judge who

15   was presiding over the State Court case, Judge Hathaway.  In

16   that letter he said he had, quote, "Been locked up for six

17   months for something I know nothing about.  The police got

18   the wrong person.  The evidence and the facts will show that

19   I haven't did anything."  That's exhibit 6H to the City's

20   motion, Your Honor.

21              On November 12, 2012, Chancellor was found guilty

22   of possession of cocaine.  According to Chancellor, and in

23   the second amended complaint in the Federal Court action,

24   Judge Hathaway explicitly relied on Geelhood's false

25   statement that identified Chancellor as the person who was

1   seen selling drugs from the target address.  Chancellor, of

2   course, denied during the trial and on appeal that Geelhood

3   had correctly identified him.

4          Chancellor was then sentenced on December 12,

5   2012, to a term of 14 years and 3 months to 30 years of

6   imprisonment.

7          Chancellor's attorney asked him what it felt like

8   to be, quote, "Wrongfully convicted."  "Every single day, the

9   question, every single day you're in that prison cell, jail

10  cell, precinct cell, being accused and ultimately wrongfully

11  convicted of doing something you didn't do, Darell, every

12  day, all day.  What did it feel like?"

13         Answer, "It felt terrible -- it feels terrible

14  when you know you ain't do something but you convicted for

15  it.  It was."

16         And that is from Mr. Chancellor's deposition

17  transcript on page 83 and 84.

18         On January 18, 2013, Chancellor appealed his

19  conviction, and his conviction was later affirmed, and the

20  Court of Appeals rejected his argument that he was a victim

21  of a mistaken identity.

22         Your Honor, Chancellor's claim arose pre-petition

23  long before his conviction was vacated.

24         Again, Chancellor argues that his claim against

25  the City did not arise until his conviction was vacated in

1    March of 2020.  That is the accrual test, Your Honor.

2              But as this Court has ruled, and the District

3    Court has uniformly ruled, the accrual test is not the test

4    to determine when a bankruptcy claim arises.  The test to

5    determine when a bankruptcy claim arises is the fair

6    contemplation test.

7              Again, this exact same argument that Mr.

8    Chancellor raises has been raised repeatedly, and denied.

9              With respect to the District Court cases.  I think

10   the *Sanford* case stated it quite well.  In that case the

11   Court said, referring to *Sanford*, he certainly contemplated

12   the factual bases underlying the claims raised in the

13   complaint since he attempted repeatedly to argue actual

14   innocence before the State Courts since at least 2008

15   insisting that his confession was falsely obtained,

16   concocted, and coerced.

17             *Sanford* correctly points out that he could not

18   have sued the City until his convictions were set aside,

19   which did not happen until after the bankruptcy.

20             But the courts that have considered the question

21   uniformly have concluded that claims based on pre-petition,

22   malicious prosecutions, were barred, notwithstanding that the

23   plaintiff could not file suit on his claims until his

24   criminal conviction was overturned.

25             The Court in *Monson* and *Burton* and this Court have

1    all had very similar rulings and findings, and there are no

2    facts in this case which could cause the Court to come to a

3    different conclusion.

4         In short, Your Honor, under the fair contemplation

5    test, Chancellor's claim arose before the City's bankruptcy

6    filing, because prior to the City's filing Chancellor could

7    have ascertained through the exercise of reasonable due

8    diligence that he had a claim against the City.

9         Your Honor, the second argument that was raised by

10   Mr. Chancellor in his response to the City's motion was

11   regarding raising discharge as an affirmative defense.

12        Now, Chancellor cited a Sixth Circuit case,

13   *Makowski,* for the proposition that the City had an

14   affirmative obligation to cite bankruptcy discharge as an

15   affirmative defense.

16        And Chancellor is wrong on a few levels here.

17        First, that decision was issued in 2005, and since

18   then, the Federal Rules of Civil Procedure have been amended

19   and they no longer require that discharge be raised as an

20   affirmative defense.

21        The City cited and quoted the Advisory Committee

22   notes which explain quite clearly why discharge and

23   bankruptcy was deleted from the list of affirmative defenses

24   and why discharge and bankruptcy does not need to be raised

25   as an affirmative defense.

1          If that weren't enough, Your Honor, this Court has

2    had the chance to consider a similar argument in a previous

3    case.

4          And this court, citing to another Sixth Circuit

5    case, decided later, *Hamilton v. Hertz*, 540 F. 3d 367.  And

6    this Court said, quote, "Even if the City had delayed raising

7    the bankruptcy discharge until after suffering an adverse

8    judgment on the Respondent's claims in the District Court

9    case, the City could not be deprived of the benefit of the

10   bankruptcy discharge.  Any such adverse judgment would be

11   deemed void *ab initio* under binding case law in the Sixth

12   Circuit."

13         And, again, I don't think we need to go any

14   further than that to see that the Plaintiff's argument that

15   the City had to raise bankruptcy discharge as an affirmative

16   defense fails, Your Honor.

17         In short, Your Honor, there were two arguments

18   raised by the Plaintiff here, both of which have been

19   rejected repeatedly.

20         No court that I'm aware of has applied the accrual

21   test to these facts and I think many courts have commented

22   that the accrual test has been uniformly rejected.

23         And the second argument that the Plaintiff makes

24   is based on a Sixth Circuit case that is no longer applicable

25   because the rule cited by that case has been revised.

