UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK CRAIGHEAD,

     Plaintiff,

v.

BARBARA SIMON, et al.,

     Defendants.

_____/

Case No. 2:23-cv-12243
Hon. Brandy R. McMillion

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE EXPERT TODD MUTCHLER (ECF NO. 90) AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO BAR TESTIMONY OF DEFENDANTS' EXPERT DR. BRADLEY BEYER (ECF NO. 93)**

Plaintiff Mark T. Craighead ("Craighead") brings this action in connection to a 2002 wrongful conviction of manslaughter and possession of a firearm during the commission of a felony for the 1997 homicide of his friend Chole Pruett ("Pruett"). *See* ECF No. 88-3, PageID.2935.  Craighead was exonerated twenty-one years later, then he filed this federal civil rights action pursuant to 42 U.S.C. § 1983 for malicious prosecution and violations of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments against Defendants City of Detroit,[1] Investigators Barbara Simon ("Simon") and James Fisher ("Fisher"), Lieutenant

---

[1] As of July 29, 2024, pursuant to the Court's Opinion and Order Granting Defendant City of Detroit's Motion to Dismiss in Lieu of an Answer (ECF No. 45), the City of Detroit is no longer a defendant is this action.

1

Bob Jackson ("Jackson"), and Polygraph Operator Andrew Sims[2] ("Sims" and collectively with Simon, Fisher, and Jackson, "Defendants"). *See generally* ECF No. 1. Before the Court are Defendants' Motion to Strike Expert Todd Mutchler ("Mr. Mutchler") (ECF No. 90) and Plaintiff's Motion to Bar Testimony of Defendants' Expert Dr. Bradley Beyer ("Dr. Beyer") (ECF No. 93). The parties offer the opinions of their respective experts on issues concerning general police practices; investigative decisions and techniques; polygraph examinations and false confessions. Having reviewed the parties' briefs, the Court finds oral argument unnecessary. *See* E.D. Mich. LR 7.1(f). For the reasons explained herein, both Motions are **GRANTED IN PART** and **DENIED IN PART**.

## I.

### A.    General Background

The underlying criminal case from which this § 1983 action arises involves the killing of Pruett, who was found dead in his apartment on June 27, 1997. *See* ECF No. 86-3, PageID.2035. Detroit Police Department ("DPD") Investigator Ronald Tate ("Tate") began investigating Pruett's death, and over two years, he interviewed several witnesses including Craighead. ECF No. 86, PageID.1996.

---

[2] Pursuant to the Court's July 17, 2026 Order (ECF No. 142), Andrew Sims is no longer a Defendant in this action. Accordingly, any expert opinions regarding his administration of Craighead's June 2000 polygraph examination, including any comments Sims made during the examination are stricken and barred from testimony at trial.

Craighead provided witness statements in 1997 and again in 1999. *Id.* Tate determined there were no viable leads, and the case eventually went cold. ECF No. 86-9, PageID.2201.

Jackson, a DPD squad head, reassigned Pruett's case to Fisher in 2000 for a "fresh set of eyes." *See* ECF No. 86, PageID.2000; ECF No. 86-9, PageID.2199. After their review of the file, Fisher identified Craighead as a "person of interest." *See* ECF No. 86-9, PageID.2198. Fisher's decision was based, in part, on an alleged drug nexus and close relationship between Pruett and Craighead. *See* ECF No. 86, PageID.1996; ECF No. 88, PageID.2895-2896. Acting on this hunch, on June 20, 2000, Jackson and Fisher went to Plaintiff's residence and Plaintiff ultimately accompanied them to the police station for questioning. *See* ECF No. 86-9, PageID.2204-2205; ECF No. 86-15, PageID.2290. The parties dispute whether Plaintiff's decision was voluntary or whether he was, in fact, detained or arrested. *See* ECF No. 86-8, PageID.2121; ECF No. 86, PageID.2010.

