UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK CRAIGHEAD,

    Plaintiff,

v.

BARBARA SIMON, et al.,

    Defendants.

Case No. 2:23-cv-12243
Hon. Brandy R. McMillion

_____/

**<u>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION TO BAR OPINIONS OF DEFENDANTS'
RETAINED EXPERT DR. MICHEL BORNEMANN (ECF NO. 94) AND
DENYING AS MOOT DEFENDANT'S MOTION TO STRIKE EXPERT
JAMES MCCLOUGHAN (ECF NO. 96)</u>**

Plaintiff Mark T. Craighead ("Craighead") filed this federal civil rights action pursuant to 42 U.S.C. § 1983 for malicious prosecution and violations of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments against Defendants City of Detroit,[1] Investigators Barbara Simon ("Simon") and James Fisher ("Fisher"), Lieutenant Bob Jackson ("Jackson"), and Polygraph Operator Andrew Sims[2] ("Sims" and collectively with Simon, Fisher, and Jackson,

---

[1] As of July 29, 2024, pursuant to the Court's Opinion and Order Granting Defendant City of Detroit's Motion to Dismiss in Lieu of an Answer (ECF No. 45), the City of Detroit is no longer a defendant is this action.

[2] Pursuant to the Court's July 17, 2026 Order (ECF No. 142), Andrew Sims is no longer a Defendant in this action. Accordingly, any expert opinions regarding his administration of

1

"Defendants"). *See generally* ECF No. 1. The action is in connection to Craighead's 2002 wrongful conviction of manslaughter and possession of a firearm during the commission of a felony for the 1997 homicide of his friend Chole Pruett ("Pruett"). *See* ECF No. 88-3, PageID.2935. Twenty-one years later, Craighead was exonerated. The Court has before it Plaintiff's Motion to Bar Opinions of Defendants' Retained Expert Dr. Michel Bornemann (ECF No. 94) is **GRANTED IN PART AND DENIED IN PART** and Defendant's Motion to Strike Expert James McCloughan (ECF No. 96) is **DENIED AS MOOT**. Having reviewed the parties' briefs, the Court finds oral argument unnecessary and will decide the Motion (ECF No. 94) on the papers. *See* E.D. Mich. LR 7.1(f).

**I.**

### A.    General Background

The underlying criminal case from which this § 1983 action arises involves the killing of Pruett, who was found dead in his apartment on June 27, 1997. *See* ECF No. 86-3, PageID.2035. Detroit Police Department ("DPD") Investigator Ronald Tate ("Tate") began investigating Pruett's death, and over two years, he interviewed several witnesses including Craighead. ECF No. 86, PageID.1996. Craighead provided witness statements in 1997 and again in 1999. Id. Tate determined there

---

Craighead's June 2000 polygraph examination, including any comments Sims made during the examination are stricken and barred from testimony at trial.

were no viable leads, and the case eventually went cold.   ECF No. 86-9, PageID.2201.

Jackson, a DPD squad head, reassigned Pruett's case to Fisher in 2000 for a "fresh set of eyes."  *See* ECF No. 86, PageID.2000; ECF No. 86-9, PageID.2199.  After their review of the file, Fisher identified Craighead as a "person of interest."  *See* ECF No. 86-9, PageID.2198.  Fisher's decision was based, in part, on an alleged drug nexus and close relationship between Pruett and Craighead.  *See* ECF No. 86, PageID.1996; ECF No. 88, PageID.2895-2896.  Acting on this hunch, on June 20, 2000, Jackson and Fisher went to Plaintiff's residence and Plaintiff ultimately accompanied them to the police station for questioning.  *See* ECF No. 86-9, PageID.2204-2205; ECF No. 86-15, PageID.2290.  The parties dispute whether Plaintiff's decision was voluntary or whether he was, in fact, detained or arrested. *See* ECF No. 86-8, PageID.2121; ECF No. 86, PageID.2010.