1          And this Court has also had the opportunity to

2   consider a similar argument, and based on the Sixth Circuit

3   case, *Hamilton*, how that the City had no obligation to raise

4   discharge as an affirmative defense.

5          And thus, both of these arguments fail and the

6   City would respectfully request that the Court enter an order

7   granting its motion.

8          THE COURT:  All right.  Thank you, Mr. Swanson.

9          Mr. Johnson, I'll hear from you now, please.

10         MR. JOHNSON:  Thank you, Judge.  Good afternoon.

11  We'll say that never did I think I would be arguing a motion

12  in Bankruptcy Court, so I appreciate the Court's indulgence.

13         When I hear the City argue about fair

14  contemplation tests it sounds so, under these circumstances,

15  so unfair under the facts and circumstances that existed for

16  Darell Chancellor.

17         It's "Darell," to correct the record.  Darell

18  Chancellor.

19         As the Court knows, my client's conviction was

20  vacated on March 24, 2020.  And I understand about what

21  accrual test means.

22         And for the record, and I know the Court knows

23  this probably, and that is for his lawsuit Darell Chancellor

24  had no lawsuit, had no claim, had no recognizable injury,

25  until his conviction was vacated; hence wrongful conviction.

1     How it works, and what would be inherently unfair

2  and unjust, would be for someone to argue, or to be

3  successful in arguing, that although my client did not have a

4  valid cause of action, and while he is falsely in prison

5  serving a wrongful sentence, like he was from December of

6  2012 through even the petition date, Judge, of July 18, 2013.

7     So, in other words, for those eight months, if we

8  were to use those dates, that somehow after his wrongful

9  conviction he was suppose to know, while he's serving in

10 state prison, that it was somehow fair that he should have

11 contemplated to watch the City of Detroit's bankruptcy

12 proceedings to know that no one, no layperson would ever

13 know, let alone a convicted -- a wrongfully convicted person

14 in state penitentiary, would ever know that he had to file a

15 claim under the bankruptcy even though he hadn't been -- his

16 conviction hadn't been acquitted  -- or hadn't been entered

17 yet.

18     So when I hear the term "fair contemplation test,"

19 trying to attach that issue to this set of cases, is

20 absolutely, from my perspective, legally laughable.

21     I can read these other opinions.  I cannot believe

22 -- and I read it, so I know it happened, what the other

23 courts have said.  I can't -- I wasn't there and I didn't

24 argue it, and I'm really sad to see what they said, but that

25 is not, in and of itself, binding on this Court, as I

1    understand it.

2              And so how was it that Mr. Chancellor, wrongfully

3    serving a -- at that time for eight months a prison term on

4    something that ultimately he was found acquitted of years

5    later, yet he was supposed to know bankruptcy law.  He was

6    supposed to get notice of the City of Detroit's bankruptcy

7    itself.  It's not like the City sent it to him or that

8    anybody in prison would ever know that.

9              So there is no fair contemplation test that passed

10   here, Judge.  It's not fair for this -- for the City to argue

11   that his claim is barred before he had a claim, before he

12   even would know of a bankruptcy, because he's removed from

13   society.  There's no showing by the City that he should have

14   known about this, because there can be none.

15             And when we talk about fairness, then we can talk

16   about affirmative defenses.  And affirmative defenses, the

17   way that they've always been interpreted as a 9 or 10-year

18   former defense lawyer, they're legal defenses that should be

19   raised immediately so that we can have these discussions and

20   these fights, if you will, beforehand.

21             And then in the event that there's need for

22   factual development, then we could -- we could have that

23   during discovery.  And in this particular case there is no

24   other argument that a bankruptcy is a legal defense.

25             In a weird way, what I believe, going back to fair

1   contemplation test, Judge, of my client, notice that my

2   client's lawyers, me and my firm, who do civil rights

3   litigation, not just in Michigan, but across the country, we

4   never filed a motion or any claim with the City of Detroit

5   because we never, ever expected that such an argument would

6   be made that something that happened, a petition while my

7   client was in prison, wrongfully, seven years before he was

8   -- his conviction was vacated, that we should do something on

9   his behalf, because we never believed, nor should we, in my

10  opinion, had believed that this claim was ever barred.

11          So to hold that my client had -- should have

12  fairly contemplated such a thing when his pretty

13  sophisticated lawyers didn't contemplate it, because no way

14  would we think it could apply, is, again, I believe,

15  something that the City fails to show as a matter of law.

16          And so we'd ask the Court under these

17  circumstances, and not identical to other cases that I'm

18  aware of, but obviously the City will say that they're

19  similar, that's their opinion, but under these circumstances,

20  Judge, we believe that as a matter of law to hold Mr.

21  Chancellor that he fairly could contemplate the City's

22  bankruptcy when he was pursuing his appeal -- which is what,

23  by the way, his lawyer did, and I might add again on his

24  behalf, lawyers involved in filing an appeal from SADO, just

25  so the, so the Court knows, no one ever advised Mr.

1    Chancellor, nor should they have for that matter, that he

2    should have filed a claim with the -- for the City's

3    bankruptcy, if you will, with the Bankruptcy Court, while

4    they're fighting an appeal.

5         And then there was another appeal even after that,

6    I might add.  And there was also a District Court action, a

7    habeas corpus.