In any event, they arrived at the station, Fisher and Jackson placed Craighead in the Squad 7 Room, and Fisher called investigator Simon to assist with questioning. ECF No. 86-9, PageID.2208, 2218. Simon periodically questioned Craighead throughout the night, ignored his requests to leave for work and to speak with his attorney, and induced him to take a polygraph examination. *See* ECF No. 88, PageID.2906-2907. While handcuffed by Simon, Craighead was transported to

3

the polygraph examination room, where Sims administered the test at 3:00 a.m. *Id.* at PageID.2908. Shortly thereafter, Sims informed Craighead that he failed the test, Simon handcuffed and locked Craighead in a DPD cell overnight. *Id.* at PageID.2908-2909. Plaintiff did not sleep while in custody overnight, and, the next morning, he renewed his request for an attorney but was denied by Simon. *Id.* Instead, Simon threatened Craighead that he would be sentenced to life in prison, offering him a way out by promising that, if he confessed to the crime, they could present the incident as an accident. *Id.* at PageID.2908-2910. Craighead complied—he made the false confession, Simon drafted the confession, and Craighead signed it. *See* ECF No. 86-16, PageID.2332; ECF No. 88-12, PageID.3122.

Craighead was charged with first degree murder, felony murder, felony firearm, and manslaughter on June 22, 2000. *See* ECF No. 86-32. A jury trial found him guilty, *see* ECF No. 86-18, PageID.2542, and he was sentenced to 40 months to 15 years in prison for the manslaughter conviction and two years in prison for the felony-firearm conviction, *see* ECF No. 88-3, PageID.2935. Subsequently, the Michigan Court of Appeals affirmed his conviction. *See People v. Craighead*, No. 243856, 2005 WL 3500831 (Mich. Ct. App. Dec. 22, 2005). However, on February 4, 2021, a Michigan trial court granted Craighead relief from his conviction based on newly discovered material evidence unavailable at the time of the original

prosecution, which the Court found created a reasonable probability of a different outcome upon retrial.  See ECF No. 88-3.  Pursuant to the Michigan Wrongful Imprisonment Compensation Act, the Michigan Court of Claims provided Craighead with statutory damages.  *See* ECF No. 88-4; Mich. Comp. Laws §§ 691.1751, 691.1754, 691.1755.  This action followed.  *See generally* ECF No. 1.

**B.      Plaintiff's Expert - Todd Mutchler**

Plaintiff retained Mr. Mutchler to "provide [his] professional opinions regarding the investigation, arrest, and prosecution of Mr. Craighead[…]" by "assess[ing] whether there were deviations from generally accepted police practices in [DPD Investigators'] the investigation" into the June 27, 1997, shooting that resulted in the death of Chole Pruett."  *Mutchler Expert Report*, ECF No. 90-2, PageID.3838.  Ultimately, after reviewing "the Complaint, investigative records, witness statements, deposition testimony, Detroit Police Department (DPD) policies, trial transcripts, professional standards, and my education, training," and based on his 38 years of law enforcement experience, Mr. Mutchler concluded that the investigation "grossly deviated from generally accepted police practices[.]"  *Id.*  Mr. Mutchler's methodology included "a review of materials provided by […] Plaintiff's counsel […] vetted against [Mr. Mutchler's] years of specialized education, training, and experience as generally accepted practices in the field of law enforcement."  *Id.* at PageID.3838.  His relied upon standards have "been established in model policies

promulgated by professional organizations such as the International Association of Chiefs of Police (IACP), and the Commission on Accreditation for Law Enforcement (CALEA)." *Id.* at PageID.3844.

Mr. Mutchler opined that Defendants: deviated from practices and standards as to report writing (ECF No. 90-2, PageID.3848-3863); failed to investigate other suspects (*id*. at PageID.3863-3865); failed to document investigative steps, rationale, or decision-making (*id*. at PageID.3865-3867); failed to follow up on claimed drug connections (*id*. at PageID.3868-3870); had investigative tunnel vision and confirmation bias (*id*. at PageID.3870-3883); failed to conduct required follow-up interrogation corroboration (*id*. at PageID.3883-3891); failed to obtain or execute necessary search warrants (*id*. at PageID.3891-3893); failed to investigate the truck fire, accelerant, and means of escape (*id*. at PageID.3893-3898); and inadequately supervised and failed to conduct proper oversight (*id*. at PageID.3898-3902). All in all, he concluded, "[t]he method and manner in which this investigation occur[ed] abandoned the objective, truth-seeking function of police work, replacing it with a results-driven approach focused on obtaining confessions or identifications that fit a predetermined outcome." *Id*. at PageID.3902.