In any event, they arrived at the station, Fisher and Jackson placed Craighead in the Squad 7 Room, and Fisher called investigator Simon to assist with questioning. ECF No. 86-9, PageID.2208, 2218.  Simon periodically questioned Craighead throughout the night, ignored his requests to leave for work and to speak with his attorney, and induced him to take a polygraph examination.  *See* ECF No. 88, PageID.2906-2907.  While handcuffed by Simon, Craighead was transported to the polygraph examination room, where Sims administered the test at 3:00 a.m.  *Id*. at

3

PageID.2908.  Shortly thereafter, Sims informed Craighead that he failed the test, Simon handcuffed and locked Craighead in a DPD cell overnight.  *Id*. at PageID.2908-2909.  Plaintiff did not sleep while in custody overnight, and, the next morning, he renewed his request for an attorney but was denied by Simon.  *Id*. Instead, Simon threatened Craighead that he would be sentenced to life in prison, offering him a way out by promising that, if he confessed to the crime, they could present the incident as an accident. *Id*. at PageID.2908-2910.  Craighead complied— he made the false confession, Simon drafted the confession, and  Craighead signed it.  *See* ECF No. 86-16, PageID.2332; ECF No. 88-12, PageID.3122.

Craighead was charged with first degree murder, felony murder, felony firearm, and manslaughter on June 22, 2000.  *See* ECF No. 86-32.  A jury trial found him guilty, *see* ECF No. 86-18, PageID.2542, and he was sentenced to 40 months to 15 years in prison for the manslaughter conviction and two years in prison for the felony-firearm conviction, *see* ECF No. 88-3, PageID.2935.  Subsequently, the Michigan Court of Appeals affirmed his conviction.  *See* People v. Craighead, No. 243856, 2005 WL 3500831 (Mich. Ct. App. Dec. 22, 2005).  However, on February 4, 2021, a Michigan trial court granted Craighead relief from his conviction based on newly discovered material evidence unavailable at the time of the original prosecution, which the Court found created a reasonable probability of a different outcome upon retrial.  *See* ECF No. 88-3.  Pursuant to the Michigan Wrongful

Imprisonment Compensation Act, the Michigan Court of Claims provided Craighead with statutory damages. *See* ECF No. 88-4; Mich. Comp. Laws §§ 691.1751, 691.1754, 691.1755. This action followed. *See generally* ECF No. 1.

## B.   Plaintiff's Expert – Mr. McCloughan

Plaintiff retained Mr. McCloughan as a polygraph expert "to offer opinions on the propriety of polygraphing a subject who was as sleep-deprived as Plaintiff, and the impacts that Plaintiff's sleep deprivation could have on his polygraph results." ECF No. 101, PageID.5418; *see generally* ECF No. 96-2 (McCloughan Expert Report). A review of Mr. McCloughan's expert report reveals that the entirety of his opinions concerns Sims' alleged acts and overall conduct. By operation of the Court's Opinion and Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment (ECF No. 142), which determined that Sims was entitled to qualified immunity, he is no longer a defendant in this action. Accordingly, Mr. McCloughan's opinions and any related testimony are not directed at any of the remaining issues in the case. Defendants' Motion to Strike Expert James McCloughan is consequently denied as moot.

## C.   Defendants' Expert – Dr. Bornemann

Dr. Bornemann is a medical doctor, specialist in Sleep Medicine, and lead investor of the Sleep Forensics Associates. ECF No. 94-5, PageID.4899.

Defendants retained him "to review case files[3] in an attempt to provide an unbiased objective expert medical opinion as to whether sleep deprivation (and subsequent cognitive impairment) was a primary influence accounting for Mark Craighead's false confession and subsequent wrongful conviction in 2002 pertaining to the 1997 murder of his friend, Chole Pruett." *Id.* at PageID.4898.  Dr. Bornemann provided the following timeline summary, which presumably forms the basis of his opinions.

> 1. From first encounter with law enforcement at home to being formally charged with murder at the Detroit Police Department:
> approximately **18 hours**
> 2. Opportunities to sleep (i.e. times where he was left alone in a room or in a cell) at the Detroit Police Department:
> 2-3 hours see **Item A**[4] above
> 1 1/2 hours see **Item B**[5] above
> 8 hours see **Item C**[6] above
> Estimated total duration of time where Mr. Craighead had an opportunity to sleep (A+B+C):
> approximately **11 1/2 - 12 1/2 hours**

ECF No. 94-5, PageID.4908 (emphasis in original).