8         So you had multiple layers of lawyers involved, no

9    one ever told him that, but somehow he's supposed to have

10   figured out on his own while he is wrongfully serving prison

11   time back in late 2012 and 2013.

12        So we ask the Court to please deny this motion.

13   Thanks, Judge.

14        THE COURT:  Mr. Johnson, a question.  You may have

15   -- and I may understand this incorrectly, but I thought I

16   heard you in your argument just now to suggest, among many

17   other things, that Mr. Chancellor being in prison at the time

18   the City filed its bankruptcy case in July of 2013, and in

19   jail thereafter for some time, that he wouldn't have known of

20   the City's bankruptcy.

21        If that -- if you're making that argument or that

22   claim now, that's the very first time Mr. Chancellor has made

23   that argument to this Court.

24        There's nothing at all about that in the written

25   response filed to the City's motion here.  Nothing.  No

1    argument about that at all, no assertion of that at all.  Are

2    you saying -- are you trying to argue that now?

3              MR. JOHNSON:  Well, absolutely, Judge.  The City

4    has failed, as the moving party, has to obviously prove that

5    he did have notice.  And they've shown nothing of what notice

6    would have been made knowable to Mr. Chancellor, and that

7    would be a crucial element of the fair contemplation test.

8              What has the City shown this Court to rule as a

9    matter of law that my client knew or should have known about

10   the City's petition and the bar date of 7/18/13?  They've

11   done nothing.  They're simply arguing that.  So their

12   argument is, in essence, no different than mine.

13             THE COURT:  All right.  So I should -- you think I

14   should accept that as one of your arguments and consider the

15   merits of it even though it's being raised for the first time

16   in this oral argument and wasn't raised in the written

17   response?

18             MR. JOHNSON:  Judge, we argued in our written

19   response that, if you will, that there's no way that Mr.

20   Chancellor knew about this or could know about this.

21             So I don't think -- maybe it wasn't stated exactly

22   how I just stated it, but I think the argument is the same.

23   So I don't believe it's being raised, if you will, for the

24   first time.

25             But again, that's the City's burden, Judge, when

1    they're moving as a matter of law on this.

2            THE COURT:  Mr. Johnson, where in your written

3    response did you argue anywhere that there's no way that Mr.

4    Chancellor knew or could have known of the bankruptcy?  I

5    didn't see that in there anywhere.  Maybe I'm missing it.

6    Where is it?

7            MR. JOHNSON:  Well, I guess first and foremost,

8    Judge, how would somebody in prison ever know about

9    bankruptcy proceedings anywhere as a matter of common sense,

10   first and foremost?

11           THE COURT:  Mr. Johnson, excuse me.

12           MR. JOHNSON:  Yes, sir.

13           THE COURT:  Excuse me.  That's not my question.

14   Answer my question.  Where is it in your written paper?

15   Anywhere?

16           MR. JOHNSON:  Well, on page 14, Judge, I'm looking

17   at paragraph 47 of my brief.

18           THE COURT:  Hold on.

19           MR. JOHNSON:  Even if Chancellor could -- I'm

20   sorry.

21           THE COURT:  Hold on a minute.

22           MR. JOHNSON:  Yes, sir.

23           THE COURT:  Your response is filed, just for the

24   record, as docket 13699.  Where are you pointing to in there

25   now?

```
 1              MR. JOHNSON:  On page 14, Judge, in paragraph 47.
 2              THE COURT:  Wait a minute.  Page 14?  There's no
 3    Page 14.
 4              MR. JOHNSON:  Sorry, Judge.  I apologize to the
 5    Court.  I was looking at the wrong thing.  I apologize to the
 6    Court.
 7              THE COURT:  So what's the answer?  Is it in there
 8    somewhere, or not?
 9              MR. JOHNSON:  Your Honor, I'm looking for it.  As
10    I said to the Court, I don't think it was stated exactly how
11    I said it.  But I'm reviewing it right now, Judge.  I
12    apologize to the Court.
13              THE COURT:  That's fine.  Take your time.
14              MR. JOHNSON:  Thank you, sir.
15         (Brief pause)
16              MR. JOHNSON:  Let me double check that I have the
17    right thing now, Judge.  Yes, Your Honor.  In page 6, please,
18    under Roman numeral III argument.
19              THE COURT:  I see page 6.  Go ahead.
20              MR. JOHNSON:  Thank you, Judge.  43, of course
21    these allegations are denied and Plaintiff's claim did not
22    accrue until his conviction was vacated on March 24, 2020;
23    44, it is undisputed -- it is disputed that under the fair
24    contemplation test Mr. Chancellor could have ascertained
25    through the exercise of reasonable due diligence that he had
```

1  a claim against the City.  His claim did not accrue until it

2  was found that Officer Geelhood had committed fraud obtaining

3  the search warrant.

4          So what I said to this Court was exactly, fair --

5  under the fair contemplation test it is not fair, nor

6  established, that he could have ascertained through exercise

7  of reasonable due diligence that he had a claim against the

8  City.

9          And as the City told the Court in its argument,

10 they knew that Mr. -- as it pertains to this proceeding, they

11 knew that my client, Mr. Chancellor, was in prison starting

12 in December of '12 is what counsel told the Court, December

13 of 2012, which, of course, is about seven months before the

14 petition.