## C.   Defendants Expert – Dr. Bradley Beyer

Defendants retained Dr. Beyer to author two reports in this case. *See generally* ECF Nos. 86-37 and 93-2. At a high level, he was to conduct a review "in light of

the polygraph technique, law enforcement interview and interrogation methods, and the phenomenon of false confessions." ECF No. 86-37, PageID.2753. To do so, Defendants provided him with extensive materials including Craighead's complaint; polygraph reports and charts; several hearing transcripts from July 6, 2000 – February 2001; Plaintiff's jury trial transcripts from June 20-24, 2002; the transcript of a June 30, 2010 evidentiary hearing; statements of Barbara Simon and Ronald Tate spanning 1997 to 2000; a DPD interrogation record completed in June 2000; a constitutional rights certificate of notification completed in 2000; various documents provided to Michigan Innocence Clinic polygraph examiner H. John Wojnaroski III; and a transcript of the September 22, 2025 deposition of Andrew Sims. *Id.* at PageID.2755-2756.

Notably, Dr. Beyer conducted an analysis of serious at-issue polygraph examinations in this case, and "explain[ed] the procedural flaws in the administration of polygraph examinations to Mark Craighead on April 29, 2009 and June 30, 2010 by H. John Wojnaroski III, as well as the inaccurate conclusions reached by Mr. Wojnaroski in both examinations. [He] also provide[d] a review and analysis of the polygraph report for Mark Craighead as administered by Andrew Sims on June 20, 2000." *Id.* at PageID.2756. His analyses included reviewing the: testing format, test question construction, relevant questions, test data analysis, lack

of movement sensors, polygraph report, examination results, purging of polygraph records, and interrogative pressure. *Id.* at PageID.2758-2768.

Separately, he examined Plaintiff's false confession allegations. ECF No. 86-37, PageID.2768-2779. He specifically considered "certain dispositional risk factors […] that some people possess that may cause them to be more malleable, and therefore more likely to render a false confession[,]" *id.* at PageID.2770, including youth, cognitive deficiencies, mental illness, and personality factors, *id.* at PageID.2770-2772. Additionally, he acknowledged, "the existing false confession research has suggested that the interrogative techniques employed by law enforcement officers during the course of an interrogation, as well as the behavior of the interrogators, can also contribute to the elicitation of a false confession." *Id.* at PageID.2773. Thus, he further examined tricking the subject into waiving their rights, length of the interrogation, sleep deprivation, confession to escape, confession because of threats, confession because of promises, physical abuse, and the self-defense theme. *Id.* at PageID.2772-2779.

Based on the facts and materials he considered, Dr. Beyer opined that "the wording of the relevant questions for the Detroit Police Department polygraph examination of Mark Craighead on June 20, 2000 was appropriate and consistent with accepted polygraph practices" (*id.* at PageID.2779); "the reports, charts, and supporting documents for Mr. Wojnaroski's examinations of Mr. Craighead on April

29, 2009 and June 30, 2010 raise a number of questions" (*id.* at PageID.2779-2780); the conclusion that Mr. Craighead's confession to Simon was false does not appear to be a conclusion that should be readily accepted (*id.* at PageID.2780); it does not appear that the police interrogative techniques and behaviors used during Craighead's interrogation were problematic within the false confession literature (*id.*); "[t]he concern expressed over the possibility that Ms. Simon may have suggested that Mr. Craighead shot Mr. Pruett out of self-defense is unwarranted" (*id.*); and, overall, that "there is little basis to believe that Mr. Craighead's confession was anything but truthful and freely given" (*id.* at PageID.2781).

Dr. Beyer's Rebuttal Report (ECF No. 93-2) was "limited to addressing the opinions, conclusions, and factual assertions offered by Mr. Todd L. Mutchler that were not previously addressed in [Dr. Beyer's] initial report[.]"  ECF No. 93-2, PageID.4501.  For the rebuttal, he reviewed substantially the same materials as he used to draft his opening report.  After which, he opined that "the majority of Mr. Mutchler's criticism relies on the ready acceptance of Mr. Craighead's unproven allegations, the supposed violation of policies and practices that were not yet enacted, administrative and bureaucratic oversights that would have had little impact on the final outcome of this investigation, and an unyielding desire to suggest that someone other than Mr. Craighead was responsible for the crime that he actually confessed to."  *Id.* at PageID.4533.