According to Dr. Bornemann, "Mr. Craighead may have been suffering from chronic insufficient sleep and hence potentially vulnerable to many of its associated

---

[3] *See* ECF No. 94-5, PageID.4902 (listing the exhibits Defendants provided to him as: 1. Complaint; 2. Mark Craighead's Witness Statements; 3. Transcript- 2001 Walker Hearing Excerpt; 4. Transcript- 2002 Jury Trial Excerpt; 5. Transcript- 2010 Evidentiary Hearing Excerpt; 6. Photographs of 9th Floor Cells, Detroit Police Department, 1300 Beaubien, taken in 2013; and 7. Transcript- October 1, 2025 Mark Craighead Hearing.

[4] *See* ECF No. 94-5, PageID.4905.

[5] *See Id.* at PageID.4906.

[6] *See Id.* at PageID.4907.

sequelae. However, if this is indeed the case, it would have been entirely caused by his own volition (his own subsequent lifestyle choices) and not directly attributed to any of his interactions with investigators at the Detroit Police Department on June 20-21, 2000." *Id.* at PageID.4909. Further, he continued, "in the unlikely event that [Craighead] did not have any sleep whatsoever during that 11 1/2 - 12 1/2 hour time frame, he would only have been vulnerable to the effects of a single night of sleep deprivation." *Id.* Although admitting Craighead likely suffered from the effects of acute sleep loss "to some degree," *id.* at PageID.4910, Dr. Bornemann opined that "it is unreasonable to assign any such possible effects as having any significant influence that ultimately lead him to succumb to the investigators coercion and his eventual false confession." *Id.*

He also clarified that while many Americans fail to get enough sleep, it does not typically result in "major cognitive derangements." *Id.* Finally, Dr. Bornemann found "no evidence that anyone associated with the Detroit Police Department was directly involved in preventing Mr. Craighead from sleeping during the 11 1/2 - 12 1/2 hour time frame in which he was alone in a locked room or prison cell and had multiple opportunities for sleep." *Id.* For example, nothing in his review of materials suggested that Defendants engaged in "maintain[ing] constant bright illumination [or] extremely hot or cold conditions[;] play[ing] excessive auditory stimulation (e.g. loud noises)[;] forc[ing] awakenings from sleep[;] forc[ing] a

7

constant upright (standing) position[;] caus[ing] physical pain[;] administer[ing] medications or agents to force wakefulness[; or] ke[eping] conditions wet or instigated a fear of drowning." *Id.*

Dr. Bornemann was deposed on April 10, 2026. ECF No. 94-1. Plaintiff's Motion to Bar Opinions of Defendants' Retained Expert Dr. Michel Bornemann (ECF No. 94) has been fully briefed and is ripe for consideration. *See* ECF Nos. 94, 104, 109.

**II.**

As the "gatekeepers" when it comes to expert testimony; district courts' role is to "'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant.'" *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (quoting *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993)). Recently amended, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

8

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Therefore, the proponent's burden is "to demonstrate to the Court that an expert's testimony more likely than not meets the four enumerated requirements for admissibility." *Al Qari v. American Steamship Co.*, 689 F. Supp. 3d 494, 499 (E.D. Mich. 2023) (quotation marks and citation omitted).

Thus, before admitting any expert testimony, the Court must ensure that the expert testimony is helpful to the trier of fact, "based on sufficient facts or data," the "product of reliable principles and methods," and reliably applies the "principles and methods to the facts of the case." Fed. R. Evid. 702 (2023); *see In re Onglyza*, 93 F.4th at 345 & n.2 (summarizing requirements under 2011 version of Rule 702 and noting changes in 2023 amendment of the Rule). However, the Court does "not […] determine whether [the expert's opinion] is correct, but rather […] determine[s] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Onglyza*, 93 F.4th at 345 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008)).

Even so, rejecting expert testimony is the exception, not the rule. *Al Qari*, 689 F. Supp. 3d at 499 (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530)). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and

9

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Al Qari*, 689 F. Supp. 3d at 499 (quoting *Daubert*, 509 U.S. at 596) (quotation marks omitted). "If there is a reasonable factual basis for expert testimony, it should be admitted." *Weidman v. Ford Motor Co.*, 646 F. Supp. 3d 928, 931 (E.D. Mich. 2022). The Court must also "distinguish between genuine questions of reliability and questions of credibility and accuracy." *Id.* Issues with the latter go to the weight of the evidence, not its admissibility. *Id.* And those issues should be addressed on cross-examination and by the "'presentation of contrary evidence' by opposing counsel." *Id.* (quoting *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 532).