15         So I believe, yes, Judge, that we did present this

16 argument exactly in that fashion.

17         And I'm looking on Page 7 --

18         THE COURT:  I don't -- I'm sorry.  I'm sorry, I

19 don't see how paragraph 43 or 44 contains an argument or

20 asserts that Mr. Chancellor did not know of the City's

21 bankruptcy case.

22         MR. JOHNSON:  Page 7, if I could, Judge, please,

23 in paragraph 45.

24         THE COURT:  Well, all right.  So now we're moving

25 to paragraph 45.  Go ahead.

1          MR. JOHNSON:  It is denied that the plan's

2    discharge provision applies to Mr. Chancellor as he did not

3    have a responsibility to file a proof of claim, as he did

4    not, under the fair contemplation test, have a reason to file

5    such a claim.

6          THE COURT:  Yes.

7          MR. JOHNSON:  So we were specifically arguing

8    about the fair contemplation test at the time when the

9    petition date was filed, 7/18/13, Judge.

10         THE COURT:  Well, I think at least it's arguable,

11   anyway, that the fair contemplation test concerns whether in

12   this case Mr. Chancellor could have ascertained through the

13   exercise of reasonable diligence, due diligence, that he had

14   a claim against the City of Detroit having to do with this

15   wrongful conviction that he's been -- that he's alleged, not

16   whether he could have exercised, through reasonable due

17   diligence or otherwise, he could have ascertained that the

18   City had filed bankruptcy.  That's a -- that's really a

19   different issue, isn't it?

20         MR. JOHNSON:  I see it, Your Honor, as in an

21   exercise of due diligence did Mr. -- or should Mr. Chancellor

22   have known that he had a claim?  He did not have a claim at

23   that time.

24         His claim that he had never materialized until

25   3/24/20, when his conviction was vacated.  So he had no

1   claim.  There was no claim to assert yet, and that's why the

2   accrual test is important under the facts and the

3   circumstances of this analysis.

4          It does matter because it absolutely, definitively

5   goes to what a normal person, or in this case, forgive me, a

6   reasonable person, with a good caveat again of this person

7   being in a federal penitentiary, wrongfully, should know

8   relative to what claim was he supposed to have filed when he

9   didn't have a claim, yet.

10          So in other words, he's supposed to file a

11  bankruptcy claim while he's in federal -- or state prison, in

12  July or so of 2013, even though he does not have a valid

13  cause of action, nor does he know that he's going to get one,

14  because many people obviously believe, and I guess I think

15  the evidence shows that many people are innocent yet

16  convicted, and yet, under this area of law he has nothing, no

17  claim until he gets it vacated, which is a huge process, as

18  the Court probably knows.

19          But he ultimately is -- his claim does accrue on

20  3/24/20, yet again, seven years before that, he's supposed to

21  know to file a bankruptcy.

22          I think that that flies in the face of truth and

23  logic.  Most lay people don't know this, let alone somebody

24  who's now in a prison sentence for serving something for a

25  crime they didn't commit, that they're now supposed to figure

1    that out on their own.

2              THE COURT:  All right.  I think, you know, you're

3    going over ground you've already tread, and we got onto this

4    discussion when I was asking about an apparent argument

5    you're making today for the first time, I think, that Mr.

6    Chancellor did not have notice or knowledge of the City's

7    bankruptcy case.

8              Is there anything more you want to say about that

9    specific issue?

10             MR. JOHNSON:  No, Judge.  Thank you.

11             THE COURT:  All right.  Well, thank you, Mr.

12   Johnson.

13             Mr. Swanson, as I normally do, I'll give you a

14   brief opportunity as the moving party here to reply in

15   support of the motion, if you want.

16             MR. SWANSON:  Thank you, Your Honor.  Marc Swanson

17   on behalf of the City.

18             There was no argument about notice in the

19   Plaintiff's response.  If Chancellor wanted to make an

20   argument about notice, you would think that at least once in

21   the response he would have used the word "notice," and notice

22   is not used at all in the response.

23             You know, similar arguments were made in *Burton*

24   and *Monson,* and in each of those cases the Court found that

25   plaintiff was an unknown creditor and the constructive notice

1    that was provided during the City's bankruptcy case with

2    respect to the bar date order, the plan, and the confirmation

3    order, which this Court has found time and time again to have

4    been valid, to constitute adequate notice.

5              With respect to fair contemplation.  Mr. Johnson

6    said, you know, there was no lawsuit, there was no claim.

7    And I can agree, perhaps, that there wasn't a lawsuit until

8    2020, but there certainly was a claim.  There was a

9    contingent claim.

10             One of the orders that we cited in our papers was

11   this Court's order in the Desmond Ricks matter, which the

12   Court held an oral argument on in 2019.

13             And during that oral argument a very similar

14   argument was asserted by the plaintiff's counsel and the

15   Court correctly said that that it was a contingent claim,

16   that even if under applicable state or federal law a claim

17   did not accrue until a conviction was vacated.  For

18   bankruptcy purposes that's not the test.

19             The test is when the claim was fairly

20   contemplated, and it was fairly contemplated far before, and

21   at that point the plaintiff had a contingent claim, and that

22   should be what the Court finds here.

23             With respect to Plaintiff's argument on

24   affirmative defenses.  Plaintiff raised nothing new.