Mr. Mutchler's deposition took place on March 24, 2026, *see* ECF No. 90-3, and Dr. Beyer was deposed on April 13, 2026, *see* ECF No. 93-1. Now, in essence, the parties have filed cross-motions to exclude each other's experts concerning investigation of the underlying crime, including the decision to pursue Craighead as a suspect, the conditions of his detention and/or arrest, the administration of a polygraph examination, and the circumstances surrounding his false confession. *See* ECF Nos. 90, 93. The motions have been fully briefed. *See* ECF Nos. 90, 93, 106-107, 114-115. The Court has reviewed the parties' briefs, finds oral argument unnecessary, and will rule on the motions based on the record before it. *See* E.D. Mich. LR 7.1(f).

## II.

As the "gatekeepers" of expert testimony; the role of the District courts is to "'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant.'" *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (quoting *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993)). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Accordingly, it is the proponent's burden "to demonstrate to the Court that an expert's testimony more likely than not meets the four enumerated requirements for admissibility." *Al Qari v. American Steamship Co.*, 689 F. Supp. 3d 494, 499 (E.D. Mich. 2023) (quotation marks and citation omitted).

Before admitting any expert testimony, then, the Court must ensure that the expert testimony is helpful to the trier of fact, "based on sufficient facts or data," the "product of reliable principles and methods," and reliably applies the "principles and methods to the facts of the case." Fed. R. Evid. 702 (2023); *see In re Onglyza*, 93 F.4th at 345 & n.2 (summarizing requirements under 2011 version of Rule 702 and noting changes in 2023 amendment of the Rule). It is not the Court's job "to determine whether [the expert's opinion] is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Onglyza*, 93 F.4th at 345 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008)).

Notably, rejecting expert testimony is the exception, not the rule. *Al Qari*, 689 F. Supp. 3d at 499 (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530).

11

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "If there is a reasonable factual basis for expert testimony, it should be admitted." *Weidman v. Ford Motor Co.*, 646 F. Supp. 3d 928, 931 (E.D. Mich. 2022). The Court must also "distinguish between genuine questions of reliability and questions of credibility and accuracy." *Id.* Issues with the latter go to the weight of the evidence, not its admissibility. *Id.* And those issues should be addressed on cross-examination and by the "'presentation of contrary evidence' by opposing counsel." *Id.* (quoting *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 532).

### III.

Generally, the Court "may resolve a *Daubert* motion without holding an evidentiary hearing." *Al Qari*, 689 F. Supp. 3d at 500 (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248-49 (6th Cir. 2001)). A *Daubert* hearing is only required "if the record is inadequate to decide the motion." *Al Qari*, 689 F. Supp. 3d at 500 (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000)). Here, the Court finds the record adequate to decide the motions without a hearing. The Court considers each expert in turn.

12

## A.     Mr. Mutchler

Defendants move to strike Mr. Mutchler's opinions and exclude his testimony at trial because (1) he is unqualified and his opinions are unreliable; (2) he utilizes an incorrect standard to form his opinion; (3) he has not disclosed the standards and authorities upon which he relies; and (4) portions of his opinion are irrelevant and unfairly prejudicial.  *See generally* ECF No. 90.

First, despite over 38 years of police experience, Mr. Mutchler is apparently unqualified to serve as Plaintiff's police practices expert because he "does not possess the specialized knowledge concerning homicide investigations in a city with a high number of homicide cases, like Detroit that permits him to offer opinions on the Defendants conduct."   ECF No. 90, PageID.3820.   Defendants seem to misunderstand the function of Mutchler's testimony, which is to "educate the jury as to standard police procedures in conducting investigations."   ECF No. 107, PageID.5653.  Defendants cannot attempt to reframe Plaintiff's intended use of his own expert, then challenge that mischaracterization.

Under the same false premise, Defendants maintain that Mr. Mutchler fails to apply "specialized knowledge" to the fact of this case.  For starters, it is not an expert's role to apply the law to the facts—that task is reserved for a jury.  Rather, an expert's testimony is relevant when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *In re Scrap Metal Antitrust Litig.*, 527

F.3d 517, 529 (6th Cir. 2008).  Here, at least one fact in issue pertains to whether Defendants had probable cause to arrest Plaintiff.  ECF No. 86, PageID.2019-2024.  Mr. Mutchler's proposed testimony goes directly to that issue.  *See* ECF No. 90-2, PageID.3839 (emphasis added).[3]  Nor does the Court's conclusion change based on Defendants' argument that "Mutchler's opinions are unreliable because he measured 1997–2000 conduct against standards he never connected to that period[...]"  ECF No. 90, PageID.3824.  An expert's qualifications—let alone that of an expert with nearly four decades of experience—is not "in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994).  Here, the Court is satisfied that Plaintiff has shown that Mr. Mutchler is qualified to address not just one, but several issues in this case within the scope of the expertise for which Plaintiff has offered him.