### III.

"Under normal circumstances, a district court may resolve a *Daubert* motion without holding an evidentiary hearing." *Al Qari*, 689 F. Supp. 3d at 500 (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248-49 (6th Cir. 2001)). Instead, a hearing is only necessary "if the record is inadequate to decide the motion." *Al Qari*, 689 F. Supp. 3d at 500 (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000)). The record here is adequate to decide the motions without a hearing.

According to Plaintiff, Dr. Bornemann relies on an incorrect sleep timeline in assessing whether Plaintiff experienced sleep deprivation that contributed to his false confession, therefore, the Court should bar his opinions. ECF No. 94, PageID.4682-

10

4685.   Defendants response, with which the Court agrees, is that "Plaintiff's complaint about Dr. Bornemann's opinion is which data he considered, not the application of his methods to that data."  ECF No. 104, PageID.5586.  As clearly stated in his report, Dr. Bornemann considered Plaintiff's Complaint and his witness statements; transcripts of the 2001 Walker hearing, jury trial, and evidentiary hearing, and October 1, 2025 hearing; and 2013 photographs of DPD's 9th floor cells in preparing his report.  ECF No. 94-5, PageID.4902.  Plaintiff's claim that Dr. Bornemann "shorten[ed] the relevant sleep timeline from the actual 56 hours to just 18 hours, and then he analyzes the effects of 18 hours of sleep deprivation" is thus better suited for trial.  *See Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 181-182 (6th Cir. 2009) ("Admissibility under Rule 702 does not require perfect methodology.  Any weaknesses in his methodology will affect the weight that his opinion is given at trial, but not its threshold admissibility.").  As a result, the Court will not bar Dr. Bornemann's opinions on this ground.

Next, Plaintiff accuses Dr. Bornemann of "mak[ing] factual determinations regarding whether the Defendants engaged in conduct that prevented Mr. Craighead from sleeping while in custody."  ECF No. 94, PageID.4686.  Defendants ask that the Court consider the expert report in full, which they argue demonstrates otherwise.

> Outside observers may note that such a sleepy individual to briefly doze off and would surmise them to be cognitively impaired.  . . . Chronic

11

sleep deprivation also importantly negatively impacts executive functioning (a set of skills that help an individual plan, monitor, problem solve, and successfully execute their goals). . . .

It would appear likely that Mr. Craighead was suffering to some degree from the effects of acute sleep loss, especially given the uncomfortable situation and conditions in which he found himself. However, it is unreasonable to assign any such possible effects as having any significant influence that ultimately lead him to succumb to the investigators coercion and his eventual false confession.

[T]here is no evidence that anyone associated with the Detroit Police Department was directly involved in preventing Mr. Craighead from sleeping during the 11 1/2 - 12 1/2 hour time frame in which he was alone in a locked room or prison cell and had multiple opportunities for sleep. For instance, during these opportunities there is no evidence that any such individual actively:
> -maintained constant bright illumination
> -maintained extremely hot or cold conditions
> -played excessive auditory stimulation (e.g. loud noises)
> -forced awakenings from sleep
> -forced a constant upright (standing) position
> -caused physical pain
> -administered medications or agents to force wakefulness
> -kept conditions wet or instigated a fear of drowning.

ECF No. 94-5, PageID.4908-4911.  Upon an independent review of the report in its entirety, the Court finds that Dr. Bornemann's opinions improperly enter the territory of questions reserved for the jury.  *See Berry v. City of Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994).[7]  To that end, Dr. Bornemann is precluded from offering any testimony regarding whether (1) Defendants were responsible for Craighead's sleep

---

[7] "With all due respect to Mr. Postill, his credentials *as set forth in the record* do not qualify him to know any more about what effect claimed disciplinary shortcomings would have on the future conduct of 5,000 different police officers than does any member of the jury."

12

deprivation or (2) there is "compelling evidence to support that insufficient sleep was a significant influence that eventually lead to Mark Craighead's false confession." ECF No. 94-5, PageID.4911.

## IV.

**IT IS HEREBY ORDERED THAT** Plaintiff's Motion to Bar Opinions of Defendants' Retained Expert Dr. Michel Bornemann (ECF No. 94) is **GRANTED IN PART AND DENIED IN PART** and Defendant's Motion to Strike Expert James McCloughan (ECF No. 96) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated: July 20, 2026                          s/Brandy R. McMillion
                                              Brandy R. McMillion
                                              U.S. District Judge

13