25   Plaintiff didn't distinguish this Court's prior opinion,

1 didn't distinguish the Sixth Circuit's opinion in *Hamilton*,

2 and didn't attempt to rescue the citation to a old Sixth

3 Circuit case which cited a prior version of a rule which is

4 no longer applicable.

5          For those reasons, Your Honor, the City would

6 respectfully request that the Court enter an order granting

7 its motion.

8          THE COURT:  All right.  Thank you.  One moment,

9 please.

10      (Pause)

11          THE COURT:  All right.  Thank you, both.  I'm

12 going to do what I hope is a fairly brief and concise oral

13 ruling now on this motion.  One moment.

14      (Pause)

15          THE COURT:  All right.  Thank you.

16          The motion has been argued both in writing and

17 orally in today's hearing, the motion by the City of Detroit,

18 for entry of an order enforcing the bar date order and

19 confirmation order against Darell Chancellor, or Darell

20 Chancellor, I think it might be pronounced.

21          For the record, again, that motion is docket

22 number 13691.

23          The respondent, Mr. Chancellor, through counsel,

24 filed a response to the motion, written response.  The

25 response was filed at docket number 13699 on the Court's

1   docket.

2          The Court has reviewed that response, the exhibits

3   that were filed with it, as well as the exhibits filed with

4   the City's papers, as well as the City's reply brief at

5   docket 13714, and I have considered the arguments in today's

6   -- made in today's hearing.

7          The first thing I'll cover and I'll say is that

8   this Court, the Bankruptcy Court here, has subject matter

9   jurisdiction over this matter, and this matter is a core

10  proceeding in which this Court has authority and jurisdiction

11  to make a final decision on the motion.

12          The authority for that I won't go into great

13  detail about.  What I'll do is cite and incorporate by

14  reference what I said in a couple of prior opinions in this

15  case about the subject of jurisdiction, core proceedings, and

16  those subjects, and also about the -- in these opinions about

17  the fact that this Court, in the plan of adjustment that was

18  confirmed by the Court, this Court retained jurisdiction to

19  rule on the very types of motions and disputes that's before

20  me with this motion and if necessary to enter injunctions to

21  further enforcing the confirmed plan of adjustment and other

22  orders of the Court in this case.

23          The earlier opinions of mine that cover this are,

24  first of all, the case of *In re City of Detroit, Michigan*,

25  548 Bankruptcy Reporter 748, a decision of mine from 2016

1  that's published, and that -- in particular, pages 753 and

2  754 of that opinion.

3           Again, I incorporate that discussion in the

4  section called Roman numeral II, Jurisdiction, in that

5  opinion by reference here and adopted and applied it in this

6  case, as well.

7           A second opinion on this subject is the decision

8  the Court made just a couple weeks ago, on September 18,

9  2023.  That's the case -- again it's *In re City of Detroit,*

10 *Michigan*.  It's not yet published in the Bankruptcy Reporter

11 as far as I know, but it is published.  It's reported at 2023

12 WestLaw 6131465.  It's also an opinion that is filed in this

13 bankruptcy case.  It's at docket number 13738.  Again, it's

14 September 18 of 2023.

15          The WestLaw citation for the jurisdictional

16 provisions is star pages 6 to 7.  The citation of the version

17 that's published, or that's filed on the Court's docket at

18 13738, is .pdf pages 13 to 14 of that opinion.

19          Again, I incorporate by reference what the Court

20 said there about subject matter jurisdiction, core

21 proceedings, the Court's authority to make a final

22 determination in this kind of matter.

23          Moving to the merits now of this dispute.

24          First of all, I do find and conclude that the --

25 from the undisputed facts that the claims alleged against the

1 City of Detroit and against Office Steven Geelhood in his

2 representative capacity, in the cases that are now pending in

3 the U.S. District Court for this District, those cases, the

4 two cases are the ones cited in the City's motion at page 5,

5 paragraphs 12 and 13, copies of complaints from those cases

6 are Exhibit 6B and 6C of the City's motion.

7 Those claims alleged against the City and against

8 Officer Geelhood in his representative capacity in those

9 cases were, in fact, discharged by the discharge in the

10 City's confirmed plan of adjustment, and Mr. Chancellor is,

11 in fact, barred and enjoined from filing and prosecuting

12 those claims.

13 That is distinct from the claims, any claims

14 alleged against Officer Geelhood in his -- solely in his

15 individual capacity.  Those were not -- they were not

16 discharged and are not enjoined.  So there is that

17 distinction, and that's a distinction that was raised in the

18 written response filed by Mr. Chancellor.

19 These claims against the City and Mr. Geelhood in

20 his representative capacity all arose before the bankruptcy

21 petition was filed in this Chapter 9 case on July 18, 2013,

22 and, therefore, were discharged.

23 First of all, the fair contemplation test that the

24 parties have argued about does indeed apply, as opposed to

25 the so-called accrual test.  I have already ruled that way in

1    prior opinions, and I reiterate that ruling now that the fair

2    contemplation test is the appropriate test to determine

3    whether a claim arose before or after the filing of a

4    bankruptcy petition.

5                A couple of places where I have ruled that way is,

6    first of all, in the City of Detroit case that I cited

7    earlier.  The one that's 548 Bankruptcy Reporter 748, at page

8    763 of the Court's opinion.