Second, Defendants assert that Mr. Mutchler applies a negligence, rather than intentional, affirmative conduct standard to Defendants' conduct.  As Plaintiff points out, "what Defendants are suggesting is prohibited in the Sixth Circuit."  ECF No. 107, PageID.5662 (quoting *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308,

---

[3] "**The seizure, transport, and detention of Mr. Craighead on June 20–21, 2000 violated generally accepted police practices and DPD policy.**  Investigators lacked reasonable suspicion or probable cause, yet restricted Mr. Craighead's freedom, denied his requests to delay the interview, threatened a patrol car, transported him involuntarily, and ultimately detained him.  These actions violated DPD Conveyance and Seizure policies and widely accepted Fourth Amendment policing standards."

317 (6th Cir. 2019)).  Considering Plaintiff has already clarified the scope of his expert's testimony, the Court is satisfied that Mr. Mutchler's opinions will not exceed this scope.[4]

Third, Mr. Mutchler allegedly fails to satisfy the requirements outlined in Fed. R. Civ. P. 26(a) because he did not disclose the standards and authorities upon which he relied.  ECF No. 90, PageID.3830.  To do so, "an expert opinion must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir.2005) (cleaned up).  Plaintiff contends that the basis for Mr. Mutchler's opinion is clear, and the Court agrees.  *See* ECF No. 107, PageID.5657-5661.  In fact, looking to Mutchler's expert report itself, he expressly stated that his "approach involves assessing the actions of law enforcement officers against widely accepted police practices, policies, and legal standards, such as those established by organizations like the IACP, CALEA, PERF and the United States Department of Justice (DOJ)."  ECF No. 90-2, PageID.3844-3845.  This is more than enough.  *See Wood v. Wal-Mart Stores E., LP*, 576 F. App'x 470 (6th Cir. 2014) ("Edwards was a non-scientific witness whose expertise came primarily from personal knowledge and experience. .

---

[4] For the purposes of this Order, the Court grants Defendants' request to strike any of Mr. Mutchler's opinions regarding application of a negligence standard to the Complaint.

. . There was ample reason for the district court to conclude that Edwards was a reliable witness whose expertise and testimony would assist the jury.").

Finally, Defendants assert, Mr. Mutchler provides opinions on the conduct of non-defendant officers, which is irrelevant and unfairly prejudicial.  True that "[a]n expert's testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000).  Here, Defendants take issue with Mr. Mutchler's decision to "critique[…] the homicide file as a whole, rather than focusing on what the individual defendants in this case did."  ECF No. 90, PageID.3831.  At this stage of the litigation, before the parties have fully briefed the motions in limine and the Court has ruled on those motions, the Court finds Plaintiff's concerns premature. Accordingly, Plaintiff's request to strike on this basis is denied.

## B.    Dr. Beyer

Plaintiff moves to bar Dr. Beyer's testimony.  *See generally* ECF No. 93.  In doing so, he begins by arguing that Dr. Beyer is not a qualified general police practices expert, which Defendants concede.  ECF No. 93, PageID.4383-4386.

> [Dr. Beyer's] opinion **does not discuss** broad police practices, nor does it discuss **generalized police policies**. Like the Sixth Circuit has emphasized, there is a "critical difference between testifying about the impact of police policies upon a large group of officers and testifying about the proper actions of individual officers in one discrete situation," where an expert is properly credentialed and assists the trier of fact. [*Champion v. Outlook Nashville*, 380 F.3d 893, 908 (6th Cir. 2004)]. The latter being acceptable.

16

ECF No. 106, PageID.5627.  Here, just as with the expert in *Champion*, the Court finds that given Dr. Beyer has "considerable experience in the field of criminology and because he [will be] testifying concerning a discrete area of police practices about which he ha[s] specialized knowledge," his testimony is admissible.  *See Champion v. Outlook Nashville*, 380 F.3d at 909.