9                In that case I ruled that the fair contemplation

10   test is the appropriate test to apply, and I discussed what

11   that test meant, and I incorporate that discussion and the

12   authority cited in that opinion by reference.

13               And the Court has applied that test in other -- in

14   deciding other motions in this bankruptcy case.  But that's

15   really the leading case, by me at least, on that subject.

16               The fair contemplation test raises -- sets the

17   standard as being that a claim is considered to have arisen

18   pre-petition if the creditor could have ascertained through

19   the exercise of reasonable due diligence that it had a claim

20   at the time the bankruptcy petition is filed.

21               In my view, the answer here is clearly that, yes,

22   indeed, Mr. Chancellor could have, with the exercise of

23   reasonable diligence, ascertained that he had a claim against

24   the City of Detroit and against Mr. Geelhood in at least in

25   his representative capacity, before the City filed its

1    bankruptcy petition on July 18, 2013.

2              That's based upon the facts and events that

3    occurred that contribute to give rise to Mr. Chancellor's

4    claims.

5              The events that occurred in November 2011, May

6    2012, November 2012, including the conviction in the state

7    court, criminal conviction of Mr. Chancellor that occurred on

8    November 12 of 2012 for which he was sentenced to prison on

9    December 12 of 2012 and promptly thereafter did go to prison.

10             These events are described in detail, and I think

11   accurately so, in the City's motion.  Again, docket 13691 at

12   paragraphs 20 to 38 of the motion.

13             Given those facts and events, all of which

14   occurred well before the City filed its bankruptcy petition

15   in July of 2013, it's clear to me that under the fair

16   contemplation test Mr. Chancellor could have ascertained

17   through the exercise of reasonable due diligence that he had

18   a claim against the City and against Mr. Geelhood in his

19   representative capacity before the petition was filed in this

20   bankruptcy case.

21             This test and this issue, that is whether the

22   claim arose pre-petition or not, is a distinct test and a

23   distinct issue from the question of whether or not a claimant

24   like Mr. Chancellor knew, or should have known, about the

25   City having filed bankruptcy, which is a different issue, and

1   I'm going to talk about that in a little bit.

2           This test -- this issue focuses on not that issue

3   but whether, rather, on whether the claimant, like Mr.

4   Chancellor here, could have ascertained with the --

5   reasonably ascertained or ascertained through the exercise of

6   reasonable due diligence that he had a claim at the time the

7   petition was filed.

8           The answer to that here is, yes, it's clear that

9   Mr. Chancellor knew of and believed to be true all the facts

10  that are recited in the City's motion that occurred before

11  the petition date.

12          He certainly knew, or thought he knew, and he

13  believed, that he was the victim of a wrongful conviction,

14  that he was the victim of a conviction that was obtained

15  through what he viewed at the time as false testimony by

16  Officer Geelhood, both in an affidavit that gave rise to --

17  that was used to get a search warrant at Mr. Chancellor's

18  mother's house in November of 2012, all the way through the

19  trial testimony of Officer Geelhood, that Mr. Chancellor

20  viewed as false.

21          He not only knew that and thought these things at

22  the time, but he also argued these things vociferously to the

23  courts, the state trial court, the State Court of Appeals, on

24  the appeal that he filed shortly after he filed his

25  conviction, and before -- and that appeal was filed before

1   the bankruptcy case was filed, as well.

2          The claims arose pre-petition here under the fair

3   contemplation test even though Mr. Chancellor's 2012

4   conviction, criminal conviction, was not vacated until March

5   24, 2020, and which, of course, was the date that was well

6   after the filing of the City's bankruptcy case in 2013.

7          Mr. Chancellor argues that his claims at issue did

8   not arise until his conviction was vacated in March of 2020

9   because his claims or cause of action under applicable law

10  did not accrue until that conviction was vacated in March of

11  2020.

12         This is, in effect, an argument seeking to --

13  asking the Court to apply the so-called right to payment or

14  accrual test for determining when a bankruptcy claim arose.

15         That accrual test is discussed by this Court in

16  its decision -- or opinion that I just cited a moment ago

17  about the fair contemplation test, 548 Bankruptcy Reporter,

18  at page 762.

19         And as the Court notes there, I think accurately

20  so, and it's still accurate, that test has been widely

21  rejected by the courts as not an appropriate test for -- not

22  the appropriate test for determining when a claim arises,

23  whether it arises before or after the bankruptcy.

24         As the City, I think, has correctly argued, as of

25  the bankruptcy petition date in this case, July 18, 2013, Mr.

1   Chancellor had a claim as that claim -- the term claim is

2   defined under the Bankruptcy Code, it's Section 101 of the

3   Bankruptcy Code, even though the claim at that time was

4   contingent, or unmatured, or both, because the claim could

5   not be pursued until the conviction was vacated later.

6          Contingent claims, unmatured claims, are expressly

7   part of what is a claim within the meaning of the Bankruptcy

8   Code for purposes of determining whether a claim arose pre-

9   petition or post-petition.

10          And the cases in which I've discussed that include

11   the case I cited a moment ago, 548 Bankruptcy Reporter, this

12   time at page 761, and also at page 762 of that opinion.

13          So even though the claim was -- excuse me.  Even

14   though the claim was contingent and unmatured as of the

15   bankruptcy petition date, there still was a claim, and it

16   arose pre-petition under the appropriate test, which is the

17   fair contemplation test.