By the same token, the Court is also satisfied that Dr. Beyer's background is sufficient to qualify him as an expert on investigative techniques and decisions, false confessions, and the associated risk factors.  *See e.g.*, ECF No. 106, PageID.5628 (He has "published […a] dissertation, journal articles, and training documents on false confessions from a psychology, law enforcement and polygrapher perspective"); ECF No. 93-3, PageID.4552 (Dr. Beyer's Qualifications and Experience).  Plaintiff's citation to *Berry* for the proposition that "a police practices expert is not necessarily qualified to opine on all areas of police practices" is unpersuasive.  ECF No. 115, PageID.5788 (citing 25 F.3d at 1352).  Defendants have not represented that Dr. Beyer will opine on "all areas of police practices."  Quite the contrary, in fact.  ECF No. 106, PageID.5626-5628.

As for Plaintiff's argument that Dr. Beyer offers opinions bearing on Plaintiff's credibility, the Court agrees with Plaintiff and finds such opinions improper.

17

> Mr. Mutchler points to Mr. Craighead's claims that the polygraph examiner informed him that polygraph tests are admissible in court and that any court in the country would believe him if he says that Mr. Craighead failed his test. It is difficult to believe this allegation for a variety of reasons. First, polygraph examiners know that their test results are not admissible in court. As such, it is hard to fathom that a certified law enforcement polygraph examiner would make up such an obvious lie. [… E]ven if we accept Mr. Craighead's claims as truthful […]. ECF No. 93-2, PageID.4520-4521.

> [Regarding the Withholding of Food] As repeatedly noted, Mr. Craighead's claims of maltreatment must be viewed with skepticism in light of the fact that they are rendered with no proof, and the secondary gain he faces if they are accepted is quite sizeable. *Id.* at PageID.4522.

These examples, along with numerous others across Dr. Beyer's opening and rebuttal reports, illustrate wholly inappropriate opinions offered by an expert. *Greenwell v. Boatwright*, 184 F.3d 492 (6th Cir. 1999) ("[W]e agree with the plaintiffs that the testimony regarding the credibility of eyewitness testimony was improper[.]"). Thus, these opinions bearing on credibility may not be offered at trial.

The Court's preclusion also extends to any of Dr. Beyer's opinions on ultimate issues in this case to the extent that those opinions include determinations of Defendants' liability in this case, or lack thereof. ECF No. 93, PageID.4389-4394. *See Babb*, 942 F.3d at 317 ("As we have explained before, there is a subtle, but nonetheless important distinction between opining on the ultimate question of liability (impermissible), and stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue (permissible)."). However, any opinions or proposed testimony

18

that go to the ultimate issues of this case without improperly implicating credibility or liability are admissible, provided the requirements of Rule 702 are met. *See id.* (cleaned up) ("Although we would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact). Thus, we have generally excluded expert testimony for stating a legal conclusion only when the witness explicitly testifies, in specialized legal terminology, that a defendant violated (or did not violate) the law.").

Finally, Plaintiff argues that Dr. Beyer employs an improper methodology and he offers opinions that lack foundation. ECF No. 93, PageID.4395-4399. The Court finds otherwise. Plaintiff is correct that "[p]olice practices experts may opine on proper police procedure, but they must employ an appropriate methodology." *Id.* However, the Court does not find that Dr. Beyer relies upon improper methodology. As an example, Plaintiff points to Dr. Beyer's opinion that "[Investigator Fisher and Lt. Jackson's] investigative decision to start with Mr. Craighead bore obvious fruit as he went on to confess to the murder of Mr. Pruett and was then subsequently charged and convicted for his crime." ECF No. 93-2, PageID.4507. At most, the Court finds that this implicates potential impermissible credibility determinations, which the Court has already precluded *supra*. So, the Court does not find that any

19

of Dr. Beyer's testimony must be barred for improper methodology and therefore denies this request.

## IV.

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** both, Defendants' Motion to Strike Expert Todd Mutchler (ECF No. 90) and Plaintiff's Motion to Bar Testimony of Defendants' Expert Dr. Bradley Beyer (ECF No. 93).

**IT IS SO ORDERED.**

Dated: July 19, 2026                         s/Brandy R. McMillion
                                             Hon. Brandy R. McMillion
                                             U.S. District Judge