18          There are, as the City points out, a number of

19   similar cases that have applied the fair contemplation test

20   to find in cases and situations very similar to this one that

21   the claimant's claim arose before the filing of the

22   bankruptcy case and, therefore, it was barred and discharged.

23          Perhaps the closest case in terms of facts and the

24   discussion by the Court is the *Sanford* case cited by the

25   City, a decision of the District Court from this District

1  from 2018.  That's *Sanford v. City of Detroit*, 2018 WestLaw

2  6331342, a decision from December 4, 2018, by the U.S.

3  District Court, Judge Lawson.  It's star page 5 in the

4  WestLaw version of that opinion.

5          The Court discusses this subject, and I think the

6  discussion is applicable equally in this case, and fully

7  supports the Court's ruling now in this case.

8          I do want to talk about this notice issue that was

9  raised for the first time in today's hearing, in my view.

10         There seemed to be an argument or suggestion by

11 counsel for Mr. Chancellor in today's hearing that Mr.

12 Chancellor, who was in state prison, incarcerated in state

13 prison, when the City filed its bankruptcy case, may not have

14 had notice or knowledge of the City's bankruptcy case in time

15 to file a proof of claim, in time to pursue the claim through

16 the bankruptcy process, and at least certainly not as of the

17 bankruptcy petition date, July of 2013.

18         That argument, first of all, is an argument that's

19 made for the very first time in oral argument in the hearing

20 today by Mr. Chancellor.  There's no hint of such an

21 argument, in my view, in the written response filed by Mr.

22 Chancellor to the motion.

23         That argument, in my view, then, has been

24 forfeited by Mr. Chancellor.

25         But even if not forfeited, in my view the argument

1    is without merit because of the unknown creditor concept.

2           Now, the City didn't brief this.  They have argued

3    it in the hearing today in response to the new argument about

4    notice of the bankruptcy, but this concept and this -- the

5    concept of the unknown creditor is one that's out there in

6    the case law and it's in one of the reported published

7    opinions of this court in this very case.  It was published a

8    little more than a year ago now and that is -- one moment.

9    That's the -- that's the case of *In re City of Detroit,*

10   *Michigan,* 642 Bankruptcy Reporter 807, a decision of this

11   Court from August 26, 2022.

12          In that case the Court talked about the unknown

13   creditor concept, beginning at page 810, 642 Bankruptcy

14   Reporter at 810.

15          There, the Court held, as numerous other courts

16   have held, that a creditor in a bankruptcy case that was an

17   unknown creditor, as the concept is defined by the case law,

18   at the time of the bankruptcy filing, is a creditor for which

19   the debtor has no duty to serve notice specifically, of the

20   bankruptcy specifically, upon.

21          But rather, one for whom notice of the bankruptcy

22   case by publication only is sufficient to put the creditor on

23   notice of the bankruptcy case for purposes of due process and

24   other concerns under the law.

25          At pages 810 to 811, at 642 Bankruptcy Reporter, I

1    talk about this concept and applied it in that case.  It

2    applies equally here.

3              The concept of an unknown creditor is, one, a

4    creditor in which the claim against the City was readily

5    ascertainable by the City during the relevant time.  That is,

6    during the time period as of the filing and thereafter in the

7    bankruptcy case.

8              And by readily ascertainable the case law requires

9    there whether the respondent, the creditor, communicated any

10   demand for payment or otherwise communicated to the City

11   before the bankruptcy was filed, the existence of a claim

12   against the City.

13             If not, then the creditor is deemed an unknown

14   creditor unless  -- well, is deemed an unknown creditor and

15   the City may provide sufficient notice of the bankruptcy

16   filing for due process purposes and otherwise by publication.

17             This case of Mr. Chancellor's is a case of an

18   unknown creditor, and that at the time of the City's

19   bankruptcy filing, and at least until 2020 when Mr.

20   Chancellor's conviction was vacated that he filed, first

21   filed suit against the City for wrongful conviction related

22   claims.

23             Until then, he was not a known creditor to the

24   City.  His claim, or claims, or existence of claims, were not

25   readily ascertainable by the City during that relevant time

1    period, and that is because there's simply no evidence or

2    argument made in the papers, or even today in the hearing by

3    Mr. Chancellor's counsel that Mr. Chancellor did anything to

4    communicate to the City that he believed he had a claim for a

5    wrongful conviction or wrongful conviction related claim

6    against the City at the time of the bankruptcy filing or any

7    time thereafter until 2020.

8           And so, being an unknown creditor he must be

9    deemed to have been given adequate notice of the City's

10   bankruptcy case by publication.

11          The Court noted in its decision in the earlier

12   case, 640 Bankruptcy -- 642 Bankruptcy Reporter, at 810, 811,

13   the fact the City did provide notice of its bankruptcy case

14   by publication properly.

15          And, of course, the City of Detroit filing

16   bankruptcy was no secret to anyone.  It was very widely known

17   throughout the Detroit area, throughout Michigan, throughout

18   the United States, and beyond, at the time.  It was the

19   largest municipal bankruptcy ever filed, I think still is,

20   the largest municipal bankruptcy ever filed in this country

21   and received enormous publicity.

22          And so given all of that -- and I should also

23   note, in the absence of any evidence provided by Mr.

24   Chancellor which he alleges or asserts that he didn't know of

25   the City's bankruptcy filing when it occurred, the argument

1    about notice, as I perceive it to have been made today, even

2    if not forfeited, is without merit and I must reject it for

3    the reasons that I have just stated.

4          So given that Mr. Chancellor's claims arose pre-

5    petition under the fair contemplation test, the claims

6    against the City and against Officer Geelhood in his

7    representative capacity were filed -- arose pre-petition

8    here.  Those claims were discharged under the City's

9    confirmed plan of adjustment, both under the terms of the

10   plan and the order confirming that plan, that confirmed the

11   plan in November of 2013 -- I'm sorry, no, November 2014.

12         And those provisions are cited and quoted in

13   detail in a prior opinion of this court in the opinion I've

14   just been citing, the 642 Bankruptcy Reporter 807 opinion, in

15   particular at page 812.  So I incorporate that reference --

16   that by reference.

17         The claims of Mr. Chancellor against the City and

18   Officer Geelhood in his representative capacity are barred

19   and enjoined under the bar date order that the City has

20   cited, the City's plan, and the order confirming plan.  All

21   of that is confirmed by what I wrote at 642 Bankruptcy

22   Reporter, at page 812, among other places in the published

23   opinions of mine, citing those particular provisions in the

24   bar date order of the plan and the order confirming plan.

25         And so the claims are discharged and Mr.

1    Chancellor is barred and enjoined already from pursuing them.

2              I will address briefly the argument of Mr.

3    Chancellor arguing that the City did not assert its

4    bankruptcy discharge as an affirmative defense in either of

5    the cases that are now pending in U.S. District Court, and I

6    presume also an argument that the City unreasonably delayed

7    in raising the issue of the bankruptcy discharge and

8    injunctions in the filing of this motion, and compared to the

9    timing and the time that the U.S. District Court cases have

10   been pending.

11             The City is correct, in my view, in everything

12   that it says and argues in its reply brief at docket 13714,

13   at pages 4 to 6, .pdf pages 4 to 6, of that -- of that brief

14   in responding to and refuting these arguments.

15             This Court held in the 642 Bankruptcy Reporter

16   case, at pages 812 to 813, citing the Sixth Circuit's

17   decision of *Hamilton v. Hertz,* that a bankruptcy debtor, like

18   the City of Detroit, has no duty to raise any sort of

19   affirmative defense or defense, or to do anything, in

20   response to claims being brought against it in a non-

21   bankruptcy court that have been discharged.

22             Any such action and any judgment, adverse judgment

23   suffered on such claims is void *ab initio* under the case law

24   and because of the bankruptcy discharge.

25             And so, it is simply not a valid argument to argue

1   anything like that the City's motion here is barred in any

2   way by the City's failure to plead as an affirmative defense

3   or otherwise raise, timely or otherwise, in the pending U.S.

4   District Court cases the discharge and bar date order and

5   injunction provisions that it's argued in this motion in this

6   Court.

7            And the City is also right that the 2010

8   amendments to Federal Rule of Civil Procedure 8(c)(1) did

9   eliminate from the list of affirmative defenses that had to

10  be pled in federal court actions generally the discharge, a

11  bankruptcy discharge.  That's no longer in the rule as an

12  affirmative defense that must be pled for the reasons that

13  I've discussed.

14           And so the Court is bound to reject those

15  arguments by Mr. Chancellor.

16           This Court, this Bankruptcy Court, does have

17  jurisdiction and authority to specifically enjoin Mr.

18  Chancellor's continued prosecution of the claims against the

19  City and the claim against Officer Geelhood in his

20  representative capacity.

21           The Court's opinion from September 18 that I cited

22  -- this year that I cited earlier points that out.  It cites

23  chapter and verse in the City's plan of adjustment, confirmed

24  plan of adjustment documents.  The plan and the order

25  confirming plan.

1         And for that I'll cite to this Court's decision,

2    2023 WestLaw Reporter 6131465, again at star pages 15 and 7,

3    and again this Court's docket, that's docket 13738, at .pdf

4    pages 31 and 14.

5         And so for these reasons, the Court will grant the

6    City's motion in the form of the proposed order that the City

7    filed with the motion in substance, with one change.

8         And that, Mr. Swanson and Mr. Johnson, the

9    changes, I will go ahead and add a paragraph to what's in the

10   order, the proposed order, that does say, for the record, and

11   I think it's clear and really not disputed, that the order

12   does not apply to claims asserted by Mr. Chancellor against

13   Officer Geelhood in his individual, solely in his individual

14   capacity.  I'll add that language myself.

15        So, Mr. Swanson, what I want you to do is simply

16   submit your proposed order as-is with no changes at all.

17   I'll take that and make changes to it, both substantive of

18   the type I just described and non-substantive.  Non-

19   substantive being things like in the first paragraph reciting

20   the fact of today's hearing and so forth.

21        So you submit that, I'll waive presentment of

22   that, and I will take the order, revise it, and get it

23   entered, and the motion will be granted on that basis.

24        That's it.  Thank you all.

25              (Time Noted:  2:33 p.m.)

1                            CERTIFICATE

2         I, RANDEL RAISON, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter, to

5    the best of my ability.

6

7

8    _____          October 25, 2023

9    Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25